**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

## MOTION INFORMATION STATEMENT

**Docket Number(s):** _____    Caption [use short title]

**Motion for:** Stay of Jan. 8 Surrender Date and For Release Pending Appeal    United States of America v. Rajat K. Gupta

Set forth below precise, complete statement of relief sought:

Mr. Gupta requests: (1) a stay of the January 8, 2013 date on which

he must surrender to the Bureau of Prisons's custody; and (2) release

on bail pending appeal of his criminal conviction.

**MOVING PARTY:** Rajat K. Gupta    **OPPOSING PARTY:** United States

☐ Plaintiff    ☐ Defendant
☐ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** Seth P. Waxman    **OPPOSING ATTORNEY:** Reed M. Brodsky

[name of attorney, with firm, address, phone number and e-mail]

Wilmer Cutler Pickering Hale and Dorr LLP    U.S. Attorney's Office, SDNY

1875 Pennsylvania Avenue, N.W.    One St. Andrew's Plaza

Washington, DC 20006    New York, NY 10007

(202) 663-6000; seth.waxman@wilmerhale.com    (212) 637-2492; reed.brodsky@usdoj.gov

**Court-Judge/Agency appealed from:** United States District Court for the Southern District of New York, Hon. Jed S. Rakoff

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☐ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☐ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?    ☐ Yes ☐ No

Has this relief been previously sought in this Court?    ☐ Yes ☐ No

Requested return date and explanation of emergency: Mr. Gupta requests a

return date of December 4 or December 11, 2012. Mr. Gupta's counsel

will be unavailable for oral argument from December 21-31, 2012.

Mr. Gupta's surrender date is set for January 8, 2013.

Is oral argument on motion requested?    ☐ Yes ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☐ No  If yes, enter date: _____

**Signature of Moving Attorney:**

_____ **Date:** _____    Service by: ☐ CM/ECF    ☐ Other [Attach proof of service]

## ORDER

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED  DENIED**.

**FOR THE COURT:**
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____    By: _____

**Form T-1080** (rev. 7-12)

# 12-4448

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

RAJAT K. GUPTA,

*Defendant-Appellant*.

On Appeal From the United States District Court for the Southern District of New York, No. 1:11-cr-00907-JSR Before the Honorable Jed S. Rakoff

### MOTION FOR STAY OF JANUARY 8, 2013 SURRENDER DATE AND FOR RELEASE PENDING APPEAL

GARY P. NAFTALIS
DAVID S. FRANKEL
ALAN R. FRIEDMAN
ROBIN M. WILCOX
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9100

PETER G. NEIMAN
ALAN E. SCHOENFELD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

November 13, 2012

SETH P. WAXMAN
PAUL R.Q. WOLFSON
MEGAN BARBERO
DANIEL AGUILAR
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

Attorneys for Rajat Gupta

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION .............................................................................1

STATEMENT....................................................................................3

ARGUMENT ....................................................................................4

I.    THE APPEAL WILL RAISE SUBSTANTIAL QUESTIONS AND A
      FAVORABLE DECISION IS LIKELY TO RESULT IN REVERSAL OR NEW
      TRIAL.........................................................................................6

      A.    The District Court Erred By Admitting Rajaratnam Wiretaps
            Under The Coconspirator Hearsay Exception......................................6

      B.    The District Court Erred By Excluding Evidence Of Gupta's
            State Of Mind Shortly Before The Alleged Tips ................................12

      C.    The District Court Erred By Excluding Evidence Of An
            Alternative Goldman Sachs Tipper ....................................................16

      D.    The District Court Erred By Constraining Character Witness
            Testimony And Excluding All Evidence On Integrity........................19

II.   SUCCESS ON APPEAL WOULD LEAD TO REVERSAL OR A NEW TRIAL
      ON ALL COUNTS............................................................................20

CONCLUSION ................................................................................20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ....................................................17

*Edgington v. United States*, 164 U.S. 361 (1896)................................................20

*Holmes v. South Carolina*, 547 U.S. 319 (2006) .............................................17, 18

*In re Sealed Case*, 352 F.3d 409 (D.C. Cir. 2003) ...............................................19

*Michelson v. United States*, 335 U.S. 469 (1948)................................................20

*Smith v. Duncan*, 411 F.3d 340 (2d Cir. 2005)....................................................14

*Taylor v. Illinois*, 484 U.S. 400 (1988) ..................................................................18

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) .........................................5

*United States v. Angelini*, 678 F.2d 380 (1st Cir. 1982).........................................19

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012) .........................................15, 18

*United States v. Crosby*, 75 F.3d 1343 (9th Cir. 1996) ..........................................18

*United States v. Davis*, 577 F.3d 660 (6th Cir. 2009)............................................18

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) ..............................................7

*United States v. Detrich*, 865 F.2d 17 (2d Cir. 1988).........................................3, 14

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006).............................................15

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011).........................................12

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003)...........................................5

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ..............................................8

*United States v. Han*, 230 F.3d 560 (2d Cir. 2000) ................................................19

*United States v. Lang*, 589 F.2d 92 (2d Cir. 1978)...............................................7, 9

*United States v. LiCausi*, 167 F.3d 36 (1st Cir. 1999)..............................................12

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980)..........................................10

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)..........................7

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001)...................................8, 11

*United States v. Means*, 695 F.2d 811 (5th Cir. 1983) ............................................10

*United States v. Mitchell*, 31 F.3d 628 (8th Cir. 1994)............................................10

*United States v. Ostrander*, 999 F.2d 27 (2d Cir. 1993)..........................................15

*United States v. Pallais*, 921 F.2d 684 (7th Cir. 1990)..............................................7

*United States v. Pujana-Mena*, 949 F.2d 24 (2d Cir. 1991) ...................................20

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007)..........................................15

*United States v. Randell*, 761 F.2d 122 (2d Cir. 1985)..........................................4, 5

*United States v. Robinson*, 544 F.2d 110 (2d Cir. 1976) .........................................16

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002)............................................10, 12

*United States v. Vallejo*, 237 F.3d 1008 (9th Cir. 2001) .........................................17

*United States v. White*, 692 F.3d 235 (2d Cir. 2012)...............................................20

*United States v. Yarbrough*, 527 F.3d 1092 (10th Cir. 2008)..................................19

## STATUTES AND RULES

Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.
        § 2518(10)...............................................................................................6

18 U.S.C.
        § 3142(c) .................................................................................................1
        § 3143(b)..............................................................................................1, 4

Fed. R. Evid.
        R. 404(a)(2)...........................................................................................19
        R. 801(d)(2)(E) .......................................................................................7
        R. 803(3) ..........................................................................................14, 15

Fed. R. App. P. 9(b) ....................................................................................1

## DOCKETED CASES

*United States v. Rajaratnam*, No. 11-4416 (2d Cir.) ......................................6, 8, 11

*United States v. Newman*, No. 12-cr-121 (S.D.N.Y.) ..............................................18

Pursuant to Federal Rule of Appellate Procedure 9(b) and 18 U.S.C.

§§ 3143(b) and 3142(c), Rajat Gupta respectfully moves for an order staying his

surrender date and granting him release pending appeal.

**INTRODUCTION**

Rajat Gupta worked his way from modest beginnings to the top of one of the

world's leading consulting firms, while maintaining, in the district court's words,

an unparalleled and "extraordinary devotion, not only to humanity writ large, but

also to individual human beings in their times of need." A84. The prosecution's

theory in this case was that after a "lifetime of good deeds and philanthropy" (A73)

and while "at the pinnacle of [his] profession" (A74), Gupta decided to throw

everything away and—for no tangible benefit—tip hedge fund manager Raj

Rajaratnam with inside information Gupta had learned from his service on the

board of Goldman Sachs. The prosecution's case was built on three wiretapped

statements from Rajaratnam, a man the prosecution knew was a liar and a fraud.

Those statements, made in conversations with third parties, supposedly supported

the allegation that Gupta twice provided Rajaratnam with inside information about

Goldman.[1] In one conversation, Rajaratnam bragged to a Galleon colleague in

Singapore who had *no* connection to *any* alleged scheme that Rajaratnam had a

source on Goldman's board who had tipped him to Goldman's disappointing

---

[1] The prosecution also charged other tips, on which the jury acquitted. A68-A69.
Those charges were not supported by any recorded statements by Rajaratnam.

earnings results.  In two other statements (making up a single interrupted conversation), Rajaratnam told another Galleon colleague in *another* scheme that he had received unspecified information from an unidentified source about "something good [that] might happen" (A125-A126) at Goldman and made excuses for not having shared that information with yet another Galleon employee.

To ensure a fair trial, the district court should have excluded these unreliable statements as hearsay.  Having admitted them, the court should have at least permitted Gupta to provide the context necessary for evaluating their reliability—including (1) Gupta's belief before both alleged tips that he had been cheated by Rajaratnam, (2) the plausible alternative source for the tips, and (3) Gupta's reputation for integrity, which rendered the prosecution's entire theory implausible.

But the district court did none of these things.  It permitted the prosecution to introduce Rajaratnam's statements on the speculative theory—unsupported by any evidence at trial—that his statements to Galleon colleagues who had no connection to Gupta and who did nothing at all to assist Rajaratnam in carrying out the alleged scheme were nonetheless statements in furtherance of the alleged Rajaratnam/Gupta conspiracy because the recipients *could* have acted on the information.  And the court kept out the critical context undermining the prosecution's proof.  It prevented Gupta's daughter from testifying to a conversation in which Gupta told her—before the alleged tips—that he had been

cheated by Rajaratnam, on the novel theory that the testimony would be *too* persuasive, because the jury was unlikely to believe that Gupta would lie to his daughter.  It excluded on hearsay grounds wiretaps in which the alternative Goldman source provided material non-public information to Rajaratnam, even though the conversations were offered not for the truth of the information conveyed, but to demonstrate the existence of an alternative source.  And it prevented character witnesses from testifying to Gupta's integrity, reasoning that integrity was somehow not pertinent to a charge that a board member with a career of handling confidential information had abused his position to convert such information to his own benefit.

This Court has long cautioned that "[w]hen the government's proof relies primarily on circumstantial evidence, trial errors tend to acquire greater significance.  It takes less to tip the scales."  *U.S. v. Detrich*, 865 F.2d 17, 22 (2d Cir. 1988).  The district court's serious evidentiary errors decisively tipped the scales in this case, and Gupta's appeal will likely result in reversal or a new trial.

## STATEMENT

Gupta was indicted on one count of conspiracy and five counts of insider trading in violation of federal securities laws.  The essence of the charges was that Gupta tipped Rajaratnam with material, non-public information Gupta had obtained as a member of the boards of directors of Goldman Sachs and Procter &

Gamble.  No evidence suggested that Gupta himself traded on the information or received any compensation from Rajaratnam for the tips.  A jury convicted Gupta on the conspiracy count and the substantive counts for which the prosecution introduced after-the-fact wiretaps of Rajaratnam boasting about his Goldman source.  The jury acquitted on the two counts for which the prosecution had no such wiretaps (one relating to Goldman and one to P&G).

Before trial, the prosecution agreed that Gupta merited release, subject to conditions, and the court granted him release pending trial.  *See* A11-A12 (Fox, M.J.); A14 (Rakoff, J.).  On October 24, 2012, the court sentenced Gupta to 24 months imprisonment and one year of supervised release, fined him $5 million, and ordered that he surrender on January 8, 2013.  A3-A4, A88-A89, A91.  Acknowledging the difficulty of finding error in its own rulings (A93-A94), the court denied Gupta's motion for release pending appeal and advised Gupta that he "could bring [his motion] before the Court of Appeals."  A97.

## ARGUMENT

The court "shall order the release" of a defendant if he establishes (1) "by clear and convincing evidence that [he] is not likely to flee or pose a danger"; and (2) his "appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in … reversal [or] an order for a new trial."  18 U.S.C. § 3143(b); *U.S. v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).  Once the defendant

- 4 -

has made "the required evidentiary showing, the statute establishes a right to liberty that is not simply discretionary but mandatory." *U.S. v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

Gupta indisputably presents no flight risk (A69) or danger, and his appeal is not for purposes of delay.[2]  As Judge Rakoff acknowledged, denying bail pending appeal would force Gupta to serve "a substantial portion of his time before his appeal is decided."  A96.  *Accord U.S. v. Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003).[3]

Gupta's appeal plainly raises a substantial question, which is "'one of more substance than would be necessary to a finding that it was not frivolous … a "close" question or one that very well could be decided the other way.'"  *Randell*, 761 F.2d at 125.  This Court has made clear that "likely to result" in reversal or new trial does not mean that a defendant must be likely to succeed on appeal.  *Id.* at 124-125.  Rather, the substantial question must be sufficiently important that *if* it "'is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial.'"  *Id.* at 125.  The statutory standard is satisfied here.  While the trial court made numerous errors that prejudiced the defendant, the

---

[2] Counsel is prepared to meet an expedited briefing and argument schedule.

[3] The median time from notice of appeal to final disposition for criminal cases in this Court is almost fourteen months.  Admin. Office of the U.S. Courts, Judicial Business of the United States Courts 85 (2011).

most salient rulings for purposes of this motion are set forth below.[4]

## I.    THE APPEAL WILL RAISE SUBSTANTIAL QUESTIONS AND A FAVORABLE DECISION IS LIKELY TO RESULT IN REVERSAL OR NEW TRIAL

### A.    The District Court Erred By Admitting Rajaratnam Wiretaps Under The Coconspirator Hearsay Exception

The prosecution's case rested demonstrably on one October 24 and two September 24, 2008 wiretapped conversations between Rajaratnam and others at Galleon; the jury acquitted on all counts except those supported by the wiretaps. Rajaratnam boasted in the October wiretap that he had a source "on the Board of Goldman Sachs" (A135) and said in the September wiretap that he received a call

---

[4] Among other errors, Gupta intends to argue on appeal that the wiretaps of Rajaratnam's conversations should have been suppressed under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(10)(a), and the Fourth Amendment because they were obtained as a result of false statements and misleading omissions in the prosecution's wiretap application. Suppression of the wiretaps raises a substantial question. For space reasons, and because this issue has been briefed in *U.S. v. Rajaratnam*, No. 11-4416 (2d Cir. arg. Oct. 25, 2012), Gupta does not further discuss the argument here. For space reasons, we have also not addressed herein the prosecution's improper use of propensity evidence. The prosecution introduced a July 29, 2008 wiretapped conversation between Rajaratnam and Gupta, in which Rajaratnam sought Gupta's help in preparing for a meeting with a Goldman executive and, in response to Rajaratnam's questions, Gupta conveyed information about Goldman's preliminary consideration of purchasing a commercial bank or other financial institution. A99-A100. Goldman never made the acquisition, and by the time of the Rajaratnam/Gupta call, Goldman executives had already disclosed in general terms their consideration of such an acquisition to analysts, who had reported it publicly. Unsurprisingly, Rajaratnam did not trade on this already public and immaterial information about preliminary acquisition discussions, and the prosecution did not argue that Gupta's statements on the call violated the securities laws. A29. Instead, the prosecution improperly asked the jury to infer from this conversation that Gupta  was the kind of person who would disclose confidential information. *See* A66. This too presents a substantial issue for appeal.

from an unidentified source "[s]aying something good might happen to Goldman" (A126).  Because the court clearly erred in finding these statements admissible under the coconspirator exception, Fed. R. Evid. 801(d)(2)(E), Gupta's conviction on all counts must be reversed.  *U.S. v. Lang*, 589 F.2d 92, 100 (2d Cir. 1978) (reversing conviction where "crucial" wiretap was erroneously admitted).

Under Rule 801(d)(2)(E), hearsay statements offered against a defendant are admissible if they are "made by the party's coconspirator during and in furtherance of the conspiracy."  This Court has rigorously enforced the "in furtherance of" requirement, stressing the importance of that limit to justify the admission of inherently problematic statements by conspirators in criminal schemes, who may well be prone to making statements that are untrue.  The Court has thus "'mandat[ed] a construction of the "in furtherance" requirement protective of defendants'" to guard against the admission of "'less reliable evidence.'"  *Lang*, 589 F.2d at 100.  To be admissible, the statement must prompt the listener "to respond in a way that promotes or facilitates the carrying out of a criminal activity."  *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990).  It must be more than "a merely narrative description by one co-conspirator of the acts of another," *U.S. v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001) (internal quotation marks omitted), or "[m]ere chitchat [or] casual admissions of culpability," *U.S. v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990).

Moreover, where, as here, the speaker sits at the hub of multiple conspiracies,[5] this Court requires special care be taken to ensure that the statements were not merely in furtherance of *a* conspiracy involving the speaker, but that they were in furtherance of the specific conspiracy involving the speaker and the defendant.  *See U.S. v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) (statements about proposed Mafia murder were inadmissible against Mafia member who did not join that specific conspiracy).  Indeed, this Court has expressly held that a tipper is not presumed to be in the same conspiracy as a remote tippee.  *U.S. v. McDermott*, 245 F.3d 133, 138 (2d Cir. 2001).  Even if Rajaratnam expected his interlocutors to trade on information discussed in the wiretaps, that would not establish that his statements were in furtherance of the alleged Rajaratnam/Gupta conspiracy.

The district court's admission of three wiretaps under the coconspirator exception cannot be sustained under this Court's law and is manifestly prejudicial.

*First*, the district court erroneously admitted an October 24, 2008, wiretapped conversation between Rajaratnam and David Lau, a Singapore-based macro-portfolio manager at Galleon.  In the midst of the global financial crisis, Rajaratnam returned a call from Lau, who was seeking to take Rajaratnam's "pulse because we are quite shocked overseas … so I just want to find out what you guys are thinking."  A134.  General chitchat about market conditions ensued, with

---

[5] *See* U.S. Br. 2-10, *U.S. v. Rajaratnam*, No. 11-4416 (2d Cir. Apr. 25, 2012).

Rajaratnam opining that "we think that the US is um relatively the safe haven …

all of these um emerging market ah countries, many of them have to reduce interest

rates, which is bad for their currencies," and that the "risk here is ah hedge fund

redemption."  *Id.*  Following this report, and apropos of nothing, Rajaratnam

claimed that he "heard yesterday from somebody who's on the Board of Goldman

Sachs, that they are gonna lose $2 per share."  A135.

The district court found that this conversation was in furtherance of the

alleged Rajaratnam/Gupta conspiracy because it was made "to an important

colleague and subordinate who had the ability to execute further trades in Galleon

International."  A20.  This was error.  No evidence suggests Lau was a

coconspirator and the prosecution did not allege he was.  Rajaratnam did not

induce Lau to join the alleged conspiracy.  Nor was it reasonably foreseeable that

Lau could take any actions to promote any conspiracy involving Gupta; Lau was a

macro-portfolio manager on the other side of the world, not a trader interested in

Goldman.  The prosecution presented no evidence that Lau acted on the

information in any way, or even that he had ever traded in the shares of any U.S.

company, much less in Goldman.

The district court's conclusion that the statement furthered the conspiracy

merely because Lau had the "ability" to trade on the information about Goldman

stretches the "in furtherance" requirement too far, *see Lang*, 589 F.2d at 100:

- 9 -

Everyone has the "ability" to trade on information; what is required under the law—and what was missing from the prosecution's presentation here—is sufficient evidence to establish that the *purpose* for which Rajaratnam provided the information was to encourage Lau to trade in Goldman stock in a manner that would further the alleged criminal agreement between Gupta and Rajaratnam, *see U.S. v. Russo*, 302 F.3d 37, 46 (2d Cir. 2002) (admissibility of coconspirator statement depends on "what objective it sought to advance"). Rajaratnam's statements were merely a narrative, backward-looking description of events of the sort that courts have regularly held fall outside the coconspirator exception.[6] His claimed tip from a Goldman board member "smacks of nothing more than casual conversation about past events." *U.S. v. Lieberman*, 637 F.2d 95, 102 (2d Cir. 1980).[7]

*Second*, the district court admitted two September 24, 2008 wiretapped conversations between Rajaratnam and his chief trader on one of his portfolios, Ian

---

[6] *See, e.g.*, *U.S. v. Mitchell*, 31 F.3d 628, 632 (8th Cir. 1994) ("A statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy[.]"); *U.S. v. Means*, 695 F.2d 811, 818 (5th Cir. 1983) (conspirator's statement was "'mere idle conversation'" and inadmissible).

[7] The court's finding that Rajaratnam's wiretapped statement was "in furtherance of" his conspiracy with Gupta was made at a pretrial hearing in which the court stated that the prosecution would need to establish at trial the conspiracy between Gupta and Rajaratnam and "show that these [wiretap statements] were in furtherance of it." A22. Defense counsel objected when the October wiretap was played at trial (A36); the court found that the connection requirement had been satisfied but, despite its earlier ruling, made no additional findings on its "in furtherance of" determination (A34; A36).

Horowitz, concerning a separate conspiracy that did not involve Gupta.  The prosecution itself argued that Rajaratnam was involved in multiple, separate conspiracies to trade on inside information, including a conspiracy with Galleon portfolio manager Leon Shaulov to exchange inside information.[8]  The prosecution introduced no evidence showing that Gupta had any dealings whatsoever with Shaulov or "suggesting that [Gupta's alleged] agreement with [Rajaratnam] encompassed a broader scope than the two of them."  *McDermott*, 245 F.3d at 138.

Following one of Rajaratnam's alleged Goldman trades, Shaulov complained to a co-worker that Rajaratnam had not provided him with the information to make the trade.  A137.  Faced with an irate colleague, Rajaratnam twice called Horowitz to enlist Horowitz's help in mollifying Shaulov.  Rajaratnam's excuse for not passing the information to Shaulov was that he received the tip late in the trading day.  Thus, he told Horowitz that he "got a call at 3:58 [pm], right? … Saying something good might happen to Goldman." A125-A126.  Less than an hour later, Rajaratnam called Horowitz to explain that he could not tip Shaulov before the markets closed at 4:00 pm.  A132.

Whether this assertion about the alleged tip's precise timing was true, the statement was plainly directed to smoothing Rajaratnam's dealings with Shaulov, not to furthering the alleged scheme with Gupta.  Gupta had no stake in the

---

[8] *See* U.S. Br. 4-9, *Rajaratnam*; A37; A132 (Rajaratnam/Shaulov conspiracy).

relationship between Shaulov and Rajaratnam.  Even if Rajaratnam's statements to

Horowitz were in furtherance of a separate conspiracy with Shaulov—and not

"merely blowing off steam or venting anxiety," *U.S. v. LiCausi*, 167 F.3d 36, 50

(1st Cir. 1999)—that does *not* make them admissible against Gupta.  *See Russo*,

302 F.3d at 44 (use of coconspirator exception is "unacceptable when the speaker

and the defendant were not jointly engaged in the criminal venture that was being

advanced by the speaker").  Given the absence of any nexus between Gupta and

Shaulov, the conversation was inadmissible.

### B.   The District Court Erred By Excluding Evidence Of Gupta's State Of Mind Shortly Before The Alleged Tips

In contrast to its permissive approach to the prosecution's evidence, the

court was impermissibly strict in construing the rules of evidence against Gupta to

exclude classically admissible testimony.  This Court reviews de novo the legal

question of "'[w]hether a statement is hearsay.'"  *U.S. v. Ferguson*, 676 F.3d 260,

285 (2d Cir. 2011).  Of particular import, the court erroneously excluded critical

evidence of Gupta's state of mind—namely, Gupta's statement to his daughter

Geetanjali on September 20, 2008, a mere three days before he supposedly tipped

Rajaratnam with information about Goldman, that he was angry with Rajaratnam

for covertly making redemptions from the Voyager fund in which both had

invested.  Specifically, Geetanjali would have testified:

> He told me that he was upset about Voyager.  He told me that

he was worried about the performance of the fund and that he *was frustrated that he couldn't get information from Raj about it*. He also told me *he was angry that Raj had taken money out of the fund without telling him* and that he thought that that—he didn't understand why he had taken the money out of the fund, and why if he had taken money out of the fund, he had not gotten any of it.

A59 (emphases added).

This testimony was critical to the defense because it showed that Gupta was angry with Rajaratnam for cheating him *before* the alleged September and October 2008 tips, which would have raised a reasonable doubt in jurors' minds as to Gupta's willingness to knowingly risk everything and provide inside information to Rajaratnam. The testimony also would have refuted the prosecution's "prebuttal" evidence that Gupta did not become aware of Rajaratnam's Voyager redemptions until 2009. *See* A39. And it provided the innocent explanation for Gupta's calls to Rajaratnam, including on September 23: Gupta was trying, without success, to get information from Rajaratnam about his investment in Voyager.

The district court excluded this testimony because the jury would "inevitably think if they accept this testimony at all that he is telling the truth to his own daughter," and the court did not "see how under 403 that gross violation of the hearsay rule can be avoided." A55, A56; *see also* A60. The court allowed Geetanjali to testify only about her father's demeanor, not the substance of what he said (A60, A61), and enforced its ruling by conducting the relevant examination

- 13 -

itself (A62).[9]  This limitation contravenes black-letter law.

Gupta did not seek to introduce Geetanjali's testimony for the truth of the information that Gupta related to her—that Rajaratnam was stealing from Gupta. Rather, Gupta sought to establish by that testimony that Gupta *believed* at the time that Rajaratnam was defrauding him and was angry about that, which would have gone far to prove that Gupta had no motive to help Rajaratnam by tipping him with inside information.  *See Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005) (noting that tape would be non-hearsay if it had not been "offered to show that gang members were *actually* coming, but rather to show that [defendant] believed they were coming"); *Detrich*, 865 F.2d at 20-21.  The jury was entitled to hear Gupta's out-of-court statement so that it could make a properly informed judgment about his state of mind.[10]  *See* Fed. R. Evid. 803(3) (exception for "[a] statement of

---

[9] The district court permitted Geetanjali to answer only three questions (put by the court) about the September 20 conversation.  She testified that Gupta had expressed "significant concern" about Voyager, that he was "quite upset" and "stressed" and "was running his hands through his hair," and that this was "more because of how Mr. Rajaratnam was treating the investment" than how the investment was doing.  A62.  She was *not* allowed to testify that Gupta was angry because he believed Rajaratnam had stolen from the fund or frustrated by Rajaratnam's refusal to provide information.  *Compare* A59, *with* A62.

The district court also severely curtailed Geetanjali's testimony about later conversations that likewise would have revealed Gupta's state of mind. Specifically, Geetanjali would have testified that on October 10, 2008, Gupta was "still very upset" about the Voyager redemptions (A63), and at Thanksgiving 2008, Gupta discussed whether "he should sue Raj Rajaratnam" (A59; *see also* A64).

[10] Some courts admit such evidence under Rule 803(3), an exception to the hearsay

the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed"); *U.S. v. Ostrander*, 999 F.2d 27, 32 (2d Cir. 1993). Gupta's statement demonstrated his anger at Rajaratnam on September 20 and rebutted the prosecution's assertion that Gupta did not learn of Rajaratnam's theft until months after the alleged tips. *See* A39 (Kumar testimony); *see also U.S. v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006). While the statement would have been inadmissible hearsay if offered to prove that Rajaratnam had *in fact* stolen from Gupta, that issue was in any event undisputed by the prosecution. *See* A140-A141; A153-A154.

The district court's error was devastating to Gupta's case. Geetanjali's testimony that Gupta "was frustrated that he couldn't get information from Raj" and "angry that Raj had taken money out of the fund without telling him" (A59), would have raised a reasonable doubt about Gupta's motive and provided an innocent explanation for Gupta's phone calls to Rajaratnam, which were key to the

---

rule for evidence of state of mind; other courts consider such evidence not hearsay at all. *See U.S. v. Quinones*, 511 F.3d 289, 312 (2d Cir. 2007). Under either analysis, the result here is the same: Gupta's statement was admissible to prove his state of mind. *See* Fed. R. Evid. 803(3) (hearsay exception); *U.S. v. Cain*, 671 F.3d 271, 300, 301 (2d Cir. 2012) (statements that "expressed anger" and "could be taken as implied threats" were properly admitted as state of mind evidence and "were not used for an impermissible hearsay purpose").

prosecution's circumstantial case.  That error is likely to result in reversal.

### C.    The District Court Erred By Excluding Evidence Of An Alternative Goldman Sachs Tipper

Gupta sought to introduce evidence tending to show that an alternative perpetrator—David Loeb, a Goldman vice president and the relationship manager for Galleon—provided Rajaratnam with the inside information on which he allegedly traded.  The district court excluded the evidence as hearsay and because it posed a risk of jury confusion.  But "[i]t was entirely proper for [Gupta] to disprove the government's contention by proving that the [insider] was someone else."  *U.S. v. Robinson*, 544 F.2d 110, 112-113 (2d Cir. 1976).

Galleon was one of Loeb's most important clients; the relationship yielded tens of millions of dollars in commissions and fees annually for Goldman.  A51.  The evidence introduced at trial showed that Loeb frequently called Rajaratnam and Adam Smith, another Galleon employee, including on September 23 and October 23, 2008, the days of the two alleged tips on which the jury convicted.  A40-A41; A156-A158.  But what the jury did *not* hear was that Loeb illegally tipped Rajaratnam with inside information about other companies, particularly Apple and Intel.  *See* A32.  To show the jury that Loeb was also likely the one who tipped Rajaratnam about Goldman, Gupta sought to introduce two wiretapped conversations in which Loeb relayed confidential Apple and Intel data and Rajaratnam reacted with palpable excitement.  A142-A152; *see* A57.  The court

excluded the evidence, ruling that wiretaps were inadmissible hearsay and would confuse the jury.  A57.[11]

By excluding probative alternative-perpetrator evidence, the court denied Gupta the opportunity to present a full and fair defense.  "'[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged.'"  *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006).  Where, as here, "the evidence [that someone else committed the crime] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt." *U.S. v. Vallejo*, 237 F.3d 1008, 1023 (9th Cir. 2001) (internal quotation marks omitted).  This rule is subject to the ordinary constraints of evidence law, but "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

Moreover, the basis for excluding the evidence—that the wiretapped statements were hearsay—was wrong.  The statements were not offered for the truth of Apple's and Intel's production data, which was the information that Loeb

---

[11] Gupta also sought to introduce emails and other documents that would have provided context for the telephone logs and wiretaps.  The court excluded all the proffered evidence in an undifferentiated, categorical ruling.  A57.

transmitted. Rather, they were offered to establish the fact that Loeb, a Goldman source, transmitted what the prosecution conceded was confidential information to Rajaratnam (*see* A32), and that Rajaratnam reacted appreciatively, showing that he was likely to trade on the information. *See Cain*, 671 F.3d at 300; *U.S. v. Davis*, 577 F.3d 660, 667 (6th Cir. 2009) (statement admissible for "[d]efendant's reaction … not the 'truth' of its substance").[12] Neither is an impermissible hearsay purpose.

Nor is the district court's jury-confusion finding sustainable. The wiretaps, taken alongside the telephone logs that had been introduced into evidence, were sufficient to place a straightforward alternative-perpetrator theory before the jury and to raise a reasonable doubt in the jurors' minds. *See U.S. v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996). The court expressed concern that the Loeb evidence proffer constituted "an attempt to introduce a whole independent issue into the case without a single witness being called in support of it." A57. But the Supreme Court has rejected the contention that evidence of an alternative perpetrator is necessarily an independent issue that would confuse the jury. *Holmes*, 547 U.S. at 327-329. Such speculative concerns (which could be mitigated with proper instructions) must yield to the defendant's compelling right to "'put before a jury evidence that might influence the determination of guilt.'" *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).

---

[12] The government itself has argued that such out-of-court statements by tippers are not hearsay because they are not "offered for the truth of any matter asserted … but rather for the fact that such information was communicated." U.S. Opp. 4, *U.S. v. Newman*, No. 12-cr-121 (S.D.N.Y. Oct. 12, 2012).

**D.     The District Court Erred By Constraining Character Witness Testimony And Excluding All Evidence On Integrity**

Finally, the district court impermissibly curtailed Gupta's character witnesses' testimony by strictly limiting important background testimony about how, how well, and in what context they knew Gupta—*i.e.*, that they were familiar with his work in financial contexts where he never engaged in any impropriety. *See, e.g.*, A44; A46; A49; A53; A65. And, in contravention of clear precedent, the court prohibited these witnesses from testifying about Gupta's character for integrity, on the ground that "some aspects" of integrity—in particular, "moral uprightness," or in the prosecution's parlance, law-abidingness—were not pertinent. A42.

A defendant may introduce evidence of a "pertinent trait" of character, Fed. R. Evid. 404(a)(2), and "the general character trait of law-abidingness is pertinent to almost all criminal offenses."[13]  Integrity was directly at issue in this case:  The fundamental question for the jury was whether Gupta, a business leader to whom countless clients and colleagues had over decades entrusted sensitive information, would have suddenly acted out of character and misused confidential information for no clear benefit to himself.  Gupta's integrity thus speaks directly to whether he

---

[13] *In re Sealed Case*, 352 F.3d 409, 412 (D.C. Cir. 2003); *see also U.S. v. Yarbrough*, 527 F.3d 1092, 1100-1103 (10th Cir. 2008); *U.S. v. Angelini*, 678 F.2d 380, 381-382 (1st Cir. 1982); *U.S. v. Han*, 230 F.3d at 563-564 (2d Cir. 2000) (finding error, albeit harmless, in exclusion of "reputation for uprightness").

would violate federal securities laws.  Particularly in these circumstances, where the prosecution's case was entirely circumstantial, evidence of Gupta's integrity may have been "of sufficient weight, by itself, to generate a reasonable doubt." *U.S. v. Pujana-Mena*, 949 F.2d 24, 30 (2d Cir. 1991).[14]

## II.  SUCCESS ON APPEAL WOULD LEAD TO REVERSAL OR A NEW TRIAL ON ALL COUNTS

Success on some or all of these claims of error will result in reversal or a new trial on all counts.  There is no serious argument that any of these errors was harmless.  *U.S. v. White*, 692 F.3d 235, 251-252 (2d Cir. 2012).  The prosecution was allowed to introduce Rajaratnam's boasts about his information related to Goldman on the unsupported theory that those statements were in furtherance of the alleged conspiracy with Gupta.  At the same time, Gupta was denied the opportunity to present the best evidence of his innocence.  These errors pervaded the whole trial.

## CONCLUSION

For the foregoing reasons, the surrender date should be stayed and release pending appeal should be granted.

---

[14] This error was not cured by allowing testimony about Gupta's honesty.  A42. Although the two concepts are related, honesty refers more directly to truth-telling and does not capture the issue of misuse of confidential information for corrupt purposes, which is at the core of this case.  The arbitrary curtailment of this testimony can only be explained by the court's begrudging attitude about character evidence generally.  A47.  But it is settled that "character is relevant in resolving probabilities of guilt," *Michelson v. U.S.*, 335 U.S. 469, 476 (1948), and "[t]he circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt." *Edgington v. U.S.*, 164 U.S. 361, 366 (1896).

Dated: November 13, 2012          Respectfully submitted.

                                  /s/ Seth P. Waxman

GARY P. NAFTALIS                  SETH P. WAXMAN
DAVID S. FRANKEL                  PAUL R.Q. WOLFSON
ALAN R. FRIEDMAN                  MEGAN BARBERO
ROBIN M. WILCOX                   DANIEL AGUILAR
KRAMER LEVIN NAFTALIS             WILMER CUTLER PICKERING
   & FRANKEL LLP                     HALE AND DORR LLP
1177 Avenue of the Americas       1875 Pennsylvania Avenue, NW
New York, NY  10036               Washington, DC  20006
(212) 715-9100                    (202) 663-6000

PETER G. NEIMAN
ALAN E. SCHOENFELD
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served by hand and electronic mail on all below counsel of record this 13th day of November 2012.

PREET BHARARA
UNITED STATES ATTORNEY
(preet.bharara@usdoj.gov)
REED BRODSKY
(reed.brodsky@usdoj.gov)
RICHARD TARLOWE
(richard.tarlowe@usdoj.gov)
DAMIAN WILLIAMS
(damian.williams@usdoj.gov)
ASSISTANT UNITED STATES ATTORNEYS
One St. Andrew's Plaza
Southern District of New York
New York, NY  10007
(212) 637-2272

/s/ Seth P. Waxman
SETH P. WAXMAN

# ADDENDUM

# TABLE OF CONTENTS

Page

Judgment, November 9, 2012 ...............................................................A1

Notice of Appeal, November 9, 2012 ...................................................A8

Transcript, October 26, 2011 (Fox, J.) (excerpts)................................A10

Transcript, October 26, 2011 (Rakoff, J.) (excerpts)...........................A13

Transcript, May 16, 2012 (excerpts).....................................................A15

Trial Transcript, May 21-June 15, 2012 (excerpts) ..............................A31

Sentencing Hearing Transcript, October 24, 2012 (excerpts) .............A71

Trial Exhibits

    Government Exhibit 9-T, Transcript of July 29, 2008 call from
        Rajat Gupta to Raj Rajaratnam.........................................A98

    Government Exhibit 21-T, Transcript of September 24, 2008 call
        from Raj Rajaratnam to Ian Horowitz............................A125

    Government Exhibit 22-T, Transcript of September 24, 2008 call
        from Raj Rajaratnam to Ian Horowitz............................A130

    Government Exhibit 29-T, Transcript of October 24, 2008 call
        from Raj Rajaratnam to David Lau ................................A134

    Government Exhibit 1629, September 23, 2008 email exchange
        between Gary Rosenbach and Leon Shaulov................A137

    Government Exhibit 2105-R, Voyager Analysis March 31, 2008..........A140

    Defense Exhibit 4006-T, Transcript of August 7, 2008 call from
        David Loeb to Raj Rajaratnam.......................................A142

    Defense Exhibit 4007-T, Transcript of August 22, 2008 call from
        David Loeb to Raj Rajaratnam.......................................A147

    Defense Exhibit 4015-T-R, Transcript of October 2, 2008 call from
        Sanjay Santhanam to Raj Rajaratnam (excerpts)..........A153

    Defense Exhibit 6060, Goldman Sachs Selective Call Detail
        Report, March 1, 2007-November, 30 2008 (excerpts)................A155

AO 245B     (Rev. 09/08) Judgment in a Criminal Case
            Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| Rajat Gupta | ) | Case Number:  S 1:11cr907-01 (JSR) |
| | ) | USM Number: 65892-054 |
| | ) | Gary Naftalis, Esq. |
| | | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   1,3,4 & 5
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 371 | CONSPIRACY TO COMMIT SECURITIES FRAUD | 1/31/2009 | 1 |
| 15 U.S.C.78j(b) &78ff | SECURITIES FRAUD | 9/23/2008 | 3 |
| 15 U.S.C.78j(b) &78ff | SECURITIES FRAUD | 9/23/2008 | 4 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   2 & 6

☑ Count(s)   of the underlying indictment   ☐ is   ☑ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/24/2012
Date of Imposition of Judgment

Signature of Judge

Hon. Jed S. Rakoff,                    U.S.D.J.
Name of Judge                          Title of Judge

Date   11/8/12

**A1**

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
            Sheet 1A

DEFENDANT:  Rajat Gupta                                       Judgment—Page __2__ of ___7___
CASE NUMBER:  S 1:11cr907-01 (JSR)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 U.S.C.78j(b) &78ff | SECURITIES FRAUD | 10/24/2008 | 5 |

AO 245B    (Rev. 09/08) Judgment in Criminal Case
            Sheet 2 — Imprisonment

Judgment — Page __3__ of __7__

DEFENDANT: Rajat Gupta
CASE NUMBER: S 1:11cr907-01 (JSR)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

On Counts 1,3,4,and 5 :TWENTY FOUR (24) MONTHS TO RUN CONCURRENT ON ALL COUNTS.

☑ The court makes the following recommendations to the Bureau of Prisons:

The Court recommends incarceration in Otisville's minimum security prison, if the B.O.P. finds the defendant qualifies.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on    1/8/2013 _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**A3**

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
              Sheet 3 — Supervised Release

DEFENDANT:  Rajat Gupta                                    Judgment—Page  4  of  7
CASE NUMBER:  S 1:11cr907-01 (JSR)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

On Counts 1,3,4,and 5: ONE (1) YEAR TO RUN CONCURRENT ON ALL COUNTS.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑  The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

A4

AO 245B   (Rev. 09/08) Judgment in a Criminal Case
Sheet 3C — Supervised Release

DEFENDANT:  Rajat Gupta
CASE NUMBER:  S 1:11cr907-01 (JSR)

Judgment—Page  5  of  7

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall make restitution, as shall be set at a future date,  pay the fine imposed and special assessment as ordered on the financial penalties page of this judgment.

2. The defendant shall provide the probation officer with access to any requested financial information.

3. The defendant shall not incur any new credit charges or open additional lines of credit with the approval of the probation officer unless the defendant is in compliance with the installment payment plan.

4. The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include testing via Breathalyzer at the direction and discretion of the probation officer.

5. The Court recommends that the defendant be supervised by the district of residence.

Judgment — Page    6    of    7

DEFENDANT:  Rajat Gupta
CASE NUMBER:  S 1:11cr907-01 (JSR)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 400.00 | $ 5,000,000.00 | $ |

☑ The determination of restitution is deferred until ___1/24/2013___ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **TOTALS** | $              0.00 | $              0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A6

AO 245B   (Rev. 09/08) Judgment in a Criminal Case
          Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT:  Rajat Gupta
CASE NUMBER:  S 1:11cr907-01 (JSR)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑ Lump sum payment of $ __400.00__  due immediately, balance due

☐ not later than _____ , or
☐ in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**  ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E**  ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑ Special instructions regarding the payment of criminal monetary penalties:

The defendant shall make restitution and pay the fine imposed at the rate of 15% of his gross monthly income
beginning with the second month of supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**A7**

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

Southern _____ District of New York _____

Caption:

United States of America _____ v.

Rajat K. Gupta _____

Docket No.: S1 11 Cr. 907 (JSR) _____

Hon. Jed S. Rakoff _____

(District Court Judge)

Notice is hereby given that Rajat K. Gupta _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ✔ , other _____

entered in this action on November 9, 2012 .                                    (specify)

(date)

This appeal concerns: Conviction only | ✔ |   Sentence only | ____ |   Conviction & Sentence | ____ |   Other | ____ |

Defendant found guilty by plea | ____ |  trial | ✔ |  N/A | ____ | .

Offense occurred after November 1, 1987?  Yes | ✔ |   No | ____ |   N/A | ____ |

Date of sentence: October 24, 2012 _____   N/A | ____ |

Bail/Jail Disposition: Committed | ____ |   Not committed | ✔ |   N/A | ____ |

Surrender date: January 8, 2013

Appellant is represented by counsel? Yes | ✔ | No | ____ |     If yes, provide the following information:

Defendant's Counsel:   Gary P. Naftalis

Counsel's Address:     Kramer Levin Naftalis & Frankel LLP

1177 Avenue of the Americas, New York, NY 10036

Counsel's Phone:       212-715-9100

Assistant U.S. Attorney:   Richard C. Tarlowe

AUSA's Address:        One St. Andrew's Plaza

New York, NY 10007

AUSA's Phone:          212-637-2330

Signature

**A8**

## CERTIFICATE OF SERVICE

I, Gary P. Naftalis, hereby certify that a true and correct copy of the Notice of Appeal

was served on November 9, 2012 by hand on the following counsel of record:

> AUSA Richard C. Tarlowe
> United States Attorney's Office
> Southern District of New York
> One Saint Andrew's Plaza
> New York, New York 10007

Dated: New York, New York
      November 9, 2012

                             Gary P. Naftalis

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              11 CR 907

5  RAJAT K. GUPTA,

6                Defendant.

7  ------------------------------x

8                                    New York, N.Y.
                                     October 26, 2011
9                                    2:30 p.m.

10

11  Before:

12                    HON. KEVIN N. FOX,

13                                   Magistrate Judge

14                    APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
   REED M. BRODSKY
17  RICHARD TARLOWE
   ANDREW MICHAELSON
18      Assistant United States Attorneys

19

20  KRAMER LEVIN NAFTALIS & FRANKEL
        Attorneys for Defendant
21  GARY NAFTALIS
   ALAN R. FRIEDMAN

22  ALSO PRESENT:  SPECIAL AGENT B.J. KANG, FBI

23

24

25

**A10**

1   there are no conditions that would reasonably assure your

2   presence in court and the safety of the community.

3           You have a right to be represented by counsel during

4   all court proceedings and during all questioning by

5   authorities.  If you are not able to retain counsel, the Court

6   can appoint counsel to represent you.

7           You're here with retained counsel today; is that

8   correct?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Should your circumstances change and you

11  are no longer able to retain counsel, you should advise the

12  Court so counsel can be appointed for you.

13          You have been named in an indictment returned by a

14  grand jury under indictment number 11 CR 907.

15          Mr. Naftalis, have you received a copy of the

16  indictment?

17          MR. NAFTALIS:  Yes, we have, your Honor.

18          THE COURT:  Do you wish to have it read to your client

19  in open court?

20          MR. NAFTALIS:  We waive a detailed reading of the

21  indictment, your Honor.

22          THE COURT:  Very well.  Have the parties received a

23  copy of the pretrial services report?

24          MR. BRODSKY:  Yes, your Honor.

25          THE COURT:  What is the government's position on bail?

**A11**

1      MR. BRODSKY:  Your Honor, we have a joint package to

2  propose for your Honor's consideration.  The package is a $10

3  million personal recognizance bond, secured by the equity in

4  Mr. Gupta's home in Connecticut, cosigned by two financially

5  responsible individuals, the surrendering of his passports,

6  travel restrictions to the continental United States, regular

7  pretrial services supervision, and to be released today on his

8  own signature with the remaining conditions to be met by

9  November 11 of this year.

10      THE COURT:  Mr. Naftalis, does that recitation comport

11  with your understanding of your discussion with the government?

12      MR. NAFTALIS:  Yes, it does, your Honor.

13      THE COURT:  Very well.  I'm going to adopt the

14  parties' recommendation on bail.

15      Is the Connecticut home the property at 59 Beachside

16  Avenue?

17      THE DEFENDANT:  Yes, your Honor.

18      THE COURT:  Thank you.  Following are bail conditions

19  for Mr. Gupta:  A $10 million personal recognizance bond to be

20  cosigned by two financially responsible persons.  The bond will

21  be supported by the equity in 59 Beachside Avenue, Westport,

22  Connecticut.  The defendant's travel is restricted to the

23  continental United States.  He must surrender all travel

24  documents he may possess to the government, and not seek or

25  obtain any new or replacement travel documents while this

**A12**

1AQ7GUPC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                  v.

 5   RAJAT K. GUPTA,

 6                  Defendant.

 7   ------------------------------x

 8                                      October 26, 2011
                                        3:00 p.m.
 9

10   Before:

11                     HON. JED S. RAKOFF
                                     District Judge
12

13                     APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  REED BRODSKY
16        RICHARD TARLOWE
          ANDREW MICHAELSON
17        Assistant United States Attorneys

18   GARY NAFTALIS
     ALAN FRIEDMAN
19        Attorneys for Defendant

20   ALSO PRESENT:  B.J. KANG, F.B.I.

21

22

23

24

25
```

**A13**

1          MR. NAFTALIS:  Although he is generally familiar.

2          THE COURT:  Take a minute to take a look.

3          (Pause)

4          THE COURT:  Mr. Brodsky, while we are waiting, what

5    bail was set by the magistrate?

6          MR. BRODSKY:  By joint proposal of the parties, a $10

7    million personal recognizance bond secured by the equity in his

8    home in Connecticut, 59 Beachside Avenue, cosigned by two

9    financially responsible individuals; surrendering of passports;

10   travel restricted to the Continental United States; regular

11   pretrial services supervision; released on his own signature

12   today, and remaining conditions to be met by November 11.

13         THE COURT:  All right.  So, Mr. Naftalis, has Mr.

14   Gupta had a chance to peruse the indictment?

15         MR. NAFTALIS:  Yes, he has, your Honor.

16         THE COURT:  It's a six count indictment.  The first

17   count charges conspiracy to commit insider trading, and the

18   other five counts are substantive counts of insider trading,

19   securities fraud.  Do you wish the entire indictment read here

20   in open court, or do you waive the public reading?

21         MR. NAFTALIS:  We would waive a detailed reading of

22   the indictment and wish to enter a plea of not guilty to all of

23   the charges.

24         THE COURT:  A plea of not guilty will be entered.

25         How long does the government want for completion of

Case: 12-4448   Document: 16   Page: 45   11/13/2012   766559   188

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4             v.                          11 CR 907 (JSR)

 5   RAJAT GUPTA,
                                           Argument
 6             Defendant.

 7   ------------------------------x

 8                                         New York, N.Y.
                                           May 16, 2012
 9                                         11:50 a.m.

10   Before:

11          HON. JED S. RAKOFF

12                                         District Judge

13

14          APPEARANCES

15

16   PREET BHARARA
          United States Attorney for the
          Southern District of New York
17   BY:  REED M. BRODSKY
          RICHARD C. TARLOWE
18        Assistant United States Attorneys

19
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
20        Attorneys for Defendant
     BY:  GARY NAFTALIS
21        DAVID S. FRANKEL
          MICHAEL S. OBERMAN
22        STEPHEN M. SINAIKO

23

24

25
```

**A15**

Csgrgup1

1    would depend on the situation.  That again shows why we really

2    can't deal with this totally on a motion in limine.

3         MR. NAFTALIS:  Yes.

4         THE COURT:  For immediate guidance the government asks

5    to exclude it altogether.  My ruling was that it would be

6    permitted but very modestly and subject to careful Court

7    scrutiny.  That remains my ruling.

8         I understand that you feel that the door will be

9    opened more broadly than I presently anticipate.  As I said at

10   the very beginning about all motions in limine, that's fair

11   game.  I don't think we can give more guidance.  I'm glad this

12   came out now so I'll be alerted to the issue.  I guess we will

13   take it up next right after the government's opening.

14        MR. NAFTALIS:  I appreciate your Honor giving us that

15   opportunity.  As I said, I hope I haven't been too aggressive

16   on the point, but I think there are things we should be able to

17   say to counter innuendos and arguments that they are making

18   expressly or implicitly attacking our client.

19        THE COURT:  All right.  Let's go to the government's

20   motion to admit the three calls.  It seemed to me that taking

21   into account both the calls themselves, which under Supreme

22   Court precedent I can take account of, though it can't be

23   sufficient, and the other documents in evidence that the

24   government proffered in its papers, the government had made out

25   a likelihood that they would be able to establish the alleged

**A16**

Case: 12-4448    Document: 16    Page: 47    11/13/2012    766559    188

1    conspiracy between Mr. Gupta and Mr. Rajaratnam sufficient for

2    evidentiary purposes, which is a preponderance standard.

3         The government wanted to know whether they could refer

4    to this in their opening. Of course, under my tentative ruling

5    the answer to that is yes. The government seemed to feel that

6    they were entitled to a final ruling on this now. I don't

7    think that's right as a matter of law and I don't think it

8    makes sense.

9         They have to prove the conspiracy anyway. They have

10   alleged a conspiracy that they are alleging they can prove

11   beyond a reasonable doubt. All they have to show to get the

12   evidence in is a preponderance. Everything I've seen so far

13   gives me every reason to believe they will be able to make that

14   showing, but I don't see why I should make a final ruling on

15   that until the evidence is in.

16        The government points out that they normally wouldn't

17   be presenting a lot of evidence about Mr. Horowitz or Mr. Lau,

18   but they don't need to. If there is a conspiracy between Mr.

19   Gupta and Mr. Rajaratnam relating to the insider trades that

20   are the subjects of these calls, Mr. Horowitz doesn't have to

21   be a co-conspirator, Mr. Lau doesn't have to be a

22   co-conspirator.

23        What has to be is that Mr. Gupta, in making these

24   statements that the government wants to introduce against him,

25   has to be acting in furtherance of the conspiracy. So, I don't

A17

1    see why we need to get into long-winded proffers about Mr.

2    Horowitz's role or Mr. Lau's role.  That is why it seemed to me

3    that this should all come in subject to connection.

4        The first call, which is September 24, 2008, at 7:09

5    a.m., is Mr. Rajaratnam saying to Mr. Horowitz, "No, I got a

6    call at 3:58, right.  This is all --"  Horowitz says, "Yeah."

7    Rajaratnam says, "Saying something good might happen to

8    Goldman, right?"

9        By the way, I think I misspoke a minute ago.  These

10   statements by Mr. Rajaratnam have to be in furtherance of the

11   conspiracy.  I might have said Gupta by accident.  These are

12   obviously statements by Rajaratnam.

13       Horowitz is his trader who was not around when the

14   alleged trades were made, so he is explaining to him, as he

15   would inevitably have to, why they were made.  If the call that

16   he got was from Mr. Gupta as part of the alleged conspiracy,

17   and the circumstantial evidence certainly permits an inference

18   to that effect, this is a discussion in furtherance of the

19   conspiracy between Rajaratnam and Gupta.

20       I'm looking now at the call itself and a little of the

21   extrinsic evidence, but of course I am required to and did look

22   at the considerable extrinsic evidence that the government

23   presented in its papers.

24       Similarly with respect to the call that occurs just a

25   little while later, also on September 24th at 7:56 a.m.  Now

**A18**

Csgrgup1

1    Rajaratnam is explaining further to Horowitz why the trade took

2    place.  Horowitz says, "Something happened."

3            Rajaratnam says, "I got a call, right, saying

4    something good's going to happen."  So he's blurting out that

5    of course something happened, I got this inside information,

6    some others may have gotten it, too, looking at the way the

7    market moved in the last few minutes.

8            Horowitz, who may be presciently worried about

9    conversations on the phone, says, "We'll talk about -- how

10   about this.  We'll talk when you come in."  Don't be a fool and

11   say this on the phone because, who knows, there might be a

12   wiretap.

13           Then there is this, if you will, self-protected

14   statement by Horowitz:  You did nothing wrong, all you did was

15   trade on inside information.  "You did nothing wrong.  We'll

16   talk about it when you come in.  Nothing's wrong."  Again, I am

17   required to look beyond the conversation itself, but I

18   certainly can look at the conversation under the holding of the

19   Supreme Court in Bourjaily.  Don't ask me, Mr. Reporter, how to

20   spell Bourjaily.  This conversation reeks of knowledge, intent,

21   and the need of Mr. Rajaratnam to explain to his lieutenant why

22   in his absence the significant trade occurred.

23           With respect to the call with Lau, here Mr.

24   Rajaratnam, in talking to Mr. Lau, is much more explicit about

25   what he has learned from an unnamed source telling him about

**A19**

Case: 12-4448   Document: 16   Page: 50   11/13/2012   766559   188

1   Goldman's bad quarterly results.  There is a dispute between

2   the parties as to whether this was really inside information or

3   was publicly available, etc.

4           On the government's proffer that Mr. Rajaratnam had

5   every reason to believe this was inside information, then this

6   becomes a call again to an important colleague and subordinate

7   who had the ability to execute further trades in Galleon

8   International, so clearly in furtherance of the conspiracy on

9   those premises.

10          I did not think the government's position on

11  statements against interest was as strong, but, as I say, I

12  don't need to reach that unless I am persuaded that the

13  co-conspirator exception is ultimately not met through lack of

14  connection or whatever.  I have already expressed my views

15  about the residual exception.  It would be an exercise in

16  residualism for me to say anything more.

17          Let me hear from the defense if they wish to be heard

18  on this.

19          MR. NAFTALIS:  May I be heard, your Honor?

20          THE COURT:  Please.

21          MR. NAFTALIS:  I had a question so I'm sure I

22  understand the scope of your Honor's ruling.

23          THE COURT:  Yes.

24          MR. NAFTALIS:  Is your Honor's ruling that the

25  government does not have to proffer evidence at the trial now

**A20**

1 | to establish a connection?

2 | THE COURT: No.

3 | MR. NAFTALIS: That's why I was a little confused.

4 | THE COURT: That's what they wanted, but I'm not

5 | ruling that. I understand the government's dilemma, so to

6 | speak. They are concerned for two things. One is they are

7 | concerned that if this evidence comes in and they do not make

8 | the connection, at that point there would be a real risk of a

9 | mistrial, because this is powerful evidence and it would be

10 | difficult to instruct the jury to disregard it and have

11 | confidence that they could follow that instruction. That's one

12 | of their concerns.

13 | Their other concern is that at least they thought

14 | there might be a possibility that they would have to prove all

15 | sorts of things about Mr. Horowitz and Mr. Lau that would be

16 | irrelevant to the real case but would be confusing to the jury.

17 | The latter is, I think, is not at concern at all, because Mr.

18 | Horowitz and Mr. Lau don't have to be co-conspirators for this

19 | to come in, in my view, as statements in furtherance of the

20 | conspiracy.

21 | If Mr. Rajaratnam is carrying out a conspiracy with

22 | Mr. Gupta, of which there is presumably going to be tons of

23 | evidence if the government is going to achieve its stated goal

24 | of proving the conspiracy count beyond a reasonable doubt, the

25 | fact that one of the conspirators, Mr. Rajaratnam, takes steps

**A21**

Case: 12-4448    Document: 16    Page: 52    11/13/2012    766559    188

1    or has conversations with third parties in furtherance of the

2    conspiracy is all you need.  That third party doesn't have to

3    be a co-conspirator.

4           Furthermore, if real push came to shove, I can at any

5    time hear evidence outside the presence of the jury relating to

6    the admissibility of evidence, and the rules of evidence don't

7    apply to those proffers.  I can hear, as I have read in the

8    papers that they have already given me here, stuff that is not

9    formally admissible in evidence at the trial or otherwise

10   complies with the rules of evidence, but I can consider it for

11   these limited purposes.

12          What I'm holding is they still have to establish to a

13   preponderance standard the conspiracy between Rajaratnam and

14   Gupta.  If they fail that, all sorts of things are going to

15   happen.  The likelihood is the conspiracy count might not even

16   get to the jury, a bunch of evidence would undoubtedly have to

17   be stricken, there might be a mistrial, etc.

18          So, yes, they still have to make out by a

19   preponderance standard the conspiracy between Rajaratnam and

20   Gupta.  That's the connection they have to make, and they have

21   to show that these were in furtherance of it.  What I'm saying

22   is that they have provided sufficient basis for my allowing

23   this into evidence subject to connection and therefore allowing

24   them to refer to it on their opening statement.  I don't know

25   what else I can tell you in that regard.

**A22**

1      MR. NAFTALIS:  I blame it on me.  I wanted to

2   understand.

3      THE COURT:  I'm sorry I'm being obscure.  What else

4   would you like to know?

5      MR. NAFTALIS:  Why you didn't come out our way.

6      (Laughter)

7      I only asked because I wanted to be sure.

8      THE COURT:  I have not made any final ruling that they

9   have shown that there is a conspiracy.  I've made a ruling that

10  they have shown sufficient evidence that there was a conspiracy

11  to allow this to come in subject to connection.

12     MR. NAFTALIS:  Where I would most respectfully take a

13  different path, your Honor, is I don't understand what evidence

14  they have proffered in a real way, as opposed to just writing

15  it in a brief, of a conspiracy between Mr. Gupta, which is

16  where you focused the issue, and Mr. Rajaratnam.  I saw no

17  evidence that they proffered here.  I would have thought that

18  before your Honor even tentatively put your toe in the water,

19  the better course, most respectfully, would be to wait to see

20  if they proffer it at the trial.

21     All we have here is ipse dixit and very, in my view,

22  unpersuasive ipse dixit, mostly aimed at an issue that I think

23  your Honor said is not a real issue, what Horowitz and what Mr.

24  Horowitz did, whereas the real issue is Mr. Gupta and Mr.

25  Rajaratnam.

**A23**

1          THE COURT:  As I said, the rules of evidence don't

2     apply.  But I agree that conclusory statements are not

3     sufficient.  For example, they proffered stuff about how right

4     after the board meeting where the relevant information was

5     conveyed, Mr. Gupta had several conversations, depending which

6     call we are talking about, with Mr. Rajaratnam and Mr.

7     Rajaratnam then makes the appropriate trade -- this is the

8     Horowitz calls -- and does so even though the guy he normally

9     works through, Horowitz, is not around, and then explains to

10    Horowitz the next morning, not once but twice, it's because he

11    got a call from a guy who told him, what was that wording

12    again?, that something good might happen to Goldman.

13          Let's take just those facts.  That is by no means all

14    of the specific nature they gave me, but let's just take that.

15    Why isn't that enough?

16          MR. NAFTALIS:  For one thing, it's perfectly clear

17    they don't have a stitch of direct evidence as to what was said

18    in any phonecall.

19          THE COURT:  Yes.

20          MR. NAFTALIS:  Also with respect to this one, your

21    Honor, there may not have even been a conversation.  There is a

22    brief connection.  That's why I think these things should be

23    best done in the trial context.  There was a brief connection

24    of one phone to another for -- how many seconds, David? -- 30

25    seconds with no direct evidence that they even had a

C5grgup1

```
 1    conversation at that point in time.  So we are doing
 2    speculation on top of speculation here.
 3              THE COURT:  I don't think that's right, but I'll hear
 4    from the government in a minute.  It seems to me that it's the
 5    government that is taking the risk here.  In the end if there
 6    is no conspiracy even to a preponderance standard, as I have
 7    already indicated, I think the likelihood, I won't make a final
 8    determination, but the likelihood is that if these calls were
 9    to come in, we would have to have a mistrial.  So they are the
10    ones who are taking that risk.
11              MR. NAFTALIS:  May I consult?
12              THE COURT:  Sure.
13              MR. NAFTALIS:  May I make one other point?
14              THE COURT:  Sure.
15              MR. NAFTALIS:  I'm slow at this early hour in the
16    morning.  I had one issue on which we most respectfully have a
17    disagreement with the government, and most respectfully I think
18    have a disagreement with what the Court can properly consider
19    and not consider.  That is a different issue.
20              THE COURT:  Go ahead.
21              MR. NAFTALIS:  It goes not to the substance of the
22    ruling.  It goes to the issue of whether or not, in connection
23    with making any sort of evidentiary ruling subject to
24    connection or whatever, the Court can and should be relying on
25    evidence which is inadmissible at the trial or not being
```

**A25**

C5GZGUP2

1          THE COURT:  Just to make clear before you answer, with

2     all the other caveats about motions in limine, nevertheless,

3     I'm denying the motion to exclude this tape and, therefore, it

4     would normally be coming in, assuming it meets, you know,

5     foundation or whatever other technical problems there might be.

6          So the question now I really want you to address is

7     not its admissibility, because that's been resolved at least

8     for now in your favor, but the argument you would make from it.

9          MR. BRODSKY:  Yes, your Honor.  We tried to list them

10    out in our papers on pages seven through eight.

11         I think we have a fundamental disagreement with the

12    defense regarding the call.  First, we have a fundamental

13    disagreement with the defense regarding how I, in the Raj

14    Rajaratnam trial, characterized the call to the jury.

15         What we told the jury in the Raj Rajaratnam trial,

16    which is something that we intend to tell the jury in this

17    trial, which is that if you listen to the call, particularly --

18    I think it's so important to listen to the call.  But during

19    this call -- but before I get to the call.  There will be

20    testimony about the role of a member of the board of directors

21    of a public company, and how that role by both policy and

22    procedure at Goldman Sachs, and also as a matter of practice is

23    in completely different than the role of management.

24         The defense would like to conflate the two.  They are

25    completely different.  An outside director of a member of the

A26

1  board of Goldman Sachs cannot discuss internal conversations

2  about board meetings regarding whether there was a mixed

3  discussion or debate about doing something.  An outside

4  director of Goldman Sachs oversees management and makes the

5  fundamental ultimate decision as to whether or not Goldman

6  Sachs will acquire a company or whether or not Goldman Sachs

7  will not take the strategic decision to acquire a company.

8          The defense seems to take the view that if management

9  Mr. Vinier, a CFO, or another member of senior management

10 speaks to an analyst on Wall Street and tells that analyst, we

11 do not believe in the near future we are unlikely -- we believe

12 we're unlikely to acquire a commercial bank unless there's a

13 regulatory seat change, they think that gives the green light

14 to an outside director to disclose the internal board

15 discussions to a hedge fund manager, whom the outside director

16 has a relationship and has an indirect investment in that fund,

17 we have a fundamental disagreement about that.  We will put on

18 testimony, from Mr. Blankfein, the CEO and potentially other

19 directors, that will show the Court and the jury that by what's

20 stated in here by Mr. Gupta revealing internal board

21 discussion, he violated Goldman Sachs policy and procedure that

22 we proffer to the court.  The defense will say that can't be,

23 because management was disclosing things to analysts.  They

24 have a completely different view of an outside director's role

25 and the policies and procedures at Goldman Sachs that apply.

**A27**

Case: 12-4448   Document: 16   Page: 58   11/13/2012   766559   188

1  So I take that fundamental big difference and I want to put

2  that before the Court.  But if you listen to the call, during

3  the call Mr. Raj Rajaratnam says he hears there is a rumor

4  about whether -- on page two, line 21 and 22 -- there's a rumor

5  Goldman might look to acquire a commercial bank.  And he says

6  he's going to, you know, have you -- on line 36 -- have you

7  heard anything along that line?  Now, listening to the call is

8  quite potent, because Mr. Gupta doesn't hesitate for a moment,

9  doesn't think to himself, which is exactly what we told the

10  jury in the Raj Rajaratnam trial.  He doesn't think to himself,

11  I shouldn't be answering that question, I'm being asked about a

12  rumor about whether Goldman Sachs plans to acquire a commercial

13  bank.  I'm an outside director on the board of Goldman Sachs,

14  I'm responsible, along with the other directors, in determining

15  whether or not to acquire a commercial bank, should management

16  come to us and recommend it.  What he does immediately, without

17  hesitation and with complete ease is says, on line 38, yeah,

18  this was a big discussion at the board meeting.  And then they

19  go on.  And Mr. Gupta says, Mr. Raj Rajaratnam on line -- page

20  three line one, buy a commercial bank?  Without hesitation Mr.

21  Gupta goes, buy a commercial bank and, you know it was a

22  divided discussion in the board.

23         He then goes on from lines eight to ten.  I think more

24  people say why, because its essence is a low return business

25  and, well, yeah, maybe interesting to develop a deposit base,

**A28**

C5GZGUP2

1   which is a low cost source of funding.  And lines 14 through

2   18, you know what we should probably explore more is, I mean we

3   aren't having trouble funding ourselves, but, you know, we

4   should explore more global sources of funding, and perhaps

5   even, you know, insurance or other things which are a low cost.

6   And then he goes on and confirms for Mr. Raj Rajaratnam, lines

7   33.  Mr. Gupta brings up insurance.  Line 33 Mr. Raj Rajaratnam

8   says, or even AIG -- which at that time nobody knew AIG was

9   going to implode, nobody knew AIG had all these problems, which

10  comes out after the Lehman bankruptcy.  But Mr. Gupta then

11  says, at line 35 to 39, or even AIG, yeah, AIG was definitely

12  in the discussion mix.

13          We will show that none of the analyst reports that Mr.

14  Gupta's defense team relies on had anything about any potential

15  acquisition of an insurance company.  It had no confirmation of

16  specific companies that were under discussion.  This is potent

17  market moving information.

18          We're not going to argue it's material.  We never

19  alleged in the bill of particulars it was material.  We alleged

20  it was an over overt act in furtherance of the charged

21  conspiracy.  We never told the jury in Raj Rajaratnam it was

22  material.  What we argued, and what they attached as a portion

23  of our argument in summation, was the ease with which, if you

24  listen to the call, Mr. Gupta responded to Mr. Raj Rajaratnam's

25  question without hesitation, revealed the nature of how they

A29

1    talked about what was going on at the board of Goldman Sachs

2    and its future plans.  They say, there's nothing non-public in

3    here because they point to three analyst reports; one that's

4    dated July 28, 2008, the day before this.  How they presume to

5    suggest that Mr. Gupta had read this analyst report is another

6    question.

7          But let's presume that Mr. Gupta had known that

8    management disclosed to Merrill Lynch on July 28 or days

9    preceding, that management was indicating they were unlikely to

10   acquire a commercial bank, there's nothing in there about

11   insurance company, there's nothing in there about confirming

12   AIG in the mix.  Management wouldn't have done that.  And even

13   if management did, a member of the board of directors, an

14   independent director who has a duty to the shareholders of that

15   company, we believe it's fair argument and inference, we can

16   argue to this jury he violated his duty of loyalty when he

17   should be loyal to the shareholders of Goldman Sachs, not to --

18         THE COURT:  All right, I understand the argument.

19         MR. BRODSKY:  Sorry for my summation.

20         THE COURT:  No, no.

21         MR. BRODSKY:  I was just working myself.

22         MR. NAFTALIS:  May I respond?

23         THE COURT:  Yes.

24         MR. NAFTALIS:  I mean, I think he makes, in part, my

25   argument for me about how he wishes to misuse this evidence the

**A30**

# In The Matter Of:

*United States Of America v*
*Rajat K. Gupta*

---

*May 21, 2012*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File C5LJGUPF.txt

**Min-U-Script® with Word Index**

**A31**

1   document.
2        MR. NAFTALIS: It was not contained in any writing.
3        THE COURT: My recollection is that the prosecutor
4   asked Ms. Eisenberg for every name she could remember of the
5   additional ones on the list and she ultimately gave two or
6   three, and she had originally stated it was like three or four
7   and I think she remembered most or something like that. But he
8   didn't limit it to Ms. Chiesi.
9        MR. NAFTALIS: Actually, your Honor, I hesitate to
10   test my recollection against yours since you soundly defeated
11   me on the side bar.
12        THE COURT: Do we have a transcript?
13        MR. BRODSKY: I don't think I did that, your Honor. I
14   am agreeing with Mr. Naftalis. I think my recollection,
15   because I did the direct, was I asked her who was --
16        THE COURT: Someone did it.
17        MR. BRODSKY: Mr. Frankel did.
18        THE COURT: Mr. Frankel did.
19        MR. BRODSKY: So he asked her about the important
20   people.
21        THE COURT: So Mr. Frankel did.
22        MR. NAFTALIS: No, but my point is, and I think it is
23   a serious point, is that once the prosecution -- we only
24   learned that because Mr. Frankel was smart enough to ask the
25   question about who else was on the list. The government never,

1   either did not make a Brady disclosure to us that Loeb, who is
2   important in this case -- and they know this is a critical
3   defense theme and we will hear a lot about that Loeb was one of
4   the important people. They did not disclose it to us. They
5   did not bring it out on direct examination. We were only lucky
6   enough to learn that because we asked the right questions on
7   cross. I think that should have been disclosed to us. That is
8   plainly Brady material.
9        MR. BRODSKY: Your Honor, it is not --
10        THE COURT: I am glad that you corrected my
11   recollection that it was Mr. Frankel, not Mr. Brodsky, who
12   brought that out.
13        Mr. Brodsky, do you want to say anything about what
14   was just said?
15        MR. BRODSKY: Sure, your Honor. I think I am being
16   accused of a Brady violation by Mr. Naftalis and whether he
17   likes it or not, that is what he is doing. I find that
18   terribly troublesome. This is what I have to say about it.
19        Ms. Eisenberg testified clearly, forcefully that, the
20   thrust of her testimony was September 23, 2008 and who called,
21   and she testified clearly it wasn't David Loeb. And David Loeb
22   did not make that call on September 23rd to her about Warren
23   Buffett. I don't view Mr. Loeb as Brady in terms of that
24   testimony and I don't view the fact that Mr. Loeb was on a list
25   of frequent callers as Brady to the defense.

1        Mr. Loeb, the evidence will show, provided Intel and
2   Apple information and HP information to Raj Rajaratnam. There
3   is no evidence, zero, none from the government that Mr. Loeb --
4   and none that we have seen from the defense in any way, shape
5   or form -- that Mr. Loeb had access to material non-public
6   information about Goldman's earnings or, based on what we heard
7   today, the possibility that he could have ever heard about the
8   Buffett deal before the announcement.
9        I know the defense wants to blow this up and confuse
10   the jury with Intel and Apple and HP and say that
11   Mr. Rajaratnam had this source, David Loeb, who could have
12   roamed the halls of Goldman Sachs and maybe snuck into a
13   meeting and saw something, but that is just plainly absurd.
14        So I reject the notion that we did anything improper.
15   And in fact, Ms. Eisenberg's testimony proves it out. His
16   request for the Brady, if he thinks it was Brady, he freely
17   brought it out. We brought out there were additional names on
18   the list. Why we didn't elicit the full names because we
19   find it completely distracting, the issue of David Loeb. It is
20   the defense case, not the government case.
21        MR. NAFTALIS: Judge, I have to tell you, number one,
22   we may have a lot to say about David Loeb and we are going to
23   have a lot to say about the evidence connecting him to
24   Mr. Rajaratnam, period. They don't like to hear it because it
25   undercuts one of the central thesis of their case and they

1   don't like the fact that we have a good defense. That is one
2   of the many good defenses we have. But we don't have to
3   litigate that. That will be up to the jury to weigh what
4   weight they put on our defense, what weight they put on the
5   government's presentation.
6        I am focusing on the Brady issue and, yes, I am saying
7   there was a Brady issue here. We were supposed to have
8   disclosure of these things, period.
9        He made a big to-do about the list of important
10   people. He made a huge to-do about it yesterday. Rajat Gupta,
11   the number two guy on the list of important people. That is
12   really, really important. They made a huge to-do about it,
13   period. The fact that that list of important people included
14   David Loeb from Goldman Sachs is an important fact. You can
15   put whatever weight you want on it or not, but we were entitled
16   to be told that given the history --
17        THE COURT: I don't think I need to rule on whether or
18   not there was a Brady violation because it seems to me clear
19   that it is immaterial. The defense has known for quite some
20   time about Mr. Loeb and about the fact that he may or may not
21   have disclosed confidential information on other matters, and
22   they have clearly been pursuing that through their own
23   investigation.
24        What would they have done if they had known that Ms.
25   Eisenberg remembered Mr. Loeb being on a list of important

May 24, 2012

---

C5OHGUP1                                    Page 629

1    MR. BRODSKY: I'm sorry, your Honor?

2    THE COURT: What is the first tape you are playing?

3    MR. BRODSKY: I'm sorry?

4    THE COURT: What is the first tape you're playing?

5    MR. BRODSKY: 21, your Honor. We offer it now. It

6 was introduced subject to connection.

7    THE COURT: How long is that time-wise?

8    MR. BRODSKY: I would say maximum of three minutes.

9    MR. NAFTALIS: We can bring it up on the screen. I

10 have a copy and we can bring it up on the screen.

11    THE COURT: Let me see it. Thank you.

12    (Pause)

13    THE COURT: So let me ask the defense, what is the

14 relevance of your portion?

15    MR. NAFTALIS: I gave my only copy to the judge.

16    THE COURT: You can have it back now.

17    MR. NAFTALIS: It is OK. I think it is more important

18 that you have it than I do.

19    THE COURT: What is the relevance?

20    MR. NAFTALIS: It is the context for the call -- he is

21 on this call. He jumps off it to pick up the other one and

22 they are talking about doubling the size of the offering.

23    THE COURT: I saw that.

24    MR. NAFTALIS: This was something we pointed out in

25 our motion papers. And Rajaratnam says, that would be good,

---

C5OHGUP1                                    Page 630

1 using the word good. The next call that follows, right after

2 that, in other words, he gets interrupted and then that is the

3 other call where he says to Horowitz, something good might

4 happen. I heard that something good might happen at Goldman.

5 He literally has just said to the other fellow, whose call gets

6 interrupted to have the Horowitz call, doubling the size of the

7 thing, that would be good.

8    THE COURT: Excuse me.

9    MR. NAFTALIS: I'm sorry, Judge.

10    THE COURT: So do you have or does the government have

11 the CD that has this portion of this first call?

12    MR. BRODSKY: Yes, we do, your Honor. In fact, I

13 apologize, but the one we did mark I just learned, 22, contains

14 both separate calls. We have a 22A that contains just the

15 Horowitz and Raj call.

16    THE COURT: So does the defense want to offer Defense

17 Exhibit 4011T under the rubric of completeness?

18    MR. NAFTALIS: Yes, your Honor.

19    THE COURT: Any objection?

20    MR. BRODSKY: Yes, your Honor. It is a different

21 call.

22    THE COURT: I understand it is a different call. Here

23 is the point.

24    I am going to allow them to put this in. Normally it

25 would come in on their case, but if we have the CD and if the

---

C5OHGUP1                                    Page 631

1 argument that is going to be made is that the two calls, that

2 the first call forms the context for what was said in the

3 second call, which of course the government disputes that but

4 that is the argument, then the jury might as well hear it all

5 together, since the thing they will have to decide is whether

6 the first call does or does not inform the second call.

7    The defense, of course I am not going to let them play

8 it twice, so either they play it now or they play it on their

9 case. Since they are saying it is the context of the first

10 that creates what they say is the explanation for the second,

11 it makes perfect sense if they want to have it played now to

12 have it played now. So I will allow that.

13    MR. NAFTALIS: Thank you.

14    MR. BRODSKY: Your Honor, what we would like to do is,

15 since we are presenting the case what we think in an effective

16 way, and obviously it is ultimately up to the court, we

17 understand that, what we would request is that we play 21. We

18 play 22 because it is between Ian Horowitz and Raj Rajaratnam

19 in 21, we then play 22 with Raj Rajaratnam and Ian Horowitz,

20 and then we play the earlier portion.

21    THE COURT: No. We are going to play 21 and 22 in its

22 entirety, but I will explain to the jury exactly what is going

23 on so they will understand it.

24    Since we only have one copy of the defense transcript,

25 you will have to put it up on the screen during the -- right,

---

C5OHGUP1                                    Page 632

1 because it is not part of the book, correct?

2    MR. BRODSKY: Correct, your Honor.

3    THE COURT: When that part of the call comes, you will

4 put it up on the screen. When the second part of the call

5 comes that is already in the books, you will take it off the

6 screen.

7    MR. NAFTALIS: Thank you, Judge.

8    THE COURT: Let's bring in the jury.

9    MR. BRODSKY: Your Honor, would you mind informing the

10 jury that, give them the instruction with respect to 21 when

11 you ask them -- to 22 when you ask them to turn to it, tell

12 them that it has been taken out of the government exhibit but

13 it will be on the screen, and then to go back to the --

14    THE COURT: I am going to explain the whole thing.

15    MR. BRODSKY: Thank you, your Honor.

16    THE COURT: For the record, the defense transcript is

17 4011T. The call is already in evidence as part of 22.

18    (Continued on next page)

19

20

21

22

23

24

25

---

United States Of America v
Rajat K. Gupta

May 24, 2012

---

C5OHGUP1                                    Page 633

1        (Jury present)
2        THE COURT: Juror No. 12, his father had a serious
3   illness which he has to attend to.  His father is not in the
4   country.  So we have had to excuse Juror No. 12.  So Alternate
5   No. 1, you should move into the seat for Juror No. 12.
6   Congratulations.  I know it is a thrill.  The other three
7   alternates, you can keep your same seats for now.
8        So we are going to play some more tapes, ladies and
9   gentlemen.  The first one is 21.  So you can turn to 21T in
10  your book.  When we get to 22, then I will have some
11  instructions, and we had some argument that took a while.  That
12  is why we are a little late in getting started.  But we will
13  start with 21.
14       The court notes for the record that the connection has
15  now been made, so 21 is received for all purposes.
16       (Government's Exhibit 21 received in evidence)
17       (Audiotape played)
18       THE COURT: All right.  So, ladies and gentlemen, we
19  are now going to hear -- could we stop that buzzing?  Thank
20  you.  We are now going to hear what has been received in
21  evidence as 22, but it is really two calls, two connected
22  calls.
23       The first call is being offered by the defense and
24  because of logistical issues they don't right now have a copy
25  for each of you, but we are going to put their copy of the

---

C5OHGUP1                                    Page 634

1   transcript up on the screen.  So when you hear the first call,
2   it won't be in your book, the transcript will be up on the
3   screen.
4        The second call, though, is being offered by the
5   government and it is 22T.  So when we get to the second call,
6   we will pause for a second and you can open your books and look
7   at 22T.
8        Just to flag in advance, the government's view is the
9   two calls are not related to each other in any way relevant to
10  your determination.  The defense position is that they are
11  related to each other in ways relevant to your evaluation.
12  That will all be argued to you on summation.  But we are going
13  to play the calls together now and then leave it to you to make
14  a determination whether they are or not related.
15       So we will start with the first call that is part of
16  22.
17       (Audiotape played)
18       THE COURT: Do you have the transcript?
19       (Audiotape played)
20       THE COURT: All right.  So now turn to 22T in your
21  book and we will hear the second part.
22       Do I understand counsel agree that what happened here
23  was that Mr. Rajaratnam got off the first call to take the
24  second call?
25       MR. NAFTALIS: Yes, your Honor.

---

C5OHGUP1                                    Page 635

1        MR. BRODSKY: Yes, your Honor.
2        THE COURT: Very good.  All right.
3        (Audiotape played)
4        THE COURT: All right.  So what is next from the
5   government?
6        MR. TARLOWE: We are prepared to call our next
7   witness.
8        THE COURT: All right.
9        MR. TARLOWE: The government calls Carolann Shields.
10  CAROLANN SHIELDS,
11       called as a witness by the Government,
12       having been duly sworn, testified as follows:
13       THE COURT: Counsel.
14       MR. TARLOWE: Thank you, your Honor.
15  DIRECT EXAMINATION
16  BY MR. TARLOWE:
17  Q.  Good morning, Ms. Shields.
18  A.  Good morning.
19  Q.  Where do you work?
20  A.  At McKinsey & Company.
21  Q.  What is McKinsey & Company?
22  A.  They are a management consulting firm.
23  Q.  Can I ask you to just try to speak a little bit closer to
24  the microphone.
25       What does that mean?

---

C5OHGUP1              Shields - direct          Page 636

1   A.  They provide, they help the company's clients that we serve
2   to develop strategies to solve problems or to reach the goals
3   of that organization.
4   Q.  What kinds of clients does McKinsey have?
5   A.  They have many clients in a lot of different industries.
6   There are banking clients, health care.  There are a lot -- it
7   crosses a broad spectrum of types of industries.
8   Q.  What is your job at McKinsey?
9   A.  I work in the IT security department.  I'm an IT security
10  program manager.
11  Q.  What does "IT" stand for?
12  A.  Information technology.
13  Q.  What do you do in that job?
14  A.  I'm responsible for the risk management.  We conduct risk
15  assessments on applications.  We do forensics investigations
16  and incident response.
17  Q.  How long have you worked at McKinsey?
18  A.  15 years.
19  Q.  In that position at McKinsey, what types of records are you
20  asked to analyze?
21  A.  E-mails, calendars, copies of hard drives, phone records,
22  voice mail, system logs.
23  Q.  Where does McKinsey have offices?
24  A.  They have offices globally, all over the world.
25  Q.  Which office do you work in?

---

C5OHGUP3                 Shields - direct                 Page 689

1         MR. TARLOWE: Mr. Fernandez, if you could publish it
2    and just blow up October 23rd. Thank you.
3    Q. Ms. Shields, if you could read the entry -- again, whose
4    calendar is this?
5    A. Rajat Gupta's.
6    Q. If you could read the entry in Mr. Gupta's calendar on
7    October 23, 2008 for 4:15 p.m. to 5:15 p.m., starting with that
8    first row.
9    A. GS board CC 212-902-2493.
10   Q. And the acronym "CC," are you familiar with what that
11   stands for?
12   A. Yes. Conference call?
13   Q. What about "GS board?"
14   A. Goldman Sachs board
15   Q. What is listed as the location of that Goldman Sachs board
16   conference call on October 23, 2008?
17   A. Dial-in number 212-902-0990, pass code 2924004.
18   Q. Showing you what's marked for identification as Government
19   Exhibit 433.
20        Ms. Shields, could you see what that document is?
21   A. Yes, I do.
22   Q. What is that document?
23   A. It appears to be a schedule of who is going to attend a
24   conference call, and based on the participant it looks like a
25   Goldman Sachs conference call and based on the dial-in number,

C5OHGUP3                 Shields - direct                 Page 690

1    it is a Goldman Sachs conference number.
2         MR. TARLOWE: The government offers Government Exhibit
3    433.
4         MR. FRANKEL: No objection.
5         THE COURT: Received.
6         (Government's Exhibit 433 received in evidence)
7         MR. TARLOWE: May we publish?
8         THE COURT: Yes.
9    Q. Can you read the title of the document, Ms. Shields?
10   A. October 23, 2008, 4:15 p.m., Board Posting Call, Status On
11   Attendance.
12   Q. Under "external directors," can you read the highlighted
13   row?
14   A. Rajat Gupta confirmed.
15   Q. Do you see a dial-in number?
16   A. Yes.
17   Q. What is the dial-in number?
18   A. 212-902-0990.
19   Q. How does that dial-in number compare to the dial-in number
20   listed in Mr. Gupta's calendar for October 23, 2008?
21   A. It's the --
22   Q. In Government Exhibit 3600?
23   A. It's the same number.
24        MR. TARLOWE: You can take that down.
25   Q. Ms. Shields, I'm showing you what's marked for

C5OHGUP3                 Shields - direct                 Page 691

1    identification as Government Exhibit 4069.
2         Do you recognize that as a McKinsey phone record?
3    A. Yes, I do.
4    Q. Are those records that you pulled?
5    A. Yes, they are.
6    Q. For what date?
7    A. October 23, 2008.
8    Q. For what phone numbers?
9    A. Extension 6701, 6709, 6710, 6750.
10   Q. And again, those are associated with whom?
11   A. The first three are associated with Rajat Gupta and the
12   last one is with Renee Gomes.
13        MR. TARLOWE: The government offers Government Exhibit
14   4069.
15        MR. FRANKEL: No objection.
16        THE COURT: Received.
17        (Government's Exhibit 4069 received in evidence)
18        MR. TARLOWE: May we publish it?
19        THE COURT: Yes.
20        MR. TARLOWE: Mr. Fernandez, if you can blow up
21   starting from the bottom, if you count up five rows from the
22   bottom. If you could just include the top three rows. So the
23   calls that end at 1649, 1650 and 1703.
24        Go up two rows. 1649, 1650 and 1703. Thank you.
25   Q. Ms. Shields, focusing on the first row on the screen, that

C5OHGUP3                 Shields - direct                 Page 692

1    shows a call from what number to what number?
2    A. That first row is a call from extension 401-6750, which is
3    Renee Gomes' extension, to 212-902-0990, which is the dial-in
4    number for the Goldman Sachs conference call.
5    Q. There is a "C." Does that indicate that there was another
6    number conferenced into that call?
7    A. Yes, it does.
8    Q. How long was that call between Ms. Gomes' extension, the
9    other party conferenced in, and the Goldman Sachs dial-in
10   number?
11   A. It was for 33 minutes and one-tenth, which is 33 minutes
12   and anything from 6 to 11 seconds.
13   Q. What time did that call end?
14   A. 1649, which is 4:00 p.m. and 49 minutes. It can be
15   anywhere from exactly 4:49 to 4:49 and 59 seconds.
16   Q. After the call between, after the call with the Goldman
17   Sachs dial-in number ended at 4:49 p.m., on October 23, 2008,
18   what is the next call that was made from Ms. Gomes' phone?
19   A. The next call was to 212-371-2335.
20   Q. Whose number is that?
21   A. That's Raj Rajaratnam's direct line.
22   Q. Was any other number conferenced into that call?
23   A. Yes. 401-6909 was conferenced into that call.
24   Q. Whose phone was that?
25   A. That is Rajat Gupta's home office line.

| | |
|---|---|
| C5OHGUP3    Shields - direct    Page 693 | C5OHGUP3    Shields - direct    Page 695 |

1 Q. How long was Mr. Gupta connected to the call with -- let me
2 rephrase that.
3 Q. How long was Mr. Gupta's home office number connected
4 to Mr. Rajaratnam's direct line at Galleon?
5 A. For 12 minutes and five-tenths, which is 12 minutes and 30
6 seconds or anywhere up to 12 minutes and 35 seconds.
7 Q. Can you tell from this record whether Ms. Gomes' extension
8 disconnected from the call prior to Mr. Gupta's number?
9 A. Yes, it did. It disconnected at 4:50.
10 Q. Who disconnected at 4:50?
11 A. Renee Gomes disconnected at 4:50.
12 Q. And Mr. Gupta's home office phone was connected until 5:03?
13 A. Yes.
14 Q. Mr. Gupta's home office phone was connected to
15 Mr. Rajaratnam's line for 12 and a half minutes?
16 A. Yes.
17 Q. That's on October 23, 2008?
18 A. Yes.
19     MR. TARLOWE: Your Honor, at this time the government
20 offers Government Exhibit 29, the phone call from the next day,
21 October 24, 2008.
22     THE COURT: Any objection?
23     MR. FRANKEL: Your Honor, may we be heard on this one?
24     THE COURT: Yes.
25     (Continued on next page)

1     (Jury present)
2     THE COURT: All right. Exhibit 29 is received.
3     (Government's Exhibit 29 received in evidence)
4     THE COURT: We are going to play another call, ladies
5 and gentlemen, so you can turn in your books to 29T.
6     MR. TARLOWE: May we publish 29T, Judge?
7     THE COURT: Yes. Both the connection reservation has
8 been satisfied, both as to 29 and 29T.
9 BY MR. TARLOWE:
10 Q. Ms. Shields, the phone records that you were just
11 testifying about, those were from the afternoon of October 23,
12 2008?
13 A. Yes.
14     MR. TARLOWE: If we can now play Government Exhibit
15 29, which is a call from the following day, October 24, 2008.
16     (Audiotape played)
17     MR. TARLOWE: No further questions.
18     THE COURT: Cross-examination.
19 CROSS EXAMINATION
20 BY MR. FRANKEL:
21 Q. Good afternoon, Ms. Shields.
22 A. Hi.
23     MR. FRANKEL: Could we bring up on the screen
24 Government Exhibit 3616, please.
25 Q. This is the calendar of Mr. Gupta's that you were asked

| | |
|---|---|
| C5OHGUP3    Shields - direct    Page 694 | C5OHGUP3    Shields - cross    Page 696 |

1     (At the side bar)
2     MR. FRANKEL: Your Honor, I apologize. We simply want
3 to preserve our prior objection. I shouldn't have come up to
4 the side bar. My mistake.
5     THE COURT: I am glad you did because I have to ask
6 counsel, how much more do you have with this witness?
7     MR. TARLOWE: This is it, just playing this call.
8     THE COURT: All right. Because you are really -- I am
9 reminded of, in the ongoing Clemens trial, Judge Walden had to
10 excuse two jurors for sleeping and he pointed out to counsel at
11 the side bar in that case that he thought that their sleeping
12 was a rational response.
13     MR. TARLOWE: I think that is about to change.
14     THE COURT: Fortunately, this jury is very alive and
15 awake and attentive. But I am glad to hear that we won't be
16 running any risk.
17     (Continued on next page)
18
19
20
21
22
23
24
25

1 some questions about on direct examination?
2 A. Yes.
3 Q. And do you see that it begins with an appointment at, I
4 believe it says 8 p.m., call with Stuart Pearce?
5     Do you see that?
6 A. Yes.
7 Q. And then there are a series of doctors' appointments after
8 that?
9 A. Yes.
10 Q. There is a haircut?
11 A. Yes.
12 Q. And then an indication of traveling from Westport to New
13 York.
14     Do you see that?
15 A. Yes.
16 Q. Then a series of additional appointments.
17     Do you see that?
18 A. Yes.
19 Q. And the Goldman Sachs board call is noted at 3:15 to 3:45
20 p.m.
21     Do you see that?
22 A. Yes.
23 Q. And there is scheduled as well a meeting in the midst of
24 that call, 3:30 to 4 p.m., with a Mr. Jorgensen.
25     Do you see that one as well?

C5TJGUP1                                    Page 1074

1  call Mr. Rajaratnam.  His secretary calls --
2         THE COURT: His secretary?
3         MR. BRODSKY: His secretary, Mr. Gupta asks his
4  secretary to call Mr. Rajaratnam.
5         THE COURT: Okay.
6         MR. BRODSKY: The secretary tries to reach
7  Mr. Rajaratnam either through the direct line or to
8  Ms. Eisenberg.  The phone records either switched over to
9  Ms. Eisenberg, Mr. Rajaratnam was on the line at the time, the
10 call is made from Mr. Gupta, the unassigned number to Galleon.
11 At that time Mr. Rajaratnam is on the line.
12        THE COURT: But what do you make of the fact that
13 Mr. Gupta's phone line shows that he was connected or at least
14 the allegation is he was connected to a call with KKR from 2:15
15 to 2:19?
16        MR. BRODSKY: There the defense will argue that was
17 Mr. Gupta.  We don't know whether that was Mr. Gupta actually
18 on the line with KKR, to assistants on the line.  They are
19 arguing the call we have identified is two assistants on the
20 line chatting or talking for over 9 minutes.  They say this had
21 to be Mr. Gupta on this other line with KKR, but that is just
22 an argument that they have.  There are two obviously
23 possibilities.
24        THE COURT: Have you interviewed the people on the KKR
25 part, end of that conversation?

C5TJGUP1                                    Page 1075

1         MR. BRODSKY: We have not, your Honor.
2         THE COURT: I ask the defense that same question?
3         MR. NAFTALIS: No, we have not.
4         MR. BRODSKY: We have a voice.
5         MR. NAFTALIS: We do know he was talking to KKR during
6  that period of time.  We can prove that one without any
7  difficulty.
8         MR. BRODSKY: We obtained a voicemail from the number
9  that was called that day in the overlap period and it is a
10 secretary at KKR.
11        We have an actual voicemail from McKensey.  McKensey
12 saves voicemail through an e-mail system.  We produced it to
13 the defense in discovery, and that number is the number of a
14 secretary at KKR.  There is a voicemail from that number.  That
15 number calls Mr. Gupta and leaves a voicemail and it is a
16 secretary at KKR.  They do have arguments, admittedly, your
17 Honor, that there is overlap and that call wasn't made by
18 Mr. Gupta.  We understand that.
19        We think the overwhelming evidence of the outside
20 trading position is the fact that 25 percent of the volume on
21 June 2nd is in Smucker's, the fact that Mr. Cardillo says the
22 only reason I traded was because Smucker's was going to buy
23 Folger's, that is the only reason I traded.  He never traded
24 Smucker's before.
25        THE COURT: I think the other thing that is involved

C5TJGUP1                                    Page 1076

1  here is if Mr. Gupta was the only person that Mr. Rajaratnam
2  was allegedly getting inside information from, it's one thing,
3  but while the defense has not proffered anyone else at Proctor
4  & Gamble per se that was the source of the inside information,
5  though what they're arguing:
6         First, Rajaratnam was getting inside information from
7  lots of people on lots of deals;
8         Second, that someone was taking this information other
9  than allegedly Mr. Gupta, at least that is a possibility
10 because the Wall Street Journal, albeit at a later point in
11 time, picks it up before the official announcement.
12        So what they're saying is that if you forget about the
13 call for a minute or agree that the call is a less than obvious
14 situation and you're just arguing, as you began your argument
15 by saying well, we know that Rajaratnam and Gupta have been
16 found by the Court by a preponderance of evidence to be
17 sufficiently in a conspiracy to warrant the admission of
18 evidence, we know that he provided information at least on one
19 other Proctor & Gamble deal, that is admitted in a defense
20 submission.  We know that he provided -- or at least for
21 admissibility purposes, none of this reflects the court's view
22 of evidence but just for admissibility purposes -- we know that
23 he provided inside information on Goldman deals and we know
24 that the statement -- we know that the trade is very unusual,
25 aberrational, as you put it in your papers, so there has to be

C5TJGUP1                                    Page 1077

1  some explanation for it.
2         The cover, what you call the cover memo explanation
3  seems on its face dubious.  That is, therefore, further
4  suggestive there was some illegal reason for the trade.
5         And the statement that is made by RK to Michael
6  Cardillo is that there is a source on the Proctor board.  I
7  think the weakest part of that part of your argument is simply
8  the fact that Rajaratnam was getting inside information from
9  numerous sources, not on this perhaps, at least there is no
10 evidence of anyone else on this, but certainly there is
11 evidence both in the record and in the Rajaratnam case of
12 inside information coming from other people.
13        MR. BRODSKY: There is no question about
14 Mr. Rajaratnam having lots of inside sources.
15        THE COURT: The most disturbing part of this case is
16 what it says about business ethics.  It is not a question of
17 one day, I am sorry to say, of recent years of a whole bushel
18 of --
19        MR. BRODSKY: Your Honor, the only thing I would say
20 about that, we have exhaustively investigated Mr. Rajaratnam's
21 sources.  That is one person who has been exhaustively
22 investigated, and the government has never identified and found
23 any evidence, and neither has the defense proffered any
24 evidence, there was a source at Proctor & Gamble.  The best the
25 defense could say, there was a contact with Morgan Stanley.  Of

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 4, 2012

---

C64JGUP1                                                Page 1849

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4              v.                    11 Cr. 907 JSR
 5   RAJAT K. GUPTA,
     a/k/a Sealed Defendant 1,
 6
                 Defendant.
 7
     ------------------------------x
 8
                                     June 4, 2012
 9                                   9:20 a.m.
10   Before:
11                   HON. JED S. RAKOFF,
12                                District Judge
13                                 and a jury
                     APPEARANCES
14
     PREET BHARARA,
15       United States Attorney for the
         Southern District of New York
16   REED MICHAEL BRODSKY,
     RICHARD CRAIG TARLOWE,
17       Assistant United States Attorneys
18   KRAMER LEVIN NAFTALIS & FRANKEL, LLP,
         Attorneys for defendant Gupta
19   BY:  GARY P. NAFTALIS, Esq.
          DAVID S. FRANKEL, Esq.
20        ROBIN MARIE WILCOX, Esq.
                 Of counsel
21
22   Also Present:
         ANDREA ESTOK, Special Agent FBI
23       SEAN FERNANDEZ-LEDON, Paralegal Specialist
         KAITLIN PAULSON, Paralegal Specialist
24
25
```

---

C64JGUP1                                                Page 1850

```
 1            (Trial resumes)
 2            (In open court; jury not present)
 3            THE COURT: Let's get the witness on the stand.  Bring
 4   in the jury.  Counsel, come to the sidebar.
 5            (At the sidebar)
 6            THE COURT: Let me hear defense counsel on the
 7   government's fifth motion in limine.
 8            MR. NAFTALIS: Your Honor, we believe this is totally
 9   irrelevant and it involves the elicitation of hearsay.  As we
10   understand the facts here, we scrambled around to learn them,
11   this involves a loan not to Mr. Gupta, but to a man named
12   Ramesh Vengal, R A M E S H, V E N G A L.  Mr. Rajaratnam
13   apparently made a short-term loan to this man Vengal of a
14   significant amount of money at a high interest rate.  Vengal
15   did not pay the loan back on time.
16            Rajaratnam got angry about it.  Mr. Gupta's only
17   involvement was to try to see if he could be helpful in getting
18   the matter involved.  I don't know what that has to do with
19   anything.
20            THE COURT: Let me hear from the government.
21            MR. BRODSKY: Mr. Gupta arranged for the loan.
22       Mr. Gupta and Mr. Vengal, we understand, and Mr. Kumar
23   told Mr. Gupta --
24            THE COURT: I think this general subject was opened up
25   in effect by the defense cross-examination of the private
```

---

C64JGUP1                                                Page 1851

```
 1   banker in terms of the difficulties that the bank had had
 2   obtaining stuff from Mr. Rajaratnam Mr. Gupta wanted.  We are
 3   getting into that kind of stuff.  I have serious doubts about
 4   the hearsay, so I am overruling the relevance objection, but
 5   we'll see how the hearsay goes.
 6            While we are at the sidebar, there is also an
 7   application, part of the fourth motion in limine to put in an
 8   e-mail the government wants to put in.  I have considered that.
 9            That application is denied.
10            (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

C64JGUP1                                                Page 1852

```
 1            (In open court; jury present)
 2            THE COURT: Good morning, ladies and gentlemen.  I
 3   wanted to bring you right in so you could see counsel and me in
 4   our natural habitat at the sidebar, but we are ready to
 5   continue.  Counsel.
 6       ANIL KUMAR, resumes
 7   DIRECT EXAMINATION (Continued)
 8   BY MR. BRODSKY:
 9   Q.  Mr. Kumar, you testified last Friday about, among other
10   things, NSR.  Do you recall your testimony?
11   A.  Yes, sir.
12   Q.  Directing your attention to the document sent out to
13   potential investors, what, if anything, did those documents
14   indicate about who was part of NSR?
15   A.  They spelt out the four general partners, the founders of
16   NSR, and they also laid out about I think three or four
17   additional people who were sort of more junior who were going
18   to help with some of the work for NSR.
19   Q.  What, if anything, did those documents say regarding
20   Mr. Rajaratnam?
21   A.  They said that Mr. Rajaratnam was a founder, which is a
22   general partner of the fund.  They said he was a member of the
23   investment committee, as I think I mentioned on Friday, which
24   is the committee which decides how to deploy the money or
25   invest the money.
```

---

C64JGUP1                                    Page 1861

1  A. Around either November or December, towards the end of the
2  year.
3  Q. What, if anything, did Mr. Gupta say to you?
4  A. He said that Mr. Rajaratnam and he had figured out that
5  there may be a way to salvage their losses. The way this
6  particular fund worked, he explained to me, they had put in 50
7  million, but they had borrowed, I think the number is almost
8  300 million on the back of that 50 million from Lehman.
9       So when Lehman collapsed, they owed Lehman the 300
10  million back, and they were trying to negotiate with Lehman to
11  give Lehman less back of the 300 million because they had lost
12  some of their investment capital.
13      He said that there was some possibility of salvaging
14  or not having to have lost all their 50 million of principal
15  that they had put in.
16  Q. Before we move to the Year 2009, other than these
17  conversations that you just described with Mr. Gupta about
18  Voyager, were you speaking with Mr. Gupta about anything else
19  in the period between September 2008 and December 2008?
20  A. Yes, I spoke to him quite a lot in that period.
21      If you recall, Mr. Gupta and I were very involved with
22  the Indian School of Business, and we would speak almost every
23  week about that for literally a period of 10 years, so I did
24  that right in that period.
25      In addition, Mr. Gupta, he introduced me to a new

C64JGUP1                                    Page 1862

1  project in July of 2008 which we began in August of 2008 at a
2  company called Genpact, where Mr. Gupta was on the board, and
3  so we would speak in connection with Genpact as well, as well
4  as other Indian sort of philanthropy opportunities.
5  Q. You said you were introduced by Mr. Gupta to Genpact so
6  we -- you used the word we could do a project. Who is the
7  "we"?
8  A. At the time I was with McKensey, so there is a very large
9  McKensey team based out of India that actually did the project.
10      Genpact is a company that is essentially based in
11  India, and I was the overall person responsible for it because
12  I had done the project for Genpact 10 years earlier when I was
13  in India so I knew the head of Genpact.
14  Q. Moving to 2009, did Mr. Gupta bring up Voyager with you
15  again?
16  A. Yes, sir.
17  Q. Approximately when?
18  A. I don't know the exact date, but it was between late
19  February and April of 2009.
20  Q. Was this in person or on the telephone?
21  A. In person.
22  Q. Where?
23  A. At my apartment in New York.
24  Q. What, if anything, did Mr. Gupta say to you?
25  A. He came with a file of papers and he said that he

C64JGUP1                                    Page 1863

1  discovered something that was quite distressing. He had
2  discovered in the meanwhile that Mr. Rajaratnam had removed
3  from that Voyager fund that they had put $50 million in, he
4  removed some of his own money, some of the money from that fund
5  for himself.
6       Mr. Gupta said that this is just plain wrong and
7  incorrect, it is accounting malpractice, and he said this is
8  even worse than having lost his money, he felt that
9  Mr. Rajaratnam may have gone further and just taken out some
10  money from the fund for himself, and that Mr. Gupta was
11  convinced of the information he had received and wanted to sue
12  Mr. Rajaratnam because he said this is not just dropping the
13  ball or not managing money well, this is like taking money out.
14  That is really bad.
15  Q. What, if anything, did Mr. Gupta ask you to do?
16  A. Mr. Gupta said he had enough evidence now that he could sue
17  Mr. Rajaratnam, but before he did that, he felt that I should
18  tell Mr. Rajaratnam that he had this evidence so that
19  Mr. Rajaratnam might see some sense about or explain to
20  Mr. Gupta as to what he was doing.
21  Q. Did Voyager come up again in your conversations with
22  Mr. Gupta after this conversation occurred between February
23  2009 and April 2009?
24      MR. NAFTALIS: Objection to the leading. I think he
25  should ask him --

C64JGUP1                                    Page 1864

1       THE COURT: I understand. Sustained.
2  BY MR. BRODSKY:
3  Q. Did you speak to Mr. Gupta again after this conversation?
4  A. Yes, I did.
5  Q. Approximately when?
6  A. In the summer of 2009.
7  Q. Was that in person or by telephone?
8  A. In person.
9  Q. What, if anything, did Mr. Gupta say to you in the summer
10  of 2009 in person?
11  A. Mr. Gupta said that Mr. Rajaratnam was being evasive, that
12  Mr. Gupta was asking Mr. Rajaratnam to explain why did that
13  money get taken away, where did it go, what was the reason, and
14  Mr. Rajaratnam was just not answering his questions. So that's
15  what he told me.
16      MR. BRODSKY: One moment, your Honor.
17      (Pause)
18      MR. BRODSKY: No further questions, your Honor.
19      THE COURT: Cross-examination.
20  CROSS EXAMINATION
21  BY MR. NAFTALIS:
22  Q. Good morning, Mr. Kumar.
23  A. Good morning, sir.
24  Q. Mr. Kumar, my name is Gary Naftalis. I am the lawyer for
25  Rajat Gupta. You and I have never met before, have we?

June 6, 2012

| C66JGUP6 | Yanagisawa - cross | Page 2267 |

1 Q. That is a call placed to 212-371-2335. Do you see that?
2 A. Yes, I do.
3 Q. Do you know whose number that is?
4 A. No, I don't.
5     MR. FRANKEL: If we could bring up, please, Government
6 Exhibit 651-B in evidence. If we can highlight that number.
7   BY MR. FRANKEL:
8 Q. Do you see that 371-2335 number there is a number there,
9 Rajaratnam direct line?
10 A. I see that, yes.
11 Q. That is the same telephone number we just saw in the call
12 detail report?
13 A. Yes.
14 Q. That was Mr. Loeb calling that number for .7 minutes at
15 8:15 in the morning on August 7, 2008?
16 A. Yes.
17 Q. If we go down three entries, you see this is again a call
18 from Mr. Loeb's number, correct, at 8:34? I am sorry, do you
19 see that number?
20 A. Yes.
21 Q. That is an outgoing call from Mr. Loeb's number?
22 A. That's correct.
23 Q. Four and a half minutes?
24 A. Yes.
25 Q. At 8:34 in the morning, correct?

| C66JGUP6 | Yanagisawa - cross | Page 2269 |

1 A. Correct.
2 Q. For a total of two and a half minutes, correct?
3 A. Correct.
4 Q. That one is to --
5 A. Yes.
6 Q. -- that is Mr. Gupta's direct office line, as we just saw?
7 A. I believe so.
8 Q. The next one, also an outgoing call this one for 4.7
9 minutes to 719-907-2350. Do you see that?
10 A. Yes, I do.
11 Q. That is Mr. Rajaratnam's cell phone as we just saw a moment
12 ago?
13 A. Yes.
14 Q. That was at 9:12 in the morning for 4.7 minutes, correct?
15 A. Correct.
16 Q. Turn to the page with Bates No. 045470, and this is a call
17 about five up from the bottom, September 23, 2008, at 12:49 in
18 the afternoon. That is a call from Mr. Loeb's number, correct?
19 A. Correct.
20 Q. For 27.7 minutes, correct?
21 A. Correct.
22 Q. That is a call that was made from that number at 12:49 pm?
23 A. Correct.
24 Q. And do you see that call was made to 212-829-4015? Do you
25 see that?

| C66JGUP6 | Yanagisawa - cross | Page 2268 |

1 A. Yes.
2 Q. And that one is to a No. 917-907-2350. Do you see that?
3 A. Yes, I do.
4 Q. Do you recognize that?
5 A. No, I don't.
6     MR. FRANKEL: If we can briefly bring up again
7 Government Exhibit 651-B in evidence, please. If we can
8 highlight the top number.
9   BY MR. FRANKEL:
10 Q. Do you see that entry for 917-907-2350?
11 A. Yes, I do.
12 Q. It says there Rajaratnam's cell phone. Do you see that?
13 A. Yes, I do.
14 Q. That is the same number we just saw in the call detail
15 report, correct?
16 A. Yes, it is.
17     MR. FRANKEL: If we could go, please, to the pages
18 with Bates No. 015464. Ray, if we could please go down to,
19 highlight two calls in a row on August 22, 2008, one at 9:07
20 and one at 9:12.
21   BY MR. FRANKEL:
22 Q. These are both outgoing calls from Mr. Loeb's phone,
23 correct?
24 A. Yes, it is.
25 Q. The one at 9:07 in the morning on August 2, 2008, correct?

| C66JGUP6 | Yanagisawa - cross | Page 2270 |

1 A. Yes, I do.
2 Q. Do you recall that being one of Mr. Smith's numbers?
3 A. I have to go back and look. I don't remember off the top
4 of my head.
5 Q. If we go to the next page, the third entry, that is also a
6 call on September 23rd, 2008, correct?
7 A. Correct.
8 Q. 3:07 in the afternoon, correct?
9 A. Yes.
10 Q. The duration of that call is 3.2 minutes, correct?
11 A. Correct.
12 Q. Also an outgoing call from Mr. Loeb's number?
13 A. Yes.
14 Q. That is to the same number we saw a moment ago,
15 212-829-4015, correct?
16 A. Yes it is.
17 Q. That number is a number associated with Mr. Smith, Adam
18 Smith, right?
19 A. I don't remember.
20     MR. FRANKEL: If we can just briefly bring up
21 Government Exhibit 2303 in evidence and if you could highlight
22 the entry for Mr. Smith.
23   BY MR. FRANKEL:
24 Q. Do you see that entry for Adam Smith?
25 A. Yes, I do.

| C66JGUP6 | Yanagisawa - cross | Page 2271 |
|---|---|---|

1 Q. Do you see that phone number associated with Mr. Smith,
2 829-4015?
3 A. Yes, I do.
4 Q. That is the number we just saw a moment ago on the call
5 detail report?
6 A. Minus the area code, yes.
7 Q. Thank you.
8         MR. FRANKEL: Finally, if we can go to Page 015482,
9 please. If you could highlight, please, Ray, the entry at 8:15
10 in the morning.
11 BY MR. FRANKEL:
12 Q. An outgoing call from Mr. Loeb's number, correct?
13 A. Correct.
14 Q. At 8:15 in the morning on October 23, 2008, correct?
15 A. Correct.
16 Q. For 2.3 minutes, correct?
17 A. Yes.
18 Q. Do you recall that number, 212-371-2335 being Mr.
19 Rajaratnam's direct line, office number?
20 A. His direct line, yes, I remember.
21 Q. Thank you.
22         MR. FRANKEL: If we can go down and highlight the two
23 calls, one at 10:29 and one at 10:48.
24 BY MR. FRANKEL:
25 Q. These are incoming calls, calls coming into Mr. Loeb's

| C66JGUP6 | Yanagisawa - cross | Page 2272 |
|---|---|---|

1 number, correct?
2 A. Correct.
3 Q. Both on October 23rd, 2008, correct?
4 A. Correct.
5 Q. And one at 10:29 in the morning for .2 minutes? Is that
6 right?
7 A. Right.
8 Q. I am sorry?
9 A. Yes, correct.
10 Q. I didn't hear your answer. I apologize. The next one at
11 10:48 is 4.0 minutes, correct?
12 A. Correct.
13 Q. Those are both calls from the number we saw a moment ago
14 associated with Mr. Smith, 212-829-4015, correct?
15 A. Yes.
16         MR. FRANKEL: If you could, Ray, go down two more to
17 the call at 11:02 in the morning.
18 BY MR. FRANKEL:
19 Q. That is another incoming call to Mr. Loeb's number?
20 A. Yes, it is.
21 Q. 3.7 minutes in duration?
22 A. Yes.
23 Q. At 11:02 in the morning on October 23rd, 2008?
24 A. Yes.
25 Q. That is a call from 646-521-2980, correct?

| C66JGUP6 | Yanagisawa - cross | Page 2273 |
|---|---|---|

1 A. 2980, correct.
2 Q. Thank you. I stand corrected, 646-521-2980?
3 A. Correct.
4 Q. Thank you. The very last one, 11:58, just a few down,
5 11:58 am -- I am sorry. The next one.
6         This is a call from Mr. Loeb's line?
7 A. Outbound from Mr. Loeb's line, yes.
8 Q. October 23rd, 2008, at 11:58 am, correct?
9 A. Correct.
10 Q. For 2.2 minutes?
11 A. Correct.
12 Q. Mr. Rajaratnam's direct office line. Is that right?
13 A. Yes.
14         (Off-the-record discussion)?
15         MR. FRANKEL: I am showing you Defense Exhibit 6061
16 for identification.
17 BY MR. FRANKEL:
18 Q. Mr. Yanagisawa, is Defense Exhibit 6061 for identification
19 a Goldman Sachs call detail report?
20 A. Yes, it is.
21 Q. Covering the period December 19, 2006 to January 18, 2010?
22 A. Correct.
23         MR. FRANKEL: Your Honor, we offer it.
24         MR. TARLOWE: No objection.
25         THE COURT: Received.

| C66JGUP6 | Yanagisawa - cross | Page 2274 |
|---|---|---|

1         (Defense Exhibit 6061 received in evidence)
2         THE COURT: How much longer do you have on cross?
3         MR. FRANKEL: Just a few more minutes.
4         THE COURT: Well, by a "few," do you mean less than
5 10?
6         MR. FRANKEL: Yes.
7         THE COURT: All right. Go ahead.
8         MR. FRANKEL: Ray, if you could highlight Defense
9 Exhibit 6061 in evidence, the page ending with Bates No.
10 015550. If you can take a look at that either on the screen,
11 sir, or in hard copy. Ray, if you could highlight the very
12 first entry on that document, where it says tandem switch.
13 BY MR. FRANKEL:
14 Q. Do you see that reference to a tandem switch,
15 Mr. Yanagisawa?
16 A. Yes, I do.
17 Q. What is a tandem switch?
18 A. A tandem switch is essentially when a call comes into the
19 firm or elsewhere and it actually gets switched over to another
20 line, so it is a connecting between two lines.
21         MR. FRANKEL: So if you could highlight, if you would,
22 Ray, also the entry under tandem switch, that first entry.
23 BY MR. FRANKEL:
24 Q. That is a reference, is it not, to an outgoing call from
25 Mr. Loeb's line?



C67JGUP1                                    Page 2330

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4           v.                    11 Cr. 907 JSR

 5  RAJAT K. GUPTA,
    a/k/a Sealed Defendant 1,
 6
               Defendant.
 7
    ------------------------------x
 8
                            June 7, 2012
 9                          9:10 a.m.

10  Before:

11              HON. JED S. RAKOFF,

12                          District Judge
13                           and a jury

14              APPEARANCES

    PREET BHARARA,
15      United States Attorney for the
        Southern District of New York
16  REED MICHAEL BRODSKY,
    RICHARD CRAIG TARLOWE,
17      Assistant United States Attorneys

18  KRAMER LEVIN NAFTALIS & FRANKEL, LLP,
        Attorneys for defendant Gupta
19  BY:  GARY P. NAFTALIS, Esq.
         DAVID S. FRANKEL, Esq.
20       ROBIN MARIE WILCOX, Esq.
                Of counsel
21
22  Also Present:
        ANDREA ESTOK, Special Agent FBI
23      SEAN FERNANDEZ-LEDON, Paralegal Specialist
24      KAITLIN PAULSON, Paralegal Specialist

25
```

C67JGUP1                                    Page 2331

1        (Trial resumes)

2        (In open court; jury not present)

3        MR. BRODSKY: Before the jury is brought in, your

4   Honor, I think the defense plans to call their first witness,

5   the character witness.

6        THE COURT: Yes.

7        MR. BRODSKY: That is where we ended the discussion

8   last night because Mr. Naftalis hadn't met with him. We did

9   have a sense of the specific proffer.

10       THE COURT: So what is he going to say, Mr. Naftalis?

11       MR. NAFTALIS: He is going to say -- I am only

12  offering it as opinion, not reputation evidence.

13       THE COURT: All right.

14       MR. NAFTALIS: His opinion is, he will give his

15  opinion as to his honesty and integrity.

16       THE COURT: Okay.

17       MR. BRODSKY: Your Honor, integrity, does that include

18  that he obeys the law because in our view, having somebody

19  testify in their opinion somebody obeys the law would not be an

20  appropriate character witness.

21       THE COURT: Integrity is one of those words that

22  everyone uses but no one knows what it means. It comes, of

23  course, from the Latin for whole, W H O L E, not H O L E. Let

24  me see what the dictionary says, its everyday meaning.

25       "Integrity:"

C67JGUP1                                    Page 2332

1        1. State or quality of being complete, undivided or

2   unbroken.

3        2. Unimpaired state, soundness, purity.

4        3. Moral soundness, honesty, uprightness.

5        So it sounds like, to the extent it is relevant at

6   all, it is a synonym for honesty, so we should apply it to

7   honesty.

8        MR. NAFTALIS: I must say I have been doing this a

9   long time, I have never had a prosecutor ever raise an issue

10  as to character witnesses before this case, I really mean that.

11       The issue, the standard question, do you have an

12  opinion as to his character for honesty and integrity, and it

13  has been asked -- your Honor has been more cases than I since you

14  try cases day in and out, and I only try once in a while,

15  but --

16       THE COURT: What you're saying, Mr. Naftalis, is that

17  because an objection has never been previously raised, that's a

18  reason for rejecting the objection, which I don't agree with.

19       MR. NAFTALIS: I am not saying that. It sounded like

20  that. I am not saying it. I guess I regard the objection as

21  reasonably frivolous, that is what I am saying.

22       THE COURT: I really have two minds of this because I

23  can see that it is common to use those two terms, honesty and

24  integrity, with a character witness, but the word "integrity"

25  really is an ambiguous word.

C67JGUP1                                    Page 2333

1        The definition given by the dictionary, for example,

2   no one, I think, uses the word very often at least in the first

3   sense given in Webster's which I just read, wholeness or

4   completeness, except in the sense of the person is, if you

5   will, a total mensch.

6        So it does convey, I think, an uncertainty of meaning

7   that is not particularly useful to the jury. What is it you

8   think they will understand by the word "integrity" that is

9   relevant to any issue in this case that was not conveyed by the

10  word honesty?

11       (Pause)

12       THE COURT: The record will reflect a veritable pause

13  while counsel consults his computer.

14       MR. NAFTALIS: It is talking back to me. It seems

15  like a tempest in a teapot. I think Definition 3 that you

16  read, moral soundness, honesty, uprightness?

17       THE COURT: I think that is one of the common

18  meanings, but moral uprightness, aside from the fact it is

19  itself somewhat an ambiguous term, conveys some aspects that

20  are not pertinent to this case, and so I think while I totally

21  agree with it is an unusual objection, I think it is a

22  valid one, and I will sustain the objection. So we will limit

23  the opinion to honesty.

24       MR. BRODSKY: The only other thing that concerns the

25  government, and I think we touched on it last night, but Mr.

| C67JGUP1 | Page 2334 |
|---|---|

1 Naftalis again didn't have the information, was to what extent
2 will this witness be allowed to talk about the eradication of
3 malaria around the world and the efforts in which he is
4 involved with public health. We are concerned if there is any
5 detail about, you know, Mr. Gupta's involvement in those
6 efforts, that is substantially prejudicial and not really
7 relevant.
8      THE COURT: It would be irrelevant to the witness's
9 determination of honesty. The person who might be totally
10 dishonest in innumerable ways might still be interested in
11 trying to eradicate malaria. So, in forming the opinion as to
12 honesty, that kind of thing would have no bearing. It would be
13 surely prejudicial and irrelevant. We have been through this
14 before. I am sure counsel will confine the questions
15 appropriately, but let's bring in the jury and let's get the
16 witness on the stand.
17      (Jury present)
18      THE COURT: Please be seated.
19      Good morning, ladies and gentlemen. After the
20 government's case concludes, the defense normally gets to put
21 on its case if it wants to. I want to remind you that the
22 burden of proof is always on the government, and the defense is
23 not required to put on any case whatsoever, but in this case
24 the defense has chosen to put on some witnesses.
25      One of those witnesses, because of other scheduling

| C67JGUP1 | Page 2335 |
|---|---|

1 problems he has, we're going to take this morning before we go
2 back to Mr. Barnacle and Mr. Blankfein. It is a short witness
3 and it won't substantially disrupt our schedule, but we wanted
4 to accommodate this witness as best we could.
5      The first witness you're going to hear this morning is
6 a defense witness, and then we'll go back to the government's
7 case. So, Mr. Naftalis, please call your witness.
8      MR. NAFTALIS: Yes, we call, Mr. Gupta would call
9 Barry Bloom as a witness.
10 BARRY BLOOM,
11      called as a witness by the Defendant,
12      having been duly sworn, testified as follows:
13 DIRECT EXAMINATION
14 BY MR. NAFTALIS:
15 Q. Good morning, Mr. Bloom.
16 A. Good morning.
17 Q. Mr. Bloom, how old are you, sir?
18 A. 75.
19 Q. Where do you live?
20 A. Cambridge, Massachusetts.
21 Q. How long have you lived there?
22 A. About 13 years.
23 Q. Before that, where did you live?
24 A. I lived in Hastings on Hudson in New York.
25 Q. Sir, where did you grow up, sir?

| C67JGUP1 | Bloom - direct | Page 2336 |
|---|---|---|

1 A. I grew up in Philadelphia.
2 Q. Did you attend college?
3 A. I did. I went to Amherst College in Massachusetts.
4 Q. Did you receive a degree, sir?
5 A. I did.
6 Q. What degree was that?
7 A. A Bachelor degree and then I received an honorary degree
8 sometime later.
9 Q. Do you have any advance degrees?
10 A. I do. I have a Ph.D from the Rockefeller University in New
11 York City.
12 Q. After getting your degree -- and what was your Ph.D in?
13 A. Biomedical sciences.
14 Q. Did you then join work at the Albert Einstein College of
15 Medicine?
16 A. First I had a fellowship in England with the professor who
17 won the Nobel Prize for structure of antibodies, and from that
18 I was invited to join the faculty of Albert Einstein College of
19 Medicine in the Bronx.
20 Q. How many years did you work there?
21 A. About 43 years.
22 Q. Did you hold any position at Albert Einstein?
23 A. I worked my way up from an instructor to a professor and
24 chair of a department and then I was awarded a Howard Hughes
25 Senior Investigatorship at Albert Einstein.

| C67JGUP1 | Bloom - direct | Page 2337 |
|---|---|---|

1 Q. Did there come a time you left Albert Albert Einstein to
2 work at another educational institution?
3 A. Yes, I was brought to Harvard in 1999 to be dean of the
4 faculty of the School of Public Health.
5 Q. Are you still on the faculty at the Harvard School of
6 Public Health?
7 A. I am, indeed. I am called the Harvard University
8 Distinguished Service Professor.
9 Q. Apart from teaching, do you have any outside activities?
10 A. I have for many years worked in various capacities for the
11 World Health Organization. I've served on a variety of
12 national advisory committees to the National Institutes of
13 Health, to the Centers for Disease Control, to the Global Fund
14 for AIDS, TB and malaria.
15 Q. Sir, do you know a man named Rajat Gupta?
16 A. I do.
17 Q. How long ago did you meet Rajat Gupta?
18 A. Perhaps I'll preface that, if I may, by saying what my
19 interest was in meeting Rajat Gupta.
20      THE COURT: No, no. That was not the question.
21      THE WITNESS: Okay.
22      THE COURT: The question was how did you meet?
23      THE WITNESS: I wrote a blind letter. I didn't know
24 him, had never met him, but knew of his work in India. I asked
25 if I could meet with him, knew he was interested in building a

| C67JGUP1 | Bloom - direct | Page 2338 |
|---|---|---|

1  business school.
2      I remember indicating to him that India did many
3  things well, public health was not one of them, and I asked if
4  he would think about helping to create at that time a School of
5  Public Health.
6  BY MR. NAFTALIS:
7  Q.  Did there come a time when an organization or school was
8  set up in India that you were involved in with him?
9  A.  Very much so.  The official opening was in 2005, so between
10  September 2001 when I first met with him, by Indian record
11  time, we had not only a single School of Public Health, but a
12  foundation, the intent of which was to build between 5 and 10
13  schools of public health across the country.
14      MR. TARLOWE: Objection.
15      THE COURT: Well, Dr. Bloom, I think you're here to
16  testify about one particular aspect of your interactions with
17  Mr. Gupta, and so we need to fairly narrow and confine your
18  testimony in that regard.  I'll let the answer stand, but let's
19  put a question that is more directly related to the issue.
20  BY MR. NAFTALIS:
21  Q.  Mighty just ask one question, what the name of the school
22  was that they --
23      THE COURT: Yes, I will allow that.
24      MR. NAFTALIS: Can I ask it as a leading question?
25  That would be --

| C67JGUP1 | Bloom - direct | Page 2339 |
|---|---|---|

1      THE COURT: Even that.
2  BY MR. NAFTALIS:
3  Q.  Was the project you worked on with Mr. Gupta that you set
4  up, was that called the Public Health Foundation of India?
5  A.  That is correct.
6  Q.  Without going into details, were you involved in other
7  public health projects with Mr. Gupta over the years?
8      THE COURT: Just answer that yes or no.
9  A.  Yes.
10  BY MR. NAFTALIS:
11  Q.  One final question on that.
12      Did there come a time when you asked Mr. Gupta to
13  serve on the Dean's Council of the Harvard School of Public
14  Health?
15  A.  I did.
16  Q.  Was that a position he still holds to this day?
17  A.  That is, in fact, the case, he is still a member of the
18  Dean's Council.
19  Q.  Sir, over the years you've had opportunities to observe and
20  interact with Mr. Gupta.  Is that correct?
21  A.  That is correct.
22  Q.  On a regular basis over the years that you've dealt with
23  him in various, various of these endeavors, correct?
24  A.  That is correct.
25  Q.  As a result, you had an opportunity to form an opinion as

| C67JGUP1 | Bloom - direct | Page 2340 |
|---|---|---|

1  to his honesty?
2  A.  I think so.  There were, if I may --
3      THE COURT: Well, that question I think can be
4  answered just yes or no.  Do you have an opinion as to his
5  honesty?
6      THE WITNESS: I do, and the answer is --
7  BY MR. NAFTALIS:
8  Q.  Can you tell the people and the jury what is your opinion
9  as to Mr. Gupta's honesty?
10  A.  I have found him to be absolutely straightforward and
11  honest even when being critical of things we did.
12  Q.  That opinion remains to this day?
13  A.  It does.
14      MR. NAFTALIS: I have no further questions.
15      THE COURT: All right.  Cross-examination.
16  CROSS EXAMINATION
17  BY MR. TARLOWE:
18  Q.  Good morning, Mr. Bloom.
19  A.  Good morning.
20  Q.  You have no knowledge as to Galleon's trading in Goldman
21  Sachs stock on September 23, 2008.  Is that correct?
22  A.  That is correct.
23  Q.  You have no knowledge as to Galleon's trading in Goldman
24  Sachs stock on October 24th, 2008.  Is that correct?
25  A.  That is correct.

| C67JGUP1 | Bloom - cross | Page 2341 |
|---|---|---|

1  Q.  Indeed, you have no knowledge as to Galleon's trading at
2  all, correct?
3  A.  Correct.
4  Q.  You have no knowledge as to conversations between Mr. Gupta
5  and the board of directors of Goldman Sachs?
6  A.  Correct.
7  Q.  You don't have any knowledge as to conversations between
8  Mr. Gupta and the board of directors of Proctor & Gamble?
9  A.  Correct.
10  Q.  You don't have any knowledge of conversations between
11  Mr. Gupta and Raj Rajaratnam, correct?
12  A.  Correct.
13  Q.  You have never been to the Galleon office, correct?
14  A.  Correct.
15  Q.  Are you aware, sir, that Mr. Rajaratnam told Mr. Gupta in
16  July 2008 --
17      MR. NAFTALIS: Your Honor, may I approach?
18      THE COURT: Yes.
19      (Continued on next page)
20
21
22
23
24
25

C68dgup6                                          Page 2715

1        (In open court)
2        THE COURT: I am going to continue informing the jury
3    of our schedule.
4        Ladies and gentlemen, the government has concluded its
5    case, and now we move to the defense case. As I told you
6    previously, the defense has no obligation to produce any
7    evidence, but they have the right to produce it, if they choose
8    to. They have chosen to produce certain evidence, and we are
9    going to begin that in about two or three minutes and go to
10   4 o'clock today so that we can get started.
11       Counsel have estimated -- and I think this sounds to
12   me like a pretty firm estimate -- that the defense case will be
13   concluded by Tuesday of next week. We will then have closing
14   arguments and my instructions of the law on Wednesday. So the
15   case will be yours by close of business Wednesday and you can
16   begin deliberating. So I wanted to give you a heads up as to
17   the schedule.
18       It is a little closer to the date that I originally
19   told you but still within that schedule. Of course, how long
20   you deliberate is totally up to you. But that is the schedule
21   we are now working with.
22       So, as soon as the defense is ready, we will take the
23   first defense witness.
24       MR. NAFTALIS: Can we just -- can I take five minutes
25   to just find the witness?

C68dgup6                                          Page 2716

1        THE COURT: Yes.
2        MR. NAFTALIS: Do you want to excuse the jury?
3        THE COURT: No, because they are going to have to come
4    right back in.
5        MR. NAFTALIS: It makes me move faster.
6        THE COURT: Take as much of the five minutes as you
7    would like.
8        (Pause)
9        THE COURT: All right.
10       THE CLERK: Please remain standing.
11   RICHARD FEACHEM,
12       called as a witness by the defendant,
13       having been duly sworn, testified as follows:
14       THE CLERK: Please be seated.
15       State your name and spell it slowly for the record.
16       THE WITNESS: My name is Richard Feachem, and that is
17   spelled F-e-a-c-h-e-m.
18       MR. NAFTALIS: May I inquire, your Honor?
19       THE COURT: Yes.
20   DIRECT EXAMINATION
21   BY MR. NAFTALIS:
22   Q. Good afternoon, Mr. Feachem.
23   A. Good afternoon.
24   Q. How old are you, sir?
25   A. 65.

C68dgup6              Feachem - direct            Page 2717

1    Q. And where do you live?
2    A. I live in Alameda, California.
3    Q. And how long have you lived there, sir?
4    A. For about 12 years.
5    Q. And where were you born and where did you grow up, sir?
6    A. I was born in Manchester, United Kingdom, and I grew up in
7    the United Kingdom.
8    Q. And would you tell the people in the jury a little bit
9    about your educational background, sir?
10   A. Well, my primary and secondary education were in the United
11   Kingdom. And I then did a Bachelor of Science Degree in Civil
12   Engineering at The University of Birmingham, followed by a
13   Ph.D. in Environmental Health at the University of New South
14   Wales in Sidney, Australia, and later in my career I did a
15   higher doctorate in medicine at the University of London.
16   Q. And do you have any other degrees, sir?
17   A. I have an Honorary Doctorate in Engineering also.
18   Q. And tell us a little bit about -- what is your current
19   occupation?
20   A. My current occupation is I'm the Professor of Global Health
21   at the University of California, San Francisco and the
22   University of California, Berkeley, and I run something called
23   the Global Health Group, which works on important health issues
24   around the world.
25   Q. And would you tell us a little bit about your career --

C68dgup6              Feachem - direct            Page 2718

1        MR. TARLOWE: Objection.
2        THE COURT: No. I put the emphasis on a "little" bit.
3    You may answer.
4        THE WITNESS: Thank you.
5    A. My career started as a volunteer with the British
6    equivalent of the Peace Corps when I went to a remote place in
7    the Sullivan Islands and constructed an airfield. And from
8    that time my career has been spent entirely in developments
9    with a particular focus on health and a particular focus on HIV
10   AIDS worldwide and malaria worldwide.
11   Q. And have you been associated with any particular entities
12   in connection with your work?
13   A. Yes. From 1989 to 1995, I was the dean Of the London
14   School of Hygiene and Tropical Medicine, which is the world's
15   premier school of public health. Then from '95 to '99, I was
16   the Director for Health Nutrition and Population at the World
17   Bank, in Washington, D.C., responsible for the many billions of
18   dollars that the World Bank makes available for work in health
19   nutrition and population.
20       Then, most recently, I was the Founding Executive
21   Director -- that's like the Chief Executive Officer -- of
22   Global Fund to fight AIDS, TB and malaria, which is a new
23   organization established in 2002, which has saved many millions
24   of lives worldwide --
25       MR. TARLOWE: Objection. I think he is going beyond a

| C68dgup6 | Feachem - direct | Page 2719 |
|---|---|---|

1   "little."
2       THE COURT: Well, all right. We'll leave it as it is.
3 Q. Did you hold any position at the United Nations, sir?
4 A. I was the Undersecretary General of the United Nations
5   between 2002 and 2007.
6 Q. Have you received any awards in connection with your work?
7       MR. TARLOWE: Objection.
8       MR. NAFTALIS: I'm just about done. This is the
9   last --
10       THE COURT: I mean, I think the -- I think we already
11   know he has been a very busy gentleman. So let's proceed.
12 BY MR. NAFTALIS:
13 Q. Do you know Rajat Gupta?
14 A. I do.
15 Q. For how long have you known Mr. Gupta?
16 A. Since 2002.
17 Q. How did you come to know Mr. Gupta?
18 A. Well, when I was appointed as the First Executive Director
19 of the Global Fund to fight AIDS, TB and Malaria, Rajat Gupta
20 was a member of the Board of that organization, and in that
21 capacity we worked extremely closely together, until the time
22 that I left the Global Fund in 2007.
23 Q. And as a result of working closely together, did you have
24   frequent contact with him?
25 A. I did, of two forms. As a board member, Rajat Gupta would

| C68dgup6 | Feachem - direct | Page 2720 |
|---|---|---|

1   spend many weeks --
2       MR. TARLOWE: Objection.
3 A. -- during the year --
4       MR. TARLOWE: Objection.
5       THE COURT: Wait a minute.
6       MR. NAFTALIS: You have to listen to the Judge.
7       THE COURT: Without getting into detail, was your
8   contact with him was in his capacity as a member of the Board
9   on Board business; yes?
10       THE WITNESS: In part.
11       THE COURT: And what was the other part?
12       THE WITNESS: The other part was that Rajat Gupta
13 acted as an advisor and wise counsel to me and the leadership
14 team at the Global Fund particularly during the early days,
15   when we were creating the institution from scratch.
16       THE COURT: OK.
17 BY MR. NAFTALIS:
18 Q. Now, as a result of your contacts with Mr. Gupta, did you
19   have an opportunity to form an opinion regarding his character
20   for honesty?
21 A. I did.
22 Q. And could you tell the people of the jury what your opinion
23   of Mr. Gupta's character for honesty is?
24 A. I found Rajat Gupta to be a man of exceptional honesty and
25   truthfulness.

| C68dgup6 | Feachem - direct | Page 2721 |
|---|---|---|

1       MR. NAFTALIS: I have no further questions.
2       THE COURT: All right. Cross-examination.
3 CROSS-EXAMINATION
4 BY MR. TARLOWE:
5 Q. Good afternoon, sir.
6 A. Good afternoon.
7 Q. Are you aware generally of the allegations against
8   Mr. Gupta in this case?
9 A. Very generally.
10 Q. And you don't have any personal knowledge about any of
11   those allegations?
12 A. I do not.
13 Q. You don't have any personal knowledge about Mr. Gupta's
14   dealings with Mr. Rajaratnam?
15 A. No.
16 Q. Or his dealings with Galleon?
17 A. Absolutely not.
18       MR. TARLOWE: No further questions.
19       THE COURT: OK. Anything else?
20       MR. NAFTALIS: No, Judge.
21       THE COURT: Thank you very much. You may step down.
22       THE WITNESS: Thank you.
23       (Witness excused)
24       THE COURT: Please call your next witness.
25       MR. NAFTALIS: Your Honor, we have the videotaped

| C68dgup6 | | Page 2722 |
|---|---|---|

1   testimony of Ajit Jain.
2       THE COURT: Yes. We will take that now. Wherever we
3   are at 4 o'clock, we will interrupt.
4       MR. BRODSKY: Your Honor, my question to your Honor is
5   on the videotape there were some documents that we showed --
6       MR. NAFTALIS: We need to mark them.
7       MR. BRODSKY: What we have for our documents that we
8   showed Mr. Jain are copies for the jury. I don't know if
9   we are able to put the video on the screen at the same time the
10   document would be on the screen.
11       (Counsel conferred)
12       MR. BRODSKY: We introduced, I think a few.
13       (Counsel conferred)
14       MR. BRODSKY: We have copies in case that doesn't
15   work, your Honor.
16       THE COURT: All right. Gentlemen, we need to start
17   the video clips.
18       MR. NAFTALIS: Yes, sir.
19       (Audio of video began playing)
20       THE COURT: Ladies and gentlemen, I should explain
21   that because Mr. Jain was not available, for legitimate
22   reasons, to testify here in person, his deposition was taken --
23   you know what a deposition is -- but because it was going to be
24   played here, it was a videotaped deposition, so it should be on
25   the screen.

June 8, 2012

---

C68dgup8                                                   Page 2751

1      MR. BRODSKY: My concern is just production and how
2  long it will take them from your rulings to produce material --
3      MR. NAFTALIS: We need the rulings.
4      THE COURT: I don't think you could expect them
5  reasonably to have it to you until Sunday night or Monday, very
6  early Monday morning.  Sunday night would be the preferable,
7  but there might be a few items that would take until Monday
8  morning.
9      So now that leads me to the next question, which is
10  the order of witnesses.  So now that we know that Mr. Gupta is
11  very likely taking the stand, is he last, or where are you
12  placing him in the order?
13      MR. NAFTALIS: He would be at the end.
14      THE COURT: Yes.  OK.  So I think, therefore going
15  back to what we were just discussing, while it would be
16  preferable if the government gets the stuff responsive to the
17  subpoena by Sunday night, I think Monday morning at the start
18  of business would be sufficient.
19      All right.  Now, Ms. Wilcox, there were some documents
20  that you would challenge.  Yes.
21      MS. WILCOX: No.  That we wanted to put --
22      THE COURT: That you wanted to put in, right.
23      MR. BRODSKY: I thought you were going to say, your
24  Honor, the order of witnesses.  If it is in the order as they
25  expect right now, Richard Schutte, Ashok Alexander, Aaron

---

C68dgup8                                                   Page 2752

1  Deuser, Savita Mahajan, John Marvin, Pramath Sinha, and then
2  the list continues.  We would respectfully ask your Honor to --
3  we would object to calling ten character witnesses.  You know,
4  there is a limit to the relevance of having ten people come in
5  and say I've known Mr. Gupta for awhile in a totally
6  non-business related --
7      THE COURT: All right.  So let me hear from the
8  defense on that.
9      MR. NAFTALIS: We were dropping some.  Actually,
10  again, I don't know right now how many are left because --
11      THE COURT: I thought about this issue.  Let me throw
12  out, and if anyone wants to disagree, I'll hear them:  I think,
13  although this is not embodied in any jurisprudence that I'm
14  aware of, I think the custom in this courthouse, particularly
15  back in the days when character witnesses were much more common
16  than they are today, was three to six.  You need enough so that
17  from the defense standpoint it doesn't look like just some odd
18  person who has a good feeling towards the defendant, but from
19  the government's standpoint, there can't be so many that it
20  would be cumulative and a waste of time, that it overwhelms
21  what surely has to always be the main focus, which is the facts
22  of these particular transactions and events.
23      So I'm willing to go as high as five, but I doubt I'm
24  I would go any higher.  If the government or the defense wants
25  to argue about that, I'll hear you now.

---

C68dgup8                                                   Page 2753

1      MR. NAFTALIS: Yes.  I would think that we should be
2  entitled to have more than five character witnesses, your
3  Honor.  I think it is an important part of our defense.  And
4  this man has been involved in a number of -- I mean, he is a
5  person of broad character in a number of places, and I think
6  the jury is entitled -- "entitled," there is no entitlement.  I
7  think it would be fair for us to be able to present this kind
8  of a defense.
9      Your Honor may be better advised of the numbers, but I
10  have tried cases, both in this courthouse and in the Eastern
11  District, where I have called ten character witnesses.  I can
12  see the wind blowing so I'm not asking for ten, but I think --
13  I would think we should be allowed to call seven or eight
14  character witnesses.
15      THE COURT: I understand your point.
16      Let me hear from the government.
17      MR. BRODSKY: The witnesses so far have just given
18  their personal opinion, not reputation.  And --
19      THE COURT: Moreover, they've dealt with Mr. Gupta in
20  a context very different from the context of this case.  The
21  whole character witness thing -- and no one on either side has
22  given me any case law but I'm not surprised.  It's much more
23  functionally of history than of logic.  Logically, character
24  witnesses should not be permitted at all because they rest on
25  the rather dubious assertion that because a person is

---

C68dgup8                                                   Page 2754

1  trustworthy in one context or one situation, he or she is
2  trustworthy in the context of the case.  And common experience,
3  and the lessons of history, suggest that there is very little
4  basis for that assumption.  And I don't want to burden the
5  record with giving the thousands of examples that one could
6  give.
7      Having said that, the law is the law.  And because
8  character witnesses go back in time to the very earliest days
9  of jury trials, even when the jury was itself an investigative
10  inquiry, this is one of the things they investigated.  It's
11  been accepted that this is something the jury should be
12  permitted to hear and evaluate.
13      But I will leave it at this.  Since, as I say, my
14  experience is that in this courthouse it's usually three to
15  six, I will allow the defense to go up to six.
16      If either side wants to present me with a case that
17  says you can't limit it in that way or, conversely, you should
18  limit it more, I will reconsider that on Monday if you get me
19  the case sometime over the weekend.
20      By the way, all communications, feel free to e-mail
21  them to Mr. Shahabian, who intends to spend his entire weekend
22  looking at his computer in case anything comes his way.  So --
23      MR. NAFTALIS: He has been very -- you know, this
24  should be on the record.  He has been very wonderful for all
25  the lawyers.  I'm sure that Mr. Brodsky would agree, for all of

---

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 11, 2012

---

C6BJGUP1                                               Page 2773

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  UNITED STATES OF AMERICA,
 4            v.                    11 Cr. 907 JSR
 5  RAJAT K. GUPTA,
    a/k/a Sealed Defendant 1,
 6            Defendant.
 7  ------------------------------x
 8                          June 11, 2012
 9                          9:25 a.m.
10  Before:
11              HON. JED S. RAKOFF,
12                          District Judge
13                          and a jury
14              APPEARANCES
    PREET BHARARA,
15       United States Attorney for the
         Southern District of New York
16  REED MICHAEL BRODSKY,
    RICHARD CRAIG TARLOWE,
17       Assistant United States Attorneys
18  KRAMER LEVIN NAFTALIS & FRANKEL, LLP,
         Attorneys for defendant Gupta
19  BY:  GARY P. NAFTALIS, Esq.
         DAVID S. FRANKEL, Esq.
20       ROBIN MARIE WILCOX, Esq.
         Of counsel
21
22  Also Present:
         ANDREA ESTOK, Special Agent FBI
23       SEAN FERNANDEZ-LEDON, Paralegal Specialist
         KAITLIN PAULSON, Paralegal Specialist
24  RAYMOND McLEOD, Managing Director Doar Lit. Consulting
25
```

---

C6BJGUP1                                               Page 2774

1         (Trial resumes)
2         (In open court; jury not present)
3         THE COURT: Who is the first witness after we finish
4  the Jain deposition?
5         MR. FRANKEL: Your Honor, it is one of --
6         THE COURT: No. Who is it? I am tired of this "one
7  of."
8         MR. FRANKEL: May I get Mr. Naftalis?
9         THE COURT: Let's bring in the jury and let's start
10  the Jain deposition.
11         MR. NAFTALIS: Good morning, your Honor.
12         THE COURT: Good morning. Who is your next witness?
13         MR. FRANKEL: Ashok Alexander.
14         THE COURT: He is a character witness?
15         MR. NAFTALIS: Character, your Honor.
16         THE COURT: And after that?
17         MR. NAFTALIS: Depending whether someone who is on his
18  way down gets here in time, it will be Anil Sood, who is a
19  character witness. If not, it will be Richard Schutte, a
20  substantive witness.
21         (Jury present)
22         THE COURT: Please be seated.
23         Good morning, ladies and gentlemen. I hope you had a
24  good weekend. For those of you who are Yankees fans,
25  congratulations. For those of you who are Mets fans, you have

---

C6BJGUP1                                               Page 2775

1  my sincere condolences. For those of you who could care less,
2  that makes sense, too.
3         We are ready to continue. You may recall we were
4  seeing the videotaped testimony of Mr. Jain, so we will
5  continue.
6         (Videotape of Mr. Jain resumes)
7         THE COURT: All right. So please call your next
8  witness.
9         MR. NAFTALIS: Mr. Gupta calls Ashok Alexander,
10  please.
11  ASHOK ALEXANDER,
12     called as a witness by the Defendant,
13     having been duly sworn, testified as follows:
14  DIRECT EXAMINATION
15  BY MR. NAFTALIS:
16  Q. Mr. Alexander, if you can speak into the mike, I think it
17     would help everybody.
18         Mr. Alexander, how old are you, sir?
19  A. I'm 58.
20  Q. Where do you live, sir?
21  A. I live in New Delhi, India.
22  Q. How long have you lived in New Delhi, India?
23  A. I have lived in New Delhi most of my life. I grew up for a
24     little time in New York and worked here as well.
25  Q. Have you traveled here to New York from New Delhi for the

---

C6BJGUP1                    Alexander - direct          Page 2776

1     purpose of testifying at this trial?
2  A. That's right.
3  Q. Where did you grow up, sir?
4  A. I grew up in New Delhi, a few years in New York.
5  Q. Where were you educated, sir?
6  A. I was educated, I did my masters in economics from the
7     Delhi School of Economics and then I did my MBA from the Indian
8     Institute of Management.
9  Q. After you getting your MBA, where were you employed, sir?
10  A. Well, my career had two parts: I worked with Mckensey &
11     Company for most of my career in management consulting 17 years
12     there, I moved to Bill and Melinda Gates Foundation in 2003 and
13     I am still with them.
14  Q. At Mckensey & Company, you say you worked there from what
15     year did you work at McKensey?
16  A. I worked at McKensey from 1986 to 2003.
17  Q. You say in 2003 you left McKensey?
18  A. That's right.
19  Q. You went to work where after that?
20  A. I went to work with the Bill and Melinda Gates Foundation.
21     That foundation made me an offer to start up a new practice in
22     India and to create an HIV prevention program which we named
23     Mahavda Gita, so I left McKensey at that time.
24  Q. Are you currently employed by the Bill and Melinda Gates
25     Foundation?

---

C6BJGUP1          Alexander - direct          Page 2777

1  A.  That's right, sir.
2  Q.  What is your position?
3  A.  I am the director, the country office director of the Gates
4   Foundation.
5  Q.  You say the country director?
6  A.  India country office.
7  Q.  Do you hold any other board positions?
8  A.  Yes, sir, I served on the board of the America India
9   Foundation in India and the public health foundation of India.
10 Q.  Do you know Rajat Gupta?
11 A.  Yes, I know Rajat for the last 26 years.
12 Q.  How did you come to meet Rajat Gupta?
13 A.  Well, I met Rajat in 1986 for the first time when I started
14  work with McKensey and over the course of time since then my
15  working relationship with him has both broadened and deepend.
16 Q.  After you left McKensey in 2003, you said?
17 A.  That's right.
18 Q.  And went to the Gates Foundation, did you continue to have
19  contact with Mr. Gupta?
20 A.  Yes, I worked with Rajat Gupta in many different contexts.
21  The first, of course, was --
22        MR. BRODSKY: Objection, your Honor.
23 A.  -- with the Gates Foundation itself and with program -- we
24  actually asked him to chair the board.
25        MR. BRODSKY: Objection, your Honor.

---

C6BJGUP1          Alexander - direct          Page 2778

1        THE COURT: Sustained.
2  BY MR. NAFTALIS:
3  Q.  Apart from working with him with the Gates Foundation, have
4   you worked, you say, and did you have regular interactions with
5   him in connection with your work at the Gates Foundation?
6  A.  I have regular interactions with him in that connection and
7   other connections.
8  Q.  In what other connections did you have interactions with
9   him?
10 A.  I had regular interactions with him through my career in
11  McKensey and in the context of the America India Foundation as
12  well as with the Public Health Foundation of India.
13 Q.  Do you consider Mr. Gupta to be a friend of yours?
14 A.  I consider him to be a friend, but I also a mentor and
15  occasional coach.
16 Q.  Over the years have you formed an opinion as to his
17  character for honesty?
18 A.  Yes, I definitely have.
19 Q.  Could you tell the people of the jury what is your opinion
20  as to Mr. Gupta's character for honesty?
21 A.  I think through the past 25 years and more I found Rajat to
22  be a person very direct, very forthright in whatever he did,
23  very transparent.  I would say he was a person to me of the
24  highest level of honesty.  In fact, I hold him up as a role
25  model.

---

C6BJGUP1          Alexander - direct          Page 2779

1        MR. NAFTALIS: I have no further questions, your
2  Honor.
3        THE COURT: Cross-examination.
4  CROSS EXAMINATION
5  BY MR. BRODSKY:
6  Q.  Mr. Alexander, you have no personal knowledge of Mr.
7   Gupta's relationship with Galleon?
8  A.  No, sir.
9  Q.  You have no personal knowledge of of Mr. Gupta's business
10  ventures with Mr. Rajaratnam?
11 A.  No, sir.
12 Q.  You have no personal knowledge of Mr. Gupta's conversations
13  with Mr. Rajaratnam?
14 A.  No.
15 Q.  You have no personal knowledge of Mr. Rajat's trading at
16  Goldman Sachs?
17 A.  No.
18 Q.  You have no personal of Mr. Rajaratnam's trading programs?
19 A.  No.
20 Q.  You have no personal knowledge of anything about Galleon,
21  correct?
22 A.  No.
23        MR. BRODSKY: No further questions.
24        THE COURT: Anything else?
25        MR. NAFTALIS: No, your Honor.

---

C6BJGUP1          Alexander- cross          Page 2780

1        THE COURT: Thank you very much.  You may step down.
2        (Witness excused)
3        THE COURT: Call your next witness.
4        MR. NAFTALIS: May I check if that other witness is
5  here, to see if he is here.
6        THE COURT: All right.
7        (Pause)
8        MR. NAFTALIS: We would call Anil Sood to the stand,
9  your Honor.
10  ANIL SOOD,
11   called as a witness by the Defendant,
12   having been duly sworn, testified as follows:
13 DIRECT EXAMINATION
14 BY MR. NAFTALIS:
15 Q.  Mr. Sood, how old are you, sir?
16 A.  I'm 62.
17 Q.  Where do you live, sir?
18 A.  I live in the Virginia suburbs of Washington, D.C.
19 Q.  How long have you worked there lived there?
20 A.  I have lived there since 1975.
21 Q.  Sir, where were you born?
22 A.  I was born in New Delhi, India.
23 Q.  Did you grow up in India?
24 A.  I grew up in India.  I completed my high school and my
25  undergraduate degree in engineering in India.

| C6bQgup2 | Schutte - Direct | Page 2825 |
|---|---|---|

1 at least in substantial part, to the same health-related
2 connection or charitable-related connections to Mr. Gupta, and
3 that, therefore, they were both cumulative and potentially
4 prejudicial.
5     The Court had already reduced the number of character
6 witnesses to six. It is certainly well within the Court's
7 discretion to reduce them even further, but I think we will
8 leave them at six. If, in fact, the six turn out to be
9 essentially saying the same thing from the same perspective,
10 the government is, of course, free to argue on summation, that
11 they are a particularized slice of Mr. Gupta's acquaintances,
12 and whatever else they may want to argue in that regard, but I
13 think we will leave it as is.
14     I also will try to get you, since we will have the
15 charging conference tonight, a draft of the charge by lunch.
16 At 5:00 I have two other short matters, so you will have
17 another half hour at least then to go over the charge before we
18 begin the charging conference.
19     Finally, just while it's on my mind, I am not
20 including a charge for venue, because as I know the defense
21 submissions, venue is conceded. Let's bring in the jury.
22     (Continued on next page)
23
24
25

| C6bQgup2 | Schutte - Direct | Page 2826 |
|---|---|---|

1     (Jury present)
2     THE COURT: Counsel.
3     MR. FRANKEL: Thank you, your Honor.
4 BY MR. FRANKEL:
5 Q. Mr. Schutte, in 2008, did Galleon have a business
6 relationship with Goldman Sachs?
7 A. Yes, we did.
8 Q. What was the nature of that business relationship?
9 A. Goldman was one of many brokerage firms that we had a
10 relationship with. It covered several facets of our business.
11 They were a prime broker to us. There were a leading -- one of
12 the -- I don't want to say leading. They were probably the
13 largest executing broker that we worked with, meaning that
14 we -- when we did trades, we traded prime -- I don't want to
15 say primarily, but they were the largest executing broker. So
16 when we would trade stock, we would go to an executing broker
17 to trade whatever it was, and Goldman was one of those. We had
18 several, but Goldman was the largest.
19     There was investment research relationship we had with
20 them. They were sell side. They would produce reports, put
21 analysts in front of us, make recommendations and so on.
22 Q. And you mentioned prime brokerage. Very briefly, for the
23 members of the jury, what is prime brokerage?
24 A. Prime brokerage is -- at our peak, we managed billions of
25 dollars. Those dollars have to sit somewhere. They sit at

| C6bQgup2 | Schutte - Direct | Page 2827 |
|---|---|---|

1 firms called prime brokers. So, Goldman had effectively
2 custody of the dollars, and lends money to us if we need it or
3 takes securities that we have there and lends them out.
4 Basically, it's where the assets physically sit, both stocks or
5 cash. At the time in mid-2008 I believe we had five or six
6 prime brokers.
7 Q. Do you recall, sir, in 2008 the size of the Galleon
8 customer assets that were in custody at Goldman?
9 A. Yeah. Roughly speaking, it was 600 million, maybe 650, in
10 that area.
11 Q. Was Goldman compensated by Galleon for providing prime
12 broker services?
13 A. There was a fee relationship associated with it, yes.
14 Q. How did that work?
15 A. It worked on if there was a margin balance, if we borrowed
16 money, because Goldman would provide leverage to firms like
17 Galleon. It's a typical practice.
18     So, if we borrowed money from them using our stock as
19 collateral or cash as collateral, there would be a small fee
20 for that. If we borrowed -- its gets sort of complicated, but
21 if we borrowed shares that we didn't own and sold them, there
22 would be an interest on that. Some were very expensive, you
23 know, 10, 20 percent-type of interest on hard to borrow
24 securities. They would get paid on that. And there were some
25 other smaller custodian fees and such, but those are the

| C6bQgup2 | Schutte - Direct | Page 2828 |
|---|---|---|

1 primary ones in terms of on the prime broker's side.
2 Q. Was Goldman compensated for providing executing broker
3 services?
4 A. Yes. I mean, we had -- we had two sort of executing broker
5 relationships with Goldman. One was purely on the agency side
6 where they would make a commission for the transaction anywhere
7 from one cents to three, four, five cents, depending on whether
8 or not they committed capital to us.
9     If a firm commits capital, typically the commissions
10 are higher. If they don't, typically it's lower. And then we
11 had an electronic trading relationship with them. We did, I
12 think, almost all of our electronic trading through Goldman's
13 regular platform, and that was a fraction of a penny that we
14 paid on the electronic side.
15 Q. When you say fraction of a penny, you mean a fraction of a
16 penny per share?
17 A. I'm sorry. Yes, a fraction of a penny per share traded.
18 Q. You mentioned the executing broker services provided by
19 Goldman on the agency side, right?
20 A. Yes.
21 Q. And the agency side means what?
22 A. If there was a a -- if it was just matching buyer and seller,
23 then they received a commission for doing so.
24 Q. Trades made on behalf of Galleon's customers, is that
25 right?

| C6bQgup2 | Schutte - Direct | Page 2829 |
|---|---|---|

1 A. Trades -- Galleon would make the trade. Galleon would have
2 the executing relationship with Goldman. It was our client's
3 money and we were investing on their behalf. But if we're
4 buying stock, there was a seller on the other side. Sometimes
5 Goldman would sell its own account; sometimes they would match
6 us with a natural seller.
7 Q. I think you said with respect to those transactions,
8 Goldman was compensated up to, I think you said, a few cents
9 per share, is that correct?
10 A. Yes, it averaged probably in the two and a half cent per
11 share range.
12 Q. Was Goldman compensated for providing investment research
13 services?
14 A. Through the commission dollars. But that was -- just to be
15 clear, this is a standard relationship we have with all our
16 executing brokers. They all averaged about the same amount,
17 two and a half cents roughly.
18 Q. If you add up the different forms of compensation to
19 Goldman, and I think you mentioned commissions, financing
20 charges, charges in connection with borrowing stock, fees and
21 interest, do you recall, sir, approximately what was the amount
22 of compensation that Galleon was paying to Goldman in 2008?
23 A. Yeah. I know what we were paying our top guys. Goldman on
24 the commission side was roughly it averaged about 25 to
25 30 million per year. On the other services, it was in the

| C6bQgup2 | Schutte - Direct | Page 2830 |
|---|---|---|

1 range of 5 to 10. So the total was somewhere around
2 35 million.
3 Q. That was true in 2008?
4 A. Yes.
5 Q. I'm showing you, sir, Defense Exhibit 71 for
6 identification. If you could please take a look at that. Do
7 you recognize that document, sir?
8 A. It's an email from Will Keaten to tech and trading and
9 financials, two distribution groups within Galleon.
10 Q. Without going into the substance of it, can you briefly
11 describe what this email is about?
12 A. Sure. It's a meeting that was hosted by CIBC Oppenheimer
13 that included the CFO of Goldman Sachs, the president and head
14 of investment banking at Goldman Sachs. So, this is the CIBC
15 Oppenheimer was a service provider to Galleon. One of the
16 services it did provide is if they had a meeting where they had
17 executives at other companies, they would host those meetings
18 and, you know, buy side clients would attend. Will Keaten was
19 one of the attendees at that meeting.
20 Q. And was it a regular part of Mr. Keaten's duties as an
21 analyst at Galleon to provide a report of such meetings?
22 A. Yes, it was.
23 Q. Does this email -- withdrawn. Is this email an example of
24 such a report created by Mr. Keaten as a part of his regular
25 duties as an analyst at Galleon?

| C6bQgup2 | Schutte - Direct | Page 2831 |
|---|---|---|

1 A. It is. This is a recap of that meeting.
2 Q. Done in the ordinary course of Galleon's business, correct?
3 A. That is correct.
4 Q. And maintained by Galleon in its files as part of its
5 regular business, correct?
6 A. That is correct.
7     MR. FRANKEL: Your Honor, we offer Defense Exhibit 71?
8     MR. BRODSKY: Can I just voir dire?
9     THE COURT: Yes.
10     MR. BRODSKY: Mr. Schutte. without describing the
11 content of the document, does Mr. Keaten report what other
12 people -- he thinks other people said?
13     THE WITNESS: I'm not sure I understand the question,
14 Mr. Brodsky. He's reporting on what the members at the meeting
15 said, the CFO, the president head of investment banking, if
16 that's what you're asking.
17     MR. BRODSKY: And do you -- were you present for this
18 meeting?
19     THE WITNESS: I was not present at this meeting.
20     MR. BRODSKY: Do you know one way or the other what
21 the individuals at this meeting said or did not say when
22 Mr. Keaten was present?
23     THE WITNESS: Outside of what is written in this
24 document, I do not.
25     MR. BRODSKY: We have an objection to the hearsay in

| C6bQgup2 | Schutte - Direct | Page 2832 |
|---|---|---|

1 the document.
2     THE COURT: Sustained.
3     MR. FRANKEL: Not for the truth, your Honor.
4     THE COURT: What's the government say to that?
5     MR. BRODSKY: We think they are offering it for the
6 truth.
7     THE COURT: Pardon?
8     MR. BRODSKY: We think they are offering it for the
9 truth. If you look at -- I am directing your Honor's attention
10 to the paragraph "after my analysis and research suggests" one,
11 two, three, the third paragraph that begins "on." We think
12 we're offering that for the truth.
13     MR. FRANKEL: Just for the fact it was said, your
14 Honor.
15     THE COURT: No, I'm going to receive it not for its
16 truth. I agree that it is arguing what was said and what was
17 conveyed as having been said to other persons in Galleon, but
18 the jury should understand, when an Exhibit -- as we've
19 received for example a lot of analysts' reports. If an analyst
20 says "my best information is that we are going to have a solar
21 eclipse tonight," that doesn't mean either that there's going
22 to be a solar eclipse tonight or that he necessarily even heard
23 information to that effect. He may just be making it up
24 because it suits his purposes, or he may have received mixed
25 information and he chooses to emphasize one and not the other.

| C6BJGUP5 | Schutte - redirect | Page 2941 |

1    MR. FRANKEL: I can ask a different question, your
2    Honor.
3        THE COURT: Yes.
4    BY MR. FRANKEL:
5    Q. Do you know, sir, as you sit here today, whether the
6    Goldman Sachs secondary stock offering in September 2008 was
7    oversubscribed?
8    A. Yes.
9    Q. And the answer is you know it was, in fact, oversubscribed?
10   A. Yes.
11   Q. Do you know, as you sit here today, the extent to which it
12   was oversubscribed?
13   A. I do not know to the extent.
14   Q. Do you know whether, from your own personal knowledge, do
15   you know whether any other hedge funds received less than the
16   allocation they requested?
17       THE COURT: Sustained.
18       MR. FRANKEL: Ray, could you bring up Defense Exhibit
19   6, please.
20   BY MR. FRANKEL:
21   Q. Do you see that exhibit, sir?
22   A. I do.
23   Q. That is an article on CNN Money?
24   A. Correct.
25   Q. What was CNN Money in or about September 2007?

| C6BJGUP5 | Schutte - redirect | Page 2942 |

1    A. What was it?
2    Q. Yes.
3    A. I am not sure I understand the question. It was a
4    financial publication.
5    Q. Did you read that publication in September 2007?
6    A. I don't believe that I read it, no.
7    Q. Do you know whether any of your colleagues at Galleon read
8    it?
9        THE COURT: Sustained.
10   BY MR. FRANKEL:
11   Q. Did the traders at Galleon have available to them terminals
12   at their desk?
13   A. Yes.
14   Q. What use did they make of those terminals, to your
15   observation?
16   A. The traders themselves, probably e-mail and internet access
17   was the primary use of those terminals.
18   Q. Did portfolio managers have access to those terminals as
19   well?
20   A. They had access to terminals, yes.
21   Q. What use, to your observation, did they make of the
22   terminals they had access to?
23   A. That and then probably some additional activities.
24   Q. What additional activities do you know?
25   A. I can speak for myself. I did financial modeling, I wrote

| C6BJGUP5 | Schutte - redirect | Page 2943 |

1    reports, I did, as I said earlier, some marketing materials,
2    organization materials, stuff like that.
3    Q. Did you have a Bloomberg as well?
4    A. I do.
5    Q. What was available on Bloomberg?
6    A. Bloomberg, the primary use was stock quotes and news. It
7    had an incredible amount of news feeds into the Bloomberg
8    service that came to Galleon.
9    Q. Did it show news feeds from CNN Money, for example?
10   A. I am sure it did. I can't say definitively, but I am sure
11   it did.
12   Q. And The Street dot com?
13   A. Yes.
14       MR. FRANKEL: If you would take a look at Defendant's
15   Exhibit 6, and Mr. Brodsky showed you a time and a date on the
16   bottom. Ray, if we could blow that up, please.
17   BY MR. FRANKEL:
18   Q. Do you see that says, "May 8, 2012 at 12:56 pm"?
19   A. He referred to that as a print date.
20   Q. What do you mean by the print date?
21   A. I assume that is the date it was printed out.
22   Q. That is the date this document was printed?
23   A. Yes.
24   Q. If you go to the top of the document, there is there
25   another time listed below the title of the article.

| C6BJGUP5 | Schutte - redirect | Page 2944 |

1    A. September 14, 2007.
2    Q. 10:48 in the morning?
3    A. 10:46.
4    Q. 10:46? That you.
5        Is that the time that article would have appeared on
6    the screen at the terminal?
7    A. I assume that is the time that the article appeared on CNN
8    Money dot com.
9    Q. That is the time of the publication of the article?
10   A. Right on their web site. It might have appeared on
11   Bloomberg or other news services at some later time.
12       MR. FRANKEL: No further questions.
13       THE COURT: Anything else?
14       MR. BRODSKY: No questions.
15       THE COURT: Thank you very much. You may step down.
16       (Witness excused)
17       THE COURT: Call your next witness.
18       MR. NAFTALIS: We call Suprotik Basu.
19   SUPROTIK BASU,
20       called as a witness by the Defendant,
21       having been duly sworn, testified as follows:
22   DIRECT EXAMINATION
23   BY MR. NAFTALIS:
24   Q. Good afternoon, Mr. Basu.
25   A. Good afternoon.

| C6BJGUP5 | Basu - direct | Page 2945 |
|---|---|---|

1  Q. How old are you, sir?
2  A. I'm 34.
3  Q. Where do you live?
4  A. I live in New York City.
5  Q. How long have you lived in New York City?
6  A. For five years.
7  Q. Tell us where were you born, sir.
8  A. In Winchester, Virginia.
9  Q. Where did you grow up?
10 A. I grew up in the South -- apologies -- Arkansas, Georgia
11   and Texas.
12 Q. Did you go to college, sir?
13 A. I did.
14 Q. Where did you go, sir?
15 A. I went to Johns Hopkins University in Baltimore, Maryland.
16 Q. What degrees did you get from John Hopkins?
17 A. I received a bachelor inches psychology with a
18   concentration in neuroscience and a masters degree in health
19   economics.
20 Q. After graduation from college, did you take a job at the
21   World Health Organization?
22 A. I did right after graduate school. I was working in Inner
23   City Baltimore on education and HIV issues. From there I moved
24   to Geneva for the World Health Organization and then from there
25   I came to Washington, D.C. to the World Bank.

| C6BJGUP5 | Basu - direct | Page 2946 |
|---|---|---|

1  Q. What did you do at the World Bank?
2  A. Focused mainly on Sub-Saharan Africa, on American economic
3   development, education, health care, infrastructure, a broad
4   range of issues mainly in Africa.
5  Q. Did you hold a position there at the World Bank?
6  A. I did, I was an economist and health specialist there.
7  Q. How long did you work at the World Bank?
8  A. The World Bank for a little under six years.
9  Q. Did there come a time -- when did you leave the World Bank?
10 A. I left the World Bank in October of 2007.
11 Q. Where did you go to work after that?
12 A. I left the bank to work for a small non-profit organization
13   here in New York called Malaria No More, and following a brief
14   stint there, I joined the office of UN Secretary General's
15   Millennium Development Goal Advocate and Special Advocate for
16   Malaria, where I eventually became and am currently the
17   managing director of that office.
18       (Continued on next page)
19
20
21
22
23
24
25

| C6bQgup6 | Basu - Direct | Page 2947 |
|---|---|---|

1  Q. How long have you had that position?
2  A. Since January 2008.
3  Q. Do you know a man name Rajat Gupta?
4  A. I do.
5  Q. How did you come to meet Mr. Gupta?
6  A. I met him -- I remember precisely when I met him in
7   May 2007. I received an urgent call from colleagues in New
8   York when I was at the World Bank to meet with a businessman
9   who was advising the secretary general that he wanted to end
10   all childhood deaths from malaria in 20 --
11       THE COURT: No. Excuse me.
12       MR. BRODSKY: Objection, your Honor.
13       THE COURT: Sustained.
14 Q. You say you got an urgent call from a businessman. And did
15   that lead to a meeting?
16 A. Yeah.
17       THE COURT: No. No. No. Did you -- as a result of
18   that meeting, did you come in contact on other occasions with
19   Mr. Gupta?
20       THE WITNESS: I did. That was the first time I met
21   him, and then --
22       THE COURT: I understand that. But you've met with
23   him subsequently?
24       THE WITNESS: Absolutely, yes.
25       THE COURT: On repeated occasions?

| C6bQgup6 | Basu - Direct | Page 2948 |
|---|---|---|

1        THE WITNESS: Yes.
2        THE COURT: Go ahead, Mr. Naftalis.
3  Q. Did you meet with Mr. Gupta, was it professionally or
4    socially?
5  A. We developed a -- we worked closely together --
6        THE COURT: All right. Excuse me. Forgive me for
7    interrupting.
8        THE WITNESS: My apologies.
9        THE COURT: You need to understand. These are
10   questions that could be answered yes or no or at least with one
11   word: Professionally or socially or both.
12       THE WITNESS: Both.
13       THE COURT: All right. Very good.
14 Q. And how did you meet with him professionally? In what
15   connection?
16 A. He was chairing an organization that was -- that --
17       THE COURT: Hold on. I think that rather weird
18   gesture from the prosecutor was intended to convey the word
19   objection, which is sustained.
20       Let me ask you this: The nature of your professional
21   meetings with Mr. Gupta, were they of a business nature? An
22   eelymosynary nature? Without going into the details, give me
23   the kind of category they were in.
24 A. The category is we were working together to close a funding
25   gap to end malaria.

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 11, 2012

---

C6bQgup6          Basu - Direct          Page 2949

1      THE COURT: All right.  Go ahead, counsel.
2  BY MR. NAFTALIS:
3  Q.  And I want to direct your attention to September of 2008.
4  In connection with the answer that you just gave to his Honor's
5  question about working on closing the funding gap regarding
6  malaria, were you working with him in that regard in September
7  of 2008?
8  A.  Yes.
9  Q.  In particular, were you working with him in that regard
10 during the period September 23 through September 25 of 2008?
11 A.  Yes.
12 Q.  Ray, if we could put up and publish Exhibit 3616 in
13 evidence?
14      MR. BRODSKY: Your Honor, may we have a sidebar on
15 this?
16      THE COURT: All right.  Take that down for a minute.
17 Let's have a sidebar.
18      (Continued on next page)
19
20
21
22
23
24
25

---

C6bQgup6          Basu - Direct          Page 2950

1      (At the sidebar)
2      THE COURT: Maybe I misunderstood that this was a
3  character witness.
4      MR. NAFTALIS: A character witness and also a factual
5  witness.
6      THE COURT: Oh, OK.  So what's he going to testify to
7  factually?
8      MR. NAFTALIS: He's going to testify that during this
9  period of time including, but not limited to, September 23, he
10 and Mr. Gupta were spending enormous amounts of time on the --
11 on the dealing with raising the funding for the malaria thing,
12 which had a drop-dead date of September 25.
13     THE COURT: A very inappropriate analogy.
14     MR. NAFTALIS: It's not the first; not my last.  I
15 hope it's not my last.  And including having meetings and
16 conversations on September 23.  This calendar is in evidence.
17 And this witness can testify to that.  I mean, they are --
18     THE COURT: OK.  Now I understand.
19     MR. BRODSKY: There is no relevance to the fact that
20 he met with somebody relating to a malaria issue on
21 September 23.  There's no showing that makes any fact more or
22 less likely or probable; and the probative value, therefore,
23 is, frankly, very little, if any, and the potential prejudice
24 of talking about Mr. Gupta's specific efforts to raise money
25 and funding are particular instances of conduct that are

---

C6bQgup6          Basu - Direct          Page 2951

1  precluded by a character witness.
2      THE COURT: Remind me, what is the time of the alleged
3  call that relates to the events of September 23?
4      MR. BRODSKY: Approximately 3:54 p.m. on September 23.
5      THE COURT: Is this witness going to be able to say he
6  was with Mr. Gupta --
7      MR. NAFTALIS: No, he will say he was with him during
8  that day before the call and after the call, and -- your Honor,
9  I think what the government is trying to do here, and what
10 they --
11     THE COURT: Woa, I just want to find out --
12     MR. NAFTALIS: No, just in answer to your Honor's
13 question, I am in no way representing that he will say, gee, at
14 3:50 whatever time -- he was actually somewhere else and wasn't
15 on the call.  No, we are in no way suggesting --
16     THE COURT: Is it clear that he was not with him at
17 that time?
18     MR. NAFTALIS: I actually don't know the answer to
19 that question.  I know he was with him before and after the
20 call.  I really don't -- I don't believe he was with him at the
21 time of the call.
22     THE COURT: So you are not introducing it to make the
23 argument that he was -- that you can infer, ladies and
24 gentlemen, that because he wasn't on that call, that he was
25 with --

---

C6bQgup6          Basu - Direct          Page 2952

1      MR. NAFTALIS: No.
2      THE COURT: Then what is the relevance?
3      MR. NAFTALIS: The relevance is they have created, in
4  my view, a very false picture that this man -- and you can even
5  see it by the cross-examination he attempted of Mr. Schutte
6  about Alhadi and all his business; that this man is motivated
7  by greed, period, and that's all he's interested in doing,
8  period.
9      And every time we try and bring out, including through
10 a character witness, or in this case, a semi-character witness,
11 the fact that he may be actually doing something else at the
12 same time, and that his interests and focus are not really --
13     THE COURT: No, I think -- and the Court has allowed
14 you through various witnesses to bring out the multi-foci of
15 your client, and the line the Court has been trying to draw is
16 allowing you to do that which I've done, over emphasizing what
17 is really not relevant, which is that he is out to save the
18 world.
19     So I will allow you to bring out that he was with
20 Mr. Gupta earlier in the day and later in the day working on
21 matters related to the entity he has already identified, but I
22 don't want him to get into -- and I will cut him off if he gets
23 into elaborate detail about: "And then we said one more death
24 from malaria is one too many."  I note for the record at the
25 sidebar that I believe malaria still exists notwithstanding

---

| C6bQgup6 | Basu - Redirect | Page 2969 |
|---|---|---|

1 questions.
2      MR. BRODSKY: I have one follow-up question.
3 RECROSS EXAMINATION
4 BY MR. BRODSKY:
5 Q. Sir, between 3:54 p.m. and 4:00 p.m. on September 23, 2008,
6 did you make any trades in Goldman Sachs stock?
7 A. I did not.
8      MR. BRODSKY: No further questions, your Honor.
9      THE COURT: Anything else? Thank you very much. You
10 may step down.
11      (Witness excused)
12      THE COURT: Please call your next witness.
13      MR. NAFTALIS: We call Geetanjali Gupta.
14 GEETANJALI GUPTA,
15      called as a witness by the Defendant,
16      having been duly sworn, testified as follows:
17 DIRECT EXAMINATION
18 BY MR. NAFTALIS:
19      THE DEPUTY CLERK: Please be seated. State your name
20 and then spell it slowly for the record.
21      THE WITNESS: Geetanjali Gupta, G-E-E-T-A-N-J-A-L-I;
22 G-U-P-T-A.
23      MR. NAFTALIS: May I inquire, your Honor?
24      THE COURT: Yes.
25 BY MR. NAFTALIS:

| C6bQgup6 | G. Gupta - Direct | Page 2970 |
|---|---|---|

1 Q. Good afternoon, Ms. Gupta.
2 A. Good afternoon.
3 Q. Ms. Gupta, where do you live?
4 A. I live in Newton, Massachusetts.
5 Q. Are you married, ma'am?
6 A. I am, yes.
7 Q. Do you have any children?
8 A. I do. I have twin daughters who are two and a half.
9 Q. Is your father Rajat Gupta?
10 A. Yes, he is.
11 Q. Could you tell the jury a little bit about your educational
12 background?
13 A. Sure. I have a bachelor's in modern math and economics
14 from Harvard College. Then I went back for graduate school,
15 and I have both a law degree and a master's in business
16 administration, both from Harvard.
17 Q. And after graduating, after getting your master's and your
18 law degree from Harvard, did you take a job?
19 A. Yes.
20 Q. Where is that?
21 A. I took a job at Harvard University Endowment at the Harvard
22 Management Company.
23 Q. What does the Harvard Management Company do?
24 A. The Harvard Management Company manages Harvard's money.
25 Harvard has a large pool of money that they use to fund their

| C6bQgup6 | G. Gupta - Direct | Page 2971 |
|---|---|---|

1 educational and research initiatives.
2 Q. I want to direct your attention to September 19, 2008.
3 A. Yes.
4 Q. Is that a date that sticks in your mind?
5 A. It is, yes.
6 Q. Why is that?
7 A. My 30th birthday was on September 20, 2008, and I had come
8 to New York to celebrate it with my family and friends. It was
9 also my mother's birthday on the 21st. So we had a family
10 celebration over the weekend in Connecticut.
11 Q. I want to direct your attention to September 20th. Did you
12 have a conversation with your father, Rajat Gupta, relating to
13 an investment he had with Raj Rajaratnam?
14 A. Yes, I did.
15 Q. What did Mr. Gupta say to you about that?
16      MR. BRODSKY: Objection. Hearsay.
17      THE COURT: Sustained.
18      MR. NAFTALIS: May I approach on this, Judge?
19      THE COURT: I assume your claim is that it's being
20 offered not for its truth but for the fact that it was said,
21 and I have considered that, but if you want, if there is
22 something else, I will certainly hear you at the sidebar.
23      (Continued on next page)
24
25

| C6bQgup6 | G. Gupta - Direct | Page 2972 |
|---|---|---|

1      (At the sidebar)
2      THE COURT: So, what are you going to say?
3      MR. NAFTALIS: I was going to say that he told her
4 that he lost his money with Rajaratnam and that Rajaratnam had
5 taken money out of the fund, and this is similar to the
6 testimony, your Honor has allowed.
7      THE COURT: Yes, I understand. The difference is
8 this: Under these circumstances, the daughter testifying as to
9 what he said in this situation, there is no way the jury can
10 evaluate this other than as an assertion for its truth. It
11 carries freight under Rule 403 that none of the other
12 permissions that I've granted to put this in on state of mind
13 carry.
14      The Court had serious issues as to whether to allow
15 and even the other statements, but I did because of your
16 argument, which is a fair one, that he would not have said
17 these things, for example, to his business associate, Mr. Jain,
18 if they still had a warm and friendly relationship or things to
19 that effect. That is the modest basis on which it was
20 received.
21      But here, where the daughter is being told whatever
22 you are about to say was said, there is no way the jury can
23 make that distinction. They are going to inevitably think if
24 they accept this testimony at all that he is telling the truth
25 to his own daughter, and they will be taking it for its truth,

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 11, 2012

C6bQgup6                G. Gupta - Direct                Page 2973

1   and I don't see how under 403 that gross violation of the
2   hearsay rule can be avoided.
3        MR. NAFTALIS: The hill looks high, but I'll try.  Two
4   things:  First, number one, the government went into this area
5   first; we didn't.  The government went into this area with
6   Mr. Kumar.  What they did was -- and I think inaccurately and
7   they think accurately; obviously, the jury will determine who's
8   right or who's wrong on the facts -- is try to push the dates
9   back.  Indeed, you remember, I may have cross-examined
10  effectively or not, Mr. Kumar as to whether he had said earlier
11  dates.  But they, according to Kumar, he said, well, that Rajat
12  Gupta only complained about money being taken out sometime
13  between February, I think, and April as opposed to it being
14  earlier in the fall.  The government obviously resisted as hard
15  as they could on cross of Mr. Jain to try and push his dates
16  out further, I don't think very successfully, but the jury will
17  decide that.
18       I think here the government wanted to put their
19  accomplice witness on Mr. Kumar to testify that the complaints
20  about the taking of money only occurred after the tipping was
21  completed here.
22       I have to be able to refute that, and this woman will
23  refute it, and the jury can take it -- look, when I say it's --
24  it doesn't matter really for the admissibility whether he's
25  right or Rajaratnam is right on the dispute.  This is what he

C6bQgup6                G. Gupta - Direct                Page 2974

1   believed.
2        It also goes to present sense impression.  I think
3   it's admissible for non-hearsay purpose, if that's 803(3), but
4   I wouldn't mind having a chance to brief that to your Honor.
5   When I say brief it, find a case or two.  But I think it could
6   come in also for a non-hearsay resistant state of mind.
7        THE COURT: Since we are almost at 5:00 -- on the
8   present showing I would sustain the objection.  But if you want
9   to brief it tonight, the government can brief it as well, and I
10  will make a ruling at 9:00 tomorrow morning, and either she
11  will testify or not.  I am certainly willing to give you that
12  opportunity.
13       MR. NAFTALIS: I appreciate that very much, your
14  Honor.
15       THE COURT: So, let's excuse her.
16       (Continued on next page)
17
18
19
20
21
22
23
24
25

C6bQgup6                G. Gupta - Direct                Page 2975

1        (In open court)
2        THE COURT: So, ladies and gentlemen, we have the
3   following quandary:
4        On the one hand, we could give you the opportunity of
5   watching the top of our heads and the back of my robe for the
6   next ten minutes while we continue this side bar that
7   undoubtedly is going to last a fair amount of time, and it's a
8   pleasure that you've had before, and we wouldn't want to
9   deprive you of having it again.
10       On the other hand, against your will, we could excuse
11  you ten minutes early tonight and pick up tomorrow at 9:00.  I
12  am just guessing that you might prefer the second alternative.
13  So we will let you go now and we will continue at 9:00 tomorrow
14  morning
15       (Jury and witness recessed)
16       (Continued on next page)
17
18
19
20
21
22
23
24
25

C6bQgup6                G. Gupta - Direct                Page 2976

1        (Jury not present)
2        THE COURT: So I will be happy to receive any briefing
3   on the issue we just discussed at the sidebar as long as it
4   arrives in chambers no later than 8:30 tomorrow morning, and I
5   will decide the matter at 9:00.
6        Is there anything else Ms. Gupta is going to testify
7   about, Mr. Naftalis?
8        MR. NAFTALIS: No.  I mean, it will be more than one
9   conversation.
10       THE COURT: But all under the same --
11       MR. NAFTALIS: And another email relating to it.
12  That's all there is.
13       THE COURT: All right.  Under the same realm.
14  Who is after Mr. Gupta?
15       MR. NAFTALIS: We have a witness from Goldman Sachs.
16  His name his James Roth.
17       THE COURT: As I understand, it's about a ten minute
18  witness?
19       MR. NAFTALIS: Yes.  We have one last character
20  witness.  We have Mr. Orman, possibly Mr. Marvin, and then we
21  have substantial documents issues.
22       THE COURT: Right.
23       MR. NAFTALIS: And some recordings.
24       THE COURT: We are going to talk about the documents
25  tonight and get that all resolved.

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 12, 2012

C6CJGUP1                                                Page 3063

```
   UNITED STATES DISTRICT COURT
 1 SOUTHERN DISTRICT OF NEW YORK
 2 ------------------------------x

 3 UNITED STATES OF AMERICA,

 4        v.                          11 Cr. 907 JSR

 5 RAJAT K. GUPTA,
   a/k/a Sealed Defendant 1,
 6
                 Defendant.
 7
   ------------------------------x
 8
                                     June 12, 2012
 9                                   9:00 a.m.

10 Before:

11                 HON. JED S. RAKOFF,

12                                  District Judge
                                    and a jury
13
                      APPEARANCES
14
   PREET BHARARA,
15      United States Attorney for the
        Southern District of New York
16 REED MICHAEL BRODSKY,
   RICHARD CRAIG TARLOWE,
17      Assistant United States Attorneys

18 KRAMER LEVIN NAFTALIS & FRANKEL, LLP,
        Attorneys for defendant Gupta
19 BY: GARY P. NAFTALIS, Esq.
        DAVID S. FRANKEL, Esq.
20      ROBIN MARIE WILCOX, Esq.
             Of counsel
21
22 Also Present:
        ANDREA ESTOK, Special Agent FBI
23      SEAN FERNANDEZ-LEDON, Paralegal Specialist
        KAITLIN PAULSON, Paralegal Specialist
24 RAYMOND McLEOD, Managing Director Doar Lit. Consulting
25
```

C6CJGUP1                                                Page 3064

1        (Trial resumes)

2        (In open court; jury not present)

3        THE COURT: Please be seated.  The jury is here.  I
4 have told them we'll take up some legal matters and we'll start
5 in a few minutes.

6        With respect to what we have been calling since last
7 night the Loeb evidence -- incidentally, Mr. Naftalis, did you
8 have a chance to give the court reporter last night the list of
9 exhibits?

10       MR. FRANKEL: I did not, your Honor.

11       THE COURT: I am going to do that right now because I
12 think you should have that on the record.

13       MR. FRANKEL: Your Honor, may I --

14       THE COURT: No, not till I finish doing it.

15       MR. FRANKEL: I am sorry.

16       THE COURT: So they are Defense Exhibits 3011, 3022,
17 3067, 3072, 3073, 3089, 3106, 3036, 3038, 3039, 3044, 400-TT,
18 3OO1 -- I am sorry -- 3035, 3048, 3049, 8051, 3052, 3053, 4007
19 T, 3058, 3077, 3079, 3080, 3081, 3082, 3084, 3088, 3098, 3101,
20 3103, 3104, 305 -- sorry -- 3068, 8440, 3069, 3054, 3070, 3096,
21 3097, 3063, 3090, 3091.

22       Yes, Mr. Frankel?

23       MR. FRANKEL: I apologize for interrupting your Honor.
24 I was going to suggest if it is acceptable that perhaps the
25 binder that contains the actual exhibits be made part of the

C6CJGUP1                                                Page 3065

1 court file just so that the exhibits are in the record
2 specifically as well.

3        THE COURT: All right, that is fine.

4        MR. FRANKEL: Then I think for completeness sake, in
5 addition to the exhibits with the T, which are the transcripts,
6 I think we need to add as well the two tapes themselves, which
7 are Defense Exhibit 4OO6, and 4007.

8        THE COURT: Okay.  So, in addition, I received --
9 first of all, the record should reflect I went through each of
10 those exhibits last night, as I promised, and I also received
11 this morning the memo which will be docketed as well of the
12 defendant's memorandum to admit the evidence.

13       Notwithstanding all of that, the court adheres to its
14 prior ruling.  The court finds that the evidence is replete
15 with inadmissible hearsay.  Most if not all of the documents
16 for admissibility and that even were any of that not true, the
17 jury cannot remotely understand what these exhibits are all
18 about without substantial either representations, from counsel
19 which would be improper, or other argument that would be
20 speculative in nature.  Essentially this is an attempt to
21 introduce a whole independent issue into the case without a
22 single witness being called in support of it.

23       It would create endless confusion on the part of the
24 jury and it is, therefore, rejected.  Not a single one of those
25 is admitted.

C6CJGUP1                                                Page 3066

1        THE REPORTER: For the record, your Honor, are those
2 exhibits admitted in evidence?

3        THE COURT: We are just putting on the record what the
4 proffer was.  Thank you for clarifying that.

5        Now, with respect to the October 2nd, 2008 call, the
6 court reserved on that last night and received a trial
7 memorandum from the defense this morning.

8        Is there anything further the government wants to say
9 with respect to that?

10       MR. BRODSKY: Your Honor, despite the defense
11 submission, we still believe that it is inadmissible hearsay.
12 We think the defense arguments contradict themselves.  It
13 doesn't fall within the penal exception for the reasons the
14 court stated, although there is an attempt by the defense to
15 made the statements made by Mr. Rajaratnam clear.  We think
16 they're ambiguous and --

17       THE COURT: I agree with most of what you just said,
18 but I thought the strongest point that the defense made was
19 that this was impeachment of Mr. Rajaratnam.  You said last
20 night well, he's telling the truth to Mr. -- I am not quite
21 sure how the other gentlemen's name is pronounced.

22       MR. BRODSKY: Santhanam.

23       THE COURT: Santhanam?  Thank you.

24       But what he is telling Mr. Santhanam is that he lied
25 and cheated Mr. Rajaratnam.  So that's impeachment.  That is a

C6CJGUP1     Page 3075

1 fund and he was --
2     THE COURT: Excuse me. I think you have flagged even
3 in your opening statement the fact that Mr. Rajaratnam and
4 Mr. Gupta were at odds in a way that was inconsistent with the
5 government's theory of tipping.
6     An important part of that has been your claim that
7 Mr. Gupta believed he had been ripped off and that why would
8 someone who was in that state of mind enter into this, so I
9 think it has been there since the opening statement.
10     MR. NAFTALIS: No, your Honor, there is no question it
11 has been there.
12     THE COURT: Yes.
13     MR. NAFTALIS: Indeed, the government, if you look at
14 the government's opening, in the government's opening they
15 opened saying that the dispute between Rajaratnam and
16 Mr. Gupta, I think I can find the pages if necessary because
17 they opened first, that happened after the tipping. Their view
18 is they are trying to move the date of it. I didn't even put a
19 date in my opening. I just said their relationship fell apart.
20 I didn't say what day, what time. I was actually very careful
21 on that one.
22     Then the government on its case puts Kumar on who has
23 no first-hand knowledge, and Kumar says I have a series of
24 conversations with Mr. Gupta going back to mid-October where he
25 is complaining about his treatment by Rajaratnam, but in the

C6CJGUP1     Page 3076

1 conversations he says the only -- the conversations in October
2 is he was upset about losing the month, that he didn't do a
3 good job managing the account, in words or substance like that.
4     Then there is a subsequent conversation about you guys
5 should make me whole as a moral matter. It is not until,
6 according to Kumar, sometime between late February or April
7 that he has a conversation with Mr. Gupta, where Mr. Gupta says
8 the guy has taken money out of the fund, which fits the
9 government's theory that their claim is he only learned about
10 that after the -- in other words, they put in February after
11 the January 29th tip.
12     THE COURT: Okay. I am going to cut you off because I
13 see where you are going and I think the more I think about
14 this, I want to hear from the witness herself outside the
15 presence of the jury exactly what she has to say.
16     So I am going to ask my courtroom deputy to tell the
17 jury that it will be another 10 minutes, and let's get the
18 witness on the stand and I'll hear further argument later.
19     MR. BRODSKY: If may may just briefly?
20     If they believe Mr. Kumar changed his testimony, they
21 can call the FBI agent. He did not change his testimony from
22 the 302. Second, in the government opening, from Page 121 to
23 122, the government stated in its opening that for Mr. Kumar,
24 he had lost $10 million, and for Gupta that meant the loss of
25 $10 million and Gupta was upset. Being upset didn't stop Gupta

C6CJGUP1     Page 3077

1 from trying to sneak benefits from Rajaratnam. We opened,
2 stating that Mr. Gupta --
3     THE COURT: Okay.
4     MR. BRODSKY: We did not say what Mr. Naftalis just
5 said.
6     THE COURT: I know you both have lots more you want to
7 say. I will give you full opportunity, but I really want to
8 get the witness on the stand.
9 GEETANJALI GUPTA, resumes.
10     THE COURT: Good morning.
11     THE WITNESS: Good morning.
12     THE COURT: The Court reminds the witness she is still
13 under oath. Mr. Naftalis, why don't you put to the witness the
14 basic questions on this issue that you would have put to her.
15 VOIR DIRE EXAMINATION
16 BY MR. NAFTALIS:
17 Q. Good morning, Ms. Gupta.
18 A. Good morning.
19 Q. I think where we left off, I directed your attention to
20 September 19th, 2008.
21 A. Yes.
22 Q. And I think I asked you why that date stuck in your mind.
23 A. Yes.
24 Q. Would you just repeat that for a second and set the
25 background.

C6CJGUP1     Page 3078

1 A. Being it was my 30th birthday on September 20th --
2     THE COURT: So this is a good day that will live in
3 infamy, right?
4     THE WITNESS: Yes. I had come to New York City to
5 celebrate my birthday with my family and friends. It was my
6 mother's birthday on the 21st. The next day, on the 20th, I
7 had gone to Connecticut to celebrate with my family.
8     THE COURT: Did you have a conversation on the 19th
9 with your father?
10     THE WITNESS: I had a conversation on the 20th.
11     THE COURT: The 20th? All right. Did this
12 conversation in part relate to Mr. Rajaratnam?
13     THE WITNESS: It did, it related to my father's
14 investment in the Voyager Fund.
15     THE COURT: As best you recall -- first of all, how
16 did this come up?
17     THE WITNESS: At the dinner the night before, he had
18 been talking about Lehman Brothers. One of my friends who was
19 at the dinner worked at Lehman, and we were talking about
20 Lehman and the market in general, which is how Voyager came up
21 the next day.
22     THE COURT: And then where were you when this
23 conversation took place physically?
24     THE WITNESS: The conversation on the 20th?
25     THE COURT: Yes.

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 12, 2012

---

C6CJGUP1                                    Page 3079

1    THE WITNESS: I was in my house, library in the house.

2    THE COURT: Just the two of you?

3    THE WITNESS: My father and I think my uncle was there

4    as well.

5    THE COURT: What did he say to you and what, if

6    anything, did you say to him?

7    THE WITNESS: He told me that he was upset about

8    Voyager.  He told me that he was worried about the performance

9    of the fund and that he was frustrated that he couldn't get

10   information from Raj about it.

11   He also told me he was angry that Raj had taken money

12   out of the fund without telling him and that he thought that

13   that -- he didn't understand why he had taken the money out of

14   the fund, and why if he had taken money out of the fund, he had

15   not gotten any of it.

16   THE COURT: What did you say to him, if anything, in

17   response?

18   THE WITNESS: I listened to him.  I asked him some

19   questions about what he thought he should do next.

20   THE COURT: What did he say?

21   THE WITNESS: He said he was still trying to get the

22   information from Raj about the performance of the fund and --

23   THE COURT: Had you known anything about this

24   investment previously?

25   THE WITNESS: I had.  He had mentioned to it me before

---

C6CJGUP1                                    Page 3080

1    when he first made the investment which was when I was still in

2    school.  I had worked at a hedge fund for one summer so he

3    mentioned he was investing with this very prominent hedge fund

4    manager named Raj.

5    THE COURT: And subsequent to this conversation, did

6    you have further conversations with your father about it?

7    THE WITNESS: From time to time he would mention that,

8    it would come up he had this investment.  We didn't have any

9    in-depth conversations.

10   THE COURT: Did you understand from the subsequent

11   conversations he was continuing in his relationship with

12   Mr. Rajaratnam?

13   THE WITNESS: Yes.

14   THE COURT: Okay.

15   MR. NAFTALIS: I think your Honor's question I think

16   was did you have -- she may have been responding did you have

17   any conversations after the first conversation but prior to the

18   September 20th conversation because I think there are

19   conversations after the September 20th.

20   THE COURT: That is the way I understood it.

21   MR. NAFTALIS: I am the only one that was confused.

22   THE COURT: Are you seeking to introduce those

23   subsequent conversations?

24   MR. NAFTALIS: Yes, I am.

25   THE COURT: Put more questions then.

---

C6CJGUP1                                    Page 3081

1    BY MR. NAFTALIS:

2    Q.  After the conversation on September 20th, did you ever have

3    subsequent conversations with your father about this?

4    A.  Yes, I had a brief conversation with him about it on

5    October 10th.  I had dinner with my father and my husband in

6    Boston.  I asked him for an update on how it was going.  I knew

7    he had been upset when we had spoken September  He was still

8    having difficulty getting information.

9    We had much more subsequent conversations about it in

10   Thanksgiving.  I was home at Thanksgiving with my family.  At

11   that point the entire family knew my father's investment in

12   Voyager had gone to zero and he was very upset about it.  We

13   were all upset and we were discussing what he should do about

14   the situation, and one of the things we talked about was

15   whether or not he should sue Raj Rajaratnam.

16   Q.  Apart from the oral testimony --

17   THE COURT: Did he, do you know?  Did he?

18   THE WITNESS: Not to my knowledge.

19   THE COURT: Go ahead.  So apart from this, did he have

20   conversations with you about Rajaratnam, other conversations?

21   THE WITNESS: Well, I knew that he was in partnership

22   with Raj Rajaratnam trying to raise money for a fund called NSR

23   because the only time I met Raj was in the offices of Harvard

24   Management when they came to present the fund.

25   THE COURT: When was that?

---

C6CJGUP1                                    Page 3082

1    THE WITNESS: October 2006.  I remember it very

2    specifically because it was my first week working at Harvard.

3    THE COURT: What about subsequent to the conversations

4    you've just mentioned, were there further discussions with your

5    father about Rajaratnam -- not about Voyager, but just about

6    Rajaratnam in any respect?

7    THE WITNESS: Sure.  I knew that originally starting

8    in 2006, he was partnering with Raj trying to raise money for

9    this fund NSR, and I know at some point they ended up not going

10   with the hedge fund part of it and they ended up just raising

11   the private equity fund, but I don't remember the timing.  I

12   would have gotten some updates about that, but I don't remember

13   the timing of those.

14   THE COURT: The last conversation you had about

15   Voyager was Thanksgiving or was --

16   THE WITNESS: Thanksgiving 2008.  After that, starting

17   in the early winter, we may have spoken about it subsequently.

18   In the early winter I was pregnant with my twins, busy at work,

19   my husband and I were looking for new house, and it fell lower

20   on the list of things to talk about, so I don't remember.  I

21   know that at some point --

22   THE COURT: Go ahead.

23   THE WITNESS: -- he had mentioned in our Thanksgiving

24   conversation that he was thinking about suing Raj, and we had a

25   conversation, a phone call with his financial advisor Greg

---

C6CJGUP1      Page 3083

1  Orman at that time, and I know one of the reasons he said he
2  didn't want to sue him at that point, they were doing
3  negotiations with their lenders so see if they could recover
4  some of the equity.  I know at some point that continued for
5  some period of time.  It didn't work out, but I don't know the
6  timing of that.
7       THE COURT: Were you familiar with a company called
8  Galleon International?
9       THE WITNESS: I was familiar with Galleon, the hedge
10 fund.  I wasn't familiar with any specific parts of Galleon.
11      THE COURT: Did your father ever tell you anything
12 about his involvement in Galleon International?
13      THE WITNESS: No.
14      THE COURT: Was it your understanding that your father
15 even after Thanksgiving 2008 continued to have regular contact
16 with Mr. Rajaratnam?
17      THE WITNESS: I wouldn't know.  I know he was trying
18 to get information from him.  I don't know if he was doing it
19 directly or if other people were doing it.  I really don't
20 know.
21      THE COURT: All right.  Any other questions either
22 side wants to put to the witness on the issues we discussed?
23      MR. BRODSKY: No.
24      THE COURT: You may step down.  If you would go back
25 to the witness room.

C6CJGUP1      Page 3084

1       (The witness left the courtroom)
2       THE COURT: I'll hear any further argument from
3  counsel.  It seems to me that the jury would have extreme
4  difficulty distinguishing what this witness has to say from
5  testimony that they should regard as for its truth as opposed
6  to state of mind, but let me hear from counsel.
7       MR. NAFTALIS: Your Honor, two things.
8       I apologize, I neglected to ask her on the stand, but
9  she would, apropos her observations of him, she would testify
10 he was visibly upset.  Consistent with how your Honor would
11 allow us to --
12      THE COURT: Yes.
13      MR. NAFTALIS: -- she would say things like that.
14      THE COURT: That sounded like it was true only at the
15 first of the conversations from what she said right here.
16      MR. NAFTALIS: The answer is I know she would say that
17 with respect to the September 20th conversation.  I don't know
18 what she would say regarding the lunch or dinner in Boston, and
19 I am not sure I know the answer.  It may have been -- I think
20 the Thanksgiving she may -- it would be a similar piece, but I
21 am not sure it was in Boston.  I just put that in the record
22 because I neglected to ask her that, although it may have been
23 obvious to the court she would say something to that effect.
24      THE COURT: Let me ask the government actually on that
25 point.  If this testimony alluded to is the subject of Voyager

C6CJGUP1      Page 3085

1  and Mr. Rajaratnam would come up and say yes, and what was Mr.
2  Gupta's demeanor?  She answer is, he was visibly upset, why
3  should that not be --
4       MR. BRODSKY: That came out from Kumar's testimony,
5  your Honor.
6       THE COURT: I agree it is cumulative.  The question is
7  are you going to be challenging -- your position on, as I
8  understand it, on summation is they may or may not have had a
9  tiff, but it didn't stop him from continuing in the overall
10 relationship.  It was a spat but nothing more.  So the defense,
11 aside from the whole timing issue, the defense wants to argue
12 that well, this was serious enough that he was visibly upset.
13 So that is their counter-argument.
14      Why shouldn't the fact that one witness has already
15 admitted it, why shouldn't they be able to corroborate that
16 with a second witness when at least from their standpoint it is
17 the strength of the dislike that is significant for their
18 defense.
19      MR. BRODSKY: I agree, your Honor, we wouldn't,
20 because we wouldn't challenge that, her testimony regarding him
21 being visibly upset, and, therefore, it wouldn't, there
22 wouldn't be a question of the government not being able to
23 challenge her on that basis because she is the daughter of the
24 defendant.  In context, you know, we have to agree, your Honor.
25 If it was limited to that, it wouldn't put the government in

C6CJGUP1      Page 3086

1  any worse position, it wouldn't be unduly prejudicial.
2       THE COURT: That is where I am leaning.  Let me hear
3  from defense counsel.
4       MR. NAFTALIS: May I be heard on this?
5       THE COURT: Yes.
6       MR. NAFTALIS: Your Honor, I think without the content
7  of the conversation, we are being really prejudiced in putting
8  forward a defense in a substantial way because the
9  government --
10      THE COURT: I think the prejudice is the other way.
11      The jury is going to, I think, draw from this, because
12 the government can't cross-examine the witness in any
13 meaningful way, that Rajaratnam, in fact, cheated Gupta, that
14 Gupta knew it and that Gupta, therefore, was completely
15 outraged; and, hence, it carries a danger here that no other
16 witness carries for the reasons that I've already elaborated on
17 the record.
18      MR. NAFTALIS: Your Honor, this proof is pretty
19 critical and crucial because they put Kumar on there to try and
20 move the date to fit their theory.
21      When Jain, he was a thoroughly disinterested witness
22 was on the stand, they try to cross-examine him in the hope, oh,
23 couldn't it have been in December '09?
24      And they're probably going to try to argue that Jain,
25 Jain may be uncertain or whatever and that, therefore, that

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 12, 2012

---

C6CJGUP1                                           Page 3087

1  conversation might have happened later in the year although
2  Jain was perfectly clear this couldn't have happened after
3  Rajaratnam's problems were public.  They're going to do
4  everything they can to undermine this argument and try and move
5  it there.
6      She is a clear, straightforward witness.  She
7  testifies --
8      THE COURT: The force, the reason for the
9  admissibility of her testimony which is your client's attitude
10 towards Rajaratnam at a given point or maybe two or three
11 points, can be brought out without the danger of getting into
12 the details of what your client said of a substantive nature
13 which presents all sorts of hearsay problems, and for the
14 reasons I just don't want to keep repeating them, seem to me to
15 be unusually prejudicial.
16     MR. NAFTALIS: Most respectfully, I don't think it is
17 unusually prejudicial.  I think we are entitled to put on a
18 defense.  What we're going to see is the government, in my
19 view, trying to mislead the jury in summation by arguing that
20 this issue of the redemptions and taking the money out was only
21 part of the mix in his mind after the tipping.  That just isn't
22 true because he tells her that.
23     The issue here in terms -- the issue here, indeed, one
24 could argue the other way that gee, you know, gee, it is his
25 daughter, she has a motive to help him and all the rest of

---

C6CJGUP1                                           Page 3088

1  that, so it seems to me that is always the argument on the
2  other side.  They may well even make it, I wouldn't be
3  surprised, but it seems to me that this is a critical piece of
4  evidence, there it is highly probative.
5      No question it is highly probative.  As your Honor
6  said many, many times, and I accept it, this is an intelligent
7  jury.  They do listen to you, your Honor.  I am not saying the
8  others don't, but this jury does really pay attention.  I think
9  they take very seriously their instructions.
10     (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

C6cQgup2                                           Page 3089

1      THE COURT: All right.  I am going to allow some of
2  this testimony.  I think we have to cabinet it carefully.  It
3  may be that the Court will have to put some of the questions to
4  the witness.  Let's bring in the jury and we will put the
5  witness on the stand.
6      MR. BRODSKY: Your Honor, while you are considering
7  that, consider that although the defense says they have a right
8  to call whomever they want, they do.  They have Orman available
9  to them without hearsay.  Orman also participated in the
10 Thanksgiving conversation as she said.  Orman was a firsthand
11 participant in that.  Orman was his financial adviser.  Orman
12 knew all about Voyager.  Orman was intimately involved in --
13     THE COURT: I agree, I think it is troubling, but I
14 think it is within their rights, but I think that the
15 government is right to point out that what is going on as a
16 tactical matter here -- and this is part of the Court's concern
17 of the difference between hearsay and non-hearsay -- the
18 defendant is not taking the stand, as is his right.  The person
19 with knowledge of, for example, whether he is going to sue or
20 not sue is not taking the stand even though he was available.
21     Now, of course, you can point to all of that.  You
22 can't point out the first, but you can point out the second one
23 on summation, but it's a bit of a gimmick.  I don't say that as
24 a basis for ruling, however, because it's within their tactical
25 rights.

---

C6cQgup2                                           Page 3090

1      MR. NAFTALIS: May I say something in response, your
2  Honor?
3      THE COURT: Yes, go ahead.
4      MR. NAFTALIS: There's something else which I think I
5  should put on the record in light of the letter that the
6  government wrote and the arguments they made involving -- there
7  was another witness we had at one time the possibility of
8  calling, a man named Trehan.  Trehan was interviewed by us and
9  told us that he had brought the issue of the redemptions to
10 Mr. Gupta's attention back in the summer of 2008.  He also,
11 when he was first interviewed by the FBI, told them it exactly
12 the same way.
13     Subsequently, as Mr. Brodsky advised the Court and as
14 he puts in his letter, Trehan changed his story, and now says
15 he can't remember when it was.  So Trehan no longer became an
16 available witness to us.  I don't want to get into a debate
17 about why he changed his story and what happened.
18     THE COURT: I really want to get the jury in here and
19 the witness in here.
20     MR. BRODSKY: Just for the record, Mr. Naftalis is
21 incorrect.  Mr. Trehan is represented by counsel.  Mr. Trehan
22 never told the government that.  He's misreading the FBI 302.
23 Mr. Trehan's counsel has informed us that Mr. Trehan remembers
24 it was in February of '09.  We interviewed Mr. Trehan multiple
25 times.  It was February of '09.  Mr. Trehan's counsel has

---

1   spoken to Mr. Naftalis about this multiple times prior to the
2   Court proceeding.  Raina Shakdher was the CFO of Broad Street
3   Capital.  Raina Shakdher has a clear recollection of when this
4   happened because she is the one who discovered the redemptions,
5   and it was in February of '09.
6          MR. NAFTALIS: I will hand up to the Court.
7          THE COURT: Oh, no.  I will tell you what --
8          MR. NAFTALIS: I need to just because I must correct
9   the misrepresentation --
10         THE COURT: At the next break --
11         MR. NAFTALIS: I apologize.
12         THE COURT: -- I will go have a snack, and you two can
13  stay here and put on the record all the conferences.  Let's
14  bring in the jury.
15         (Continued on next page)
16
17
18
19
20
21
22
23
24
25

1          (Jury present)
2      GEETANJALI GUPTA, resumed.
3          called as a witness by the Defendant,
4          having been previously duly sworn, testified further as
5   follows:
6   DIRECT EXAMINATION CONTINUED
7   BY MR. NAFTALIS:
8          THE COURT: Good morning, ladies and gentlemen.  Sorry
9   for the delay.  We were very busy with numerous legal issues
10  that had to be taken up.  Plus, of course, I was celebrating
11  another Yankee win last night.  Who's counting?
12         But we are ready to proceed.  Mr. Naftalis.
13         MR. NAFTALIS: Thank you, your Honor.
14  BY MR. NAFTALIS:
15  Q.  Good morning, Ms. Gupta.
16  A.  Good morning.
17  Q.  I think when we left off yesterday, I think I had asked you
18  about September 19, 2008?
19  A.  Yes.
20  Q.  I think I'd asked you why it is that you remembered that
21  date?
22  A.  Yes.
23  Q.  Could you remind the people of the jury and the Court about
24  that.
25  A.  Yes.  September 20, 2008 was my 30th birthday.  I had come

1   into New York City on the 19th to have dinner with my family
2   and friends to celebrate; and then since it was my mother's
3   birthday on the 21st, I went to Connecticut the next day to
4   celebrate with my family.
5   Q.  I want to ask you whether on September 20 you had any
6   conversation with your father relating to an investment that
7   Mr. Gupta had with Mr. Rajaratnam called Voyager?
8   A.  Yes, I did.
9          THE COURT: Did you have an understanding of who
10  Mr. Rajaratnam was?
11         THE WITNESS: Yes, I did.
12         THE COURT: Who did you understand him to be?
13         THE WITNESS: I understood him to be a hedge fund
14  manager who managed a hedge fund named Galleon.
15         THE COURT: Did you have an understanding of whether
16  your father had business relations with him?
17         THE WITNESS: I knew that my father had at some point
18  was in the process of raising a fund with him called NSR,
19  which--
20         THE COURT: Anything else?
21         THE WITNESS: I knew that he had an investment in a
22  hedge fund called Voyager with him.
23         THE COURT: Anything else?
24         THE WITNESS: No.
25         THE COURT: All right.  Go head.

1   BY MR. NAFTALIS:
2   Q.  Do you recall what your father said to you regarding his
3   investment in Voyager?
4          MR. BRODSKY: Objection, your Honor.
5          THE COURT: Well, for the reasons already discussed,
6   just answer these questions yes or no.  Did your father express
7   to you some concern about his investment in Voyager?
8          THE WITNESS: Yes, significant concern.
9          THE COURT: And in relating this to you, what was his
10  demeanor?
11         THE WITNESS: He was upset.  He was stressed.  He was
12  running his hands through his hair, which he often does when
13  he's stressed.  He was walking about.  He was quite upset.
14  He's normally a very calm and collected person.
15         THE COURT: Was it your understanding, if you had one,
16  that this was because of how the investment was doing or
17  because of how Mr. Rajaratnam was treating the investment or
18  what?
19         THE WITNESS: It was more because of how
20  Mr. Rajaratnam was treating the investment.  My father had been
21  very upset that --
22         THE COURT: No.  You've answered the question.  All
23  right I think we need to move on now to the next conversation,
24  Mr. Naftalis.
25  Q.  Did there come a point in time when you had a further

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,                                                                    June 12, 2012

| C6cQgup2 | G. Gupta - Direct | Page 3095 |
|---|---|---|

1    conversation with your dad about this?
2    A.  Yes, there did.
3    Q.  Do you remember when that was?
4    A.  The next conversation I can remember is on October 10.  It
5    was a brief conversation.  We had dinner with my father and my
6    husband, and because my father had been so upset about the
7    investment when I spoke with him in September, I asked him how
8    it was going, and he told me that he was still having
9    difficulty getting information from Mr. Rajaratnam.  He was
10   very frustrated about it.
11           MR. BRODSKY: Objection.
12   A.  And he was still very upset about the money that
13   Mr. Rajaratnam --
14           MR. BRODSKY: Objection.
15           THE COURT: So, ladies and gentlemen, this witness
16   obviously doesn't know of her own personal knowledge whether
17   Mr. Gupta was or was not having difficulty getting information
18   from Mr. Rajaratnam.  All she is relaying is what she was told,
19   which may or may not be accurate.  So you need to consider this
20   and this whole testimony only on the issue of what bearing it
21   has, if at all, on Mr. Gupta's attitude toward Mr. Rajaratnam
22   during the period of time in question.
23           Let's move on to the final conversation.
24           MR. NAFTALIS: I just wanted to introduce a document
25   before that.

| C6cQgup2 | G. Gupta - Direct | Page 3096 |
|---|---|---|

1           THE COURT: All right.
2           MR. BRODSKY: Your Honor, for your consideration.
3           THE COURT: So, I take it the government thinks that
4    if this is admissible at all, it should be in the form set
5    forth in 9138, is that it?
6           MR. BRODSKY: Yes, your Honor.  We object to its
7    admissibility.  If it is admissible, the complete email
8    exchange should be in.
9           THE COURT: So I will get to admissibility in a
10   minute.  Is there any disagreement by the defense that if it
11   comes in at all, it should come in as 9138?
12          MR. NAFTALIS: I don't have a problem with both of
13   them coming in.  I think I would send her the first one and
14   then the response -- I'm happy to put them both in evidence
15   because --
16          THE COURT: Well, it would be duplicative.  Why don't
17   you lay a foundation, in any event.  Let's assume it's going to
18   be 9138, but if you want to lay a foundation to see if it can
19   be received at all, go ahead.
20   BY MR. NAFTALIS:
21   Q.  I put in front of you first Defense Exhibit 2152, which is
22   an email you sent to your dad?
23   A.  Yes, correct.
24   Q.  I am going to put in front of you Exhibit 9138, which
25   contains that email and the response from your dad, right?

| C6cQgup2 | G. Gupta - Direct | Page 3097 |
|---|---|---|

1    A.  Yes, correct.
2    Q.  The first email is dated what?
3    A.  It's dated October 29, 2008.
4    Q.  It says subject Bhakti/Dell?
5    A.  Yes, correct.
6    Q.  What is that?
7    A.  It was a friend of mine who worked in the area of
8    microfinance, and she was interested in getting my father to
9    help her with a position at the Dell Foundation.  And since he
10   is very involved with public health, he's involved with the
11   Dell Foundation, so that is what I had emailed him about.
12   Q.  In addition to communicating with your dad about this
13   position for your friend at the Dell Foundation, did you also
14   ask him a question relating to the problems he was having with
15   the investment with Mr. Rajaratnam?
16   A.  Yes, I did.  I asked him how bad --
17          THE COURT: No.  OK.  So I will receive 9138.
18          MR. NAFTALIS: Thank you, your Honor.
19          THE COURT: So you asked him -- maybe we should put
20   the whole exhibit up, 9138.
21          (Defendant's Exhibit 9138 received in evidence)
22          THE COURT: So in the middle of your email, like call
23   emails, the lower one is the earlier one, and then there is a
24   response.  So do you want to blow up the sentence beginning --
25   Q.  Can we blow up the first one first, which is the bottom

| C6cQgup2 | G. Gupta - Direct | Page 3098 |
|---|---|---|

1    half of 9138, which is also Defense Exhibit 9152, "Hi Baba."
2    Is that how you refer to your dad?
3    A.  Yes, that's what I call my father.
4           THE COURT: That's sort of Indian for Poppa?
5           THE WITNESS: Yes.
6    Q.  It's signed Sonu, that's how you refer to --
7    A.  Yes.  Sonu is my nick name.  Geetanjali is quite long.
8    Q.  The first paragraph of the letter --
9           THE COURT: No.  No.  Let's move it along.
10   Q.  You told us about it?
11   A.  Yes, I told you about asking my father to help my friend
12   with the microfinance position.
13   Q.  Then in the second -- can we highlight the second sentence,
14   please, Mr. Fernandez -- what does that say, ma'am?
15   A.  It says, "How bad are things with the Raj fund?"
16   Q.  What were you referring to there?
17   A.  I was referring to the earlier conversations we'd had when
18   he was upset about --
19          THE COURT: The ones you previously told us about?
20          THE WITNESS: Yes, the conversation I previously told
21   you about, and I --
22          THE COURT: Excuse me.
23          THE WITNESS: Of course.
24          THE COURT: You've answered the question.
25   Q.  And then the third paragraph is some personal --

| C6cQgup2 | G. Gupta - Direct | Page 3099 |
|---|---|---|

1 A. Yes, about when I'll be going to Connecticut.

2　　　THE COURT: Did you get a response to the question of

3 how bad are things with the Raj fund, an email response?

4　　　THE WITNESS: I did not get an email response to it.

5 I got a verbal response.

6　　　THE COURT: The email response you got is the one

7 above, correct?

8　　　THE WITNESS: Correct.

9　　　THE COURT: Which relates to the other issue?

10　　　THE WITNESS: Yes.

11　　　THE COURT: All right.  Go ahead, Mr. Naftalis.

12 Q.  You say you got a verbal response?

13 A.  Yes, it came up on a phone conversation we had.

14 Q.  What did your dad say?

15　　　MR. BRODSKY: Objection.

16　　　THE COURT: Sustained.

17 Q.  Now, did there come a time -- I want to direct your

18 attention to Thanksgiving of 2008.  Is it fair to say that the

19 family gets together on Thanksgiving like other families?

20　　　MR. BRODSKY: Objection.

21　　　MR. NAFTALIS: Just trying to move it along,

22 Mr. Brodsky, honestly.

23　　　THE COURT: Well, gentlemen...

24　　　MR. NAFTALIS: I'm happy to put another question.

25　　　THE COURT: Thank you.

| C6cQgup2 | G. Gupta - Direct | Page 3100 |
|---|---|---|

1 BY MR. NAFTALIS:

2 Q.  Directing your attention to Thanksgiving of 2008, were you

3 with your family?

4 A.  I was, yes, we were having a family Thanksgiving

5 celebration.

6 Q.  Where was that?

7 A.  It was in Westport, Connecticut at my parents' house.

8 Q.  Without going into any other matters, during the course of

9 the time you were there at Thanksgiving, was there any further

10 conversation with your dad about the problem he was having with

11 Mr. Rajaratnam and the Voyager investment?

12 A.  Yes, there was quite a bit of conversation over

13 Thanksgiving about Voyager.  My father was quite different from

14 his normal self.  He was quite depressed and withdrawn about

15 it.  He was upset about the Voyager investment.  At that point

16 the family knew that he had lost all of his money --

17　　　THE COURT: No.  No.  No.  You've answered the

18 question, I think.  And I remind you, ladies and gentlemen,

19 again, this is evidence that's received not for whether there

20 really -- whatever may or may not have been going on at

21 Voyager, but only for what Mr. Gupta's state of mind was with

22 respect to Mr. Rajaratnam at this particular time, and you may

23 receive it and give it whatever weight you want, but that's the

24 limited purpose for which it is received.

25　　　MR. NAFTALIS: Your Honor, I think I have no further

| C6cQgup2 | G. Gupta - Direct | Page 3101 |
|---|---|---|

1 questions?

2　　　THE COURT: Yes.  Any cross-examination?

3 CROSS-EXAMINATION

4 BY MR. BRODSKY:

5 Q.  Ma'am, you love your father?

6 A.  Yes, I do.

7 Q.  You would do what you could to help your father?

8 A.  I would do many things to help my father.  I would not lie

9 though on the stand.

10　　　MR. BRODSKY: No further questions.

11　　　THE COURT: Anything else?

12　　　MR. NAFTALIS: No, your Honor.

13　　　THE COURT: All right.  Thank you very much.  You may

14 step down.

15　　　(Witness excused)

16　　　THE COURT: Please call your next witness.

17　　　MR. FRANKEL: Mr. Gupta calls James Roth, your Honor.

18 JAMES ROTH,

19 　　called as a witness by the Defendant,

20 　　having been duly sworn, testified as follows:

21 DIRECT EXAMINATION

22 BY MR. FRANKEL:

23　　　THE DEPUTY CLERK: Please be seated.  State your name

24 and spell it slowly for the record.

25　　　THE WITNESS: Todd Summers.  T-O-D-D; S-U-M-M-E-R-S.

| C6cQgup2 | Summers - Direct | Page 3102 |
|---|---|---|

1　　　MR. FRANKEL: I have no defense whatsoever.  I don't

2 know what to do now.

3　　　THE COURT: I take it you are not known as Mr. James

4 Roth?

5　　　MR. FRANKEL: Your Honor, we have two choices:  Either

6 Mr. Naftalis examines this witness or we make a switch.

7　　　THE COURT: No, that's fine.  Mr. Naftalis can examine

8 this witness.  Did you spell your name for the record I'm

9 sorry?  Yes.

10　　　MR. NAFTALIS: I got as much notice as the Court.

11 BY MR. NAFTALIS:

12 Q.  Good morning, Mr. Summers.

13 A.  Good morning.

14 Q.  Mr. Summers, where do you live, sir?

15 A.  I live in Sperryville, Virginia.

16 Q.  How long have you lived there?

17 A.  Six years.

18 Q.  Where were you born, sir?

19 A.  Rochester, New York.

20 Q.  Did you grow up and go to school in Rochester?

21 A.  I did, Fairport High School.

22 Q.  Did you go to college?

23 A.  I did Middlebury College in Middlebury, Vermont.

24 Q.  Did you get a degree there?

25 A.  I did I got a bachelor's of arts in religion.

UNITED STATES OF AMERICA, v
RAJAT K. GUPTA,

June 12, 2012

---

C6cQgup2                Summers - Direct                Page 3103

1  Q.  What did you do after graduating college?
2  A.  I do what anyone does with a religion degree, which is, I
3     went home and started doing construction work with my brother.
4     So I ended up --
5         THE COURT: Well, it's the Lord's work.
6  A.  Role of the carpenter.  So, I ended up renovating old
7     houses.  I bought an old house and spent a year and a half
8     fixing it up and moved to Boston when I was 23.
9  Q.  What did you do after that, sir?
10 A.  Started working in real estate.  Ended up working for a
11    large real estate development company starting as a financial
12    analyst and working my way up to vice-president; and then I
13    left that to go work at a non-profit sector still doing
14    affordable housing and eventually ended up starting a
15    non-profit that focused on housing for people living with HIV.
16 Q.  What was the name of that organization?
17 A.  The AIDS Housing Corporation.
18 Q.  How long did you work there?
19 A.  Seven or eight years.  I left in 1997 to go work for the
20    Clinton Administration as a deputy director of the White House
21    Office of National AIDS Policy.
22 Q.  How long did you hold that position?
23 A.  Three years.
24 Q.  What have you done subsequently to leaving the government?
25 A.  Well, after I left in 2000, I went to work for myself as a

---

C6cQgup2                Summers - Direct                Page 3104

1     consultant mostly focused on health issues, particularly HIV.
2     I did a lot of work addressing the domestic epidemic but
3     increasingly spent time working on the global AIDS epidemic.
4     So I started working on a number of projects, spent a lot of
5     time working for the Bill and Melinda Gates Foundation as a
6     consultant.
7  Q.  What's your current occupation?
8  A.  I'm back to being an independent consultant.
9  Q.  Now, do you know a man named Rajat Gupta?
10 A.  I do.
11 Q.  How did you come to meet Mr. Gupta?
12 A.  Through my work on the Global Fund to fight AIDS,
13    tuberculosis and malaria.
14 Q.  What were you doing -- in what connection did you deal with
15    Mr. Gupta there?
16        MR. BRODSKY: Objection, your Honor.
17        THE COURT: Sustained.
18 Q.  Mr. Did Mr. Gupta have a connection with the Global Fund?
19        MR. BRODSKY: Objection.
20        THE COURT: Did you come to know Mr. Gupta in
21    connection with the work of the fund?
22        THE WITNESS: Sure.  I was part of a board delegation
23    for private foundations and Rajat --
24        THE COURT: Just answer my question, if you can, yes
25    or no.

---

C6cQgup2                Summers - Direct                Page 3105

1         THE WITNESS: Yes.
2         THE COURT: Over what period of time did you get to
3     know him?
4         THE WITNESS: From about 2002 to 2008 was when he left
5     his work at the Global Fund.
6         THE COURT: Did you have numerous interactions with
7     him during that period in connection with the fund?
8         THE WITNESS: I did.
9         THE COURT: In general terms, what was the nature of
10    these interactions?
11        THE WITNESS: Well, we attended board meetings
12    together three times a year and we sat next to each other
13    during the board meetings.  I was eventually on the board with
14    Rajat so we were sitting next to each other during board
15    meetings.  I also chaired a board committee when Rajat was the
16    chair of the Global Fund board, so I was part of his executive
17    chair of the committee, if you will.
18        THE COURT: All right.  Go ahead, Mr. Naftalis.
19 Q.  Without going into details, did you have interactions and
20    communications and dealings with him apart from the board
21    meetings and the like?
22 A.  I did.  We interacted on the side of board meetings and
23    also would occasionally connect on other global health issues.
24 Q.  Over the course of knowing and working with Mr. Gupta, had
25    you come to form an opinion as to his character for honesty?

---

C6cQgup2                Summers - Direct                Page 3106

1  A.  I have.  I think Rajat is an honest and honorable man.
2         MR. NAFTALIS: I have no further questions.
3         THE COURT: Cross-examine.
4  CROSS-EXAMINATION
5  BY MR. BRODSKY:
6  Q.  To the best of your recollection, sir, in 2007
7     approximately how many times did you speak to Mr. Gupta in
8     person or by telephone?
9  A.  It would have been probably well over a hundred.
10 Q.  In 2007, do you have any personal knowledge of Mr. Gupta's
11    relationship with Mr. Rajaratnam?
12 A.  None.
13 Q.  In 2007, did you ever visit the offices of Galleon?
14 A.  No.
15 Q.  In 2007, did you ever observe Mr. Gupta in meetings with
16    Mr. Rajaratnam?
17 A.  No.
18 Q.  In 2008, did you ever visit the offices of Galleon?
19 A.  No.
20 Q.  Did you ever observe Mr. Gupta meeting with Mr. Rajaratnam?
21 A.  No.
22 Q.  Did you ever overhear or participate in conversations
23    between Mr. Gupta and Mr. Rajaratnam?
24 A.  No.
25 Q.  Do you have any personal knowledge of Galleon?

---

| C6dQgup2 | Summation - Tarlowe | Page 3206 |
|---|---|---|

1  International, Galleon Group  I mean, you've given me a
2  position in Galleon International."
3      There is something else interesting about Galleon
4  International.  You heard that it's a fund that's supposed to
5  invest in foreign companies.  Mr. Schutte told you that.  The
6  marketing materials for Galleon International say Pan Asia
7  multi-strategy.  That is what Mr. Schutte told you.  Non United
8  States equities that's what it invested in, in foreign
9  international companies, primarily Asian companies.
10      Let's take a look at the trading, some of the trading
11  by Galleon International.  This is trading by Galleon
12  International, all of their trading in Goldman Sachs stock from
13  March 2007 to June 30, 2008.  Goldman Sachs stock is not a
14  foreign equity.
15      Look at the three times that Galleon International
16  during this period traded Goldman Sachs' stock.  March 12,
17  2007; that's one of the tips from Gupta that we are going to
18  get to.  September 19, 2007, one of the tips we're going to get
19  to.  And June 2008, one of the tips we're going to get to.
20      Ladies and gentlemen, that is not a coincidence.
21  Galleon International traded Goldman stock based on his tips,
22  and then he was given an ownership stake and a position in the
23  company.  It's no wonder they're fighting so hard for the
24  defendant's affiliation with Galleon International.  It's no
25  surprise they've been trying over and over again to run away

| C6dQgup2 | Summation - Tarlowe | Page 3207 |
|---|---|---|

1  from it.  But the evidence is clear, Gupta believed he was
2  chairman of Galleon International, he believed he had an
3  ownership stake in it, and he believed that he was entitled to
4  performance fees.
5      Now, you didn't see any evidence of actual payments to
6  Gupta for Galleon International.  And we submit to you that's
7  because Galleon International, like almost every Galleon fund,
8  Mr. Schutte told you this, lost money in 2008.  You know there
9  was the financial crisis and the Galleon funds performed
10  poorly.  You know that from Mr. Schutte.  You know that from
11  Government Exhibit 1950, which is hard to see, but this shows
12  the performance of Galleon International as of October 2008.
13  And you see all the negative numbers: Down 16 percent, down
14  20 percent, down 13, down 65 percent.  Gupta was entitled to
15  performance fees.  There are no performance fees when the fund
16  is down 30 percent.
17      Now, a few other things about this July 29, 2008 call.
18  Agent Barnacle from the FBI testified -- he was the witness who
19  went through the charts with you.  He testified that he
20  identified about 150 calls between Gupta and Rajaratnam during
21  the period when there was a wiretap on Rajaratnam's cell phone,
22  but there were only two conversations between Gupta and
23  Rajaratnam that were actually captured on the wiretap, and that
24  is because virtually all of the 150 calls were on phones that
25  were not being tapped.

| C6dQgup2 | Summation - Tarlowe | Page 3208 |
|---|---|---|

1      So we're left with those two tapped calls on the
2  Rajaratnam cell phone.  One is just a brief call setting up a
3  schedule.  It's talking about scheduling a meeting.  The other
4  is this 25-minute conversation on July 29, 2008.  It's the only
5  substantive conversation between Gupta and Rajaratnam that was
6  recorded, and it gives you a unique window into their
7  relationship.
8      I want to touch upon a few different aspects of the
9  call.  But one is, this is a call where Rajaratnam tells Gupta
10  that he heard a rumor that Goldman might be buying a commercial
11  bank, and then he asks Gupta whether Gupta has heard anything
12  along those lines.  Think about that for a minute.  It's really
13  quite extraordinary what's going on there.  The purchase of a
14  bank is the type of thing that the board of directors, and only
15  the board of directors, can authorize.  Management can't do a
16  transaction like that.  So Rajaratnam has heard rumors in the
17  marketplace, speculation.  Everyone has access to that.  He
18  wants the inside scoop.  So he turns to his insider, Rajat
19  Gupta, and asks him about the rumors about Goldman buying a
20  commercial bank, and you'll listen to the call the way
21  Rajaratnam asks, such a casual and cavalier man.  That tells
22  you it's not the first time that he's asking Gupta about what's
23  going on at Goldman Sachs.
24      And what's even more telling than the way Rajaratnam
25  asks is the way Gupta answers.  Gupta doesn't say, "Raj, what

| C6dQgup2 | Summation - Tarlowe | Page 3209 |
|---|---|---|

1  are you thinking?  You know I can't talk about Goldman Sachs;
2  I'm on the board.  Raj, why are you asking me that question?"
3      These are sophisticated businessmen.  They know board
4  members can't have those kind of discussions.  Without
5  flinching, without hesitation, Gupta launches right into a
6  detailed discussion of what happened at a Goldman Sachs board
7  meeting at St. Petersburg, Russia as if he's talking about what
8  happened at a Yankees game yesterday.
9      Let's take a look at the transcript, take a look at
10  some portions of the transcript this is Government Exhibit 9
11  and 9-T.  For the sake of time, we are not going to play it
12  now, but the first four pages of 9-T contain this dialogue.
13  You will see in that dialogue that Gupta tells Rajaratnam about
14  the deliberations of the board, what they discussed, what board
15  members' views were.  Gupta says it was, "a divided discussion
16  among the board."  He goes on to say that they also talked
17  about possibly buying an insurance company.  Rajaratnam asks
18  was AIG a part of that discussion?  And Gupta confirms that
19  yes, AIG was definitely in the mix.  And you know what, ladies
20  and gentlemen?  You know that is what was discussed at the
21  board that day.
22      Here's an email that was sent to Gupta and the other
23  board members on July 22, 2009.  It contains this documents:
24  Key Takeaways from Strategy Review.  Strategy review refers to
25  that board meeting in St. Petersburg, Russia.  This email was

1 sent to Gupta about a week before the call Rajaratnam. That
2 top part is from the presentation: Insurance (AIG.) "It was
3 agreed that the only possible candidate would be AIG. Then
4 there is the transcript of a call between Gupta and Rajaratnam
5 and you see on line 39: "AIG it was definitely on, in, in, in,
6 the discussion." He's revealing specifics about board
7 discussions in St. Petersburg, Russia.
8      You heard he was not authorized to do that. Indeed,
9 Goldman Sachs has strict policies that prohibit that kind of
10 disclosure by board members. Gupta not only knew that; he was
11 part of the board that adopted those very rules. He was at the
12 board meeting when they adopted those rules.
13      In his opening statement, Mr. Naftalis said in
14 describing this conversation, there is nothing wrong with it
15 unless you want to put a dirty spin on it. Well, ladies and
16 gentlemen, no one is trying to put a dirty spin on anything.
17 The very policy that Gupta himself adopted at Goldman
18 prohibited what he did in this call.
19      Take a look at Government Exhibit 205 which is the
20 corporate governance guideline that Gupta and the board
21 adopted. Number 7 "Speaking on behalf of the company. It is
22 important that the company speak to employees and outside
23 constituencies with a single voice, and that management serve
24 as the primary spokesman. If a situation does arise in which
25 it seems necessary for a non-employee director" -- that's what

1 Gupta was -- "to speak on behalf of the company to one of these
2 constituencies, the director should consult with the CEO." The
3 CEO was on the witness stand. Mr. Gupta didn't consult with
4 him. Mr. Gupta didn't ask him, Can I tell Rajaratnam, a
5 $7 billion hedge fund manager, about what we talked about at
6 the board meeting?"
7      The same corporate governance guidelines that Gupta
8 adopted say, "Confidentiality. The proceedings and
9 deliberations of the board and its committees shall be
10 confidential. Each director shall maintain the confidentiality
11 of information received in connection with his or her service
12 as a director."
13      The defense knows that this call is a problem. They
14 know that it's bad for the defendant, and they tried hard to
15 minimize the significance of it. Mr. Naftalis asked
16 Mr. Blankfein, "This policy is not the same thing as the
17 federal securities laws, right?" Of course it's not. But
18 we're not suggesting that it is. To be clear, we don't allege
19 insider trading in connection with the disclosure in that call.
20 But the manner in which Rajaratnam easily asked for, and the
21 manner in which Gupta so easily, so willingly, so comfortably
22 provided information about what happened during a Goldman board
23 discussion speaks volumes about the relationship between Gupta
24 and Rajaratnam, and it's further evidence of their unlawful
25 agreement.

1      Another attempt the defense made to try to down-play
2 the significance of this call, they showed you a bunch of
3 research reports where analysts talked about meetings they had
4 with management of Goldman Sachs. Well, a few things about
5 that. One, you saw in the corporate governance guidelines
6 management, the role of management is to be the primary
7 spokesman. Gupta's not management. He's a non-employee
8 director. They're not supposed to speak. A couple other
9 things about those analysts' reports. Those analysts' reports
10 had no discussion. You could look through them all you want.
11 They had no discussion of the deliberations of the board. They
12 don't say it was a divided discussion. They don't say AIG was
13 in the mix. That's all stuff that Gupta freely told
14 Rajaratnam, and he wasn't allowed to.
15      And in a last ditch effort to deal with this call,
16 they called Mr. Richard Schutte to the stand to tell you about
17 a meeting at Galleon in July 2008, a couple of days after the
18 call where Gary Cohn met with people at Galleon. Mr. Schutte
19 told you that Rajaratnam used the information he had gotten
20 from Gupta to ask questions of Gary Cohn. He also told you
21 that Gary Cohn basically blew off Rajaratnam. He gave a
22 dismissive answer something like "The problem is you don't know
23 what you're getting." That's the answer Gary Cohn gave. He
24 didn't reveal anything remotely close to what Gupta revealed to
25 Rajaratnam. And even if he did, there is no evidence that he

1 did. Gary Cohn is management; Gupta's not.
2      Now, there is something else telling about the call on
3 July 29, 2008 between Gupta and Rajaratnam. Right after the
4 discussion about what had happened at the board meeting, right
5 after it, the next thing they turn to in that call immediately
6 after that discussion is Voyager, and they talk about Gupta's
7 balance in Voyager. Rajaratnam says, "I will have George,"
8 meaning George Lau send you a balance on Galleon letterhead. A
9 few days later Gupta gets this letter. "This is to inform you
10 that Rajat Gupta's balance in Voyager is $16 million and
11 change." You may remember this document. According to this
12 document, his value is twelve-six, but value as per agreement
13 $16,406,974. Rajaratnam bumped up Gupta's stake in Voyager by
14 $4 million, and they had that conversation right after Gupta
15 tells him about what happened at the board meeting in St.
16 Petersburg, Russia.
17      What else does this call tell you about their
18 relationship? There is a discussion in this call about Anil
19 Kumar. You remember Anil Kumar was a witness who pled guilty
20 to providing inside information to Rajaratnam. During this
21 call, Rajaratnam tells Gupta, "I'm giving him" -- Anil Kumar --
22 "a million a year for doing literally nothing, just because."
23      And Gupta's response, "I know, you're being -- I think
24 you're being very generous."
25      Then they continue to talk about Anil Kumar and these

| 6fQgupF | Trial | Page 3394 |
|---|---|---|

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA
 4           v.                    11 CR 907 (JSR)
 5   RAJAT K. GUPTA
     a/k/a Sealed Defendant 1
 6
             Defendant
 7
     ------------------------------x
 8                              June 15, 2012
 9                              10:00 a.m.
10   Before:
11                  HON. JED S. RAKOFF
12                          District Judge
13                          and a jury
                      APPEARANCES
14
     PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16   REED MICHAEL BRODSKY
     RICHARD CRAIG TARLOWE
17       Assistant United States Attorneys
18   KRAMER LEVIN NAFTALIS & FRANKE LLP
         Attorneys for defendant Gupta
19   BY:  GARY P. NAFTALIS Esq.
          DAVID S. FRANKEL Esq.
20        ROBIN MARIE WILCOX Esq.
          Of counsel
21
22   Also Present:
23       ANDREA ESTOK, Special Agent FBI
         SEAN FERNANDEZ-LEDON, Paralegal Specialist
         KAITLIN PAULSON, Paralegal Specialist
24   RAYMOND McLEOD, Managing Director Doar Lit. Consulting
25
```

| C6fQgupF | Verdict | Page 3396 |
|---|---|---|

1 take account of. And then, those who do not want to talk to
2 the press, we will ask the CSOs to escort them out of the
3 courthouse. Those who do want to talk to the press, our Press
4 Officer, Stephanie Cirkovich, will take them into the courtroom
5 next door 14A. Then the press can talk to them.
6    I will ask the members of the press who want to
7 interview the jurors to stay here until that's all set up, so
8 there is not sort of a mad rush in the direction of any given
9 juror, but all those who want to talk to the press will be in
10 the room adjoining this one. Then as soon as Stephanie tells
11 me they are all there, you can go speak with them.
12    In terms of counsel, my rule is that counsel cannot
13 talk to any members of the jury without prior permission of the
14 Court, so if you have a reason you want to talk to a juror,
15 make an application to the Court, and we will deal with it
16 then.
17    Unless any one has anything else, well bring in the
18 jury. Let's do it
19    (Jury present)
20    THE COURT: Please be seated.
21    So, ladies and gentlemen, we have your verdict
22 envelope. I am going to open it in a minute, and then we will
23 read it to you and ask you if that is your verdict, but I will
24 not comment on your verdict because the determination of the
25 verdict is your job; not mine.

| C6fQgupF | Verdict | Page 3395 |
|---|---|---|

1    (In open court; jury not present)
2    THE COURT: I am told we have a verdict. I will bring
3 in the jury the minute. I received last night from the press
4 the following letter:
5    "Dear Judge Rakoff:
6    "On behalf of the reporters covering the trial of
7 Rajat Gupta, we are writing to request that after the jury has
8 announced its verdict you could inquire if they'd be willing to
9 speak to members of the press in the courthouse.
10    "Such a session isn't without precedent, as your
11 colleague, U.S. District Court Judge Miriam Cedarbaum, allowed
12 panel members to be interviewed after the Martha Stewart jury
13 rendered its verdict. In that instance, the court set aside a
14 room to interview willing jurors.
15    "Respectfully submitted,
16    "New York Times, Bloomberg News,Wall Street Journal,
17 Thomson Reuters, New York Law Journal, Financial Times,
18 Associated Press, New York Daily News, New York Post,
19 hereinafter after collectively called The Newsies. So I have a
20 feeling that they had to scout around to find that sole
21 precedent. Nevertheless I am inclined to accommodate that
22 request.
23    So, I am going to tell the jury when they come in that
24 they are free to talk to the press or not, as they choose. And
25 I will explain some of the considerations they might want to

| C6fQgupF | Verdict | Page 3397 |
|---|---|---|

1    But before we open the verdict, I want to advise you
2 that everyone here has been so impressed with this jury. Over
3 the last four weeks, you have been one of the most attentive
4 juries I have ever seen. I actually have another trial coming
5 up in a couple of weeks; I thought maybe I would ask you to
6 stay for that, but, in all seriousness, you have been most
7 terrific, and we are all very grateful for your excellent
8 service.
9    So let me open the verdict.
10    The verdict is in proper form. I will give it to my
11 courtroom deputy to take the reading of the verdict.
12    THE DEPUTY CLERK: Mr. Foreman, please rise. You say
13 you've agreed upon a verdict.
14    THE FOREPERSON: Yes, we have.
15    THE DEPUTY CLERK: As to United States v. Rajat Gupta
16 on Count Two - the charge of securities fraud for unlawfully
17 disclosing material non-public information in connection with
18 the purchase of at least 350,000 shares of Goldman Sachs stock
19 on March 12, 2007, we the jury find Rajat Gupta: Guilty or not
20 guilty.
21    THE FOREPERSON: Not guilty.
22    THE DEPUTY CLERK: On Count Three - the charge of
23 securities fraud for unlawfully disclosing material non-public
24 information in connection with the purchase of approximately
25 150,000 shares of Goldman Sachs stock on September 23, 2008, we

| C6fQgupF | Verdict | Page 3398 |
|---|---|---|

1 the jury find Rajat Gupta: Guilty or not guilty.

2    THE FOREPERSON: Guilty.

3    THE DEPUTY CLERK: On Count Four - the charge of

4 securities fraud for unlawfully disclosing material non-public

5 information in connection with the purchase of approximately

6 67,200 shares of Goldman Sachs stock on September 23, 2008, we

7 the jury find Rajat Gupta: Guilty or not guilty.

8    THE FOREPERSON: Guilty.

9    THE DEPUTY CLERK: On Count Five - the charge of

10 securities fraud for unlawfully disclosing material non-public

11 information in connection with the sale of approximately

12 150,000 shares of Goldman Sachs stock on October 24, 2008, we

13 the jury find Rajat Gupta: Guilty or not guilty.

14    THE FOREPERSON: Guilty.

15    THE DEPUTY CLERK: On Count Six - the charge of

16 securities fraud for unlawfully disclosing material non-public

17 information in connection with the sale of approximately

18 180,000 shares of Proctor & Gamble stock on January 29, 2009,

19 we the jury find Rajat Gupta: Guilty or not guilty.

20    THE FOREPERSON: Not guilty.

21    THE DEPUTY CLERK: Conspiracy (Count One). On Count

22 One - the charge of conspiracy to commit securities fraud, we

23 the jury find Rajat Gupta: Guilty or not guilty.

24    THE FOREPERSON: Guilty.

25    (Jury polled; each juror answered in the affirmative)

| C6fQgupF | Verdict | Page 3399 |
|---|---|---|

1    THE COURT: Thank you. Get the verdict from the

2 foreperson.

3    So, ladies and gentlemen, let me mention two other

4 things. First of all, after you go back into the jury room,

5 you will need to decide whether or not to talk to the press.

6 The press is here. They, of course, have a natural interest in

7 wanting to talk to you, but it is your decision, and I think

8 you should consider on the one hand the natural desire of the

9 public to know how the jury reached a verdict; but, on the

10 other hand, the fact is there is a good reason why jury

11 deliberations are secret so that jurors can be free and easy

12 about giving their views with one another without fearing that

13 that's going to become a matter of public record.

14    So, those are competing views, and it will be up to

15 you individually to decide if you want to talk to the press.

16 If you do not want to talk to the press, the CSO, the court

17 officers, will take you out of the courthouse. If you do want

18 to talk to the press, our press officer will take you next door

19 to the room where the reporters who want to talk to you will be

20 able to talk to you. So, it is totally your individual view,

21 and when you go back in the jury room, you can each make your

22 own decision.

23    Lastly, you may want to know that you are now excused

24 from jury service for four years, but we will get you back

25 eventually. In the meantime, I want to again thank you so much

| C6fQgupF | Verdict | Page 3400 |
|---|---|---|

1 for a job very well done and you are now excused. Thank you.

2    (Jury discharged)

3    THE COURT: Please be seated.

4    We will set sentencing down for October 18 at

5 4:00 p.m.

6    Is there anything else that counsel needs to raise

7 with the Court?

8    MR. BRODSKY: Your Honor, the government would like to

9 have the opportunity to speak to Mr. Naftalis regarding the

10 current bail conditions and then come back to your Honor with

11 any joint or separate proposals for your Honor's consideration.

12 The government is not seeking the detention of Mr. Gupta, but

13 we would like to consider enhancing the current bail

14 conditions.

15    THE COURT: Well, you are welcome to make any proposal

16 you want. My own feeling is that Mr. Gupta is not a risk of

17 flight at all; but make whatever proposal you want, and I will

18 of course consider it.

19    Anything else?

20    MR. NAFTALIS: Your Honor, we would want, if you would

21 allow, we would want sufficient time to make post verdict

22 motions.

23    THE COURT: Yes, so the rule is ten days, but I will

24 give you more than that. How much do you want?

25    MR. NAFTALIS: Can I consult?

| C6fQgupF | Verdict | Page 3401 |
|---|---|---|

1    THE COURT: Yes, absolutely.

2    MR. NAFTALIS: May we have 60 days, your Honor?

3    THE COURT: Yes, but that will be the maximum because

4 I have to decide any such motion, obviously, before sentencing.

5 So today is June 15. So why don't we say August 15.

6    How long does the government want for a response?

7    MR. BRODSKY: 30 days, your Honor.

8    THE COURT: That is a Saturday, so I am going to force

9 you to a measly 29, so September 14. That puts us pretty

10 close. I am going to say one week for any reply papers

11 September .

12    21. If there is a need for oral argument, I don't

13 think there usually is on these motions, but if there is a need

14 for oral argument, I will reach out to you shortly after the

15 24th to set an oral argument date.

16    MR. NAFTALIS: Your Honor, if they were filing on

17 Friday, could we have the Monday or Tuesday; in other words,

18 ten days or eleven days?

19    THE COURT: So that would be the 17th, yes? I'm

20 sorry. Wait a minute. Your paper is on August 15. Their

21 paper is on September 14th. So, I see, you want to

22 September 24.

23    MR. NAFTALIS: Yes.

24    THE COURT: That's fine.

25    Anything else? So in every case there is always a

Case: 12-4448    Document: 16    Page: 100    11/13/2012    766559    188

| C6fQgupF | Verdict | Page 3402 |
|---|---|---|

1 winning party and a losing party, and it certainly is a very
2 different psychological situation, but in terms of the
3 lawyering, I do want to repeat that I thought the lawyering by
4 both sides was at the highest traditions of the legal
5 profession and all of you have a right to be very proud of the
6 job you did for your respective clients.  So this matter is
7 adjourned.  Thanks very much.
8          With respect to the reporters, my law clerk will tell
9 you as soon as we get the hi sign, you can go next door to
10 where the jurors are, but I will ask you to remain in this room
11 until then.  Yes?
12          REPORTER: Your Honor, will we be interviewing them,
13 if they want to, in the jury room or in another courtroom?
14          THE COURT: No, in the courtroom.  We got you the
15 whole courtroom.
16          REPORTER: Thank you.
17          THE COURT: But I just don't know which jurors want to
18 do it.  I think in fairness to them, we should wait until they
19 are there, and then have you go over and talk with them.  So my
20 law clerk here will let you know as soon as that is ready.
21 Thank you.
22          (Trial concluded)
23
24
25

Caodgup1                        Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                        11 Cr. 907 (JSR)

5   RAJAT K. GUPTA,
    a/k/a Sealed Defendant 1,
6
                 Defendant.
7
    ------------------------------x
8
                                          October 24, 2012
9                                         2:09 p.m.

10  Before:

11                     HON. JED S. RAKOFF,

12                                          District Judge

13

14                     APPEARANCES

15  PREET BHARARA,
         United States Attorney for the
16       Southern District of New York
    RICHARD CRAIG TARLOWE
17  DAMIAN WILLIAMS,
         Assistant United States Attorneys
18
    KRAMER LEVIN NAFTALIS & FRANKEL, LLP,
19       Attorneys for defendant Gupta
    BY:  GARY P. NAFTALIS
20       DAVID S. FRANKEL
         ROBIN MARIE WILCOX
21       ALAN ROY FRIEDMAN

22       - also present -

23  Andrea Estok, Special Agent, FBI

24

25

**A71**

CAOUGUP2                    Sentence

1      I do say, though, two things in response to the issues

2  your Honor raises, that:  One, if the Court, it provides a

3  vehicle to establish something good coming out of the sentence

4  as well because the Covenant House thing which we put as our

5  first suggestion -- your Honor, we put a specific sentence --

6  we will do any kind of community service.  The only reason we

7  came up with two, apart from trying to be innovative lawyers,

8  is that it is sometimes more helpful to the Court to have a

9  concrete proposal in front of it as opposed to something in the

10  sky.

11      THE COURT:  No.  I thought they were excellent

12  proposals.  I have problems with them, but just the one that I

13  am raising the one right now which is the obvious one.  Mr.

14  Gupta, from everything that you have told me, devotes himself

15  to these kinds of activities so it is not a punishment, it is

16  actually what he finds satisfaction in doing.  Moreover,

17  someone who has suffered a reputational loss has a strong

18  motive to do those kinds of things.  I somewhat unfairly made a

19  joke at the expense of Mr. Milken previously, but he is a good

20  example of a person who has attempted to recapture his

21  reputation by doing good works.

22      So I see this as a positive thing that would happen

23  anyway and, therefore, not really fulfilling the requirements

24  of Section 3553(a) which include just punishment.

25      Maybe it is time to hear from the government.

**A72**

1      We will come back to you, Mr. Naftalis.

2      MR. TARLOWE:  Thank you, your Honor.

3      I just wanted to talk a little bit about the offender

4  characteristics because we agree with Mr. Naftalis that, of

5  course, the sentencing determination is an individualized one

6  that must be specific to the defendant before the Court.  In

7  terms of the --

8      THE COURT:  Which is why -- forgive me, I still have

9  this unfortunate tendency to interrupt -- while disparities

10 have to be looked at, and I won't deny that, comparisons

11 between different sentences, unless handled with extreme care

12 and caution, can often be misleading, and there are too many

13 individualized circumstances to make a comparison easy.

14     And the guidelines were supposed to do away with

15 sentencing disparities, taking a realistic look at them will

16 show that they substituted new irrational disparities for the

17 ones they were supposed to correct.  So I agree with you that a

18 very individual look at the situation is what is called for.

19     MR. TARLOWE:  In terms of the offender characteristics

20 here, obviously, there are a lot of factors.  There are a

21 constellation of factors that the Court needs to look at, and

22 those certainly do include the lifetime of good deeds and

23 philanthropy which we agree have been extraordinary.  And it is

24 certainly something that the Court should -- and sounds like

25 will -- give significant consideration to, and we don't for a

**A73**

1    minute seek to dispute them or to minimize the importance of

2    that, but at the same time, there are a number of other

3    characteristics about this defendant that, frankly, in the

4    context of other types of crimes, would probably be viewed as

5    mitigating factors.  In the context of this particular crime

6    and this offense, we think that they actually elevate

7    significantly the seriousness of the conduct.  And those

8    include Mr. Gupta's sophistication, his professional

9    experience.  He was at the pinnacle of a profession --

10           THE COURT:  So he had no good reason to do this and he

11   knew darn well that what he was doing was wrong.  I agree with

12   that.

13           MR. TARLOWE:  Your Honor, I think it is beyond that he

14   had no good reason to do it; it was that he was in such an

15   extraordinary position of trust.  And I think it is difficult

16   to identify any other corporate insider who has been convicted

17   of insider trading who held such an extraordinary position of

18   trust, and I think that --

19           THE COURT:  I think that's a fair point.  It is

20   interesting that, in a funny way, it cuts for a non-guidelines

21   sentence, albeit going in the other direction from the one that

22   the defense is arguing because the guidelines only add two

23   points for abuse of trust, whereas what you are arguing is this

24   was really a blatant and brazen abuse of trust.

25           On the other hand, another reason why that is

A74

CAOUGUP2                    Sentence

1    We will take a 10-minute break.

2    (Recess)

3    THE COURT:   I should mention that I am giving now or

4    will have the courtroom deputy give a copy of this sentencing

5    memorandum to the court reporter, but immediately after we

6    conclude I will have it docketed and also I will send a copy to

7    Ms. Cirkovich so that it would be made available to whoever

8    needs it.

9    The Court is called upon to impose sentence on Rajat

10   K. Gupta, who on June 15, 2012, was found guilty by a jury of

11   one count of conspiracy and three counts of substantive

12   securities fraud, in connection with providing material

13   non-public information to Raj Rajaratnam.   Federal law requires

14   as court to state, not only orally but in writing, its reasons

15   for imposing a sentence "different from" a Guidelines sentence.

16   This will be a non-guidelines sentence, and, accordingly, the

17   Court will both read this Sentencing Memorandum in open court

18   and docket it promptly thereafter.

19   Imposing a sentence on a fellow human being is a

20   formidable responsibility.   It requires a court to consider,

21   with great care and sensitivity, a large complex of facts and

22   factors.   The notion that this complicated analysis, and moral

23   responsibility, can be reduced to the mechanical adding-up of a

24   small set of numbers artificially assigned to a few arbitrarily

25   selected variables wars with common sense.   Whereas apples and

**A75**

CAOUGUP2                    Sentence

1   oranges may have but a few salient qualities, human beings in

2   their interactions with society are too complicated to be

3   treated like commodities, and the attempt to do so can only

4   lead to bizarre results.

5           Nowhere is this more obvious than in this very case,

6   where the sentencing guidelines assign just 2 points to Mr.

7   Gupta for his abuse of a position of trust -- the very heart of

8   his offense -- yet assign him no fewer than 18 points for the

9   resultant but unpredictable monetary gains made by others, from

10  which Mr. Gupta did not in any direct sense receive one penny.

11          It may be worth remembering that the sentencing

12  guidelines were originally designed to moderate unwarranted

13  disparities in federal sentencing by enacting a set of

14  complicated rules that, it was hypothesized, would cause

15  federal judges to impose for any given crime a sentence

16  approximately equal to what empirical data showed was the

17  average sentence previously imposed by federal judges for that

18  crime.  From almost the outset, however the guidelines deviated

19  from this goal.  For example, even though a perceived racial

20  disparity in sentencing was one of the evils the guidelines

21  were designed to combat, in actuality the guidelines imposed in

22  narcotics sentencing a huge racial disparity that dwarfed any

23  prior such problem.  Specifically, the Sentencing Commission,

24  based on limited and faulty data, originally determined that an

25  ounce of crack cocaine should be created as the equivalent of

1   100 ounces of powder cocaine for sentencing purposes, even

2   though the two substances were chemically almost identical and,

3   as later studies showed, very similar in their effects.  Since,

4   however, 85 percent of crack cocaine offenders were black,

5   while most of those who dealt in powder cocaine were Caucasian

6   or Hispanic, the result of the 100-to-1 ratio was t force upon

7   the courts a gross racial disparity in narcotics sentencing

8   resulting.  It was only in 2010 that the ratio was changed from

9   100-to-1 to 18-to-1; and even then as much on the basis of

10  conjecture as evidence.  For the Sentencing Commission had no

11  more empirical basis for imposing the 18-to-1 than for earlier

12  imposing the ratio of 100-to-1.  In both cases, the numbers

13  were plucked from thin air.

14          While this example is drawn from the area of

15  narcotics, the fundamental point is equally applicable to the

16  instant case.  Here, as there, the numbers assigned by the

17  Sentencing Commission to various sentencing factors appear to

18  be more the product of speculation, whim, or abstract

19  number-crunching than of any rigorous methodology -- thus

20  maximizing the risk of injustice.

21          Another example of the deviation of the guidelines

22  from the original goals of the Sentencing Commission -- and one

23  more directly relevant to the instant case -- is the huge

24  increase in recommended guideline sentences for securities

25  fraud cases.  The guidelines' calculation for this offense are

**A77**

1  no longer tied to the mean of what federal judges had

2  previously imposed for such crimes, but instead reflect an ever

3  more draconian approach to white collar crime, unsupported by

4  any empirical data.  Take the hypothetical but typical case

5  described by Professor Kate Stith of Yale Law School, involving

6  a typical securities fraud defendant who pled guilty to

7  inflating the financial figures of a public company, thereby

8  causing at least 250 shareholders to collectively suffer a

9  reduction of more than $12.5 million in the value of their

10 shares.  In 1987, such a defendant would have faced a

11 guidelines sentence of 30 to 37 months; but by 2003, the same

12 defendant would have faced a guidelines sentence of 151 to 188

13 months, and more than 500 percent increase.  Was such a crime

14 really 500 percent worse in 2003 than it was in 1987?  Had any

15 of the factors that underlie rational sentencing so radically

16 changed as to warrant such a huge increase?

17         In fairness, this vast increase in white collar

18 sentencings was partly mandated by Congress, reacting in turn t

19 public outcry over such massive frauds as Enron and WorldCom.

20 But in implementing the Congressional mandate, the Sentencing

21 Commission chose to focus largely on a single factor as the

22 basis for enhanced punishment:  The amount of monetary loss or

23 gain occasioned by the offense.  By making a guidelines

24 sentence turn, for all practical purposes, on this single

25 factor, the Sentencing Commission effectively ignored the

**A78**

1    statutory requirement that federal sentencing take many factors

2    into account, and, by contrast, effectively guaranteed that

3    many such sentences would be irrational on their face.

4         This Court has already had occasion to comment on the

5    unreasonableness of this approach in <u>United States v. Adelson</u>,

6    and hereby adopts by reference the observations made there.

7    But there is no better illustration of the irrationality of

8    this approach than the instant case:  For of the total of 30

9    guidelines points calculated by the probation department and

10   endorsed by the government as reflecting the proper measure of

11   Mr. Gupta's crime and punishment, no fewer than 20 -- or

12   two-thirds of the total -- are exclusively the product of

13   Rajaratnam's and his companies' monetary gain, in which Mr.

14   Gupta did not share in any direct sense.

15        It might be argued that the guidelines still work to

16   minimize disparities.  But if the sentences so calculated are

17   the product of placing an overwhelming emphasis on a factor

18   that may be central to some frauds but largely incidental to

19   others, the effect is to create, in the name of promoting

20   uniformity, a sentencing disparity of the most unreasonable

21   kind.

22        The heart of Mr. Gupta's offenses here, it bears

23   repeating, is his egregious breach of trust.  Mr. Rajaratnam's

24   gain, though a product of that breach, is not even part of the

25   legal theory under which the government proceeded, which would

**A79**

CAOUGUP2                          Sentence

1   have held Gupta guilty even if Rajaratnam had not made a cent.

2   While insider trading may work a huge unfairness on innocent

3   investors, Congress has never treated it as a fraud on

4   investors, the Securities Exchange Commission has explicitly

5   opposed any such legislation, and the Supreme Court has

6   rejected any attempt to extend coverage of the securities fraud

7   laws on such a theory.  Prosecution of insider trading

8   therefore proceeds, as in this case, on one or more theories of

9   defrauding the institution (or its shareholders) that owned the

10  information.  In the eye of the law, Gupta's crime was to

11  breach his fiduciary duty of confidentiality to Goldman Sachs;

12  or to put it another way, Goldman Sachs, not the marketplace,

13  was the victim of Gupta's crimes as charged.  Yet, the

14  guidelines assess his punishment almost exclusively on the

15  basis of how much money his accomplice gained by trading on the

16  information.  At best, this is a very rough surrogate for the

17  harm to Goldman Sachs.

18       The Court is nonetheless mandated to calculate the

19  defendant's guidelines range, even if, as the Court now holds,

20  the non-guideline sentence that it intends to impose would not

21  vary one whit if the guidelines calculation was that proposed

22  by the government, that proposed by the defendant, or anywhere

23  in between.

24       The parties agree that the base offense level for the

25  offense of which Mr. Gupta stands convicted is 8 points and

**A80**

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   that 2 points must be added for abuse of trust.  For these 10
2   points must be added the number of points corresponding to the
3   amount of monetary gain resulting from the offense.  Such gain
4   is defined in the official comment to the pertinent section of
5   the guidelines as "the total increase in value realized through
6   trading in securities by the defendant and persons acting in
7   concert with the defendant or to whom the defendant provided
8   inside information."  As Judge Holwell pointed out in
9   connection with Mr. Rajaratnam's sentencing, this "phrase is
10  not a model of clarity."  Nonetheless, it seems reasonably
11  clear to this Court that the comment limits the calculation to
12  gains made or losses avoided in trades that were based, in
13  whole or in part, on the inside information.
14          In the instant case, however, it is also clear to the
15  Court, both from the jury's split verdict and from the Court's
16  own assessment of the evidence, that the trades in question
17  were those made by Rajaratnam and his Galleon funds on
18  September 23, 2008 and October 24, 2008, directly and
19  immediately as the result of tips from Gupta.  In the former
20  case, Gupta, late on the afternoon of September 23, tipped
21  Rajaratnam about Warren Buffett's soon-to-be-announced infusion
22  of $5 billion into Goldman Sachs, whereupon Rajaratnam caused
23  various Galleon funds to purchase large quantities of Goldman
24  stock just before the market closed.  When the Buffett
25  investment was announced the following morning, the stock

**A81**

1    surged, causing Galleon to realize an immediate gain of

2    $1,231,630.  In the latter case, Gupta on October 23, tipped

3    Rajaratnam that Goldman Sachs would soon report third quarter

4    losses, whereas many analysts were predicting a profit.  On the

5    next day, Rajaratnam sold 150,000 shares of Goldman.

6    Thereafter, as word began to seep out about Goldman's reduced

7    prospects, the stock began to fall, and when the poor third

8    quarter results were finally made public on December 16, 2008,

9    it fell still further.  Based on all the evidence, the Court

10   concludes that it is more likely than not that Rajaratnam, in

11   the absence of Gupta's tip, would not have caused Galleon to

12   sell its valuable Goldman stock until the morning of December

13   17, 2008.  The tip thus enabled Galleon to avoid losses of

14   $3,800,565.  Taken together, therefore, the September and

15   October tip-based trades resulted in an illegal "gain" of

16   $5,032,195.

17            This figure, while large, is less than one-third of

18   the $15,355,409 gain calculated by the government and endorsed

19   by the presentence report of the probation department.  But in

20   the arbitrary world of the guidelines, this big difference

21   makes little difference.  Instead of adding 20 points to

22   Gupta's guidelines score, it adds 18 points, still overwhelming

23   all other factors.

24            Although the defendant propounds a number of other

25   theories for still further reducing the gain figure, the Court

**A82**

1    rejects these arguments, essentially for the reasons given by

2    Judge Holwell in rejecting similar arguments at the time of the

3    Rajaratnam sentencing, as well as the additional reasons set

4    forth in the government's two sentencing memoranda submitted in

5    this case.  Thus, the Court concludes that the total offense

6    level is 28, the criminal history category is I, and the

7    guidelines range is 78 to 97 months' imprisonment.

8          But this guidelines range does not rationally square

9    with the facts of this case, not only for the reasons already

10   stated but also because it does not take adequate account of

11   the factors this Court is required by law to consider in

12   imposing sentence.  The Court therefore turns to the bedrock of

13   all federal sentencing, Section 3553(a) of Title 18, entitled

14   "Factors to be considered in imposing a sentence."  The very

15   first factor is "the nature and circumstances of the offense

16   and the history and characteristics of the defendant."  Thus,

17   at the very outset, there is presented the fundamental problem

18   of this sentence, for Mr. Gupta's personal history and

19   characteristics starkly contrast with the nature and

20   circumstances of his crimes.

21         All the evidence before the Court -- not just the

22   letters written on Mr. Gupta's behalf but also the objective

23   facts of record -- establish beyond cavil that Mr. Gupta has

24   selflessly devoted a huge amount of time and effort to a very

25   wide variety of socially beneficial activities, such as the

**A83**

CAOUGUP2                    Sentence

1   Global Fund to Fight AIDS, Tuberculosis and Malaria, the Public
2   Health Foundation of India, the Indian School of Business, the
3   Pratham Foundation (which provides quality education to
4   underprivileged children in India), the Cornell Medical
5   School, the Rockefeller Foundation, and many, many more. As
6   well summarized in his counsel's sentencing memorandum, such
7   activities are but illustrations of Mr. Gupta's big heart and
8   helping hand, which he extended without fanfare or
9   self-promotion, to all with whom he came in contact.
10          While some have suggested that the large volume of
11  poignant letters submitted on Mr. Gupta's behalf are simply the
12  stratagem of a well-connected defendant endeavoring to derail
13  the Court from focusing on his crimes, this is simply not the
14  case, for the facts recited in most of the letters are well
15  documented and, indeed, undisputed by the government. The
16  Court can say without exaggeration that it has never
17  encountered a defendant whose prior history suggests such an
18  extraordinary devotion, not only to humanity writ large, but
19  also to individual human beings in their times of need. The
20  guidelines virtually ignore this measure of the man, but here
21  as elsewhere the guidelines must take second place to Section
22  3553(a), which requires a court to take account of defendant's
23  character in imposing sentence. And how could it be otherwise,
24  for on this day of judgment, must not one judge the man as a
25  whole?

**A84**

1          THE COURT:  (Continuing) But when one looks at the

2    nature and circumstances of the offense, the picture darkens

3    considerably.  In the Court's view, the evidence at trial

4    established, to a virtual certainty, that Mr. Gupta, well

5    knowing his fiduciary responsibilities to Goldman Sachs,

6    brazenly disclosed material non-public information to

7    Mr. Rajaratnam at the very time, September and October of 2008,

8    when our financial institutions were in immense distress and

9    most in need of stability, repose, and trust.  Consider, for

10   example, his tip to Rajaratnam on September 23, 2008.  With

11   Goldman Sachs in turmoil but on the verge of being rescued from

12   possible ruin by an infusion of $5 billion, Gupta, within

13   minutes of hearing of the transaction, tipped Rajaratnam, so

14   that the latter could trade on this information in the last few

15   minutes before the market closed.  This was the functional

16   equivalent of stabbing Goldman in the back.

17         So why did Mr. Gupta do it?  Since motive is not an

18   element of the offenses here in issue, it did not need to be

19   proved at trial, and so one can only speculate.  Having

20   finished his spectacular career in 2007, Gupta, for all his

21   charitable endeavors, may have felt frustrated in not finding

22   new business worlds to conquer; and Rajaratnam, a clever

23   cultivator of persons with information, repeatedly held out

24   prospects of exciting new international business opportunities

25   that Rajaratnam would help fund but that Gupta would lead.

**A85**

Caodgup3                              Sentence

1    There is also in some of the information presented to the Court

2    under seal an implicit suggestion that, after so many years of

3    assuming the role of father to all, Gupta may have longed to

4    escape the straitjacket of overwhelming responsibility, and had

5    begun to loosen his self-restraint in ways that clouded his

6    judgment.  But whatever was operating in the recesses of his

7    brain, there is no doubt that Gupta, though not immediately

8    profiting from tipping Rajaratnam, viewed it as an avenue to

9    future benefits, opportunities, and even excitement.  Thus, by

10   any measure, Gupta's criminal acts represented the very

11   antithesis of the values he had previously embodied.

12        So how does a court balance these polar extremes?  In

13   arguing for a non-guideline sentence in the presentence report,

14   the experienced Senior U.S. Probation Officer Emily Frankelis

15   had this to say:  "We believe the defendant's commission of the

16   instant offenses was aberrant behavior - not aberrant as

17   defined by the U.S. Sentencing Guidelines, but rather as

18   defined by Merriam-Webster:  '. . . Atypical.'"  The Court

19   agrees, and finds that the aberrant nature of Mr. Gupta's

20   conduct by itself would warrant a non-guideline sentence, even

21   aside from the other factors favoring leniency.  But in order

22   to find just the right sentence, the Court must also consider

23   two further mandates of Section 3553(a):  First, "the need for

24   the sentence imposed" to afford specific deterrence, general

25   deterrence, "just punishment," and the like; and, second, the

**A86**

Caodgup3                    Sentence

1  requirement that any sentence imposed be "sufficient, but not

2  greater than necessary, to comply with [these] purposes."

3         As to specific deterrence, it seems obvious that,

4  having suffered such a blow to his reputation, Mr. Gupta is

5  unlikely to repeat his transgressions, and no further

6  punishment is needed to achieve this result.  General

7  deterrence, however, suggests a different conclusion.  As this

8  Court has repeatedly noted in other cases, insider trading is

9  an easy crime to commit but a difficult crime to catch.  Others

10  similarly situated to the defendant must therefore be made to

11  understand that when you get caught, you will go to jail.

12  Defendant's proposals to have Mr. Gupta undertake various

13  innovative forms of community service would, in this Court's

14  view, totally fail to send this message.  Moreover, if the

15  reports of Mr. Gupta's charitable endeavors are at all

16  accurate, he can be counted on to devote himself to community

17  service when he finishes any prison term, regardless of any

18  order of the Court.

19         At the same time, no one really knows how much jail

20  time is necessary to materially deter insider trading; but

21  common sense suggests that most business executives fear even a

22  modest prison term to a degree that more hardened types might

23  not.  Thus, a relatively modest prison term should be

24  "sufficient, but not more than necessary," for this purpose.

25         There are, however, still other factors set forth in

**A87**

1    Section 3553(a) that the Court must, and has, considered, of

2    which perhaps the most difficult, but most important one, is

3    the concept of "just punishment."  While all the other factors

4    under Section 3553 partake to a lesser or greater degree of

5    policy considerations, "just punishment" taps a deeper vein.

6    Human beings, as social animals, are programmed to respect

7    moral values.  This is why people without shame or guilt are

8    considered psychopaths, and also why violation of the moral

9    order raise such deep passions in the human breast.  As people

10   have come to understand that insider trading is not only a

11   sophisticated form of cheating but also a fundamental breach of

12   trust and confidence, they have increasingly internalized their

13   revulsion for its commission.  While no defendant should be

14   made a martyr to public passion, meaningful punishment is still

15   necessary to reaffirm society's deep-seated need to see justice

16   triumphant.  No sentence of probation, or anything close to it,

17   could serve this purpose.

18           After carefully weighing all these, and other,

19   relevant factors, the Court concludes that the sentence that

20   most fulfills all the requirements of Section 3553(a) is two

21   years in prison.  Rajat K. Gupta is therefore sentenced to 24

22   months' imprisonment, concurrent on all counts, to be followed

23   by one year of supervised release, on the terms stated from the

24   bench and here incorporated by reference.  The otherwise

25   mandatory forfeiture has been waived by the government, but the

**A88**

1   Court imposes a fine in the sum of $5 million.  The Court will

2   defer the determination of restitution for up to 90 days, as

3   permitted by federal law.  A formal Judgment embodying these

4   terms and incorporating this Memorandum by reference will issue

5   shortly.  Meanwhile, Mr. Gupta is ordered to surrender to the

6   designated prison by 2 p.m. on December 11, 2012.

7           Now, let me turn to the terms of supervised release.

8   They are as follows:

9           First, the mandatory conditions that the defendant

10  shall not commit any other federal, state or local crime; that

11  the defendant shall not illegally possess a controlled

12  substance; that the defendant shall not possess a firearm or

13  destructive device; and that the defendant shall cooperate in

14  the collection of DNA.

15          The mandatory drug testing condition is suspended

16  based on the Court's determination that the defendant poses a

17  low risk of drug substance abuse.

18          There will also be imposed the standard conditions of

19  supervision 1 through 13.  They appear on the face of the

20  judgment and will be gone over with the defendant by the

21  Probation Officer when the defendant reports to begin his

22  period of supervised release.

23          There will also be imposed the following special

24  conditions:

25          First, that the defendant will pay the restitution

**A89**

Caodgup3                          Sentence

1    amount to be arrived at subsequently plus the $5 million fine

2    at the rate of 15 percent of his gross monthly income beginning

3    with the second month of supervised release.

4            Second, that the defendant shall provide the Probation

5    Officer with access to any requested financial information, and

6    shall not incur new credit charges or open additional lines of

7    credit without the approval of the Probation Officer unless he

8    is in compliance with the aforesaid installment payment

9    schedule.

10            Third, the defendant shall participate in an alcohol

11    aftercare treatment program under the standard terms and

12    conditions at the direction and discretion of the Probation

13    Office.

14            And, finally, that the defendant is to report to the

15    nearest Probation Office within 72 hours of his release from

16    prison, and he will be supervised by the district of his

17    residence.

18            Now, before I advise the defendant with respect to

19    appeal, is there anything else that either counsel needs to

20    raise?  Anything else from the government?

21            MR. TARLOWE:  No, your Honor.

22            THE COURT:  Anything from defense?

23            MR. NAFTALIS:  Just two things, your Honor.

24            One, I think you indicated that there would be direct

25    surrender.

**A90**
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Caodgup3                        Sentence

1        THE COURT:  Yes.

2        MR. NAFTALIS:  And may your Honor recommend -- may we

3    request of your Honor to make a recommendation for a facility?

4        THE COURT:  Yes.  As I'm sure you've already advised

5    your client, I can only recommend, not order, and these days

6    the prisons are overcrowded and that recommendation is not

7    always followed, but I will make any reasonable recommendation.

8    What do you suggest?

9        MR. NAFTALIS:  We would recommend the Otisville

10   minimum security facility.

11       THE COURT:  I will recommend that.  I'm not sure he

12   qualifies for that, but if he does and the Bureau of Prisons

13   agrees, I have no problem making that recommendation.

14       MR. NAFTALIS:  And, secondly, I think your Honor had

15   made a date for surrender.  Could we have a date in January,

16   would that be OK with your Honor, after the holidays?

17       THE COURT:  Any objection?

18       MR. TARLOWE:  No, your Honor.

19       THE COURT:  All right.  I'll change it -- let's see.

20   What is the first Monday in January?

21       THE CLERK:  The 7th.

22       THE COURT:  I will change it to January 8, 2013.

23       And I've signed the Order.  I will give it now to my

24   courtroom deputy to docket.

25       Anything else?

**A91**

Caodgup3                    Sentence

1          MR. NAFTALIS:  Your Honor, we have the issue of the

2     bond.  There will be an appeal, as your Honor knows.

3          THE COURT:  Yes.  What is the government's view on the

4     terms of that release?

5          MR. TARLOWE:  The government is content with the

6     current bail conditions.

7          THE COURT:  That's fine.

8          So, Mr. Gupta, you have a right to appeal the

9     sentence.  Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  I am obliged to also tell you that if you

12     can't afford counsel for the appeal, the Court will appoint one

13     for you free of charge.  Do you understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Very good.  Anything else?

16          MR. TARLOWE:  No, your Honor.

17          THE COURT:  This matter stands adjourned.

18          THE CLERK:  All rise.

19          (Pause)

20          THE COURT:  I just was informed counsel have another

21     issue.  Please be seated.

22          MR. NAFTALIS:  Yes, your Honor, and I apologize for

23     imposing on the Court.

24          I wasn't sure whether what happened there was that we

25     were granted bail pending appeal.  If we weren't, then I

**A92**

```
 1    obviously -- or we would have an application for bail pending

 2    appeal.

 3            THE COURT:  Well, there are two different time periods

 4    here.  There is the period of between now and the surrender

 5    date.  That's what I think was agreed to by the government.

 6            Now, if you want to make an application for bail

 7    pending appeal, I'm happy to hear you now or subsequently,

 8    whatever you would like.

 9            MR. NAFTALIS:  We wouldn't mind being heard now, your

10    Honor.

11            THE COURT:  All right.  So the issue there is -- the

12    burden is on you, and the issue is whether you have a

13    substantial appeal issue.

14            The other issue is risk of flight.  Unless the

15    government thinks otherwise, I don't see that there is a

16    recollection of flight.

17            But what is the substantial appeal issue?

18            MR. NAFTALIS:  Yes, your Honor.  Your Honor, this is

19    always kind of a difficult issue to argue to a judge.  It

20    doesn't mean that you have to agree that we are right; all you

21    have to is agree is that we have an issue.

22            THE COURT:  I understand that.  When I sit on the

23    district court, it is clear to me that everything that both I

24    and my colleagues do is totally correct.  When, on occasion, I

25    have had the privilege of sitting on the Court of Appeals, I
```

**A93**

1   see that the district court makes a phenomenal number of

2   errors.  So, go ahead.

3               MR. NAFTALIS:  Basically, as I understand the cases,

4   that it would be an issue which if we were correct on would

5   require reversal of the conviction.  I think that is what the

6   Randell case says.

7               THE COURT:  Right.

8               MR. NAFTALIS:  Look, we have a number of issues.

9   Obviously, your Honor has ruled upon them and didn't agree,

10  respectfully, with our position, which we think are substantial

11  issues.

12              THE COURT:  Yes.  So what are they?  Because, you

13  know, my law clerk went downstairs, and I don't want to break

14  his heart but we might as well find out what they are.

15              MR. NAFTALIS:  Well, first of all, these issues go --

16  one of the issues would deal with the admissibility, the

17  admission of evidence by the government of in particular the

18  wiretap evidence of those three phone calls, the two on

19  September 24th and the one on October 24th, which was the

20  subject of -- we killed a lot of trees, both sides, on that

21  and --

22              THE COURT:  Well, essentially, as I follow Judge

23  Holwell's findings and conclusions in that regard, this is, if

24  I understand you, essentially the issue that's being raised in

25  the Rajaratnam appeal.

**A94**

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Caodgup3                    Sentence

1   so he could assess whether there were reasonable alternatives

2   to wiretapping.

3           MR. TARLOWE:  What I say to that, Judge, is

4   Mr. Rajaratnam is sitting in prison.  And I don't remember

5   exactly what happened before the Court of Appeals, but I'm

6   almost certain that he appealed to the Court of Appeals on the

7   issue of bail pending appeal and it was denied.

8           THE COURT:  So they have already ruled that that is

9   not --

10          MR. TARLOWE:  That is my understanding.

11          MR. NAFTALIS:  I think there was again -- and I don't

12  want to misquote an opinion that I haven't looked at for months

13  and months and month, but my memory is that on the Rajaratnam

14  bail application there was also a flight issue.  Am I right

15  about that?  In terms of there was --

16          THE COURT:  They might have denied --

17          MR. NAFTALIS:  Again, I don't want to -- because I

18  don't purport -- this is on unaided recollection.

19          THE COURT:  All right.  Well, this creates a dilemma

20  for the Court because there are many things about this standard

21  that seem to me unfortunate.  Before the statute existed, it

22  was just a question of flight risk.  I do not consider

23  Mr. Gupta to be a flight risk in the slightest degree.  And

24  there is something that sticks in the craw about having a

25  person who is not a flight risk sent to jail and maybe serve,

**A95**
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    since the sentence here is only two years, a substantial

2    portion of his time before his appeal is decided.  I appreciate

3    that the defense is intending to expedite the appeal as best

4    they can, but, of course, the Second Circuit has its own

5    constraints and, though the present Chief Judge has done a

6    remarkable job in getting the court more current, it is still

7    not uncommon for appeals to take two years or more.

8            Another unfortunate part about this statute is the

9    fact that it calls upon the court to essentially distance

10   itself from its own determinations; look at them and say, well,

11   even though the court spent many hours coming to various

12   conclusions that it was totally convinced they were correct, it

13   would be a reasonable argument to say that they were incorrect,

14   at least sufficiently substantial an argument to have a

15   meaningful chance of prevailing on appeal.

16           So I wish it were in my power to grant bail pending

17   appeal, but I have to say that I do not regard any of the four

18   issues as substantial under any analysis.

19           The portions of the tapes that after careful scrutiny

20   the Court permitted in were in the Court's view unquestionably

21   in furtherance of the conspiracy.

22           The portion of Mr. Gupta's daughter's testimony that I

23   excluded not only was in the Court's view properly excluded but

24   was, in any event, harmless error, because what I allowed in,

25   after the arguments of counsel made on the basis of it, more

**A96**

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Caodgup3                          Sentence

1   than fully conveyed that argument to the jury, of which the

2   jury could have rejected.

3          The Loeb testimony was not only hearsay but suffered

4   from other deficiencies in terms of relevance and -- not in

5   relevance, in terms of timing and other things of that sort.

6          And with great respect to defense counsel, who has

7   done an unbelievably good job for his client in this case, that

8   most of what he wanted on the issue of character witnesses, he

9   got, even though the Court would have been well within its

10  discretion in giving him much less.  Everything of substance

11  that he sought to bring before the jury through character

12  witnesses was permitted into evidence.

13         So to be frank, my heart would like to grant this

14  motion but my head does not permit me to do so.

15         So the motion is denied.  Of course, you could bring

16  it before the Court of Appeals.

17         All right.  Anything else we need to take up?

18         (Pause)

19         Very good.

20

21                              -   -   -

22

23

24

25

| | | | |
|---|---|---|---|
| 1 | DATE: | July 29, 2008 | |
| 3 | TIME: | 5:39 PM | |
| 5 | WIRETAP: | OVER 917-907-2350 | |
| 7 | CALL FROM: | RAJAT GUPTA (203-977-6701) | |
| 9 | CALL TO: | RAJ RAJARATNAM (917-907-2350) | |
| 11 | OTHER | | |
| 12 | PARTICIPANTS: | RENEE GOMES | |
| 14 | KEY: | Unintelligible: | UI |
| 15 | | Inaudible: | IA |
| 16 | | Phonetic Spelling: | PH |
| 17 | | Voice Overlap: | // |

---

20 RAJ RAJARATNAM:     Hello?

22 RENEE GOMES:     Raj?

24 RAJ RAJARATNAM:     Yep.

26 RENEE GOMES:     Hi. It's Renee.

28 RAJ RAJARATNAM:     Hi Renee. How are you?

30 RENEE GOMES:     I'm good. How are you?

32 RAJ RAJARATNAM:     I'm good. Thanks.

34 RENEE GOMES:     Good. Good. I have Rajat. Are you available to talk to him now?
35                 Or...

37 RAJ RAJARATNAM:     Absolutely

39 RENEE GOMES:     OK.  One moment.

41 RAJ RAJARATNAM:     (Clears throat)

43 RAJAT GUPTA:     Hey, Raj. How is working from Connecticut?

1

GOVERNMENT
EXHIBIT
9 –T
S1 11 Cr. 907 (JSR)

**A98**

| | |
|---|---|
| RAJ RAJARATNAM: | It's good. I get more work done because people don't... See I have an open door, open (clears throat) office policy, right? |
| RAJAT GUPTA: | Right. Right. Right. |
| RAJ RAJARATNAM: | Because you have to keep the culture so that people can come to you anytime. |
| RAJAT GUPTA: | Yeah. Yeah. |
| RAJ RAJARATNAM: | But then, what happens you're not as productive as you are. |
| RAJAT GUPTA: | Yeah. |
| RAJ RAJARATNAM: | When you are... Um, I called you because I am meeting with Gary Cohn on Thursday. |
| RAJAT GUPTA: | Yeah. |
| RAJ RAJARATNAM: | And there's a rumor, that Goldman might look to buy a commercial bank. |
| RAJAT GUPTA: | Uh-hum. |
| RAJ RAJARATNAM: | You know? And you know this guy Bob Steele, who was a senior guy at Goldman was under Secretary |
| RAJAT GUPTA: | (UI) Yeah. At Wachovia. |
| RAJ RAJARATNAM: | ...at Paulson and went to Wachovia and they have a large demand, I mean deposit base and all that. |
| RAJAT GUPTA: | Yeah. |
| RAJ RAJARATNAM: | Have you heard anything along that line? |
| RAJAT GUPTA: | Yeah. This was a big discussion at the board meeting. |
| RAJ RAJARATNAM: | Uh-hum. |
| RAJAT GUPTA: | Uh, on whether we, uh... |

2

**A99**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | Buy a commercial bank? |
| 2 | | |
| 3 | RAJAT GUPTA: | Buy a commercial bank. And, you know it was a uh, divided |
| 4 | | discussion in the board. |
| 5 | | |
| 6 | RAJ RAJARATNAM: | Uh-hum. |
| 7 | | |
| 8 | RAJAT GUPTA: | I think more people saying why, because in essence it's a low |
| 9 | | return business and while yeah it may be interesting to develop a |
| 10 | | deposit base which is a low cost source of funding. |
| 11 | | |
| 12 | RAJ RAJARATNAM: | Right. |
| 13 | | |
| 14 | RAJAT GUPTA: | Uh, you know, what we should probably explore more is, I mean, |
| 15 | | we aren't having trouble funding ourselves but, you know we |
| 16 | | should explore more global sources of funding. And perhaps even |
| 17 | | you know uh, insurance or other things which also are a low uh, |
| 18 | | cost, also. |
| 19 | | |
| 20 | RAJ RAJARATNAM: | Return business |
| 21 | | |
| 22 | RAJAT GUPTA: | Now, having said all this... |
| 23 | | |
| 24 | RAJ RAJARATNAM: | Right. |
| 25 | | |
| 26 | RAJAT GUPTA: | ...they are an opportunistic group, so... |
| 27 | | |
| 28 | RAJ RAJARATNAM: | Okay |
| 29 | | |
| 30 | RAJAT GUPTA: | If Wachovia was a good deal and they, you know, it's quite |
| 31 | | conceivable they'd come and say let's go buy Wachovia. |
| 32 | | |
| 33 | RAJ RAJARATNAM: | Or even AIG, right? |
| 34 | | |
| 35 | RAJAT GUPTA: | Or even AIG. Yeah. |
| 36 | | |
| 37 | RAJ RAJARATNAM: | Uh-hum. |
| 38 | | |
| 39 | RAJAT GUPTA: | A, AIG, it was definitely on, in, in, in, the discussion... |
| 40 | | |
| 41 | RAJ RAJARATNAM: | Uh-hum. |
| 42 | | |
| 43 | RAJAT GUPTA: | ...mix. Um, and you know, their view was actually, which has |

3

**A100**

| | | |
|---|---|---|
| 1 | | proven to be wrong, their view was very bearish on the |
| 2 | | commercial banks, but uh obviously, the commercial banks have |
| 3 | | had a pop in the last. |
| 4 | | |
| 5 | RAJ RAJARATNAM: | Yes. That's maybe, just a dead cat bounce or a… |
| 6 | | |
| 7 | RAJAT GUPTA: | //Yeah it could be that. I mean, because their view of credit losses |
| 8 | | and all that is still more to come, credit cards, retail. You know? |
| 9 | | |
| 10 | RAJ RAJARATNAM: | Right. |
| 11 | | |
| 12 | RAJAT GUPTA: | But, but you now sometimes all that gets factored into the market, |
| 13 | | as you know better than I do and… |
| 14 | | |
| 15 | RAJ RAJARATNAM: | O.K. |
| 16 | | |
| 17 | RAJAT GUPTA: | Uh, so, I would be extremely surprised if uh… |
| 18 | | |
| 19 | RAJ RAJARATNAM: | There was anything active. |
| 20 | | |
| 21 | RAJAT GUPTA: | Anything imminent. Yeah. |
| 22 | | |
| 23 | RAJ RAJARATNAM: | Right. O.K. That was one that I wanted to just, you know, see |
| 24 | | whether there was any thoughts on that. Because it'd be a good |
| 25 | | discussion point. I'm gonna start by saying how do you see the |
| 26 | | future financial services firms, the winners, right? |
| 27 | | |
| 28 | RAJAT GUPTA: | Yeah. Yeah. |
| 29 | | |
| 30 | RAJ RAJARATNAM: | You know, can they just fund for short term? Too much paper or |
| 31 | | do they need deposits and insurance and things like that. |
| 32 | | |
| 33 | RAJAT GUPTA: | Yeah. |
| 34 | | |
| 35 | RAJ RAJARATNAM: | Because there are some values out there. |
| 36 | | |
| 37 | RAJAT GUPTA: | Yeah. |
| 38 | | |
| 39 | RAJ RAJARATNAM: | AIG and Wachovia and see what he, you know says. |
| 40 | | |
| 41 | RAJAT GUPTA: | Yeah. Yeah. |
| 42 | | |
| 43 | RAJ RAJARATNAM: | O.K. And then uh… |

4

**A101**

| | | |
|---|---|---|
| 1 | | |
| 2 | RAJAT GUPTA: | Good. |
| 3 | | |
| 4 | RAJ RAJARATNAM: | George, I'm gonna be out in the office on Thursday. |
| 5 | | |
| 6 | RAJAT GUPTA: | O.K. |
| 7 | | |
| 8 | RAJ RAJARATNAM: | So, I'm gonna get George to just uh, write the balances, if you |
| 9 | | want. |
| 10 | | |
| 11 | RAJAT GUPTA: | Well, what I did is I, you know, uh, as we had agreed, I just did |
| 12 | | the calculations for the (UI). |
| 13 | | |
| 14 | RAJ RAJARATNAM: | Yes. (UI) Right |
| 15 | | |
| 16 | RAJAT GUPTA: | (UI) you know... |
| 17 | | |
| 18 | RAJ RAJARATNAM: | Yeah. So George will just certify that and (UI), send you uh... |
| 19 | | |
| 20 | RAJAT GUPTA: | Yeah. |
| 21 | | |
| 22 | RAJ RAJARATNAM: | I mean, I, I'll you know, I'll do it on my Galleon letterhead, (UI). |
| 23 | | |
| 24 | RAJAT GUPTA: | Yes, yes and, let, let, let, let him update it to 30th of June if you |
| 25 | | can, so, whatever it is. (UI). |
| 26 | | |
| 27 | RAJ RAJARATNAM: | 30th June, it will be slightly down. |
| 28 | | |
| 29 | RAJAT GUPTA: | Slightly down is fine. |
| 30 | | |
| 31 | RAJ RAJARATNAM: | You know because of the uh,.. |
| 32 | | |
| 33 | RAJAT GUPTA: | Yeah. Cost of money. Yeah. |
| 34 | | |
| 35 | RAJ RAJARATNAM: | Cost and all that so (UI)? |
| 36 | | |
| 37 | RAJAT GUPTA: | Yeah. Yeah |
| 38 | | |
| 39 | RAJ RAJARATNAM: | All right. Anything else? Anything interesting? |
| 40 | | |
| 41 | RAJAT GUPTA: | No. No that's it. Otherwise you know uh, uh, I saw, (sighs) you |
| 42 | | know, Anil, how, how is, I mean, he seems, seems a little |
| 43 | | unsettled yesterday.  I don't know. |

5

**A102**

| | | |
|---|---|---|
| 1 | | |
| 2 | RAJ RAJARATNAM: | He seemed unhappy. |
| 3 | | |
| 4 | RAJAT GUPTA: | Yeah. |
| 5 | | |
| 6 | RAJ RAJARATNAM: | Because he did come to me and asked me, do you have deal with |
| 7 | | Rajat on Galleon International. |
| 8 | | |
| 9 | RAJAT GUPTA: | Yeah. |
| 10 | | |
| 11 | RAJ RAJARATNAM: | And I just said, nothing concrete. I didn't want to get into with |
| 12 | | him? |
| 13 | | |
| 14 | RAJAT GUPTA: | Yeah. Yeah. |
| 15 | | |
| 16 | RAJ RAJARATNAM: | I sort of dismissed it without getting him into it. |
| 17 | | |
| 18 | RAJAT GUPTA: | Yeah. |
| 19 | | |
| 20 | RAJ RAJARATNAM: | Because (coughs) I'm getting a feeling that he's trying to, just do a |
| 21 | | mini, you know, be a mini Rajat, right? |
| 22 | | |
| 23 | RAJAT GUPTA: | Yes. Yes. |
| 24 | | |
| 25 | RAJ RAJARATNAM: | Without bringing anything new to the party, right? |
| 26 | | |
| 27 | RAJAT GUPTA: | Yeah. Yeah. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Because then he was trying to talk about whether he can |
| 30 | | participate somehow in Galleon International and, you know at |
| 31 | | some point, you know I'm also running a business with people |
| 32 | | who work hard and uh... |
| 33 | | |
| 34 | RAJAT GUPTA: | Yes. |
| 35 | | |
| 36 | RAJ RAJARATNAM: | You don't need to be compensated and you know, you can't just |
| 37 | | keep on giving, right? |
| 38 | | |
| 39 | RAJAT GUPTA: | Yeah. Yeah. Yeah. |
| 40 | | |
| 41 | RAJ RAJARATNAM: | And I, you know, honestly, Rajat, I'm, giving him a million |
| 42 | | dollars a year for doing literally nothing. Just because... |
| 43 | | |

6

**A103**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | I know, you're being... I think you're being very generous. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | //Yeah, but you know I, sometimes... |
| 4 | | |
| 5 | RAJAT GUPTA: | But he should sometimes say thank you for that, you know? |
| 6 | | |
| 7 | RAJ RAJARATNAM: | Yeah but he's never ever, ever said, I mean, look he is my friend |
| 8 | | so, take it with that spirit, right? |
| 9 | | |
| 10 | RAJAT GUPTA: | Yeah. Yeah, I, I... |
| 11 | | |
| 12 | RAJ RAJARATNAM: | But he just seemed uh, I don't know what, he just seemed, I don't |
| 13 | | think he's, I mean that's why I asked you, uh, I've never seen him |
| 14 | | laugh and be really happy, you know? |
| 15 | | |
| 16 | RAJAT GUPTA: | Yeah, because... |
| 17 | | |
| 18 | RAJ RAJARATNAM: | He is constantly, sche, not scheming is not the right word, but |
| 19 | | constantly trying to figure out what other people's angles are. |
| 20 | | |
| 21 | RAJAT GUPTA: | Right. |
| 22 | | |
| 23 | RAJ RAJARATNAM: | And then he seems to know what everybody else is worth, you |
| 24 | | know he leads with, "Oh, Sunil Mittal is worth 20 billion dollars", |
| 25 | | you know, when he starts thinking like that... |
| 26 | | |
| 27 | RAJAT GUPTA: | Yeah. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | You know, "and this guy he wants to make 500 million dollars |
| 30 | | and... |
| 31 | | |
| 32 | RAJAT GUPTA: | Yeah. |
| 33 | | |
| 34 | RAJ RAJARATNAM: | And (UI) wants to make 300 million dollars, and this guy"... |
| 35 | | |
| 36 | RAJAT GUPTA: | Yeah. Yeah. Yeah. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | And you know he was tell me Vin Gupta wants to make 100 |
| 39 | | million dollars on this deal and you now if you start thinking like |
| 40 | | that. |
| 41 | | |
| 42 | RAJAT GUPTA: | Yeah. |
| 43 | | |

7

**A104**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | It, you know, you build the business and the money will come, |
| 2 | | you know? |
| 3 | | |
| 4 | RAJAT GUPTA: | Yes. Yes. Yes. |
| 5 | | |
| 6 | RAJ RAJARATNAM: | And.. |
| 7 | | |
| 8 | RAJAT GUPTA: | Add value and, and leave it to, you know I, I, I look at how hard |
| 9 | | he was fighting for this two percent in NSR equity, I mean it was |
| 10 | | just kind of, you know. |
| 11 | | |
| 12 | RAJ RAJARATNAM: | You know without, without a leg to stand on. I mean, you know, I |
| 13 | | think he (Coughs) everybody was doing it (Coughs) because they |
| 14 | | were magnanimous good people. |
| 15 | | |
| 16 | RAJAT GUPTA: | Look, his overall deal in NSR, as you was agreeing, it is a very |
| 17 | | good, I mean, you know he gets 400 thousand in cash, ten million |
| 18 | | in, in, you know. |
| 19 | | |
| 20 | RAJ RAJARATNAM: | Carry. |
| 21 | | |
| 22 | RAJAT GUPTA: | Carry. |
| 23 | | |
| 24 | RAJ RAJARATNAM: | Uh-hum. |
| 25 | | |
| 26 | RAJAT GUPTA: | And you know, six percent equity. I mean, |
| 27 | | |
| 28 | RAJ RAJARATNAM: | Right. And I don't know, um, um, um, you know, I can argue that |
| 29 | | I did more for NSR than he did. |
| 30 | | |
| 31 | RAJAT GUPTA: | I, I, he, I... Absolutely right. Absolutely right. (UI). |
| 32 | | |
| 33 | RAJ RAJARATNAM: | He, he, he coordinated the, he coordinated those uh, telephone |
| 34 | | meetings, right? |
| 35 | | |
| 36 | RAJAT GUPTA: | Yeah. Yeah. Yeah. Absolutely right. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | And that's about it, right? |
| 39 | | |
| 40 | RAJAT GUPTA: | Yeah. Yeah. Yeah. |
| 41 | | |
| 42 | RAJ RAJARATNAM: | I put in 50 million bucks, whatever.. |
| 43 | | |

8

**A105**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | Yeah. Yeah. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | I went on the trips. Whatever, but.. |
| 4 | | |
| 5 | RAJAT GUPTA: | Yeah. Yeah. Yeah. |
| 6 | | |
| 7 | RAJ RAJARATNAM: | And I, look, I'm happy with you know... |
| 8 | | |
| 9 | RAJAT GUPTA: | You're happy. You're at a different place.  You don't uh, I |
| 10 | | understand |
| 11 | | |
| 12 | RAJ RAJARATNAM: | Yeah. I mean, I'm happy with it, but you know there's a fairness, |
| 13 | | right? |
| 14 | | |
| 15 | RAJAT GUPTA: | Yeah. |
| 16 | | |
| 17 | RAJ RAJARATNAM: | Now from, for the last three or four, I mean, four or five years I've |
| 18 | | given him a million bucks a year, right? |
| 19 | | |
| 20 | RAJAT GUPTA: | Yeah. Yeah. |
| 21 | | |
| 22 | RAJ RAJARATNAM: | After taxes, off shore. cash. |
| 23 | | |
| 24 | RAJAT GUPTA: | Yeah. Yeah. |
| 25 | | |
| 26 | RAJ RAJARATNAM: | Right? And then he comes to me and he tells me, "You know, |
| 27 | | moving to New York is going to be expensive and I'm only |
| 28 | | moving to be with NSR and you guys and, you know is there |
| 29 | | anything more we can expect?" And you know and it's like, I, I |
| 30 | | and I felt, between you and I, I felt like he was putting a stake |
| 31 | | through my... |
| 32 | | |
| 33 | RAJAT GUPTA: | Yeah. |
| 34 | | |
| 35 | RAJ RAJARATNAM: | ...you know stomach, because instead of saying thank you for |
| 36 | | giving me 5 million dollars after taxes. |
| 37 | | |
| 38 | RAJAT GUPTA: | Yeah, other, other thing is I don't understand why he doesn't ok |
| 39 | | you mention it once, and if people want to do it, they will come. I |
| 40 | | mean, like NSR thing, you mention it once, if people want to do |
| 41 | | it, they will do it for you, otherwise, you just say O.K. You know. |
| 42 | | Fine. |
| 43 | | |

9

**A106**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | No (UI) if he comes and does a big deal and he's instrumental in |
| 2 | | orchestrating a deal and getting it done, right? People might say, |
| 3 | | hey here is a bonus, you know? |
| 4 | | |
| 5 | RAJAT GUPTA: | Yeah. |
| 6 | | |
| 7 | RAJ RAJARATNAM: | So, I don't know. |
| 8 | | |
| 9 | RAJAT GUPTA: | Yeah. |
| 10 | | |
| 11 | RAJ RAJARATNAM: | But anyway, I think it would be fun to do this uh, (UI). |
| 12 | | |
| 13 | RAJAT GUPTA: | It'll be fun to do this thing. I think (UI). |
| 14 | | |
| 15 | RAJ RAJARATNAM: | But we'll uh, (Coughs) we'll, and keep your eyes and ears open if |
| 16 | | you hear anything. Just anything that you think may be interesting |
| 17 | | and I will uh, I will track him down and see what's in the market |
| 18 | | and you know I'll bring that angle to it you know? |
| 19 | | |
| 20 | RAJAT GUPTA: | Do, do you, do you have two more minutes? |
| 21 | | |
| 22 | RAJ RAJARATNAM: | Yes. Of course. |
| 23 | | |
| 24 | RAJAT GUPTA: | Uh, first I wanted to get your straight opinion on whether uh, uh, I |
| 25 | | think, you think I should do this KKR thing, and second I want to |
| 26 | | tell you about what I learned kind of maybe the deal he's gonna |
| 27 | | offer me. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Right. |
| 30 | | |
| 31 | RAJAT GUPTA: | Which I want to bounce off you, if you, first I mean... |
| 32 | | |
| 33 | RAJ RAJARATNAM: | (UI). |
| 34 | | |
| 35 | RAJAT GUPTA: | You know, do you, do you really feel in the gut that given |
| 36 | | everything it's a good thing to do? |
| 37 | | |
| 38 | RAJ RAJARATNAM: | I think so. I think if you do it in a way, (Sniffles) see right now I |
| 39 | | think everybody expects you to spend 100 percent of your time |
| 40 | | other than charity on NSR, right? You know. |
| 41 | | |
| 42 | RAJAT GUPTA: | That should not, a full... |
| 43 | | |

10

**A107**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | Or 40 percent or 50 percent. |
| 2 | | |
| 3 | RAJAT GUPTA: | (UI) 40. |
| 4 | | |
| 5 | RAJ RAJARATNAM: | And I think you have to just kill that right away. Right? |
| 6 | | |
| 7 | RAJAT GUPTA: | Yeah. |
| 8 | | |
| 9 | RAJ RAJARATNAM: | And say that your value added is not to do cash flows and not to, |
| 10 | | you know, (Clears throat) that your value added is to bring people |
| 11 | | together, deals together, at the right time make the call, introduce |
| 12 | | people so on and so forth. You know like the old merchant |
| 13 | | bankers use to do, you know? |
| 14 | | |
| 15 | RAJAT GUPTA: | And that's, that's, that's exactly what I've been doing. |
| 16 | | |
| 17 | RAJ RAJARATNAM: | And that is, that is, yeah. |
| 18 | | |
| 19 | RAJAT GUPTA: | Yeah. |
| 20 | | |
| 21 | RAJ RAJARATNAM: | And that's what the, if anybody complains that you're not |
| 22 | | spending one day or two days or you promised that then they are |
| 23 | | not understanding your value. Right? |
| 24 | | |
| 25 | RAJAT GUPTA: | No. No. Correct and I told Parag I said Parag, if you can point to |
| 26 | | anything you would like me to do for NSR that I'm not doing, |
| 27 | | please say, do that, you know? |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Yeah. So I think, I think you're instrumental in uh, architecting |
| 30 | | this NSR in raising capital. |
| 31 | | |
| 32 | RAJAT GUPTA: | Yeah. |
| 33 | | |
| 34 | RAJ RAJARATNAM: | And in giving it huge credibility in India. |
| 35 | | |
| 36 | RAJAT GUPTA: | Uh-hum. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | Huge credibility. |
| 39 | | |
| 40 | RAJAT GUPTA: | Yeah. |
| 41 | | |
| 42 | RAJ RAJARATNAM: | In fact, giving part, and that is worth a lot, right? |
| 43 | | |

11

**A108**

| | |
|---|---|
| 1  RAJAT GUPTA: | Yeah. Yeah. |
| 3  RAJ RAJARATNAM: | (Clears throat) But I think you should not be boxed into NSR. |
| 5  RAJAT GUPTA: | No. No. I'm not. I'm not. So... |
| 7  RAJ RAJARATNAM: | (UI). |
| 9  RAJAT GUPTA: | I think that the condition is, I, I have had that discussion with Parag. I said, "Look, you know, uh, firstly you know I don't buy any of that and I'm gonna do what I'm good at. I'm not gonna do other stuff. |
| 14  RAJ RAJARATNAM: | Right. |
| 16  RAJAT GUPTA: | And that'll be of immense value. |
| 18  RAJ RAJARATNAM: | Yeah. |
| 20  RAJAT GUPTA: | And by the way, who are you to say anything because you said you were gonna spend (Chuckles) 180 days in (UI) India." |
| 23  RAJ RAJARATNAM: | (UI). |
| 25  RAJAT GUPTA: | You've hardly done that and are doing three other things. So Parag... |
| 28  RAJ RAJARATNAM: | Let's see, yeah. |
| 30  RAJAT GUPTA: | ...you know, he automatically just shut up after that. He never said anything else. |
| 33  RAJ RAJARATNAM: | So I think that you table that first, right? |
| 35  RAJAT GUPTA: | Yeah. That's done. That's that. |
| 37  RAJ RAJARATNAM: | The second thing I think is you create a platform called whatever, right? (UI). |
| 40  RAJAT GUPTA: | In a way, it, it... In a way that's also there, I mean. |
| 42  RAJ RAJARATNAM: | Yeah. |

12

**A109**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | It's a portfolio of, of, I mean. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | A portfolio things that you enjoy doing and you want to do and |
| 4 | | that you, you can add value at, right? |
| 5 | | |
| 6 | RAJAT GUPTA: | Yeah. |
| 7 | | |
| 8 | RAJ RAJARATNAM: | So Galleon International can be one…. |
| 9 | | |
| 10 | RAJAT GUPTA: | By the way, on that I want you to keep, us to keep having the |
| 11 | | dialogue as to what... |
| 12 | | |
| 13 | RAJ RAJARATNAM: | Yeah. |
| 14 | | |
| 15 | RAJAT GUPTA: | ...you know how I can be helpful in Galleon International. By the |
| 16 | | way not Galleon International, Galleon Group. I mean you've |
| 17 | | given me… |
| 18 | | |
| 19 | RAJ RAJARATNAM: | Galleon Group, right. |
| 20 | | |
| 21 | RAJAT GUPTA: | ...a position in Galleon International. That's good enough. I, I... |
| 22 | | |
| 23 | RAJ RAJARATNAM: | Yeah, but you know what, I, I am now at the point where I, in the |
| 24 | | last couple of years, I'm building, right? |
| 25 | | |
| 26 | RAJAT GUPTA: | Yeah. |
| 27 | | |
| 28 | RAJ RAJARATNAM: | Rather than just making returns, just and not building, right? |
| 29 | | |
| 30 | RAJAT GUPTA: | Right. Right. (UI). |
| 31 | | |
| 32 | RAJ RAJARATNAM: | So I'm putting the structure in place and all of that, right? So we |
| 33 | | will build this into a ten billion dollar company, hopefully by the |
| 34 | | end of 2009. |
| 35 | | |
| 36 | RAJAT GUPTA: | Yes. Yes you will. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | You know? |
| 39 | | |
| 40 | RAJAT GUPTA: | Yeah. Yeah. |
| 41 | | |
| 42 | RAJ RAJARATNAM: | And so that's sort of the goal, right? |
| 43 | | |

13

**A110**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | Yeah. Yeah. Yeah. Yeah. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | And so I, my goal, what I told people was 2010 we enter with 10 |
| 4 | | billion. |
| 5 | | |
| 6 | RAJAT GUPTA: | Right. Right. And there you know, I do want to, I, I, I, will now |
| 7 | | next week, I'll, I mean I've been having periodic meetings with |
| 8 | | these guys. |
| 9 | | |
| 10 | RAJ RAJARATNAM: | Right. |
| 11 | | |
| 12 | RAJAT GUPTA: | On the fund-raising side and I'll continue to do that and, you |
| 13 | | know, they pulled me in but I'm, you know, please keep telling |
| 14 | | them, they, they should pull me in wherever they think I can add |
| 15 | | value and, you know? |
| 16 | | |
| 17 | RAJ RAJARATNAM: | Yeah. And I think yeah... |
| 18 | | |
| 19 | RAJAT GUPTA: | And you should do the feel the same. Any meeting you want me |
| 20 | | you know come... |
| 21 | | |
| 22 | RAJ RAJARATNAM: | Right. |
| 23 | | |
| 24 | RAJAT GUPTA: | Not come.. |
| 25 | | |
| 26 | RAJ RAJARATNAM: | So, so that thing. So I think you know, having a portfolio of |
| 27 | | opportunities, right? To really leverage your, you know, |
| 28 | | experience, is the right way to do it, right? |
| 29 | | |
| 30 | RAJAT GUPTA: | Uh-hum. |
| 31 | | |
| 32 | RAJ RAJARATNAM: | And even this AT&T thing, right? |
| 33 | | |
| 34 | RAJAT GUPTA: | Yeah. |
| 35 | | |
| 36 | RAJ RAJARATNAM: | You can easily recruit the top notch guy a Parag equivalent right? |
| 37 | | |
| 38 | RAJAT GUPTA: | Yes. Yes. |
| 39 | | |
| 40 | RAJ RAJARATNAM: | And give him 30 percent of the economic or 35% (UI). |
| 41 | | |
| 42 | RAJAT GUPTA: | Yes absolutely. Absolutely. |
| 43 | | |

14

**A111**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | And tell Parag look, this is my contact, right? |
| 2 | | |
| 3 | RAJAT GUPTA: | Yeah. |
| 4 | | |
| 5 | RAJ RAJARATNAM: | They are doing it because of that. |
| 6 | | |
| 7 | RAJAT GUPTA: | Oh he knows that. He knows that and he acknowledges that. I |
| 8 | | mean this won't happen without, you know? |
| 9 | | |
| 10 | RAJ RAJARATNAM: | And then for me to execute this properly, right? |
| 11 | | |
| 12 | RAJAT GUPTA: | Yeah. |
| 13 | | |
| 14 | RAJ RAJARATNAM: | I will. I'm, I'm gonna recruit somebody. I don't know who it is, |
| 15 | | but you know you recruit somebody really good. |
| 16 | | |
| 17 | RAJAT GUPTA: | I already told that to him. |
| 18 | | |
| 19 | RAJ RAJARATNAM: | O.K. |
| 20 | | |
| 21 | RAJAT GUPTA: | That's' already... |
| 22 | | |
| 23 | RAJ RAJARATNAM: | And that you, you know, might or might not use NSR's people on |
| 24 | | the ground because this guy also might say look I don't think |
| 25 | | Vivek is the right guy. I might need my own guy, you know? |
| 26 | | |
| 27 | RAJAT GUPTA: | Vivek is not the right guy. Yeah. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Right, for Telecom, right? |
| 30 | | |
| 31 | RAJAT GUPTA: | Yeah. |
| 32 | | |
| 33 | RAJ RAJARATNAM: | So he might create this way, right? |
| 34 | | |
| 35 | RAJAT GUPTA: | (UI) yeah. Yeah. Yeah. |
| 36 | | |
| 37 | RAJ RAJARATNAM: | He might craft it this way, right? (Sniffles) |
| 38 | | |
| 39 | RAJAT GUPTA: | Yeah. |
| 40 | | |
| 41 | RAJ RAJARATNAM: | And you say, you know, that, I mean just because Parag came to a |
| 42 | | meeting or two at AT&T doesn't mean that , you know? |
| 43 | | |

15

**A112**

| | |
|---|---|
| 1<br>2<br>3 | RAJAT GUPTA: | Well he didn't come in. It was a phone call. I have done all the meetings. |
| 4<br>5<br>6 | RAJ RAJARATNAM: | Meetings, yeah. So I think you do that and you get somebody that you enjoy working with. |
| 7<br>8 | RAJAT GUPTA: | Yeah. Yeah. |
| 9<br>10 | RAJ RAJARATNAM: | Like today (Cough) I got a call from a guy called Varun Bery. |
| 11<br>12 | RAJAT GUPTA: | Oh I know Varun very well. A former McKinsey guy. |
| 13<br>14<br>15 | RAJ RAJARATNAM: | (Cough) O.K. He called me and he said there's this Singtel deal, right? |
| 16<br>17 | RAJAT GUPTA: | Yeah. |
| 18<br>19<br>20<br>21<br>22 | RAJ RAJARATNAM: | That we were looking at and whether I'd be interested and I said look, I'm not doing private equity but uh, talk to Parag, you know? And he said I've been trying to get a hold of Parag and you know, I could just send him an e-mail, right? |
| 23<br>24 | RAJAT GUPTA: | Yeah. |
| 25<br>26<br>27 | RAJ RAJARATNAM: | He was only here for, and apparently he's running like a 700 million dollar Asia fund or something, you know? |
| 28<br>29 | RAJAT GUPTA: | Right. Correct. Correct |
| 30<br>31 | RAJ RAJARATNAM: | Based on, based on India in, in, in India or? |
| 32<br>33<br>34 | RAJAT GUPTA: | Telecom. It's a Telecom fund. I'm actually an investor in that fund. |
| 35<br>36<br>37 | RAJ RAJARATNAM: | O.K. He's running a Telecom fund, so maybe then they're exiting this invest something, right? |
| 38<br>39 | RAJAT GUPTA: | Yeah. O.K. |
| 40<br>41<br>42<br>43 | RAJ RAJARATNAM: | But you know, they are people (Coughs) I, I, don't, I, remember meeting him because he seemed very familiar with me and, "Hello Raj. How are you?" And I just couldn't put a face to a... |

16

**A113**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | Yeah (Laughs). |
| 2 | | |
| 3 | RAJ RAJARATNAM: | ...name (Chuckles) so you know, I chatted like I knew him, right? |
| 4 | | |
| 5 | RAJAT GUPTA: | Yeah. Yeah. |
| 6 | | |
| 7 | RAJ RAJARATNAM: | But he is only here for two days. |
| 8 | | |
| 9 | RAJAT GUPTA: | Yeah. Yeah. |
| 10 | | |
| 11 | RAJ RAJARATNAM: | Today and tomorrow, but there are people like that, that if you |
| 12 | | give em 25, 30 percent of the economics |
| 13 | | |
| 14 | RAJAT GUPTA: | No. It'll be... Yeah. It'll be... |
| 15 | | |
| 16 | RAJ RAJARATNAM: | See, you know, Rajat how I built a firm, was I kept 50 percent of |
| 17 | | the profits. |
| 18 | | |
| 19 | RAJAT GUPTA: | Yeah. |
| 20 | | |
| 21 | RAJ RAJARATNAM: | For my, you know, talking to investors and to uh, you know, |
| 22 | | building the thing and being the resident shrink and all of that |
| 23 | | stuff, right? |
| 24 | | |
| 25 | RAJAT GUPTA: | Yeah. |
| 26 | | |
| 27 | RAJ RAJARATNAM: | And I gave 50 percent away. |
| 28 | | |
| 29 | RAJAT GUPTA: | Yeah. Yeah (UI). |
| 30 | | |
| 31 | RAJ RAJARATNAM: | And then, but I kept the equity, myself. |
| 32 | | |
| 33 | RAJAT GUPTA: | Yeah. |
| 34 | | |
| 35 | RAJ RAJARATNAM: | And then when the firm got to the point where I needed to give |
| 36 | | equity, I gave equity. |
| 37 | | |
| 38 | RAJAT GUPTA: | Yeah. Yeah. Yeah. |
| 39 | | |
| 40 | RAJ RAJARATNAM: | You know? And so that model, and that's how I got reasonably |
| 41 | | wealthy because in the early stages (Clears throat) you know, you, |
| 42 | | you build and then your capital grows for you, see. |
| 43 | | |

17

**A114**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | No. No. No. That's fine. That's fine. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | I think the model of, you know, giving away half to the team, is... |
| 4 | | |
| 5 | RAJAT GUPTA: | Right. |
| 6 | | |
| 7 | RAJ RAJARATNAM: | ...you know, if Shaukat raises money he is gonna give half the |
| 8 | | incentive fee to his team. |
| 9 | | |
| 10 | RAJAT GUPTA: | Uh-hum. |
| 11 | | |
| 12 | RAJ RAJARATNAM: | You know? |
| 13 | | |
| 14 | RAJAT GUPTA: | Uh-hum. Yeah |
| 15 | | |
| 16 | RAJ RAJARATNAM: | And you do that. Right? |
| 17 | | |
| 18 | RAJAT GUPTA: | Yeah. |
| 19 | | |
| 20 | RAJ RAJARATNAM: | And don't give any e, equity right now. |
| 21 | | |
| 22 | RAJAT GUPTA: | Yeah. |
| 23 | | |
| 24 | RAJ RAJARATNAM: | Right? At some point if you think you need to give equity, you |
| 25 | | give equity. You know? |
| 26 | | |
| 27 | RAJAT GUPTA: | Uh-hum. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Because I tell you what everybody forgets. The first fund is the |
| 30 | | toughest to raise. |
| 31 | | |
| 32 | RAJAT GUPTA: | Uh-hum. |
| 33 | | |
| 34 | RAJ RAJARATNAM: | The first Telecom fund is the toughest to raise. |
| 35 | | |
| 36 | RAJAT GUPTA: | Uh-hum. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | To get the first anchor investor... |
| 39 | | |
| 40 | RAJAT GUPTA: | Uh-hum. |
| 41 | | |
| 42 | RAJ RAJARATNAM: | ...is the toughest. |
| 43 | | |

18

**A115**

| | | |
|---|---|---|
| 1 | RAJAT GUPTA: | Uh-hum. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | Once you get that and you get the first fund going... |
| 4 | | |
| 5 | RAJAT GUPTA: | Uh-hum. Hm-hm. |
| 6 | | |
| 7 | RAJ RAJARATNAM: | ...then based on a few Wall Street stories you can raise... |
| 8 | | |
| 9 | RAJAT GUPTA: | Yeah. Yeah. |
| 10 | | |
| 11 | RAJ RAJARATNAM: | A lot of people won't even look at first time funds. |
| 12 | | |
| 13 | RAJAT GUPTA: | Yeah. No. That's right. That's right. So, you know going back to, |
| 14 | | I mean that is kind of the set up that I have. I, I do agree that I've |
| 15 | | been kind of you know, naturally on private equity stuff, reaching |
| 16 | | out to NSR but I have already told Parag that I wanted this |
| 17 | | Telecom fund to be separate. So, um, you know, I have to, I have |
| 18 | | to, go and... |
| 19 | | |
| 20 | RAJ RAJARATNAM: | You just have to find one good guy who can build it for you. |
| 21 | | |
| 22 | RAJAT GUPTA: | Yeah. Right. |
| 23 | | |
| 24 | RAJ RAJARATNAM: | And once you get one good guy, you know, whether it is Ramesh |
| 25 | | (PH) or whoever, right? |
| 26 | | |
| 27 | RAJAT GUPTA: | Yeah. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Who knows Telecom and who is willing to work with you. |
| 30 | | |
| 31 | RAJAT GUPTA: | Yeah. |
| 32 | | |
| 33 | RAJ RAJARATNAM: | Now you'll find that you know Anil will put his hand up for some |
| 34 | | equity in that (Chuckles) and (UI)... |
| 35 | | |
| 36 | RAJAT GUPTA: | I'm sure he... Yeah. Yeah. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | You know, and that I mean, (Clears throat) I mean I don't think he |
| 39 | | needs any, but, you know, that's your call. |
| 40 | | |
| 41 | RAJAT GUPTA: | Yeah. Yeah. I mean you know, uh, ah, that's, that's a minor point. |
| 42 | | I mean, I'm, I'm not... I mean, I'm even fine with it, but, um, but |
| 43 | | here is the KKR advice so... |

19

**A116**

1

2  RAJ RAJARATNAM:      And the KKR I would do it in a heartbeat.

3

4  RAJAT GUPTA:        O.K.

5

6  RAJ RAJARATNAM:      You know. Again, again not, you know I think institutionally (UI).

7

8  RAJAT GUPTA:         But Anil is a funny guy I must tell you. (UI).

9

10  RAJ RAJARATNAM:      (UI).

11

12  RAJAT GUPTA:        That Sunday I met, he just told me Raj thinks you should not do
13                      KKR, you know? You know, he thinks...

14

15  RAJ RAJARATNAM:      What?

16

17  RAJAT GUPTA:         Yes. (Chuckles) Yeah.

18

19  RAJ RAJARATNAM:      No, No. What I did tell him was I said look, these guys are not...
20                      They're very sharp, Jewish tough guys.

21

22  RAJAT GUPTA:         Of course. Of course.

23

24  RAJ RAJARATNAM:      But if you define the role.

25

26  RAJAT GUPTA:        Yeah.

27

28  RAJ RAJARATNAM:      And it's institutional building and it's contacts.

29

30  RAJAT GUPTA:        Yeah. Yeah.

31

32  RAJ RAJARATNAM:      And you know things like that. O.K.? Look, if you go with the
33                      head of KKR in Asia to meet Anil Ambani (PH).

34

35  RAJAT GUPTA:        Yeah.

36

37  RAJ RAJARATNAM:      Or to meet Sunil Mittal (PH).

38

39  RAJAT GUPTA:        Yeah.

40

41  RAJ RAJARATNAM:      Or to meet the uh...

42

43  RAJAT GUPTA:        It's a completely different meeting.

20

**A117**

| | | |
|---|---|---|
| 1 | | |
| 2 | RAJ RAJARATNAM: | Ruias right? |
| 3 | | |
| 4 | RAJAT GUPTA: | Yeah. |
| 5 | | |
| 6 | RAJ RAJARATNAM: | Ruias.  It's a completely different access that they have. |
| 7 | | |
| 8 | RAJAT GUPTA: | Yeah. |
| 9 | | |
| 10 | RAJ RAJARATNAM: | You know? Than if the just they have to go and compete with |
| 11 | | Blackstone and TPG and Carlyle and all that, right? |
| 12 | | |
| 13 | RAJAT GUPTA: |  (UI). |
| 14 | | |
| 15 | RAJ RAJARATNAM: | And that's really what you, you know, he told me that you |
| 16 | | shouldn't do it. Right? |
| 17 | | |
| 18 | RAJAT GUPTA: | (Laughs) |
| 19 | | |
| 20 | RAJ RAJARATNAM: | And I said that look, these guys are, they are tough Jewish guys. |
| 21 | | |
| 22 | RAJAT GUPTA: | Yeah. They are. They are. |
| 23 | | |
| 24 | RAJ RAJARATNAM: | But depending on the role, you should do it. |
| 25 | | |
| 26 | RAJAT GUPTA: | Yeah. |
| 27 | | |
| 28 | RAJ RAJARATNAM: | You know, and segment it.  What I did tell him was you should be |
| 29 | | like Wolfensohn, you know? Look. Wolfensohn gets 10 million |
| 30 | | dollars a year from Citicorp he told me. |
| 31 | | |
| 32 | RAJAT GUPTA: | Yeah. Yeah. |
| 33 | | |
| 34 | RAJ RAJARATNAM: | Just to be on the international advisory committee. |
| 35 | | |
| 36 | RAJAT GUPTA: | Yeah. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | Right? Then he gets 10 million dollars from some Russian thing, |
| 39 | | right? |
| 40 | | |
| 41 | RAJAT GUPTA: | Yeah. |
| 42 | | |
| 43 | RAJ RAJARATNAM: | So you got 20 million dollars and I don't think he does much, you |

21

**A118**

| | | |
|---|---|---|
| 1 | | know? |
| 2 | | |
| 3 | RAJAT GUPTA: | Yeah. |
| 4 | | |
| 5 | RAJ RAJARATNAM: | It's access and you know. |
| 6 | | |
| 7 | RAJAT GUPTA: | Yeah. Yeah. Yeah. |
| 8 | | |
| 9 | RAJ RAJARATNAM: | Things like that. |
| 10 | | |
| 11 | RAJAT GUPTA: | Yeah. So you know, uh, so I think what they are having difficulty |
| 12 | | is in calibrating what they should pay me. Uh, they are so, you |
| 13 | | know, Henry's saying the floor. He wants to set a floor. |
| 14 | | |
| 15 | RAJ RAJARATNAM: | Right. |
| 16 | | |
| 17 | RAJAT GUPTA: | And then he wants to say uh, you know, trust me. We'll take a |
| 18 | | look at, because you, we don't know where you'll, would be. You |
| 19 | | know you could be contributing in many different ways. Uh. |
| 20 | | |
| 21 | RAJ RAJARATNAM: | Right. |
| 22 | | |
| 23 | RAJAT GUPTA: | And in fact, actually, a lot of it could be bigger outside. For |
| 24 | | example I just joined this Sberbank, right? The Russian bank. |
| 25 | | |
| 26 | RAJ RAJARATNAM: | Right. Right. |
| 27 | | |
| 28 | RAJAT GUPTA: | They're going into a partnership with uh, uh, Credit Suisse, |
| 29 | | private equity in Russia. |
| 30 | | |
| 31 | RAJ RAJARATNAM: | Yeah. |
| 32 | | |
| 33 | RAJAT GUPTA: | They are in the best position for private equity in Russia, right? |
| 34 | | |
| 35 | RAJ RAJARATNAM: | Yeah |
| 36 | | |
| 37 | RAJAT GUPTA: | They are the largest bank. They have all the banking relationships |
| 38 | | with all the enterprises there. |
| 39 | | |
| 40 | RAJ RAJARATNAM: | Uh-hum. |
| 41 | | |
| 42 | RAJAT GUPTA: | So on and so forth, so... |
| 43 | | |

22

**A119**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | Right. |
| 2 | | |
| 3 | RAJAT GUPTA: | So, you know, uh, I told Sparebank, I was having a meeting with |
| 4 | | the CEO in London last week and I said, "You know, have you |
| 5 | | talked to people like KKR?" Why don't you, you know, why, |
| 6 | | Credit Suisse is, you know they, they, they, talk to one of the best |
| 7 | | because you would be one of the most attractive partner in Russia. |
| 8 | | |
| 9 | RAJ RAJARATNAM: | Right. |
| 10 | | |
| 11 | RAJAT GUPTA: | So, he said well, we talked to, they had talked at some lower level |
| 12 | | you know and KKR was kind of, you know, lukewarm and they |
| 13 | | didn't understand what Sparebank was or any of it, so... |
| 14 | | |
| 15 | RAJ RAJARATNAM: | Right. |
| 16 | | |
| 17 | RAJAT GUPTA: | So anyway I, so I, uh, so he said, you know if you think so, you |
| 18 | | know I'd be happy to open up the discussion with KKR and... |
| 19 | | |
| 20 | RAJ RAJARATNAM: | That's a huge uh... |
| 21 | | |
| 22 | RAJAT GUPTA: | That's kind of... It, it, could be many things right? So anyways, so |
| 23 | | here's what he said, he said the contribution can come in many |
| 24 | | ways, and I will be able to see. So let me define a floor, and then |
| 25 | | it could be twice that. Three times that. Four times that. |
| 26 | | |
| 27 | RAJ RAJARATNAM: | Right. |
| 28 | | |
| 29 | RAJAT GUPTA: | Uh, and the floor he is defining is, to give uh, uh quarter of a |
| 30 | | percent of uh, their earnings. |
| 31 | | |
| 32 | RAJ RAJARATNAM: | Uh-hum. |
| 33 | | |
| 34 | RAJAT GUPTA: | Well, their earnings were last year a billion dollars. |
| 35 | | |
| 36 | RAJ RAJARATNAM: | Right. |
| 37 | | |
| 38 | RAJAT GUPTA: | Uh, this would be in cash. |
| 39 | | |
| 40 | RAJ RAJARATNAM: | Uh-hum. |
| 41 | | |
| 42 | RAJAT GUPTA: | So uh... |
| 43 | | |

23

**A120**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | So what's that? |
| 3 | RAJAT GUPTA: | Hm? |
| 5 | RAJ RAJARATNAM: | So a quarter of a percent is 25 million or two and a half? |
| 7 | RAJAT GUPTA: | Two, two and half.  Cash. |
| 9 | RAJ RAJARATNAM: | Uh-hum. |
| 11 | RAJAT GUPTA: | Uh, and it could be five, six hundred instead of a billion. Last year was a, a very good year, you can't expect, you know. |
| 14 | RAJ RAJARATNAM: | Yeah. |
| 16 | RAJAT GUPTA: | And, and he said this is what they do in partners. They give a percentage and that's what everybody, you know, wherever it comes from. Doesn't matter. The entire firm. They have only one kind of pool, like that. |
| 21 | RAJ RAJARATNAM: | Right. |
| 23 | RAJAT GUPTA: | And then he said, quarter of a percent of all the, um, all the um, carry. |
| 26 | RAJ RAJARATNAM: | Uh-hum. |
| 28 | RAJAT GUPTA: | So typically, uh, depends upon on how much they invest. So, whatever they invest in the year, you get the carry going forward. |
| 31 | RAJ RAJARATNAM: | Right. |
| 33 | RAJAT GUPTA: | And, so, typically they've been investing six to eight billion dollars a year. |
| 36 | RAJ RAJARATNAM: | Wow. Hm. |
| 38 | RAJAT GUPTA: | So, you take the six billion. That's uh, three million in carry. |
| 40 | RAJ RAJARATNAM: | Uh-hum. |
| 42 | RAJAT GUPTA: | Uh, because that's 120, uh, six billion will create 1.2 billion of carry. |

24

**A121**

| | | |
|---|---|---|
| 1 | | |
| 2 | RAJ RAJARATNAM: | Right. |
| 3 | | |
| 4 | RAJAT GUPTA: | And, a quarter of a percent of that is three million. |
| 5 | | |
| 6 | RAJ RAJARATNAM: | Right. |
| 7 | | |
| 8 | RAJAT GUPTA: | Uh, and then he said I'll give you ten million dollars of stock. |
| 9 | | |
| 10 | RAJ RAJARATNAM: | Uh-hum. |
| 11 | | |
| 12 | RAJAT GUPTA: | Which will be a grant. |
| 13 | | |
| 14 | RAJ RAJARATNAM: | Uh-hum. |
| 15 | | |
| 16 | RAJAT GUPTA: | Uh, vested over four years. |
| 17 | | |
| 18 | RAJ RAJARATNAM: | Right. |
| 19 | | |
| 20 | RAJAT GUPTA: | So, (UI). |
| 21 | | |
| 22 | RAJ RAJARATNAM: | So, the net present value is about five million a year or so. |
| 23 | | |
| 24 | RAJAT GUPTA: | Five million a year or so. |
| 25 | | |
| 26 | RAJ RAJARATNAM: | Yeah. |
| 27 | | |
| 28 | RAJAT GUPTA: | So he said this is the floor, and... |
| 29 | | |
| 30 | RAJ RAJARATNAM: | Right. |
| 31 | | |
| 32 | RAJAT GUPTA: | You know, it could be um... |
| 33 | | |
| 34 | RAJ RAJARATNAM: | (Clears throat) |
| 35 | | |
| 36 | RAJAT GUPTA: | ...three times that, four times that, he said, you know, partners |
| 37 | | make about eight times that. |
| 38 | | |
| 39 | RAJ RAJARATNAM: | Uh-hum. |
| 40 | | |
| 41 | RAJAT GUPTA: | They are full time there (UI) and so on, so... |
| 42 | | |
| 43 | RAJ RAJARATNAM: | Right. |

25

**A122**

```
1
2      RAJAT GUPTA:              That's the best performing partners.
3
4      RAJ RAJARATNAM:           Uh-hum.
5
6      RAJAT GUPTA:               He has, you know, the, the (UI)
7
8                                [CALL MINIMIZED]
9
10     RAJ RAJARATNAM:           You know, but you're spending a fair amount of time doing
11                               charity.
12
13     RAJAT GUPTA:              Yeah. (UI).
14
15     RAJ RAJARATNAM:           And, you know, and talk about the Gates Foundation and all that
16                               because, you know.
17
18     RAJAT GUPTA:              Yeah.
19
20     RAJ RAJARATNAM:           He would love to meet with Bill Gates and, you know?
21
22     RAJAT GUPTA:              Yeah. Yeah. Yeah.
23
24     RAJ RAJARATNAM:           Things like that, and...
25
26     RAJAT GUPTA:              Yeah, O.K. But you, you, you're, you're, you don't think it's...
27
28     RAJ RAJARATNAM:           (Coughs)
29
30     RAJAT GUPTA:              Uh, eh, you know, at some point, it doesn't matter what the level
31                               is. You just want to be treated equitably, right? I mean fairly...
32
33     RAJ RAJARATNAM:           Yeah. I think that's the right thing. You have to be, you want to be
34                               treated equitably and you want to be with firms that...
35
36                               [CALL MINIMIZED]
37
38                               [END OF CALL]
```

26

**A123**

27

**A124**

| | |
|---|---|
| DATE: | September 24, 2008 |
| TIME: | 7:09 AM |
| WIRETAP: | OVER 917-907-2350 |
| CALL FROM: | RAJ RAJARATNAM (917-907-2350) |
| CALL TO: | IAN HOROWITZ (212-223-9999) |
| OTHER PARTICIPANTS: | MCCOWN SMITH<br>RICK SCHUTTE<br>UNIDENTIFIED MALE |
| KEY: | Unintelligible:      UI<br>Inaudible:           IA<br>Phonetic Spelling:   PH<br>Voice Overlap:       // |

---

UNIDENTIFIED MALE:    Trading?

RAJ RAJARATNAM:    McCown please, it's Raj.

UNIDENTIFIED MALE:    One second Raj.

IAN HOROWITZ:    Hey.

RAJ RAJARATNAM:    Hey Ian.

IAN HOROWITZ:    Hey, buddy, how are you?

RAJ RAJARATNAM:    Good. So, big drama yesterday, but I have to ....

IAN HOROWITZ:    Yeah, I, I, I heard.

RAJ RAJARATNAM:    Hum.

IAN HOROWITZ:    I heard a little, um, you mean the last three minutes of the day?

RAJ RAJARATNAM:    No, I got a call at 3:58, right?

1

GOVERNMENT
EXHIBIT
21 –T
S1 11 Cr. 907 (JSR)

**A125**

| | | |
|---|---|---|
| 1 | IAN HOROWITZ: | Yeah. |
| 2 | | |
| 3 | RAJ RAJARATNAM: | Saying something good might happen to Goldman.  Right? |
| 4 | | |
| 5 | IAN HOROWITZ: | So it is what it is.  Everything's, everyone's fine, I saw it cross the |
| 6 | | board.... |
| 7 | | |
| 8 | RAJ RAJARATNAM: | No I saw, I, so, I told Ananth to buy some, he was fucking around, |
| 9 | | he can't, you know. So I went to Gary and said just buy me, right? |
| 10 | | |
| 11 | IAN HOROWITZ: | Mm hmm. |
| 12 | | |
| 13 | RAJ RAJARATNAM: | Because you were not there.  It happens all the fucking time, you |
| 14 | | know you're there every day of the year, right?  So, so anyway |
| 15 | | Gary... |
| 16 | | |
| 17 | MCCOWN SMITH: | Raj, hey, it's McCown. |
| 18 | | |
| 19 | [1 min 0 sec] | |
| 20 | | |
| 21 | RAJ RAJARATNAM: | I want to... |
| 22 | | |
| 23 | MCCOWN SMITH: | (UI) in Rick's office. |
| 24 | | |
| 25 | RAJ RAJARATNAM: | Yeah, I want to, yeah, I want go for two, to get 2 million shares of |
| 26 | | Goldman Sachs. |
| 27 | | |
| 28 | MCCOWN SMITH: | So make it a total of 2 million. |
| 29 | | |
| 30 | RAJ RAJARATNAM: | Right. |
| 31 | | |
| 32 | MCCOWN SMITH: | Okay. |
| 33 | | |
| 34 | RAJ RAJARATNAM: | And also tell them that you know look, we didn't pull a single |
| 35 | | dollar out, we didn't do anything, we were good guys.  Right? |
| 36 | | |
| 37 | MCCOWN SMITH: | You know, absolutely.  I was just down there in Rick's office |
| 38 | | because he was calling Ronnie Morgan as well so. |
| 39 | | |
| 40 | RAJ RAJARATNAM: | Okay. |
| 41 | | |
| 42 | MCCOWN SMITH: | But I'll, I'll change our indication right now.  I mean, you know, |
| 43 | | look, I get the sense this is a deal that is, you know, it's going |

2

**A126**

|    |                    |                                                                                                                                                                                                                                |
|----|--------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1  |                    | pretty well, I mean, they just upsized it from 2-1/2 to 5 billion. |
| 2  |                    | Gonna (UI) I mean, to me, this Buffett thing is somewhat of a |
| 3  |                    | game changer. |
| 4  |                    | |
| 5  | RAJ RAJARATNAM:     | Yeah, so just tell them you're going for 2 million because of the |
| 6  |                    | size, you know, upsizing.  Right? |
| 7  |                    | |
| 8  | MCCOWN SMITH:      | Okay. |
| 9  |                    | |
| 10 | RAJ RAJARATNAM:     | And that we really want 2 million and that…when will they price |
| 11 |                    | it? |
| 12 |                    | |
| 13 | MCCOWN SMITH:      | They're gonna, they're close the books in about 20 minutes.  I got |
| 14 |                    | a feeling they're gonna.  They've pretty much said they're gonna |
| 15 |                    | price last sale.  I got, I got a sense they're gonna you know go out |
| 16 |                    | with allocations sometime between 8 and 8:45. |

Line numbers 1–43 appear in the left margin.

| 18 | RAJ RAJARATNAM:     | Just make a big push, right? |
| 20 | MCCOWN SMITH:      | Absolutely. |
| 22 | RAJ RAJARATNAM:     | And that tell them that we really want it, and that we were very |
| 23 |                    | supportive. |
| 25 | MCCOWN SMITH:      | Okay.  I'll, I'm gonna make those calls right now. |
| 27 | RAJ RAJARATNAM:     | And then…okay. |
| 29 | MCCOWN SMITH:      | Do you want me to, do you want me to call, I'll obviously call you |
| 30 |                    | back with our numbers, stuff like that. |
| 32 | RAJ RAJARATNAM:     | I'll be there. |
| 34 | MCCOWN SMITH:      | Hold on, hold on one second, Raj, Rick's coming here too. |
| 36 | RAJ RAJARATNAM:     | Yeah. |
| 38 | RICK SCHUTTE:       | Hey.  The other guy is Steve Pierce. |
| 40 | RAJ RAJARATNAM:     | Okay. (UI)  Okay. |
| 42 | RICK SCHUTTE:       | He runs capital… |

3

**A127**

| | | |
|---|---|---|
| 1 | RAJ RAJARATNAM: | I don't, I know Dave Heller, right? |
| 2 | | |
| 3 | RICK SCHUTTE: | Yeah. |
| 4 | | |
| 5 | RAJ RAJARATNAM: | Can you get me Dave Heller's number? |
| 6 | | |
| 7 | RICK SCHUTTE: | Yeah, I gotta, I gotta do this call, but I just lobbed a call into |
| 8 | | Ronny, just so you know, he's in a, he's in a meeting right now |
| 9 | | with Steve Pierce talking about allocations. |
| 10 | | |
| 11 | RAJ RAJARATNAM: | Okay. |
| 12 | | |
| 13 | RICK SCHUTTE: | So I'll call him as soon, as soon as this is over I'll call Ronny |
| 14 | | back, because obviously Ronny has some pull in this. |
| 15 | | |
| 16 | RAJ RAJARATNAM: | Tell McCown to put in for two point, 2 million or 2-1/2 million. |
| 17 | | |
| 18 | RICK SCHUTTE: | Yeah, I would. Absolutely. |
| 19 | | |
| 20 | RAJ RAJARATNAM: | Okay, tell him 2-1/2 million. |
| 21 | | |
| 22 | RICK SCHUTTE: | 2-1/2. |
| 23 | | |
| 24 | RAJ RAJARATNAM: | And we'll, 1-1/2, 1.1 is what the firm wants. We, you and I will |
| 25 | | allocate the other 1.4. |
| 26 | | |
| 27 | RICK SCHUTTE: | Okay. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | If we get it, okay? |
| 30 | | |
| 31 | RICK SCHUTTE: | Okay, when you get in we'll do that. You're coming in, right? |
| 32 | | |
| 33 | RAJ RAJARATNAM: | Yeah. |
| 34 | | |
| 35 | RICK SCHUTTE: | So 2-1/2? |
| 36 | | |
| 37 | RAJ RAJARATNAM: | Yeah. Bye. |
| 38 | | |
| 39 | RICK SCHUTTE: | Okay, thanks. Bye. |
| 40 | | |
| 41 | [3 min 14 sec] | |
| 42 | | |
| 43 | *                          *                          *                          * | |

4

1
2                              [END OF CALL]

5

DATE:                    September 24, 2008

TIME:                    7:56 AM

WIRETAP:                 OVER 917-907-2350

CALL FROM:               RAJ RAJARATNAM (917-907-2350)

CALL TO:                 IAN HOROWITZ

KEY:                     Unintelligible:        UI
                         Inaudible:             IA
                         Phonetic Spelling:     PH
                         Voice Overlap:         //

---

[0 min 0 sec]

*                   *                    *                     *

[5 min 9 sec]

RAJ RAJARATNAM:          Hello.

IAN HOROWITZ:            Hey.

RAJ RAJARATNAM:          Hey, sorry, I was in with Singapore, with bloody, it's impossible
                         to move anywhere, you know?

IAN HOROWITZ:            Yeah.

RAJ RAJARATNAM:          I'm on 70th street now, from 54th...

IAN HOROWITZ:            Oh because of the UN.

RAJ RAJARATNAM:          UN shit.  Anyway.

IAN HOROWITZ:            You're better off fucking walking today.

RAJ RAJARATNAM:          Yeah, I should but now I'm up here.  Anyway, what's going on?

IAN HOROWITZ:            No allocation is done yet.  The message was sent.  We want 2.5,
                         we stressed the importance of it.  Haven't gotten in touch with

1

GOVERNMENT
EXHIBIT
22 –T
S1 11 Cr. 907 (JSR)

**A130**

| | | |
|---|---|---|
| 1 | | Ronny, they've been in the war room. Supposedly Gary Cohn's |
| 2 | | gonna be the one being, doing the allocations. |
| 3 | | |
| 4 | RAJ RAJARATNAM: | Okay. |
| 5 | | |
| 6 | IAN HOROWITZ: | I mean, I stressed enough the importance, we've been, we've been |
| 7 | | doing the majority of our business and Adam's business with |
| 8 | | them, even last week, with all the bullshit going on, we continue to |
| 9 | | go through them for the trading. I don't think that went unnoticed. |
| 10 | | |
| 11 | RAJ RAJARATNAM: | Right, and we didn't move a single prime brokerage account away |
| 12 | | from? |
| 13 | | |
| 14 | IAN HOROWITZ: | Nothing. So hopefully these guys are smart and see us as you |
| 15 | | know, one of their biggest partners we've the commission dollars |
| 16 | | we paid them this year is by far and away the tops on the list of |
| 17 | | any brokerage firm. |
| 18 | | |
| 19 | RAJ RAJARATNAM: | Right. |
| 20 | | |
| 21 | IAN HOROWITZ: | So, now it's just out of our hands. |
| 22 | | |
| 23 | RAJ RAJARATNAM: | How is the market? |
| 24 | | |
| 25 | IAN HOROWITZ: | Market is getting smoked, and now it's, it's now up nine and up |
| 26 | | 14, it was just flat, it just bounced seven handles, it's like, they're |
| 27 | | trading in, in seven handle increments. |
| 28 | | |
| 29 | RAJ RAJARATNAM: | Okay. How much Goldman do we have on the books? |
| 30 | | |
| 31 | IAN HOROWITZ: | 367. |
| 32 | | |
| 33 | RAJ RAJARATNAM: | Okay, yeah, let me tell you what happened, honestly, right? |
| 34 | | |
| 35 | IAN HOROWITZ: | Yeah, no, I looked at our price, I looked at our price, and I looked |
| 36 | | at what happened. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | Yeah. |
| 39 | | |
| 40 | IAN HOROWITZ: | Someone had this before us, someone, whatever went on, |
| 41 | | something happened, someone, they… |
| 42 | | |
| 43 | RAJ RAJARATNAM: | I got a call, right, saying something good's gonna happen. |

2

**A131**

| 1 | | |
|---|---|---|
| 2 | IAN HOROWITZ: | We'll talk about, how 'bout this, we'll talk when you come in. |
| 3 | | |
| 4 | RAJ RAJARATNAM: | Okay. |
| 5 | | |
| 6 | IAN HOROWITZ: | We'll talk when you come in, okay? |
| 7 | | |
| 8 | RAJ RAJARATNAM: | But I didn't do anything, you were not there, I asked Ananth to buy |
| 9 | | some. |
| 10 | | |
| 11 | IAN HOROWITZ: | You did nothing. |
| 12 | | |
| 13 | RAJ RAJARATNAM: | Then I went to Gary…and… |
| 14 | | |
| 15 | IAN HOROWITZ: | You did nothing wrong. |
| 16 | | |
| 17 | RAJ RAJARATNAM: | Yeah at 3:58, I can't, I can't yell out in the fucking halls. |
| 18 | | |
| 19 | IAN HOROWITZ: | No.  You did nothing wrong, we'll talk about it when you come in, |
| 20 | | nothing's wrong. |
| 21 | | |
| 22 | RAJ RAJARATNAM: | It is, I guess, Leon was very upset.  You know, fuck him, look, |
| 23 | | I've kept my mouth shut when he gave me WaMu, right? |
| 24 | | |
| 25 | IAN HOROWITZ: | Get, get upset about what?  You got nothing, this is at 3:58. |
| 26 | | |
| 27 | RAJ RAJARATNAM: | Yeah, if it was, one o'clock, I always am good with him, I always |
| 28 | | call him in, I tell him everything, you know?  AMD, IBM, |
| 29 | | everything, right? |
| 30 | | |
| 31 | IAN HOROWITZ: | He's not in, so I'm, he hasn't said anything.  Listen, if something |
| 32 | | comes in, I'll let you know. |
| 33 | | |
| 34 | RAJ RAJARATNAM: | Yeah.  All right, so um what's our net long exposure? |
| 35 | | |
| 36 | IAN HOROWITZ: | We are currently right now 44%. |
| 37 | | |
| 38 | RAJ RAJARATNAM: | All right.  We need the market to go up man. |
| 39 | | |
| 40 | IAN HOROWITZ: | We need a big day. |
| 41 | | |
| 42 | RAJ RAJARATNAM: | Yeah. |
| 43 | | |

3

1    IAN HOROWITZ:          I'll see you when you get in, boss.

2

3                                    [END OF CALL]

4

| | |
|---|---|
| DATE: | October 24, 2008 |
| TIME: | 12:12 PM |
| WIRETAP: | OVER 917-907-2350 |
| CALL FROM: | RAJ RAJARATNAM (917-907-2350) |
| CALL TO: | DAVID LAU (659-631-9969) |
| KEY: | Unintelligible:     UI |
| | Inaudible:     IA |
| | Phonetic Spelling:     PH |
| | Voice Overlap:     // |

---

DAVID LAU:      Hey big guy.

RAJ RAJARATNAM:      Hey David, you called?

DAVID LAU:      Yeah, just to give me, give me a, find the pulse because we are quite shocked overseas and uh long bonds, I mean quite shocked in relative for the VAR...because VAR broke out, blew out and our positions are the same so I just want to find out what you guys are thinking.

RAJ RAJARATNAM:      Yeah, I mean, I think, ah we think that the US is um relatively the safe haven, right.

DAVID LAU:      Um.

RAJ RAJARATNAM:      Because all of these um emerging market ah countries, many of them have to reduce interest rates, which is bad for their currencies, right.

DAVID LAU:      Um um um.

RAJ RAJARATNAM:      And, I mean today for example there is a reasonable calmness in the market you know the market is only down 2 or 3%, right.

DAVID LAU:      Yeah, that's why I'm surprised.  I thought it would go nuts.

RAJ RAJARATNAM:      Yeah I mean our risk here is ah hedge fund redemption risk, right

1



GOVERNMENT
EXHIBIT
29 –T
S1 11 Cr. 907 (JSR)

**A134**

|    |                 |                                                                                                                                                                                                                                                                                                                             |
|----|-----------------|---|
| 1  |                 | Citadel I hear is in trouble, you know, and things like that but I |
| 2  |                 | think generally, not that I want to be long equities, but generally I |
| 3  |                 | think one trade in equities would be, you know, buy the Spiders |
| 4  |                 | and short the EEMs or something, you know. |
| 5  |                 | |
| 6  | DAVID LAU:      | Hmm Hmm. |
| 7  |                 | |
| 8  | RAJ RAJARATNAM: | But it looks like here the most cyclical companies the semi |
| 9  |                 | equipment companies, and the home builders are the ones that are |
| 10 |                 | leading the way out right. |
| 11 |                 | |
| 12 | DAVID LAU:      | Right. |
| 13 |                 | |
| 14 | RAJ RAJARATNAM: | Um, now I, I heard yesterday from somebody who's on the Board |
| 15 |                 | of Goldman Sachs, that they are gonna lose $2 per share. The |
| 16 |                 | Street has them making $2.50. |
| 17 |                 | |
| 18 | DAVID LAU:      | Really? |
| 19 |                 | |
| 20 | RAJ RAJARATNAM: | You know. Yeah. Now I can get that number, you know, one, |
| 21 |                 | they don't report until December, they, I think their quarter ends in |
| 22 |                 | November, but (UI) one more, but you know they have these huge |
| 23 |                 | marks in ICBC and all of that stuff right. That uh is getting |
| 24 |                 | absolutely clobbered. You know. |
| 25 |                 | |
| 26 | DAVID LAU:      | Right. |
| 27 |                 | |
| 28 | RAJ RAJARATNAM: | So what he was telling me was that uh, Goldman, the quarter's |
| 29 |                 | pretty bad. They have zero revenues because their trading |
| 30 |                 | revenues are offset by asset losses, and to date they have lost $2 |
| 31 |                 | per share, they just announced a 10% cut and uh you know, the |
| 32 |                 | basic business is ok but uh you know this is uh tough for them. I |
| 33 |                 | don't think that's built into Goldman Sachs stock price. So if it |
| 34 |                 | gets to $105, I'm gonna, it's $99 now, it was at $102. I was |
| 35 |                 | looking for $105, I'm gonna whack it you know. |
| 36 |                 | |
| 37 | DAVID LAU:      | (Laughs) Okay. Okay. Okay (UI)... |
| 38 |                 | |
| 39 | RAJ RAJARATNAM: | Okay, I don't think it makes sense to take longer term views right |
| 40 |                 | now. But anyway it must be late your time right? |
| 41 |                 | |
| 42 | DAVID LAU:      | No. Still early. It's 12:00. (UI) fucking I sleep at 3. Don't worry, |
| 43 |                 | don't worry. I'm ok. |

2

**A135**

| 1 | | |
|---|---|---|
| 2 | RAJ RAJARATNAM: | Alright.  Okay.  Take care, thanks bye. |
| 3 | | |
| 4 | DAVID LAU: | Bye. |
| 5 | | |
| 6 | | [END OF CALL] |

3

**A136**

| | |
|---|---|
| **From:** | Gary Rosenbach <GRosenbach@galleongrp.com> |
| **Sent:** | Tuesday, September 23, 2008 6:19 PM |
| **To:** | Leon Shaulov <LShaulov@galleongrp.com> |
| **Subject:** | Re: Energy Policy: Senate passes energy tax amendment to tax package in 93-2 vote |

Number

----- Original Message -----
From: Leon Shaulov
To: Gary Rosenbach
Sent: Tue Sep 23 18:16:16 2008
Subject: Re: Energy Policy: Senate passes energy tax amendment to tax package in 93-2 vote

Thx for the heads up btw. I'm short 170mm fins. Not one word from anyone. Thnku very much. All I get is sick dilution 0 help. 0.

What I give vs what I get back is disgusting.

But at least all my deffered is in bucc. That ll help me

Fucking bull shit

----- Original Message -----
From: Gary Rosenbach
To: Tech & Trading Group
Sent: Tue Sep 23 18:07:17 2008
Subject: Fw: Energy Policy: Senate passes energy tax amendment to tax package in 93-2 vote

----- Original Message -----
From: Homsher, Peter F <phomsher@StanfordEagle.com>
Sent: Tue Sep 23 18:04:45 2008
Subject: Energy Policy: Senate passes energy tax amendment to tax package in 93-2 vote

The Senate voted 93-2 to adopt the compromise energy tax amendment to a broad tax extenders package. The energy tax amendment includes extensions of the renewable energy tax credits. The Senate is scheduled to consider two more amendments before voting on the entire package. The Senate package is expected to pass this evening.

Despite a statement from the White House today in support of the Senate package, the House continues its plan to split up the partially offset Senate bill. Draft proposals from the House have not yet been released and the voting schedule remains fluid. However, as we write this note the House is considering splitting the package into 3-4 separate bills:

1.   A bill on mental health parity which will likely have a roll call vote this evening (Rick Weissenstein and John Shepard have been following these provisions)

2.   A standalone Alternative Minimum Tax (AMT) measure without offsets (no draft proposal has been released, however the House could vote on this tomorrow)

3.   A fully offset, pared-down tax extenders package which includes the renewable energy tax credits, R&D extenders, and other



GOVERNMENT
EXHIBIT
1629
S1 11 Cr. 907 (JSR)

A137

CONFIDENTIAL                                                        USAO GALLEON 00406830

extenders (no draft proposal has been released, however the House could vote on this tomorrow)

4.    Disaster relief provisions without offsets (no draft proposal has been released, however the House could vote on this tomorrow)

We emphasize that the situation on the House's strategy for addressing tax extenders remains fluid.

These outstanding questions remain:

1)    What does the House decide to do on renewable energy tax credits and other extenders? What do they include / exclude in their bill? (It is possible that we see a draft of the House plan tonight, but that may be delayed).

2)    Would the Senate accept the House's provisions? (Senate leaders have made it clear in the Senate debate today that the Senate compromise bill was a fragile compromise and that any changes to the compromise could kill it in the Senate).

3)    Does the Senate have the time to address the House's version of tax bills? (The priorities now are a $700 billion financial bailout package and passage of a continuing resolution to keep the government from shutting down on Oct. 1).

If the House continues on its plan to split up and amend the Senate's compromise package, we believe that tax extenders risk becoming a lame duck issue. Political and economic tensions have made the situation in Washington very fluid right now and a possibility persists that the renewable energy tax credits could be enacted before Congress breaks for Oct. campaigning.

K. Whitney Stanco
Electricity and Energy Policy
Policy Research

STANFORD GROUP COMPANY
1055 Thomas Jefferson St, NW
Suite 450
Washington, DC 20007

877 227-3114 Toll Free
202 295-2366 Direct
713 992-2129 Mobile
202 298-6146 Fax

wstanco@stanfordeagle.com <mailto:wstanco@stanfordeagle.com>
<http://www.stanfordinstitutional.com/> www.stanfordinstitutional.com

Any information or data provided in this message has been obtained from sources we believe to be reliable, but we do not guarantee its accuracy or completeness. Such information reflects current market conditions, is subject to change without notice and should not be relied upon for tax purposes. Any transactional details are provided at your request and do not supersede your normal trade confirmations or monthly statements. Any product recommended is subject to prior sale. Stanford Group Company, its affiliated companies, and/or officers, directors or employees, may at times have a position in or make a market in any security described above,

and/or may act as an investment banker or advisor to any company referenced.

Stanford Group Company reserves the right to monitor and review the content of all e-mail communications sent and/or received by its employees.

Stanford Group Company does not accept time-sensitive transactional messages, including orders to buy and sell securities, via e-mail.

This information is intended to be confidential and solely for the use of Stanford Group Company and those persons or entities to whom it is directed.  It is not to be reproduced, retransmitted, or in any other manner redistributed.

If you received this message in error, please contact Stanford Group Company immediately at 800-958-0009.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

CONFIDENTIAL

USAO GALLEON 00406832

| VOYAGER ANALYSIS 3-31-2008 | | | |
|---|---|---|---|
| **PARTNERS** | RAJ | RAJAT | TOTAL |
| BEGINNING BALANCE IN 05 | 40,000,000 | 5,000,000 | |
| PURCHASED RAVI'S PORTION- 2006 | 8,425,000 | | |
| APPRECIATION FROM INCEPT TO 2006 | 32,920,137 | 4,038,349 | |
| VALUE AS OF 12-31-2006 | 81,345,137 | 9,038,349 | 90,383,486 |
| INVESTED TO BRING 80%/ 20% | | 5,000,000 | |
| REDEMPTION TO BRING 80% / 20% | (25,191,743) | | |
| VALUE AS OF 1-1-2007 | 56,153,394 | 14,038,349 | |
| DEPRECIATION FOR 2007 | (5,640,545) | (1,410,137) | |
| VALUE AS OF 12-31-2007 | 50,512,849 | 12,628,212 | 63,141,061 |
| AS PER RAJ VALUE AS OF 12-31-2007 NEW RATIO | 46,734,087 74.0154% | 16,406,974 25.9846% | 63,141,061 |
| VALUE AS OF 3-31-2008 | 36,415,365 | 12,784,372 | 49,199,737 |
| | | | |
| | | | |
| **FUND** | | | |
| BEGINNING CAPITAL 2005 | 400,000,000 | | |
| CONTRIBUTION IN 2006 | 8,425,000 | | |
| TOTAL CAPITAL | 408,425,000 | | |
| APPRECIATION BEFORE EXPENSES 2006 | 58,494,165 | | |
| NET VALUE AS OF 12-31-2006 | 466,919,165 | | |
| SWAP INCOME / EXPENSES AS OF 2006 | 2,071,100 | | |
| PAYABLE TO LEHMAN AS OF 2006 | (323,663,788) | | |
| PAYABLE TO SWISSRE AS OF 2006 | (54,942,992) | | |
| PAYABLE TO PARTNERS-2006 | 90,383,485 | | |
| | | | |
| NET VALUE AS OF 12-31-2006 | 466,919,165 | | |
| CONTRIBUTION IN 2007 | 5,000,000 | | |
| REDEMPTION IN 2007 | (25,191,743) | | |
| NET VALUE AS OF 1-1-2007 | 446,727,422 | | |
| APPRECIATION BEFORE EXPENSES 2007 | 23,448,585 | | |
| NET VALUE AS OF 12-31-2007 | 470,176,007 | | |
| SWAP INCOME / EXPENSES AS OF 2007 | (1,951,381) | | |
| PAYABLE TO LEHMAN AS OF 2007 | (345,724,866) | | |
| PAYABLE TO SWISSRE AS OF 2007 | (59,358,699) | | |
| PAYABLE TO PARTNERS-2007 | 63,141,061 | | |
| | | | |
| NET VALUE AS OF 12-31-2007 | 470,176,007 | | |
| CONTRIBUTION IN 2008 | - | | |

GOVERNMENT EXHIBIT
2105-R
S1 11 Cr. 907 (JSR)

A140

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDEMPTION IN 2008 | | - | | | | | | | |
| NET VALUE AS OF 3-31-2008 | | 470,176,007 | | | | | | | |
| APPRECIATION BEFORE EXPENSES 2008 | | (5,038,347) | | | | | | | |
| NET VALUE AS OF 12-31-2007 | | 465,137,660 | | | | | | | |
| SWAP INCOME / EXPENSES AS OF 3-31-08 | | (5,317,140) | | | | | | | |
| PAYABLE TO LEHMAN AS OF 3-31-08 | | (350,133,200) | | | | | | | |
| PAYABLE TO SWISSRE AS OF 3-31-08 | | (60,487,583) | | | | | | | |
| PAYABLE TO PARTNERS-2007 | | 49,199,737 | | | | | | | |
| | | | | | | | | | |

DATE:                       Thursday, August 07, 2008

TIME:                       8:39:10 AM

DURATION OF CALL:           00:04:34

WIRETAP:                    OVER 917-907-2350

SESSION:                    1959

CALL FROM:                  DAVID LOEB (212-902-4746)

CALL TO:                    RAJ RAJARATNAM (917-907-2350)

OTHER PARTICIPANTS:         N/A

TIMES MINIMIZED:            N/A

DURATION MINIMIZED:         N/A

KEY:                        Unintelligible:          UI
                            Inaudible:               IA
                            Phonetic:                PH
                            Voice Overlap:           //

_____


RAJARATNAM:                 Hey champ.

LOEB:                       How are you, boss?

RAJARATNAM:                 All right.  What's up?

LOEB:                       Hey.  Um, Intel?

RAJARATNAM:                 Yeah.

LOEB:                       Um, the Henry check on chipsets--  [background noise]

RAJARATNAM:                 Um hmm.

LOEB:                       --is quite interesting.

RAJARATNAM:                 Okay.


1

**A142**



DEFENSE
EXHIBIT
**4006-T**
S1 11 Cr. 907 (JSR)

| | | |
|---|---|---|
| 1<br>2<br>3 | LOEB: | //And, um, how much detail do you want on it 'cause I have a lot or I can just give you the bottom line. |
| 4<br>5 | RAJARATNAM: | //Give me the details.  Is, is it that Atom is picking up? |
| 6<br>7 | LOEB: | Say it again? |
| 8<br>9 | RAJARATNAM: | The Atom wafers are picking up, is that what you call it? |
| 10<br>11<br>12 | LOEB: | Ye-, that's, that's the thrust. But let, let me give you some detail cause it's pretty interesting. |
| 13<br>14 | RAJARATNAM: | //Okay. |
| 15<br>16<br>17 | LOEB: | Let me give you the numbers first and then I'll give you some color, okay? |
| 18<br>19 | RAJARATNAM: | //Okay. |
| 20<br>21 | LOEB: | Uh, this is worldwide chipset units. |
| 22<br>23 | RAJARATNAM: | Uh huh. |
| 24<br>25 | LOEB: | Okay?  Uh, for the motherboard side-- |
| 26<br>27 | RAJARATNAM: | Mm hm. |
| 28<br>29 | LOEB: | The new September number is 3-4 spot 5-1 million. |
| 30<br>31 | RAJARATNAM: | 3 spot 4-- |
| 32<br>33 | LOEB: | Eh, sorry.  3-4 spot 5-1 million. |
| 34<br>35 | RAJARATNAM: | Uh huh. |
| 36<br>37 | LOEB: | The prior check was 3-3 spot 6-7 million. |
| 38<br>39 | RAJARATNAM: | Uh huh. |
| 40<br>41 | LOEB: | And the prior quarter, the June quarter, was 3-1 spot 6-0 million. |
| 42<br>43 | RAJARATNAM: | Wow. |
| 44<br>45<br>46 | LOEB: | Yeah.  So you've now got a 4, uh, sorry a 9% from a 7% sequential. |

2

**A143**

| 1 | RAJARATNAM: | Um hm. |
| 2 | | |
| 3 | LOEB: | Okay?  On the notebook side, uh, by the way within that-- |
| 4 | | |
| 5 | RAJARATNAM: | //Um hmm. |
| 6 | | |
| 7 | LOEB: | --the Eaglelake, which is the Montevina platform-- |
| 8 | | |
| 9 | RAJARATNAM: | Right. |
| 10 | | |
| 11 | LOEB: | --is now 7 spot 7 million and it was 7 spot 6 million, so it's a slight |
| 12 | | uptick. |
| 13 | | |
| 14 | RAJARATNAM: | [UI] |
| 15 | | |
| 16 | LOEB: | --on the notebook front. |
| 17 | | |
| 18 | RAJARATNAM: | Mm hm. |
| 19 | | |
| 20 | LOEB: | The new September quarter is 3-9 spot 4-1 million.  The prior |
| 21 | | September check was 3-4 spot 6-5 million. |
| 22 | | |
| 23 | RAJARATNAM: | So it's 5 million better? |
| 24 | | |
| 25 | LOEB: | Yeah, huge uptick.  The prior quarter was 3-3 spot 1-1 million, so |
| 26 | | you've now got 19% sequential from a 5% sequential last time. |
| 27 | | |
| 28 | RAJARATNAM: | Um hm. |
| 29 | | |
| 30 | LOEB: | Within that, to your point, the Cantiga, which is the Montevina |
| 31 | | platform-- |
| 32 | | |
| 33 | RAJARATNAM: | Mm hm. |
| 34 | | |
| 35 | LOEB: | --um, which the GM45, is now 17 spot 7-9 million.  The last check |
| 36 | | was 16 spot 2-5, but the Atom should be in the Crestline. |
| 37 | | |
| 38 | RAJARATNAM: | Mm hm. |
| 39 | | |
| 40 | LOEB: | I think. And that goes to 16 spot 6 million from the last check of 14 |
| 41 | | spot 1 million.  So that's, that's a big increase. |
| 42 | | |
| 43 | RAJARATNAM: | Mm hm. |
| 44 | | |

**A144**

4006-T-3

| | | |
|---|---|---|
| 1<br>2<br>3<br>4 | LOEB: | Uh, on the server embedded in other products, there's also strangely a big increase. It's now 3 spot 3-7 million from 2 spot 3-9 million. Last quarter was 3 spot 3-5 million. |
| 5<br>6 | RAJARATNAM: | Um hm. |
| 7<br>8<br>9<br>10<br>11 | LOEB: | So sequential goes from minus 29% to up 1%. And so we get total global chipsets of 7-7 spot 2-9 million. Prior check was 7-0 spot 7-1 million, and prior quarter was 6-8 spot 0-7 million so you're now at 14% sequential from a 4% sequential. |
| 12<br>13 | RAJARATNAM: | //Wow. |
| 14<br>15<br>16<br>17 | LOEB: | It's, it's both Atom, other notebook, a little bit of desktop and server. Um, now, a couple thoughts, because this is obviously very weird. |
| 18<br>19 | RAJARATNAM: | Right. |
| 20<br>21 | LOEB: | Um and somewhat contradictory to all the sort of chain type stuff. |
| 22<br>23 | RAJARATNAM: | Right. |
| 24<br>25 | LOEB: | Um, is that it's possible that this last check that we did in July-- |
| 26<br>27 | RAJARATNAM: | Right. |
| 28<br>29 | LOEB: | --did not yet include the full month of September. How, however-- |
| 30<br>31 | RAJARATNAM: | //It's still a good number. |
| 32<br>33 | LOEB: | It's still a fucking good number, right, on a sequential basis. |
| 34<br>35 | RAJARATNAM: | Yeah. |
| 36<br>37 | LOEB: | Um, so even if the revision looks bigger than it should-- |
| 38<br>39 | RAJARATNAM: | Right. |
| 40<br>41 | LOEB: | --the sequential is very strong. One-- |
| 42<br>43 | RAJARATNAM: | [UI] couple points. |
| 44<br>45 | LOEB: | --yeah. |
| 46 | RAJARATNAM: | I'm sure the data [UI]. Thank you. |

4

**A145**

| | | |
|---|---|---|
| 1 | | |
| 2 | LOEB: | Yeah.  No, I think it's probably worth it.  You know, we'll, we'll, |
| 3 | | hopefully – it's part of the puzzle, right? |
| 4 | | |
| 5 | RAJARATNAM: | //Yeah. |
| 6 | | |
| 7 | LOEB: | It's not the whole answer but they are quite something I think those |
| 8 | | numbers.  And, and, Raj? |
| 9 | | |
| 10 | RAJARATNAM: | Yup? |
| 11 | | |
| 12 | LOEB: | One thing since, um, you know I've normally given this, this to |
| 13 | | Adam to give to you, I need your help to protect Henry.  This,-- |
| 14 | | |
| 15 | RAJARATNAM: | [UI] |
| 16 | | |
| 17 | LOEB: | this goes to you and Adam only. |
| 18 | | |
| 19 | RAJARATNAM: | Yeah.  No, absolutely not, I don't talk to anybody. |
| 20 | | |
| 21 | LOEB | Yeah.  And then, you know, I tell a couple of guys on the Street |
| 22 | | but you guys get the first call and that's it. |
| 23 | | |
| 24 | RAJARATNAM: | Okay.  Good. |
| 25 | | |
| 26 | LOEB | Thank you.  Okay? |
| 27 | | |
| 28 | RAJARATNAM: | Yeah. |
| 29 | | |
| 30 | LOEB | Thanks a lot, buddy.  Okay. |
| 31 | | |
| 32 | RAJARATNAM: | Thanks.  Bye. |
| 33 | | |
| 34 | | |
| 35 | | [END OF CALL] |

5

**A146**

| | | |
|---|---|---|
| 1 | DATE: | Friday, August 22, 2008 |
| 3 | TIME: | 9:17:23 AM |
| 5 | DURATION OF CALL: | 00:04:55 |
| 7 | WIRETAP: | OVER 917-907-2350 |
| 9 | SESSION: | 2285 |
| 11 | CALL FROM: | DAVID LOEB (212-902-4746) |
| 13 | CALL TO: | RAJ RAJARATNAM (212-902-4746) |
| 15 | OTHER PARTICIPANTS: | N/A |
| 17 | TIMES MINIMIZED: | N/A |
| 19 | DURATION MINIMIZED: | N/A |
| 21 | KEY: | Unintelligible:        UI |
| 22 | | Inaudible:           IA |
| 23 | | Phonetic            PH |
| 24 | | Voice Overlap:        // |

27  [PHONE RINGING]

29  RAJARATNAM:        Hey, doctor.

31  LOEB:             How are you, boss?

33  RAJARATNAM:        I'm good.  I'm taking my kid to see colleges.

35  LOEB:             Oh nice.

37  RAJARATNAM:        Pennsylvania, so.

39  LOEB:             Oh, really?

41  RAJARATNAM:        // Yeah.

43  LOEB:             U. Penn and like Swarthmore and those guys?

45  RAJARATNAM:        We're going to U. Penn and Swarthmore today.  Did you go to
46                    Swarthmore?

1

**A147**



DEFENSE
EXHIBIT
**4007-T**
S1 11 Cr. 907 (JSR)

1
2    LOEB:                    No, but I'll, I, my stepfather is the head of one of the, uh, big
3                             departments at Wharton.
4
5    RAJARATNAM:              At Wharton?
6
7    LOEB:                    // Umm. Yeah. So I'm sure if you need any help around U. Penn
8                             you should let me know.
9
10   RAJARATNAM:              [laughs] Oh, okay. Thank you.
11
12   LOEB:                    // Yeah. Yeah, um, but Swarthmore I used to visit, I tried to get in
13                            there.
14
15   RAJARATNAM:              // You had any girlfriends at Swarthmore?
16
17   LOEB:                    Exactly. I tried to get in but they wouldn't let me.
18
19   RAJARATNAM:              Okay. [both laugh]
20
21   LOEB:                    Anyway, um--
22
23   RAJARATNAM:              // [UI] excuse me. Go ahead.
24
25   LOEB:                    Uh, some quick stuff. First, on uh Apple.
26
27   RAJARATNAM:              Right.
28
29   LOEB:                    Um, this is a, a series of checks that, uh, Henry does quite
30                            effectively and I used to share, you know, with Adam that he
31                            would pass on to you, but I want to get 'em to you first. Um, and
32                            this is [UI] production data, but it's directly from Apple and it's
33                            been pretty good on the production side.
34
35   RAJARATNAM:              Uh huh.
36
37   LOEB:                    Okay? Um, so, usually we get a check once a month, okay?
38
39   RAJARATNAM:              Right.
40
41   LOEB:                    Um, so the iPhone side is, uh, for the June quarter, the actual was
42                            1.2 million.
43
44   RAJARATNAM:              Uh huh.
45
46   LOEB:                    The September number is now 9.6 million,--

2

**A148**

| | | |
|---|---|---|
| 1 | | |
| 2 | RAJARATNAM: | Uh huh. |
| 3 | | |
| 4 | LOEB: | --and the December is now 7.8 million.  The, the last check was |
| 5 | | 1.5-- |
| 6 | | |
| 7 | RAJARATNAM: | // Uh huh. |
| 8 | | |
| 9 | LOEB: | --9.3 and 7.8 so basically June slightly moved into September. |
| 10 | | |
| 11 | RAJARATNAM: | Right. |
| 12 | | |
| 13 | LOEB: | And the net number's the same, but what's interesting to me is that |
| 14 | | the December quarter remains unchanged and pretty much higher |
| 15 | | than what the Street's at. |
| 16 | | |
| 17 | RAJARATNAM: | Right. |
| 18 | | |
| 19 | LOEB: | Um, again this is supply side, doesn't necessarily translate directly |
| 20 | | to shipments, but I think it's pretty [UI]. |
| 21 | | |
| 22 | RAJARATNAM: | // But shows that demand is still strong. Yeah. |
| 23 | | |
| 24 | LOEB: | Yeah, um, and on the iPod side, uh, June Q: 11 spot 2; September: |
| 25 | | 16 spot 3; December: 21 spot 3; um and the last check was June 11 |
| 26 | | spot 4, 16 spot 9, and 20 spot 8.  So this has actually ticked up-- |
| 27 | | |
| 28 | RAJARATNAM: | //A little ticked down. |
| 29 | | |
| 30 | LOEB: | -- [UI] it ticked up a bit. Um, uh |
| 31 | | |
| 32 | RAJARATNAM: | I'm sorry, it has picked up, yeah, yeah, yeah. |
| 33 | | |
| 34 | LOEB: | In, in net. |
| 35 | | |
| 36 | RAJARATNAM: | //Right. Right. |
| 37 | | |
| 38 | LOEB: | But the September quarter, you're right, is down from the last one |
| 39 | | and the December quarter is a bit up.  Within that it's pretty much |
| 40 | | Shuffle going up a little bit, and Touch continuing to go down. |
| 41 | | |
| 42 | RAJARATNAM: | Right. |
| 43 | | |
| 44 | LOEB: | // Okay?  Um, on Intel, on the Atom front? |
| 45 | | |
| 46 | RAJARATNAM: | Um hm. |

3

**A149**

1
2   LOEB:               Um, the CPU side, not the chip set data that we've talked about in
3                       the past--
4
5   RAJARATNAM:         //Um hm.
6
7   LOEB:               --but the CPU side for Atom, we have new, new check on that.
8
9   RAJARATNAM:         // [UI] Okay.
10
11  LOEB:               Um, the original September quarter was 3 spot 7 and 3 spot 8
12                      million units.
13
14  RAJARATNAM:         Uh huh.
15
16  LOEB:               And it's now 4 spot 9, so 1 plus million uptick.
17
18  RAJARATNAM:         Wow.  Wow.
19
20  LOEB:               Yup. Yup. And the original December was the 4 to 5 million, um,
21                      the current is 5 spot 5.  So more than a million uptick there.
22
23  RAJARATNAM:         Does [UI], uh, does, uh, your guy not share this with Covello
24                      because Covello's getting negative on this stuff, right?
25
26  LOEB:               //Yeah.  No, well we, we have to be very careful around that stuff.
27
28  RAJARATNAM:         Okay.
29
30  LOEB:               Like I'll, I, my preference is to keep this kind of thing pretty
31                      directed.
32
33  RAJARATNAM:         Well I know that. I, look I'm not, I'm not talking to anybody but
34                      I'm asking you [UI]//
35
36  LOEB:               //Yeah.  Yeah no, so what he di-, what he does is he usually shares
37                      directional with him.
38
39  RAJARATNAM:         Oh, okay.
40
41  LOEB:               And sometimes the actual numbers, but on a lagged basis.
42
43  RAJARATNAM:         Okay.
44
45  LOEB:               You know what I mean?
46

4

**A150**

| | | |
|---|---|---|
| 1 | RAJARATNAM: | Right. |
| 2 | | |
| 3 | LOEB: | Um, but you know the Covello thing to be clear -- |
| 4 | | |
| 5 | RAJARATNAM: | //Right. |
| 6 | | |
| 7 | LOEB: | --well, actually, two, two points.  One, Covello thing to be very |
| 8 | | clear, is, he's still saying that he thinks 3Q and 4Q will beat. |
| 9 | | |
| 10 | RAJARATNAM: | Right. |
| 11 | | |
| 12 | LOEB: | He's not making calls on the quarter.  His tone shift is gradual and |
| 13 | | it's about first half '09. |
| 14 | | |
| 15 | RAJARATNAM: | Okay. |
| 16 | | |
| 17 | LOEB: | You know him.  He does-- |
| 18 | | |
| 19 | RAJARATNAM: | //Yeah [UI] |
| 20 | | |
| 21 | LOEB: | --the big cyclical stuff.  So he's not, he's not talking about 3Q, 4Q. |
| 22 | | And then the second thing I'd say is, you know, I think it's very |
| 23 | | important to get this Atom data but at the same time it's not going |
| 24 | | to make or break their quarter. |
| 25 | | |
| 26 | RAJARATNAM: | I understand that, yeah. |
| 27 | | |
| 28 | LOEB: | //Yeah. |
| 29 | | |
| 30 | RAJARATNAM: | Okay. |
| 31 | | |
| 32 | LOEB: | All right? |
| 33 | | |
| 34 | RAJARATNAM: | Yeah.  And also just keep my cell phone.  Anytime you want to |
| 35 | | call me, just call me on my cell. |
| 36 | | |
| 37 | LOEB: | I got it. |
| 38 | | |
| 39 | RAJARATNAM: | //If I'm not in the office.  Right? |
| 40 | | |
| 41 | LOEB: | All right.  Perfect. |
| 42 | | |
| 43 | RAJARATNAM: | Okay.  Thank you. |
| 44 | | |
| 45 | LOEB: | Thanks.  Have a good weekend. |
| 46 | | |

5

**A151**

```
1   RAJARATNAM:          //Bye.
2
3   LOEB:                Thanks.
4
5   RAJARATNAM:          [UI]
6
7
8                        [END OF CALL]
```

**A152**

4007-T-6

| | | |
|---|---|---|
| DATE: | Thursday, October 2, 2008 | |
| TIME: | 7:37:24 AM | |
| DURATION OF CALL: | 10:04 | |
| WIRETAP: | OVER 917-907-2350 | |
| SESSION: | 3086 | |
| CALL FROM: | SANJAY SANTHANAM (659-656-9964) | |
| CALL TO: | RAJ RAJARATNAM (917-907-2350) | |
| OTHER PARTICIPANTS: | N/A | |
| TIMES MINIMIZED: | 1 | |
| DURATION MINIMIZED: | 00:00:20 | |
| KEY: | Unintelligible: | UI |
| | Inaudible: | IA |
| | Phonetic: | PH |
| | Voice Overlap: | // |

---

RAJARATNAM:     Hello.

SANTHANAM:     Morning Raj, Sanjay.

RAJARATNAM:     Morning Sanjay, how are you?

SANTHANAM:     I'm all right, man, how are, under the circumstances, how are you holding up?

RAJARATNAM:     Okay.

SANTHANAM:     Huh?

RAJARATNAM:     All right.

SANTHANAM:     So, I, uh, basically, I'm, I have been going through all the stuff on Voyager, whatever I have.

RAJARATNAM:     Okay.

1



DEFENSE
EXHIBIT
**4015-T-R**
S1 11 Cr. 907 (JSR)

**A153**

4015-T-R-1

| | | |
|---|---|---|
| 11<br>12<br>13<br>14 | RAJARATNAM: | Look, it's, it's, game, part of the game. Look, I mean, you know, when you take leverage you, you know. My problem is I, I'm a big boy. I hope Rajat is a big boy. You know? |
| 15<br>16 | SANTHANAM: | No, other that, that is something we'll have to sit and figure out. |
| 17<br>18<br>19 | RAJARATNAM: | And then I didn't, I, I, I didn't tell him that I took that equity out, Right? |
| 20<br>21 | SANTHANAM: | I know, uh, yes you-- |
| 22<br>23<br>24 | RAJARATNAM: | When you come back, when you come back there to pull the file and show him a thing, right? |
| 25<br>26 | SANTHANAM: | Correct. |
| 27<br>28<br>29<br>30<br>31 | RAJARATNAM: | What I want to do is show him, you know, and I might say things like, you know, um, this, instead of 20 million, 30 million in Lehman that we put a claim against and we have to wait for it, you know? |
| 32 | SANTHANAM: | Correct. And some time when--// |

9

**A154**

**GOLDMAN SACHS**
**SELECTIVE CALL DETAIL REPORT**
**ALL CALLS TO/FROM SELECTED NUMBERS**
**03/01/2007 - 11/30/2008**

| GOLDMAN NUMBER | DATE | TIME | DIALED/ INCOMING NUMBER | DURATION (MIN.T) | CALL TYPE |
|---|---|---|---|---|---|
| 2129024746 | 03/01/2007 | 03:50 | 9173430000 | 1.6 | IN |
| 2129024746 | 03/01/2007 | 03:50 | 2129022222 | 1.6 | OT |
| 2129024746 | 03/01/2007 | 07:35 | 9173430000 | 0.5 | IN |
| 2129024746 | 03/01/2007 | 11:40 | 6172042000 | 0.3 | IN |
| 2129024746 | 03/01/2007 | 16:57 | 9173430000 | 8.4 | IN |
| 2129024746 | 03/02/2007 | 11:26 | 2129021000 | 2.3 | IN |
| 2129024746 | 03/02/2007 | 16:38 | 9173430000 | 8.1 | IN |
| 2129024746 | 03/04/2007 | 23:34 | 9173430000 | 1.7 | IN |
| 2129024746 | 03/04/2007 | 23:34 | 2129022222 | 1.7 | OT |
| 2129024746 | 03/05/2007 | 10:04 | 2129990000 | 2.8 | IN |
| 2129024746 | 03/05/2007 | 10:44 | 6229308458 | 1.3 | IN |
| 2129024746 | 03/05/2007 | 11:47 | 6939007118 | 5.1 | IN |
| 2129024746 | 03/05/2007 | 11:55 | 6939007118 | 5.0 | IN |
| 2129024746 | 03/05/2007 | 14:48 | 2123573545 | 0.1 | IN |
| 2129024746 | 03/05/2007 | 18:35 | 2126524512 | 0.3 | IN |
| 2129024746 | 03/06/2007 | 02:03 | 9173430000 | 1.7 | IN |
| 2129024746 | 03/06/2007 | 02:03 | 2129022222 | 1.7 | OT |
| 2129024746 | 03/06/2007 | 02:40 | 9734391745 | 1.3 | IN |
| 2129024746 | 03/06/2007 | 02:40 | 2129022222 | 1.3 | OT |
| 2129024746 | 03/06/2007 | 07:20 | 9173430000 | 11.8 | IN |
| 2129024746 | 03/06/2007 | 12:14 | 6172042276 | 0.3 | IN |
| 2129024746 | 03/06/2007 | 13:09 | 2123575793 | 2.2 | IN |
| 2129024746 | 03/07/2007 | 09:28 | 9173430000 | 0.3 | IN |
| 2129024746 | 03/07/2007 | 10:17 | 2038383188 | 4.9 | IN |
| 2129024746 | 03/07/2007 | 10:51 | 2038383188 | 4.1 | IN |
| 2129024746 | 03/07/2007 | 11:52 | 2038383188 | 0.3 | IN |
| 2129024746 | 03/07/2007 | 19:31 | 4152831099 | 4.9 | OT |
| 2129024746 | 03/08/2007 | 10:04 | 2129021000 | 2.2 | IN |
| 2129024746 | 03/08/2007 | 11:53 | 2123322782 | 1.3 | IN |
| 2129024746 | 03/09/2007 | 08:35 | 9173430000 | 12.2 | IN |
| 2129024746 | 03/09/2007 | 10:11 | 2127827000 | 0.3 | IN |
| 2129024746 | 03/09/2007 | 12:44 | 2123330100 | 0.8 | IN |
| 2129024746 | 03/09/2007 | 14:18 | 4103452438 | 1.6 | IN |
| 2129024746 | 03/09/2007 | 17:14 | 2038636730 | 1.5 | IN |
| 2129024746 | 03/11/2007 | 23:45 | 9734391745 | 2.0 | IN |
| 2129024746 | 03/11/2007 | 23:45 | 2129022222 | 2.0 | OT |
| 2129024746 | 03/12/2007 | 07:11 | 8772321062 | 16.3 | OT |
| 2129024746 | 03/12/2007 | 07:41 | 2266169052 | 14.5 | IN |
| 2129024746 | 03/12/2007 | 08:25 | 9173430000 | 15.5 | IN |

GS-SECG 015262



**DEFENSE EXHIBIT**
**6060**
S1 11 Cr. 907 (JSR)

**A155**

| | | | |
|---|---|---|---|
| 2129024746 | 09/18/2008 17:18 | 2038903613 | 0.2 IN |
| 2129024746 | 09/18/2008 17:59 | 2129691000 | 32.5 IN |
| 2129024746 | 09/18/2008 18:20 | 2128825000 | 0.4 IN |
| 2129024746 | 09/18/2008 23:10 | 9173430000 | 1.5 IN |
| 2129024746 | 09/18/2008 23:10 | 2129022222 | 1.5 OT |
| 2129024746 | 09/19/2008 08:17 | 2038903613 | 7.0 IN |
| 2129024746 | 09/19/2008 08:23 | 6466587700 | 5.9 IN |
| 2129024746 | 09/19/2008 09:16 | 8774653626 | 13.6 OT |
| 2129024746 | 09/19/2008 09:33 | 2123571444 | 5.1 OT |
| 2129024746 | 09/19/2008 09:38 | 2124546182 | 3.3 IN |
| 2129024746 | 09/19/2008 09:59 | 01185229781545 | 4.5 OT |
| 2129024746 | 09/19/2008 11:40 | 2126524512 | 34.8 IN |
| 2129024746 | 09/19/2008 11:43 | 4152508705 | 0.0 IN |
| 2129024746 | 09/19/2008 11:43 | 4152508705 | 0.6 IN |
| 2129024746 | 09/19/2008 11:56 | 2234873705 | 0.4 IN |
| 2129024746 | 09/19/2008 12:56 | 9143104140 | 6.6 OT |
| 2129024746 | 09/19/2008 13:10 | 2128294015 | 17.6 OT |
| 2129024746 | 09/19/2008 13:11 | 4153527100 | 3.3 IN |
| 2129024746 | 09/19/2008 13:45 | 9178806286 | 10.3 IN |
| 2129024746 | 09/19/2008 14:14 | 4153527100 | 0.4 IN |
| 2129024746 | 09/19/2008 14:24 | 4153527102 | 52.6 OT |
| 2129024746 | 09/19/2008 15:20 | 2128825626 | 31.5 OT |
| 2129024746 | 09/19/2008 16:20 | 6465283921 | 4.3 IN |
| 2129024746 | 09/22/2008 08:00 | 2038903613 | 0.4 IN |
| 2129024746 | 09/22/2008 08:46 | 9173430000 | 12.0 IN |
| 2129024746 | 09/22/2008 08:55 | 2038903613 | 0.3 IN |
| 2129024746 | 09/22/2008 08:58 | 2038903613 | 9.3 OT |
| 2129024746 | 09/22/2008 11:14 | 2124780000 | 3.8 IN |
| 2129024746 | 09/22/2008 13:28 | 9142532145 | 3.8 OT |
| 2129024746 | 09/22/2008 13:45 | 6173574592 | 9.2 OT |
| 2129024746 | 09/22/2008 15:34 | 9142532145 | 1.8 OT |
| 2129024746 | 09/22/2008 15:50 | 2124543051 | 0.8 OT |
| 2129024746 | 09/22/2008 16:46 | 2124780512 | 13.4 OT |
| 2129024746 | 09/23/2008 07:00 | 6465283921 | 4.7 IN |
| 2129024746 | 09/23/2008 09:13 | 9173430000 | 29.5 IN |
| 2129024746 | 09/23/2008 10:36 | 9173430000 | 0.5 IN |
| 2129024746 | 09/23/2008 11:22 | 6172042000 | 0.6 IN |
| 2129024746 | 09/23/2008 11:45 | 011886227304181 | 1.2 OT |
| 2129024746 | 09/23/2008 11:48 | 9179217431 | 0.4 OT |
| 2129024746 | 09/23/2008 11:57 | 6172042000 | 2.2 IN |
| 2129024746 | 09/23/2008 12:21 | 9173430000 | 22.4 IN |
| 2129024746 | 09/23/2008 12:37 | 4153527100 | 0.5 IN |
| 2129024746 | 09/23/2008 12:49 | 2128294015 | 27.7 OT |
| 2129024746 | 09/23/2008 13:17 | 4153527102 | 14.9 OT |
| 2129024746 | 09/23/2008 13:34 | 2038903613 | 8.9 IN |
| 2129024746 | 09/23/2008 14:00 | 2038903613 | 31.4 OT |
| 2129024746 | 09/23/2008 14:13 | 9179217431 | 0.4 IN |

GS-SECG 015470

**A156**

| | | | |
|---|---|---|---|
| 2129024746 | 09/23/2008 14:17 | 2124546294 | 0.3 IN |
| 2129024746 | 09/23/2008 14:32 | 2124546294 | 0.8 OT |
| 2129024746 | 09/23/2008 15:07 | 2128294015 | 3.2 OT |
| 2129024746 | 09/23/2008 15:12 | 6463880316 | 2.5 OT |
| 2129024746 | 09/23/2008 15:15 | 2123289300 | 0.4 IN |
| 2129024746 | 09/23/2008 15:38 | 2038903613 | 0.2 IN |
| 2129024746 | 09/23/2008 15:48 | 2123289300 | 53.4 IN |
| 2129024746 | 09/23/2008 16:52 | 6509639338 | 1.6 IN |
| 2129024746 | 09/23/2008 17:00 | 2038903613 | 3.3 IN |
| 2129024746 | 09/23/2008 18:21 | 9175539864 | 3.1 IN |
| 2129024746 | 09/23/2008 18:31 | 9175539864 | 0.0 IN |
| 2129024746 | 09/23/2008 18:33 | 9173430000 | 0.4 IN |
| 2129024746 | 09/23/2008 18:43 | 9175539864 | 1.0 IN |
| 2129024746 | 09/23/2008 18:47 | 9173430000 | 0.3 IN |
| 2129024746 | 09/23/2008 19:00 | 9175539864 | 0.6 IN |
| 2129024746 | 09/23/2008 19:13 | 9175539864 | 6.7 IN |
| 2129024746 | 09/23/2008 19:22 | 9175539864 | 4.4 IN |
| 2129024746 | 09/24/2008 07:47 | 9173430000 | 0.7 IN |
| 2129024746 | 09/24/2008 07:48 | 2038903613 | 0.2 IN |
| 2129024746 | 09/24/2008 07:48 | 01181364069737 | 4.4 OT |
| 2129024746 | 09/24/2008 07:54 | 2038903613 | 1.0 OT |
| 2129024746 | 09/24/2008 08:00 | 6591552223 | 7.7 IN |
| 2129024746 | 09/24/2008 08:08 | 6591552223 | 2.6 IN |
| 2129024746 | 09/24/2008 08:08 | 9173430000 | 1.7 IN |
| 2129024746 | 09/24/2008 09:26 | 2129886234 | 1.2 IN |
| 2129024746 | 09/24/2008 09:29 | 2128294015 | 0.3 IN |
| 2129024746 | 09/24/2008 09:44 | 2123577082 | 1.2 IN |
| 2129024746 | 09/24/2008 09:47 | 9173430000 | 9.4 IN |
| 2129024746 | 09/24/2008 10:20 | 5229180712 | 1.1 IN |
| 2129024746 | 09/24/2008 10:28 | 01185225213838 | 18.7 OT |
| 2129024746 | 09/24/2008 10:34 | 6464320682 | 0.3 IN |
| 2129024746 | 09/24/2008 10:58 | 2123577082 | 6.0 IN |
| 2129024746 | 09/24/2008 10:59 | 6464320682 | 3.7 IN |
| 2129024746 | 09/24/2008 11:51 | 6464320682 | 30.6 IN |
| 2129024746 | 09/24/2008 12:37 | 9173432127 | 3.7 IN |
| 2129024746 | 09/24/2008 12:53 | 4153527100 | 27.4 IN |
| 2129024746 | 09/24/2008 13:21 | 4153527100 | 6.8 IN |
| 2129024746 | 09/24/2008 14:50 | 2128559043 | 0.6 OT |
| 2129024746 | 09/24/2008 15:35 | 2128294015 | 0.5 IN |
| 2129024746 | 09/24/2008 15:38 | 2128294015 | 2.3 OT |
| 2129024746 | 09/24/2008 16:00 | 2023294476 | 0.4 IN |
| 2129024746 | 09/24/2008 16:03 | 2129323523 | 6.3 OT |
| 2129024746 | 09/24/2008 16:33 | 6465283921 | 1.9 IN |
| 2129024746 | 09/24/2008 16:36 | 9173794197 | 0.8 OT |
| 2129024746 | 09/24/2008 16:39 | 2129323523 | 1.0 OT |
| 2129024746 | 09/24/2008 16:45 | 4158347801 | 4.0 IN |
| 2129024746 | 09/24/2008 16:50 | 9173430000 | 2.3 IN |

GS-SECG 015471

6060-211

| | | | | |
|---|---|---|---|---|
| 2129024746 | 10/22/2008 | 17:46 | 2038383188 | 6.8 OT |
| 2129024746 | 10/22/2008 | 18:20 | 2038383188 | 0.3 IN |
| 2129024746 | 10/22/2008 | 18:46 | 2038383188 | 5.9 IN |
| 2129024746 | 10/22/2008 | 18:55 | 4153527100 | 1.6 IN |
| 2129024746 | 10/23/2008 | 01:36 | 9173430000 | 1.4 IN |
| 2129024746 | 10/23/2008 | 01:36 | 2129022222 | 1.4 OT |
| 2129024746 | 10/23/2008 | 06:28 | 9173430000 | 0.1 IN |
| 2129024746 | 10/23/2008 | 08:15 | 2123712335 | 2.3 OT |
| 2129024746 | 10/23/2008 | 08:30 | 9173430000 | 0.8 IN |
| 2129024746 | 10/23/2008 | 08:45 | 01182237881778 | 1.9 OT |
| 2129024746 | 10/23/2008 | 08:47 | 2038903613 | 1.2 OT |
| 2129024746 | 10/23/2008 | 08:51 | 011886227304181 | 2.6 OT |
| 2129024746 | 10/23/2008 | 09:02 | 9173430000 | 6.5 IN |
| 2129024746 | 10/23/2008 | 09:51 | 9173430000 | 11.3 IN |
| 2129024746 | 10/23/2008 | 10:20 | 2128556704 | 2.2 OT |
| 2129024746 | 10/23/2008 | 10:29 | 2128294015 | 0.2 IN |
| 2129024746 | 10/23/2008 | 10:48 | 2128294015 | 4.0 IN |
| 2129024746 | 10/23/2008 | 10:52 | 2038903613 | 3.0 OT |
| 2129024746 | 10/23/2008 | 10:55 | 011886227304181 | 6.2 OT |
| 2129024746 | 10/23/2008 | 11:02 | 6465212980 | 3.7 IN |
| 2129024746 | 10/23/2008 | 11:19 | 2129990000 | 8.7 IN |
| 2129024746 | 10/23/2008 | 11:26 | 4152508705 | 0.4 IN |
| 2129024746 | 10/23/2008 | 11:58 | 2038903613 | 0.2 IN |
| 2129024746 | 10/23/2008 | 11:58 | 2123712335 | 2.2 OT |
| 2129024746 | 10/23/2008 | 12:09 | 2123289305 | 25.7 OT |
| 2129024746 | 10/23/2008 | 12:41 | 4153527102 | 17.3 OT |
| 2129024746 | 10/23/2008 | 12:43 | 2038903613 | 0.3 IN |
| 2129024746 | 10/23/2008 | 13:03 | 2038903613 | 6.1 OT |
| 2129024746 | 10/23/2008 | 13:27 | 9145178650 | 22.8 IN |
| 2129024746 | 10/23/2008 | 14:37 | 2124546294 | 34.5 OT |
| 2129024746 | 10/23/2008 | 15:24 | 6466587718 | 3.0 OT |
| 2129024746 | 10/23/2008 | 15:49 | 2038635819 | 3.2 OT |
| 2129024746 | 10/23/2008 | 16:15 | 2128559840 | 0.6 IN |
| 2129024746 | 10/23/2008 | 16:47 | 2038383188 | 7.0 IN |
| 2129024746 | 10/23/2008 | 17:06 | 2128559840 | 0.1 IN |
| 2129024746 | 10/23/2008 | 17:25 | 9174026226 | 0.4 IN |
| 2129024746 | 10/23/2008 | 17:47 | 6465283921 | 0.3 IN |
| 2129024746 | 10/23/2008 | 17:54 | 9173430000 | 3.8 IN |
| 2129024746 | 10/23/2008 | 18:02 | 2129323523 | 1.2 OT |
| 2129024746 | 10/24/2008 | 07:25 | 9173430000 | 0.8 IN |
| 2129024746 | 10/24/2008 | 09:03 | 011886227304181 | 14.4 OT |
| 2129024746 | 10/24/2008 | 10:22 | 1391220720 | 2.7 IN |
| 2129024746 | 10/24/2008 | 10:30 | 2128294015 | 3.6 IN |
| 2129024746 | 10/24/2008 | 10:41 | 2123712335 | 1.8 OT |
| 2129024746 | 10/24/2008 | 10:44 | 2038383188 | 13.5 IN |
| 2129024746 | 10/24/2008 | 11:03 | 2128294015 | 0.3 IN |
| 2129024746 | 10/24/2008 | 11:48 | 2038383188 | 13.4 IN |

GS-SECG 015482

6060-222