# 12-4448

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

RAJAT K. GUPTA,

*Defendant-Appellant*.

On Appeal From the United States District Court for the Southern District of New York, No. 1:11-cr-00907-JSR Before the Honorable Jed S. Rakoff

### BRIEF FOR DEFENDANT-APPELLANT RAJAT K. GUPTA

GARY P. NAFTALIS
DAVID S. FRANKEL
ALAN R. FRIEDMAN
ROBIN M. WILCOX
KRAMER LEVIN NAFTALIS
    & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9100

PETER G. NEIMAN
ALAN E. SCHOENFELD
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

SETH P. WAXMAN
PAUL R.Q. WOLFSON
MEGAN BARBERO
DANIEL AGUILAR
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

January 18, 2013

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................iv

PRELIMINARY STATEMENT ................................................................ 1

JURISDICTION........................................................................................ 4

ISSUES PRESENTED FOR REVIEW ..................................................... 4

STATEMENT OF THE CASE................................................................... 5

STATEMENT OF FACTS ......................................................................... 5

    A.    Background ................................................................. 5

    B.    Criminal Charges....................................................... 6

    C.    The Prosecution's Case ............................................. 9

        1.    The wiretapped conversations.................................... 9

            a.    *July 2008 wiretap* ......................................... 9

            b.    *September 2008 wiretap* ................................ 10

            c.    *October 2008 wiretap* ................................... 14

        2.    The acquitted conduct .............................................. 16

        3.    The prosecution's theory of Gupta's motive ............. 17

    D.    The Defense Case ...................................................... 19

        1.    State-of-mind evidence .............................................. 20

        2.    Evidence of an alternative perpetrator ..................... 23

        3.    Evidence of Gupta's integrity ................................... 26

    E.    Sentencing ................................................................. 27

SUMMARY OF ARGUMENT ...........................................................27

STANDARD OF REVIEW ...............................................................30

ARGUMENT .................................................................................30

I.  THE COURT ERRED IN ADMITTING THE WIRETAPS ...........................30

    A.  The October And September Wiretaps Were Not
       Admissible Under The Coconspirator Hearsay Exception .................30

        1.  Rajaratnam's conversation with Lau was not "in
           furtherance of" the alleged Rajaratnam/Gupta
           conspiracy ..................................................................32

        2.  Rajaratnam's conversation with Horowitz was not
           "in furtherance of" the alleged Rajaratnam/Gupta
           conspiracy ..................................................................36

    B.  Rajaratnam's Statements In The October And September
       Wiretaps Would Not Be Admissible As Statements
       Against Interest....................................................................39

    C.  Title III And The Fourth Amendment Mandate
       Suppression Of The Wiretaps ...............................................42

    D.  Exclusion Of Any Wiretap Requires A New Trial .............................44

II.  THE COURT ERRED BY EXCLUDING CRITICAL DEFENSE
    EVIDENCE .................................................................................45

    A.  The Court Erred By Excluding Evidence Of Gupta's
       State Of Mind ......................................................................45

        1.  The court erred by excluding testimony from
           Geetanjali Gupta concerning her father's state of
           mind shortly before the alleged tips..........................46

        2.  The court erred by excluding the portion of
           Heather Webster's notes that concerned Gupta's
           intent to donate his wealth to charity ........................50

B.   The Court Erred By Excluding Evidence Of An
     Alternative Goldman Sachs Tipper ....................................................53

C.   The Court Improperly Curtailed Gupta's Character
     Defense ..............................................................................................57

D.   None Of These Errors Was Harmless .................................................61

CONCLUSION ....................................................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Dutton v. Evans*, 400 U.S. 74 (1970) ........................................................40

*Edgington v. U.S.*, 164 U.S. 361 (1896) .............................................58, 60

*Fiero v. FINRA, Inc.*, 660 F.3d 569 (2d Cir. 2011) ...............................42

*Franks v. Delaware*, 438 U.S. 154 (1978).........................................43, 44

*Gill v. Arab Bank, PLC*, __ F. Supp. 2d __, 2012 WL 5395746 (E.D.N.Y. Nov. 6, 2012) ..........................................................................................40

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134 (2d Cir. 2010)...................60

*Holmes v. South Carolina*, 547 U.S. 319 (2006) .............................54, 56

*In re Sealed Cases*, 352 F.3d 409 (D.C. Cir. 2003) ...............................58

*Katz v. U.S.*, 389 U.S. 347 (1967)..........................................................44

*Michelson v. U.S.*, 335 U.S. 469 (1948) ...........................................58, 60

*Rakas v. Illinois*, 439 U.S. 128 (1978)...................................................42

*Smith v. Duncan*, 411 F.3d 340 (2d Cir. 2005)......................................49

*Taylor v. Illinois*, 484 U.S. 400 (1988) .................................................56

*U.S. v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ..................................61

*U.S. v. Butler*, 71 F.3d 243 (7th Cir. 1995)............................................41

*U.S. v. Canfield*, 212 F.3d 713 (2d Cir. 2000) .......................................42

*U.S. v. Cardascia*, 951 F.2d 474 (2d Cir. 1991) ...................................52

*U.S. v. Crosby*, 75 F.3d 1343 (9th Cir. 1996) ........................................55

*U.S. v. Desena*, 260 F.3d 150 (2d Cir. 2001)...................................32, 36

*U.S. v. Detrich*, 865 F.2d 17 (2d Cir. 1988)...............................4, 45, 49

*U.S. v. Ewing*, 638 F.3d 1226 (9th Cir. 2011) ........................................................42

*U.S. v. Farhane*, 634 F.3d 127 (2d Cir. 2011) .......................................................30

*U.S. v. Faulkner*, 439 F.3d 1221 (10th Cir. 2006)...............................................42

*U.S. v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) ...................................................30

*U.S. v. Garcia*, 882 F.2d 699 (2d Cir. 1989) ........................................................42

*U.S. v. Geibel*, 369 F.3d 682 (2d Cir. 2004) ........................................................32

*U.S. v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ........................................................33

*U.S. v. Giordano*, 416 U.S. 505 (1974) .................................................................43

*U.S. v. Johnson*, 507 F.3d 793 (2d Cir. 2007) ....................................................53

*U.S. v. Lang*, 589 F.2d 92 (2d Cir. 1978)..............................................................31

*U.S. v. Lawal*, 736 F.2d 5 (2d Cir. 1984)........................................................48, 52

*U.S. v. Lewis*, 482 F.2d 632 (D.C. Cir. 1973)......................................................61

*U.S. v. Lieberman*, 637 F.2d 95 (2d Cir. 1980) .................................................36

*U.S. v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ...............................31

*U.S. v. McDermott*, 245 F.3d 133 (2d Cir. 2001) .......................................32, 38

*U.S. v. Means*, 695 F.2d 811 (5th Cir. 1983) ......................................................36

*U.S. v. Ostrander*, 999 F.2d 27 (2d Cir. 1993) ..................................................48

*U.S. v. Pallais*, 921 F.2d 684 (7th Cir. 1990) .....................................................32

*U.S. v. Persico*, 645 F.3d 85 (2d Cir. 2011)........................................................30

*U.S. v. Pujana-Mena*, 949 F.2d 24 (2d Cir. 1991).......................................58, 60

*U.S. v. Quinones*, 511 F.3d 289 (2d Cir. 2007) .................................................48

*U.S. v. Rajaratnam*, No. 09 Cr. 1184, 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) .......................................................................................43

*U.S. v. Rivera*, 22 F.3d 430 (2d Cir. 1994) .............................................................32

*U.S. v. Robinson*, 544 F.2d 110 (2d Cir. 1976).....................................................54

*U.S. v. Russo*, 302 F.3d 37 (2d Cir. 2002) ..............................................................38

*U.S. v. Salvador*, 820 F.2d 558 (2d Cir. 1987) ....................................................41

*U.S. v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) .......................................................52

*U.S. v. Urbanik*, 801 F.2d 692 (4th Cir. 1986) .....................................................36

*U.S. v. Yarbrough*, 527 F.3d 1092 (10th Cir. 2008) .............................................58

*U.S. v. White*, 692 F.3d 235 (2d Cir. 2012) .........................................................61

*Wray v. Johnson*, 202 F.3d 515 (2d Cir. 2000).....................................................45

## DOCKETED CASES

*U.S. v. Newman*, No. 12-cr-121 (S.D.N.Y. 2012) ...................................................55

*U.S. v. Rajaratnam*, No. 09-cr-1184 (S.D.N.Y. 2011) ...........................................55

*U.S. v. Rajaratnam*, No. 11-4416 (2d Cir. 2012)...................................................17

## STATUTES AND RULES

15 U.S.C.
   § 78j(b)...........................................................................................................5
   § 78ff ............................................................................................................5

18 U.S.C.
   § 371..............................................................................................................5
   § 2518(1)(b) ................................................................................................43
   § 3231............................................................................................................4

28 U.S.C. § 1291 ....................................................................................................4

Fed. R. Evid.
    Rule 106 ........................................................................................52
    Rule 403 ..................................................................................21, 48
    Rule 404 ........................................................................................58
    Rule 801 ..............................................................................30, 31, 33
    Rule 803 ........................................................................48, 49, 51, 52
    Rule 804 ........................................................................................40

## OTHER AUTHORITIES

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1993) ....................................59

*Webster's New College Dictionary* (2007) ...............................................59

*Webster's Ninth New Collegiate Dictionary* (1988)................................59

## PRELIMINARY STATEMENT

Over the course of four decades, Rajat Gupta achieved a sterling reputation in management consulting, a field in which the signal professional demand is safeguarding clients' confidential plans and strategies.  His reputation for discretion and good judgment led some of the nation's leading corporations to elect him to their boards of directors.  And he pursued a life of extraordinary philanthropy, dedicating his wealth and time to causes great and small.  As the court explained at sentencing, hundreds of testimonials attested to "Mr. Gupta's big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came in contact."  A1619.  Indeed, the court observed "without exaggeration that it [had] never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need."  *Id.*

The prosecution alleged that Gupta tipped hedge-fund manager Raj Rajaratnam with inside information he obtained from his service on the boards of Goldman Sachs and Procter & Gamble (P&G)—acts that would have been gross deviations from the integrity and discretion for which he was so esteemed.  The prosecution's case rested exclusively on circumstantial evidence, and predominantly on wiretap statements—not of Gupta, but of Rajaratnam, a highly unreliable declarant, speaking with other people with no connection to Gupta.  The

prosecution characterized these wiretaps as "essential evidence," and the jury
agreed:  Although the prosecution brought substantive charges based on four tips,
the jury convicted only on the two supported by wiretaps.

The district court admitted these hearsay statements—which Gupta could not
cross-examine given Rajaratnam's unavailability—as the result of an erroneous
ruling under the coconspirator exception to the hearsay rule:  Neither of the
statements was made to further the alleged Rajaratnam/Gupta conspiracy, a
necessary prerequisite for admission.  In one wiretap, Rajaratnam casually bragged
about having inside information to a nonconspirator colleague.  In the other,
Rajaratnam sought to smooth over relations in a separate conspiracy unconnected
to Gupta.  Without a proper basis for admission, these untestable, unreliable
hearsay statements had no place in a criminal trial, and their admission alone
compels reversal.

At the same time and in marked contrast, the court significantly curtailed
Gupta's three principal defenses.  The court excluded classic state of mind
testimony from Gupta's daughter that Gupta was furious at Rajaratnam for
cheating him out of millions of dollars.  That conversation occurred three days
before the first convicted tip and only a month before the second, and would have
led the jury to question whether Gupta had any motive to tip the man who had
stolen millions from him (as the government established).  The court also

prohibited Gupta from introducing evidence of a plausible alternative source for the tips. And it excluded evidence of Gupta's reputation for integrity, which rendered the prosecution's entire theory implausible.

The court's decidedly asymmetrical interpretation of the rules of evidence left the jury with a distorted picture, in which Gupta was accused by the self-serving hearsay of a known fabulist beyond Gupta's power to cross-examine, but was unable to explain to the jury that he had neither the motive nor the inclination to benefit that person, and that there was a plausible alternative perpetrator.

The jury in this case was called upon to decide whether a fundamentally good man had done a bad thing. No one had less incentive to tip Rajaratnam, or more to lose, than Rajat Gupta. He was financially secure; he had already decided to leave most of his money to charity; he received no financial benefit from the supposed tips; and, far from having an inclination to benefit Rajaratnam, he believed that Rajaratnam had swindled him and left him largely holding the bag in an unsuccessful venture. But the trial court's rulings left him effectively unable to make these points and to confront the government's principal evidence, and thus denied him a fundamentally fair ability to present this defense.

The case was a close one, as demonstrated by Gupta's acquittal on two counts. The evidence of tipping was entirely circumstantial and indirect. And the basic premise of the prosecution's case—that Gupta tipped Rajaratnam hoping for

a vague, potential benefit at some indeterminate point in the future—was doubtful given Gupta's actual, profound, and intense mistrust of Rajaratnam as a swindler. As this Court has long cautioned, "[w]hen the government's proof relies primarily on circumstantial evidence, trial errors tend to acquire greater significance. It takes less to tip the scales." *U.S. v. Detrich*, 865 F.2d 17, 22 (2d Cir. 1988). This Court should reverse the convictions in view of the court's serious evidentiary errors, which decisively tipped the scales in this case.

## JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. On November 9, 2012, Gupta filed a timely notice of appeal from a final judgment of conviction entered that day.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in admitting three wiretapped conversations as evidence against Gupta because (a) two of the communications, to which Gupta was not a party, did nothing to further the conspiracy in which Gupta allegedly participated; (b) those two communications also were not admissible as statements against penal interest by the declarant; and (c) all three wiretaps were obtained in violation of Title III and the Fourth Amendment.

2.      Whether the district court erred in (a) excluding critical evidence of Gupta's state of mind that would have established Gupta's lack of motive and rebutted already admitted prosecution evidence; (b) excluding evidence of an alternative perpetrator; and (c) improperly constraining the jury's consideration of Gupta's character.

## STATEMENT OF THE CASE

The superseding indictment charged Gupta with one count of conspiracy, 18 U.S.C. § 371, and five counts of securities fraud, 15 U.S.C. §§ 78j(b) & 78ff.  A15-A39.  On June 15, 2012, before Hon. Jed S. Rakoff, the jury convicted Gupta of conspiracy and three counts of securities fraud, and acquitted him of two counts of securities fraud.  SPA33-SPA34.

## STATEMENT OF FACTS

### A.      Background

Rajat Gupta rose from humble beginnings in India to serve three terms as the global managing partner of McKinsey & Co., one of the world's leading consulting firms.  *See* A654, A677, A1524.  Based on his professional history as a trusted counselor to "'institutions, governments and business leaders around the world,'" as well as his "'strategic and operational expertise and judgment,'" Gupta was appointed to the boards of directors of Goldman Sachs and P&G.  A1183, A1524.

Both before and after retiring from McKinsey in 2007, Gupta devoted himself to philanthropy. He served (among other capacities) as chairman of the board of the Global Fund to Fight AIDS, Tuberculosis, and Malaria (A892, A989); founded the Public Health Foundation of India (A796), the Indian School of Business (A654), and the American India Foundation (A656); and served on the advisory board of the Bill and Melinda Gates Foundation (A597, A907, A1279). In his charitable activities he served as a trusted advisor to philanthropists, public servants, and scholars. *See* A795-A796, A891-A892, A907-A908.

## B.    Criminal Charges

The prosecution charged that Gupta decided to gamble away his achievements and his professional and personal reputation by tipping inside information to Raj Rajaratnam, founder and principal of Galleon Group, a network of hedge funds. The alleged tips occurred on March 12, 2007, September 23 and October 23, 2008, and January 29, 2009—the first three in connection with Goldman and the last in connection with P&G. A36. The motive for Gupta to tip Rajaratnam, however, was obscure. There was no evidence that Gupta received money from any of Rajaratnam's trades. Nor did Gupta himself trade on inside information. Rather, the prosecution argued that Gupta and Rajaratnam were friends and partners in various legitimate business ventures, and contemplated

further ventures together, and so "[w]hat was good for Rajaratnam and Galleon was good for Gupta." A1014.

Although Gupta and Rajaratnam spoke regularly by telephone, and although the government wiretapped Rajaratnam's cell phone calls for nine months, there was not a single call (nor any witness or document) showing that Gupta tipped Rajaratnam with confidential inside information that Rajaratnam used to trade. Instead, the prosecution relied on inferences from three of Rajaratnam's wiretapped conversations. (The substance of these conversations is described *infra* at pages 9 through 15.) The first, a July 2008 conversation between Gupta and Rajaratnam, was *not* charged as a tip, did not involve material information, and did not provide Rajaratnam with a basis to trade Goldman stock; but the prosecution used it to show Gupta's alleged proclivity to reveal confidential Goldman information to Rajaratnam. In the other two, from September and October 2008, Rajaratnam asserted to third parties that he had received information about Goldman. These wiretaps were critical to the prosecution's case: The jury acquitted Gupta on the charged March 2007 and January 2009 tips, for which the prosecution introduced no wiretap evidence, but convicted on the September and October 2008 tips to which the wiretaps related (as well as the conspiracy count). *See* SPA33-SPA34, A1142-A1143, A1148-A1149, A1153. The jury thus agreed

- 7 -

with the prosecution that these wiretap recordings were "indispensable evidence." A48.

The defense sought to undermine the prosecution's motive theory by showing that, at the time of the supposed tips, Gupta believed that Rajaratnam had stolen money from him and thus that Gupta would not have been inclined to benefit Rajaratnam with illegal tips. In 2005, Gupta and Rajaratnam had jointly invested in an investment fund known as Voyager. Over the years, Gupta (who was a passive investor) put $10 million in capital into the fund; Rajaratnam (who managed the fund) invested approximately $40 million. A675, A741. The prosecution's evidence showed that, by the end of 2007, Rajaratnam had secretly and unilaterally withdrawn about $25 million in equity from Voyager. A676, A1441; *see also* A758, A759. Rajaratnam had thus effectively swindled Gupta, leaving him disproportionately exposed to Voyager's collapse in late 2008. A676; *see also* A746, A760.

The date on which Gupta learned that Rajaratnam had withdrawn funds from Voyager was a critical issue at trial. Gupta sought to show that he discovered that Rajaratnam had unilaterally taken money out of Voyager shortly *before* September 23, 2008, when Gupta supposedly tipped Rajaratnam. Had Gupta been able to establish that he believed before that date that Rajaratnam had been deceiving him, his motive for helping his supposed friend and business partner would have been

- 8 -

highly doubtful. The prosecution was aware before trial began that this argument was central to Gupta's defense (A183 & n.1), and put on evidence in its case-in-chief suggesting that Gupta learned of Rajaratnam's theft months later, in early 2009. A676.

To rebut the government's evidence of timing, Geetanjali Gupta, the defendant's daughter, was prepared to testify that her father told her he was angry about Rajaratnam's theft on September 20, 2008—a date she recalled specifically because it was her birthday, and which preceded *both* tips on which the jury convicted. But the court precluded Geetanjali from doing so, ruling erroneously that her testimony was inadmissible hearsay. *See infra* pp. 20-23.

### C.    The Prosecution's Case

#### 1.    The wiretapped conversations

Lacking any direct evidence of tips from Gupta to Rajaratnam, the prosecution sought to establish Gupta's guilt through circumstantial evidence and three wiretapped conversations. The prosecution did not bring charges based on the one wiretapped conversation between Gupta and Rajaratnam, and the other two wiretaps—between Rajaratnam and his colleagues at Galleon—were erroneously admitted under the coconspirator exception to the hearsay rule.

##### a.    *July 2008 wiretap*

In a recorded July 29, 2008 conversation, Rajaratnam sought Gupta's help in preparing for a meeting with the co-president of Goldman, and inquired about

news—already reported by market analysts who had spoken to senior Goldman executives—that Goldman was considering purchasing a commercial bank. A1116-A1117, A1488.  Gupta confirmed that the topic had been discussed at a board meeting, and that two companies Rajaratnam named (one a commercial bank, one an insurer) had been mentioned.  Goldman never made such an acquisition.  The prosecution did not argue that Gupta's statements on the call violated the securities laws.  A1016.  Instead, the prosecution elicited testimony that Goldman deemed *all* board discussions confidential (*see, e.g.*, A705, A722-A723), and did not authorize board members to disclose those discussions even if, as here, Goldman executives had done so (A878-A879, A1503).  The prosecution then argued in closing that Gupta's provision of additional details on a topic already publicly disclosed by Goldman showed Gupta's willingness to go much further and criminally reveal material non-public information so that Rajaratnam could trade on it.  A1016.

### b.    *September 2008 wiretap*

The prosecution introduced a second wiretapped conversation to show that, on September 23, 2008, Gupta tipped Rajaratnam that Warren Buffett had committed to making a $5 billion investment in Goldman during a period of market turmoil.  The prosecution contended that Gupta learned about the Buffett investment during a Goldman board call on September 23, before Goldman

disclosed the information to the market, and then tipped Rajaratnam.  There were multiple calls between Gupta's and Rajaratnam's various telephones that day, and no direct evidence of what was said on any of these calls.  There was, however, a highly plausible topic of conversation other than the Buffett investment:  The evidence showed that Gupta was at the time pressing Rajaratnam for information about their joint investment in Voyager.  *See infra* p. 47 & n.9.  But *one* of the calls—a thirty-second call at 3:54 p.m. placed by Gupta's assistant to Rajaratnam's office line—was made about one minute after Gupta finished participating in the Goldman call during which the board approved Buffett's investment.  A338-A339, A375-A376, A1220-A1221, A1245-A1246.  Shortly thereafter—the precise time was not documented in the record—Rajaratnam ordered two Galleon traders—Ananth Muniyappa and Gary Rosenbach—to purchase more than 200,000 shares of Goldman stock before the 4:00 p.m. market close.  A304-A308, A1180, A1260.  Goldman announced the Buffett investment after the market closed.  A1226-A1227.

The prosecution went to great lengths to try to show that the Buffett investment was a closely held secret, and thus only a very small pool of individuals could have tipped Rajaratnam.  But a Goldman executive testified that he was personally aware of six employees who knew of the investment (A335, A337), and there was powerful circumstantial evidence that someone had leaked news before

the board meeting in which Gupta participated:  Goldman's stock price began rising steadily around 1:30 p.m. on September 23, nearly two hours *before* the board call.  A1604; *see also* A617-A618, A1515-1519.

To bolster its case that the call relayed a tip relating to Goldman, the prosecution introduced two wiretapped recordings (comprising a single, interrupted conversation the following morning) between Rajaratnam and Ian Horowitz, a Galleon trader.  The recordings were admitted under the coconspirator exception to the hearsay rule, but neither that conversation nor any other evidence suggested that Rajaratnam was trying to induce Horowitz to do anything to further the alleged Rajaratnam/Gupta conspiracy.  Rajaratnam did not mention the Buffett investment or identify the source of the information leading to his Goldman trade.  Nor did he ask Horowitz to take any action.

Instead, Rajaratnam spoke of *when* he had gotten the information, claiming it had come in at the very end of the trading day, too late to share it with anyone else.  Rajaratnam began by explaining that there had been "big drama yesterday" after he "got a call at 3:58 … [s]aying something good might happen to Goldman." A1142-A1143.  Although Rajaratnam's account did not precisely match the timing of the call Gupta's assistant placed to Rajaratnam, and although there was no evidence of Galleon's internal phone records (A820), the prosecution used Rajaratnam's assertion about the timing of this call, and evidence that the only

- 12 -

external call to Rajaratnam's line between 3 p.m. and 4 p.m. came from Gupta's line, to argue that this was a reference to Gupta's call, and that the "something good" was inside information about Goldman that Rajaratnam received from Gupta. A1043.

But the full conversation, and related documents introduced by the prosecution, revealed the purpose of Rajaratnam's call to Horowitz—which had nothing to do with furthering the alleged Rajaratnam/Gupta conspiracy. Another Galleon trader, Leon Shaulov, with whom Rajaratnam had exchanged inside information in the past, had carried a large short position in financial stocks into the end of the trading day. A320, A1261. That proved to be a bad bet when the Buffett investment was announced, and Shaulov (apparently aware that Rajaratnam had made the opposite, and winning, bet without telling him) was "very upset." A1149. Shaulov complained to Rajaratnam's trader Gary Rosenbach, "[w]hat I give vs what I get back is disgusting." A321, A1261. Rosenbach emailed Rajaratnam about Shaulov's complaint early on the morning of September 24. A1264. Rajaratnam's intercepted call with Horowitz followed forty-six minutes later.

On that call, Rajaratnam repeatedly told Horowitz that the call on Goldman had only come in at the very end of the trading day, and used that alleged fact as an excuse for why he had not given Shaulov notice: "if it was, one o'clock, I always

- 13 -

am good with [Shaulov], I always call him in, I tell him everything, you know?
AMD, IBM, everything, right?"  A1149.  Horowitz responded that Shaulov "hasn't
said anything.  Listen, if something comes in, I'll let you know."  *Id.*

### c.    *October 2008 wiretap*

The prosecution also charged that, on October 23, 2008, Gupta tipped
Rajaratnam with information that Goldman Sachs stood to lose $2 per share during
the current quarter.  According to the prosecution, Gupta learned that information
during a Goldman board call that took place on October 23 from approximately
4:16 until 4:49 p.m.  A383-A384, A441, A725-A726, A799, A1160, A1234-
A1235, A1463.  Immediately after the board call ended, Gupta's assistant
connected his home line with Rajaratnam's direct line, and the two lines were
connected for approximately 12 minutes.  A383-A384, A1463.  The following
morning, Galleon sold all of its 150,000 shares of Goldman.  A799-A800.

To establish that Gupta conveyed Goldman's projected earnings on the
afternoon of October 23, the prosecution introduced a recording of a conversation
the following day between Rajaratnam and David Lau.  The basis for admitting
this call was also the coconspirator exception, even though there was no allegation
that Lau was a coconspirator nor any evidence that Rajaratnam was trying to
induce him to take any action whatsoever.

- 14 -

Lau joined Galleon's Singapore office in June 2008 as the portfolio manager of the Galleon Asia Macro Fund. A594, A995, A1355, A1389. On October 24, Rajaratnam returned a call from Lau, who had called him in the midst of the financial crisis to discuss global market trends and to "find the pulse because we are quite shocked overseas … [and] want to find out what you guys are thinking." A1152. Rajaratnam and Lau proceeded to discuss general market conditions, with Rajaratnam opining that "we think that the US is um relatively the safe haven … all of these um emerging market ah countries, many of them have to reduce interest rates, which is bad for their currencies." *Id.* Following this report, and apropos of nothing, Rajaratnam claimed that he "heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share." A1153.

Other evidence undermined Rajaratnam's claim that this information came from a Goldman board member. The two-dollar projected quarterly loss described by Rajaratnam was *not* Goldman's internal projected quarterly loss at the time of the board call. *Compare* A1228 (projected loss of $1.96 per share on October 17) *with* A1231 ($1.75 on October 22). Goldman's chairman, under leading questioning, agreed with the prosecution's suggestion that he might have rounded up when reporting to the board, but could not recall whether he had done so. A838. There were no minutes of the board call, and no board member recalled the

quarterly loss forecasted at the meeting—or even whether a specific figure was given.  A438, A861-A862.

### 2.    The acquitted conduct

The jury acquitted Gupta of the two counts unsupported by wiretapped conversations.  The prosecution sought to prove that, on March 12, 2007, Gupta tipped Rajaratnam about Goldman's projected earnings during that quarter.  The prosecution's evidence showed that on March 12, Gupta participated, from Galleon's office, in a Goldman audit committee call related to first quarter earnings.  A564, A709-A710, A1161, A1201, A1213, A1397.  In the three hours following the call, Galleon purchased 450,000 Goldman shares.  A749, A802, A1259, A1162.  The following day, Goldman publicly announced record first-quarter earnings.  A1236; *see also* A1018.  The prosecution had no wiretap recordings relevant to this count.  The jury acquitted.

Similarly, the prosecution sought to prove that on January 29, 2009, Gupta tipped Rajaratnam with inside information about projected P&G earnings.  Prosecution evidence showed that on January 29, Gupta participated from Switzerland in a telephonic P&G audit committee meeting concerning the reduction in P&G's organic sales growth forecast and its earnings-per-share expectations.  A491-A492, A813, A1172, A1258.  Several hours later, a Swiss phone number called Gupta's direct office line and, shortly thereafter, that number

- 16 -

was connected to Rajaratnam's direct line.  A813, A1172.  Later that day, Michael
Cardillo, a Galleon trader, shorted 180,000 shares of P&G stock.  A814, A1179.
Cardillo testified that Rajaratnam's brother told him to short the stock because "the
organic sales number was going to come in lighter and he said it was coming from
Raj's guy on the P&G board."  A471.  The next day, P&G publicly announced its
earnings and organic sales numbers.  A1247.  Again, the prosecution had no
wiretap recordings relevant to this count.  The jury acquitted.

### 3.    The prosecution's theory of Gupta's motive

There was no evidence that Rajaratnam compensated Gupta for the alleged
tips—in contrast to other Rajaratnam tippers, who received substantial payments in
offshore accounts.  A1119-A1120, A1123; Answering Br. 4-7, *U.S. v. Rajaratnam*,
No. 11-4416 (2d Cir. Jan. 25, 2012).  To plug this gap and explain why, despite
Gupta's sterling record, he would have decided to gamble away his entire career,
the prosecution primarily argued that Gupta and Rajaratnam were connected in
business ventures, including Voyager and Galleon International, a Galleon entity
that invested primarily in Asian securities.

The evidence showed that Rajaratnam and Gupta had various business
connections, but that their relationship collapsed when Gupta discovered that
Rajaratnam had swindled him in Voyager.  Voyager was highly leveraged, and
Rajaratnam, who managed the fund, had secretly withdrawn $25 million of capital

from the fund by 2007 (A758-A759, A1440-A1441), leaving Gupta unknowingly

and disproportionately exposed to losses when global markets collapsed in 2008.

What was in dispute was *when* the relationship foundered.  The

prosecution—through the testimony of cooperating witness Anil Kumar—sought

to prove the relationship remained intact until late February 2009, shortly after the

last charged tip.  Kumar testified that while Gupta told him in November or

December 2008 that Voyager had lost money, it was only some time "between late

February and April of 2009" that Gupta indicated to Kumar that Rajaratnam had

secretly withdrawn funds before Voyager's collapse.  A676.  Based on this

testimony, the prosecution argued that Gupta was especially motivated in the fall

of 2008 to help Rajaratnam and "to do whatever he could to recoup" his Voyager

investment (A1017)—including, if necessary, to provide inside information.

The prosecution also tried to prove that Gupta hoped to receive a tangible

benefit for tipping Rajaratnam through a position as chairman of Galleon

International.  *See, e.g.*, A634, A1469-A1470; *see also* A575-A576, A579.[1]  Gupta

and Rajaratnam discussed that potential appointment during the spring and summer

of 2008, when Gupta did some fundraising for Galleon International.  But no

---

[1]     In addition, the prosecution contended that Gupta was motivated to help
Rajaratnam because Gupta, in turn, "wanted Rajaratnam's help in raising money
for NSR," a private equity fund focused on South Asia that the two co-founded.
A659-A660, A664-A665, A673-A674, A1014.  But fundraising for NSR
concluded well before September 2008.  *See* A665.

- 18 -

appointment was ever consummated.  Galleon documents refer to a "forthcoming announcement" of Gupta's role, but that announcement was never made (A601); Galleon executives testified that they never heard that the position was actually bestowed (*e.g.*, A601, A927); Gupta's work assisting Galleon International ceased by the summer of 2008 (A601-A602); and there was no evidence that Gupta ever received any proceeds from Galleon International.  Even the prosecution conceded that Gupta and Rajaratnam "didn't reach a final agreement" on the terms of the appointment.  A632.

### D.    The Defense Case

Gupta sought to present three defenses, each of which the court significantly curtailed.  *First*, Gupta sought to rebut the prosecution's theory of motive by showing that, before the alleged September 2008 tip, Gupta believed that Rajaratnam had swindled him by silently redeeming his Voyager investment.  The court permitted Gupta to elicit testimony that he was upset about the investment's performance in September 2008, and also permitted testimony from defense witness Ajit Jain that in January 2009 Gupta told him he believed Rajaratnam had stolen from him.  But the Court precluded testimony from Geetanjali Gupta that her father had formed that belief by *September 2008*.  The court also precluded evidence of Gupta's intent to donate the majority of his wealth to charity.  *Second*, Gupta sought to present evidence of an alternative perpetrator—David Loeb, a

highly-placed Goldman Sachs employee with a history of providing confidential

information about public companies to Rajaratnam.  The court allowed evidence

that Loeb called Rajaratnam and his subordinate on the days of the alleged

September and October 2008 tips, but excluded evidence that Loeb had repeatedly

given Rajaratnam inside information during 2008.  *Third*, Gupta sought to

introduce evidence of his character for integrity, the trait directly implicated by the

prosecution's theory that he had violated confidences he had promised to maintain.

The court allowed cursory character testimony about Gupta's *honesty*, but

excluded testimony about his *integrity*, and refused to instruct the jury that

character evidence alone was sufficient to establish reasonable doubt.

### 1.    State-of-mind evidence

One of Gupta's core defenses was that he had no motive to tip Rajaratnam in

September and October 2008 because he had just discovered Rajaratnam's theft

from Voyager.  The prosecution presented evidence establishing the theft (A676,

A1441), but sought to prove that Gupta did not learn about Rajaratnam's covert

redemptions until February 2009 (A676).  To refute this "pre-buttal" evidence,

Gupta sought to introduce his daughter Geetanjali's testimony that on September

20, 2008—three days before the alleged September 23 tip and one month before

the alleged October tip—Gupta told her that he was angry at Rajaratnam.[2]

Geetanjali proffered the following testimony outside the presence of the jury:

> He told me that he was upset about Voyager. He told me that he was worried about the performance of the fund and that he was frustrated that he couldn't get information from Raj about it.
>
> He also told me he was angry that Raj had taken money out of the fund without telling him and that he thought that that—he didn't understand why he had taken the money out of the fund, and why if he had taken money out of the fund, he had not gotten any of it.

A983.

The court excluded Geetanjali's testimony that her father "was angry that Raj had taken money out of the fund without telling him," reasoning that there was "no way the jury can evaluate this other than as an assertion for its truth," and that the jurors would believe that Gupta was "telling the truth to his own daughter, and they will be taking it for its truth, and I don't see how under [Fed. R. Evid.] 403 that gross violation of the hearsay rule can be avoided." A955-A956; *see also* A984 (concluding "[t]he jury is going to … draw from this … that Rajaratnam, in fact, cheated Gupta, that Gupta knew it and that Gupta, therefore, was completely outraged").

---

[2]    The court allowed Gupta to introduce testimony that Gupta told Jain that Gupta had been "swindled or cheated by Raj and he had lost his entire 10 million that he had invested." A1071. Jain testified that this conversation "most probably" occurred on January 12, 2009. A1073. The jury acquitted Gupta on the substantive count relating to the one tip that occurred after January 12.

The court permitted Geetanjali to answer three questions in the presence of the jury (put by the court) about the September 20 conversation.  She testified that Gupta had expressed "significant concern" about Voyager, that he was "upset," "stressed," and "was running his hands through his hair," and that this was "more because of how Mr. Rajaratnam was treating the investment" than how the investment was doing.  A986.  When Geetanjali attempted to elaborate on her answer, the court cut her off.  *Id.*  Geetanjali was not allowed to testify that Gupta was angry because he believed Rajaratnam had deceived him.

The court allowed Geetanjali to testify that she spoke to Gupta about Voyager again on October 10, and that Gupta said he was "still having difficulty getting information from Mr. Rajaratnam.  He was very frustrated about it."  A987.  The court then issued a limiting instruction.  *Id.*  The court similarly limited Geetanjali's testimony about a Thanksgiving 2008 conversation with Gupta about Voyager, interrupting her testimony to issue a limiting instruction.  A988.

Circumscribed in this way, Geetanjali's testimony established only that Gupta was upset in September 2008 about the *performance* of the Voyager investment—not his belief that Rajaratnam had stolen from him.  As curtailed by the court, the meaning of Geetanjali's testimony was fundamentally altered, and may have well have harmed Gupta's defense, because it ended up being consistent with the prosecution's evidence that Gupta learned only about the losses (not the

theft) in Voyager about that time—testimony the prosecution argued *confirmed*, rather than disproved, Gupta's motive to tip Rajaratnam to help recoup the fund's losses.  A1017.

The court also excluded evidence of Gupta's intent to donate the majority of his wealth to charity, which would have further undermined the prosecution's theory of motive.  Gupta met with his private banker, Heather Webster, in April 2008.  The court allowed the prosecution to introduce (as a recollection recorded (A631, A634)) a portion of Webster's handwritten notes from that meeting to attempt to prove that Gupta held a financial stake in Galleon International.  *See* A1470.  The court allowed the defense to introduce the portion of the notes concerning Gupta's other sources of wealth.  A626; *see also* A631.  But it excluded the portion of the notes addressed to Gupta's charitable plans, ruling that the statements were hearsay and not encompassed by the rule of completeness. A631, A1471, A1473.

### 2.    Evidence of an alternative perpetrator

Having explained to the jury in opening argument that "Rajaratnam has sources all over town giving him information," including "other sources at Goldman Sachs" (A250), defense counsel sought to put evidence of this alternative perpetrator before the jury.  The prosecution had previously told the defense in *Brady* disclosures that David Loeb, the Goldman Sachs senior vice president in

charge of the Galleon account, had provided Rajaratnam with confidential information concerning public companies, including Apple and Intel. *See* A343, A962.

Trial evidence also showed that Loeb had direct, privileged access to Rajaratnam and his subordinate, Adam Smith, during September and October 2008. A778-A780; *see also* A278. Indeed, the evidence showed that Loeb spoke to Rajaratnam and Smith multiple times on the days of the two alleged Goldman tips. On October 23—the day Rajaratnam allegedly received a tip that Goldman was losing money—Loeb called Rajaratnam multiple times. A698, A779; DX 6060-222.[3] On September 23—the day the Goldman board approved Buffett's investment—Loeb called Smith at 12:49 p.m. and 3:07 p.m. A778; DX 6060-210, 6060-211. The prosecution did not introduce any record of internal Galleon calls and there was no evidence that Smith did not call or talk to Rajaratnam after receiving these calls from Loeb. A820. Smith's office was one door down from Rajaratnam's. A926.

Gupta sought to introduce evidence that would complete the picture of Loeb as a plausible alternative tipper inside Goldman, namely: (1) wiretapped calls in August 2008 in which Loeb provided Rajaratnam confidential information about

---

[3]    Exhibits with the preface "DX" cited herein have been filed with the Court on disc.

Apple and Intel; (2) emails immediately preceding these wiretapped calls, and other emails proposing "urgent" and "important" calls, urging Rajaratnam to contact him "in the next 3-5 minutes" or before the stock market's opening; (3) emails bearing on the relationship between Loeb and Rajaratnam; and (4) emails showing the variety of stocks that Loeb and Rajaratnam discussed. *See, e.g.*, A1552, A1557-A1558, A1559, A1563, A1564, A1567, A1569, A1588-A1589; *see also* A979.

Near the end of the trial, the court tentatively excluded all the proffered defense evidence about Loeb. A962-A963. The court held that the emails and wiretaps were "blatant hearsay," and concluded that no "jury could remotely understand" the evidence's meaning without a witness to testify to it. A962. Defense counsel briefed the admissibility of the evidence that evening, advancing distinct arguments for each category of evidence—including separate arguments for the admissibility of the two wiretapped conversations. *See* A1102-A1106. The court then reiterated its ruling. A979. Without attending to the specific arguments advanced for each category of proffered evidence, it classified all the evidence as "replete with inadmissible hearsay," and concluded that it would "create endless confusion on the part of the jury." *Id.* As a result, the jury only learned that Loeb had called Rajaratnam and Smith on the days of the tips on which the jury

convicted, but did not learn the central fact that Loeb had a history of tipping Rajaratnam with confidential information.

### 3. Evidence of Gupta's integrity

Given that the charged conduct—revealing sensitive confidential information for personal benefit—stood markedly in contrast with the rest of Gupta's professional and philanthropic career, this is a case in which character testimony could have had great weight with the jury. The court permitted Gupta to call six character witnesses (A900, A919), and Gupta proposed to elicit their opinions "as to his honesty and integrity" (A794), as revealed in various professional and philanthropic contexts.

The court, however, expressed deep skepticism about character testimony in general and was dismissive towards Gupta's proffered evidence in particular. A900. The court strictly circumscribed the witnesses' background testimony about how and how well they knew Gupta. *See, e.g.*, A796, A892, A908, A949, A989. The court also refused to allow the witnesses to offer opinions about Gupta's *integrity*, reasoning that "some aspects [of integrity or 'moral uprightness,' one of the dictionary definitions of integrity] are not pertinent to this case"—even though the essence of the charges was that Gupta misused a position of trust for gain. A794. The court only permitted perfunctory testimony about Gupta's *honesty*. *See* A796, A892, A907, A989.

- 26 -

Finally, the court refused to instruct the jury that character evidence alone may be sufficient to create reasonable doubt, noting that this Court has held that such a charge, though permitted, is not required.  A972-A973, A1001-A1002.  Instead, the court told the jury that character witnesses "hav[e] no personal knowledge of the transactions at issue in this case," and that the jury may consider this evidence "together with all the other facts and all the other evidence in the case, and give it such weight as [it] deem[ed] appropriate."  SPA19-SPA20.  By contrast, the court charged the jury that testimony from cooperating witnesses "may be sufficient in itself to warrant conviction if it convinces you of the defendant's guilt beyond a reasonable doubt."  SPA19.

## E.  Sentencing

The court sentenced Gupta to 24 months' imprisonment on each count, to run concurrently; one year of supervised release; and a substantial fine and assessment.  A1620.  On December 4, 2012, this Court (Cabranes & Raggi, JJ.) granted Gupta bail pending appeal.  A1647.

## SUMMARY OF ARGUMENT

Rajat Gupta had a right to be tried on the basis of admissible evidence, subject to cross-examination, and to present a complete defense.  The district court deprived him of both rights, first by erroneously admitting two hearsay statements that the government admitted were essential to its case, and second by barring

- 27 -

Gupta from presenting admissible evidence that would have shown he had no motive to tip Rajaratnam, that there was an alternative source at Goldman with a history of tipping Rajaratnam, and that Gupta had a reputation for integrity wholly at odds with the conduct alleged.

I.      The district court clearly erred in admitting Rajaratnam's wiretapped statements to Lau and Horowitz under the coconspirator exception to the hearsay rule on the speculative theory—unsupported by any evidence at trial—that Rajaratnam's statements to Galleon colleagues who had no connection to Gupta and who did nothing in response to those statements to assist Rajaratnam in carrying out the alleged Rajaratnam/Gupta scheme were nonetheless statements in furtherance of that alleged conspiracy because the recipients *could have* acted on the information Rajaratnam relayed.  *See infra* Part I.A.  Rajaratnam's statements are also inadmissible under the government's alternative theory that they are statements against penal interest.  Rajaratnam—who had a known history of exaggeration—had reason to lie about both the source and timing of the supposed inside information.  *See infra* Part I.B.  Moreover, all of the wiretaps should have been suppressed under Title III and the Fourth Amendment because the government materially misstated facts in its original wiretap application.  *See infra* Part I.C.

- 28 -

II.    Whereas the district court allowed the government to rely on unreliable hearsay, it crippled Gupta's defense by excluding admissible testimony critical to the defense.  Based on an untenable hearsay ruling, the court erroneously prevented Gupta's daughter from testifying to a conversation in which Gupta told her—before the alleged September and October tips—that he was angry that Rajaratnam had effectively stolen from the Voyager fund.  *See infra* Part II.A.1. The court further hobbled Gupta's attempt to disprove the prosecution's motive theory by excluding admissible state-of-mind evidence that Gupta intended to donate most of his wealth to charity.  *See infra* Part II.A.2.  The court excluded as hearsay wiretapped conversations showing that a different source at Goldman had given Rajaratnam inside information in the past, even though those conversations were offered not for the truth of the information conveyed, but to demonstrate the existence of a plausible alternative source.  *See infra* Part II.B.  Finally, the court erroneously constrained the jury's consideration of Gupta's character:  It prohibited character witnesses from testifying to Gupta's integrity, even though that trait was directly pertinent to the charge that Gupta had abused his position to convert confidential information to his own benefit; it drastically curtailed what character evidence it allowed; and it refused to instruct the jury that character evidence alone could create a reasonable doubt.  *See infra* Part II.C.

None of these errors is harmless.  *See infra* Parts I.D, II.D.  Gupta is entitled

to a new trial at which Rajaratnam's unreliable hearsay statements are excluded,

and the jury hears the full story of Gupta's defense.

## STANDARD OF REVIEW

This Court generally reviews evidentiary rulings for abuse of discretion.

*U.S. v. Persico*, 645 F.3d 85, 99 (2d Cir. 2011).  However, the Court reviews *de*

*novo* the legal question "'[w]hether a statement is hearsay,'" *U.S. v. Ferguson*, 676

F.3d 260, 285 (2d Cir. 2011), and reviews the district court's admission of out-of-

court statements under the coconspirator exception in Fed. R. Evid. 801(d)(2)(E)

for clear error, *U.S. v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011).

## ARGUMENT

### I.   THE COURT ERRED IN ADMITTING THE WIRETAPS

#### A.   The October And September Wiretaps Were Not Admissible Under The Coconspirator Hearsay Exception

The prosecution's case rested principally on two wiretapped conversations

between Rajaratnam and his colleagues at Galleon.  Rajaratnam's statements were

undisputedly out-of-court statements introduced for the truth of the matter asserted,

and hence inadmissible unless they fell within an exception to the hearsay rule.

The court concluded they were admissible under the coconspirator exception

(A196-A197), which permits the admission of statements offered against the

defendant only if they are "made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).

That ruling was clearly erroneous.  The prosecution failed to demonstrate that these conversations were in furtherance of the alleged Rajaratnam/Gupta conspiracy, as was its burden.  And without those wiretaps—and especially without the October 24 call in which Rajaratnam boasted of a source on Goldman's board—the convictions cannot stand.  *U.S. v. Lang*, 589 F.2d 92, 100 (2d Cir. 1978).

Coconspirator statements present heightened concerns about reliability: Conspirators often do not tell the truth, and may perversely have an incentive to exaggerate their participation in criminal conduct.  Yet as here, defendants often cannot cross-examine alleged coconspirators about their out-of-court statements, given the Fifth Amendment privilege against self-incrimination.  This Court has therefore "mandat[ed] a construction of the 'in furtherance' requirement protective of defendants" to guard against the admission of "less reliable evidence."  *Lang*, 589 F.2d at 100.

To be admissible, a conspirator's statement must prompt the listener "to respond in a way that promotes or facilitates the carrying out of a criminal activity."  *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990).  The statement must be more than "'a merely narrative' description by one co-

conspirator of the acts of another." *U.S. v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001). "[C]asual admissions of culpability, and other noise and static in the information stream are not admissible." *U.S. v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990) (Posner, J.). Moreover, the statement must be in furtherance of the conspiracy in which the defendant is implicated, and not some other conspiracy. *See U.S. v. Geibel*, 369 F.3d 682, 689-690 (2d Cir. 2004); *U.S. v. McDermott*, 245 F.3d 133, 138 (2d Cir. 2001). Where, as here, a party seeks to broaden the reach of the exception to admit a statement made to a *non*conspirator, that party must show the statement was "*designed* to help the coconspirators to achieve the conspiracy's goals." *U.S. v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) (emphasis added). The prosecution failed to establish any basis for admission of the Rajaratnam statements.

### 1.    Rajaratnam's conversation with Lau was not "in furtherance of" the alleged Rajaratnam/Gupta conspiracy

The October 24 wiretapped conversation between Rajaratnam and David Lau, in which Rajaratnam boasted of hearing from a source on Goldman's board, was the single most damaging piece of prosecution evidence—the prosecution said it was "devastating," and that "there is no better evidence of insider trading." A1044. And it was admitted only as a result of the court's error. Lau—based in

- 32 -

Singapore and recently hired to manage Galleon's Asia Macro Fund[4]—was not alleged to be a member of the Rajaratnam/Gupta conspiracy; he was just one of Rajaratnam's 145 employees. A1313. Accordingly, the prosecution's primary pretrial theory for admission of this statement was not that it furthered the conspiracy, but that it was against Rajaratnam's penal interest, a theory the district court declined to adopt. *See infra* Part I.B.

The court instead accepted the prosecution's secondary theory—that the statement somehow furthered the Rajaratnam/Gupta conspiracy—on the thin reed that Lau "had the ability to execute further trades in Galleon International." A197. This was clear error: The mere fact that Rajaratnam's statements were made to another Galleon employee with a theoretical ability to trade on Galleon's behalf (which every Galleon trader had) cannot justify their admission under Rule 801(d)(2)(E). What was required in this context was proof that Rajaratnam's *purpose* was to induce Lau to trade, not merely that Lau was theoretically capable of doing so. *See U.S. v. Gigante*, 166 F.3d 75, 82-83 (2d Cir. 1999) (statements must be "'in furtherance of' a specific criminal purpose" and are inadmissible

---

[4]    The Asia Macro Fund was one of various Galleon International "sub portfolios which invest[ed] … [in] Emerging Asian Markets." A1386. As a macro fund, the fund was designed to focus on trading in bonds, interest rates, and currencies, rather than individual stocks. A1498. Before joining Galleon International, Lau's career had focused singularly on Asian markets. A1389. The prosecution introduced no evidence that Lau ever traded in Goldman Sachs or any other U.S. stock.

where "there was no evidence that [the listener] ever joined a conspiracy" or took actions to promote that conspiracy).

There was no evidence, in either the October 24 conversation itself or the broader record before the court, that Rajaratnam meant to induce Lau to trade on the information provided. Lau was a decidedly illogical person for Rajaratnam to tip with news about Goldman's expected quarterly loss on the expectation that he would trade on the news. As the manager of an Asia-focused macro portfolio, Lau would not have been concerned with the quarterly ups and downs of an individual U.S. equity. The Galleon trading records introduced at trial did not reflect a single trade by Lau in Goldman securities.[5]

The content and context of the call were inconsistent with Rajaratnam intending to induce Lau to trade on inside information. Lau, not Rajaratnam, initiated the conversation. Lau began by asking not for a specific trading tip, but Rajaratnam's general views on global markets. Rajaratnam responded with five separate observations about broad trends, before mentioning out of the blue that he learned from "somebody who's on the Board of Goldman Sachs" that the firm

---

[5] The prosecution argued that Galleon International—the umbrella fund within which Lau managed one portfolio—had on a handful of occasions traded in Goldman stock, and that somehow this showed that Rajaratnam intended for Lau to do so here. But the prosecution's own evidence showed that *Rajaratnam* managed the portfolio within Galleon International that had traded in Goldman stock. A303, A802.

would post a loss, and that he intended to short the stock (which had risen from $99 to $102) if it reached $105. A1153. Lau responded by laughing and saying "Okay," at which point Rajaratnam directed the conversation to personal matters. *Id*.

Lau's and Rajaratnam's subsequent conduct made clear that neither viewed their conversation as a conspiratorial instruction to trade on inside information. During the October 24 trading day, Goldman's stock price eventually reached the $105 level that Rajaratnam had said on the call would lead him to short the stock. A801, A1480. But neither Lau nor Rajaratnam did so. Rajaratnam's failure to take the very action he told Lau he would take is flatly inconsistent with the prosecution's theory that his Goldman comments to Lau were intended to induce trading by Lau, and Lau's inaction confirms what his laughing response suggested—he did not take Rajaratnam's comments seriously.

The only fair inference is that Rajaratnam was bragging, perhaps in an effort to impress a new colleague. Indeed, that is precisely how the *prosecution* described it in Rajaratnam's trial ("essentially bragging"), where the statement came in as an admission against Rajaratnam, and the prosecution therefore had no need to invent other, far-fetched purposes for the statement. Decl. of Stephen Sinaiko, Dkt. 64, Exh. E at 7 (Rajaratnam Trial Tr. 5246). This kind of "casual conversation about past events" is not admissible under the "in furtherance"

- 35 -

exception to the hearsay bar. *U.S. v. Lieberman*, 637 F.2d 95, 97-98, 102 (2d Cir. 1980). Indeed, courts of appeals (including this court) have consistently held that this kind of narrative, boastful statement falls outside the coconspirator exception. *See, e.g.*, *Desena*, 260 F.3d at 158 (conspirator's admission of attempted arson made to bar patron); *U.S. v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) (conspirator's identification, during conversation about weightlifting, of fellow weightlifter as a drug dealer); *U.S. v. Means*, 695 F.2d 811, 818 (5th Cir. 1983) (conspirator's statement to his driver that he was about to bribe a government official). Likewise, Rajaratnam's offhand statement about what he claimed to have learned from a person on Goldman's board, to a person who had no plausible use for the information and made none of it, should have been excluded.

### 2. Rajaratnam's conversation with Horowitz was not "in furtherance of" the alleged Rajaratnam/Gupta conspiracy

Rajaratnam's wiretapped statement on September 24 that he had received Goldman information in the last two minutes of the prior trading day was also inadmissible hearsay. The evident purpose of that call was to enlist Horowitz in placating their Galleon colleague Leon Shaulov, and not to further any alleged conspiracy between Rajaratnam and Gupta. Shaulov had a substantial short position in financial stocks and was furious that Rajaratnam had not shared whatever information had led Rajaratnam to buy Goldman shares. By claiming he only learned of that information at the very end of the trading day, Rajaratnam had

an excuse for not sharing it with Shaulov.  As he explained to Horowitz, "if it was, one o'clock, I always am good with [Shaulov], I always call him in, I tell him everything, you know?  AMD, IBM, everything, right?"  A1149.  But with the information not arriving until a "call at 3:58 … [s]aying something good might happen to Goldman" (A1142-A1143), it was simply too late to advise Shaulov, because Rajaratnam could not "yell out in the f—ing halls" about the information he had allegedly received (A1149).

Rajaratnam's clear purpose undermines both the reliability and the admissibility of his statements.  The need to placate Shaulov provided a motive to dissemble about *when* Rajaratnam had learned the news:  If it had come in at "one o'clock," around when Goldman's share price started trending up (A1604), or at 3:07, when phone records showed Goldman's David Loeb called Rajaratnam's trader Adam Smith (DX 6060-211), then Shaulov's ire about not being notified would surely have increased.  Rajaratnam's focus on placating Shaulov eliminates the predicate for admissibility against *Gupta*, because placating Shaulov had nothing to do with furthering the alleged conspiracy between Rajaratnam and Gupta.

Shaulov, a portfolio manager at Galleon, had his own quid pro quo relationship with Rajaratnam:  Each provided the other with inside information when he learned it.  There is no evidence that Gupta had any stake in Rajaratnam's

separate conspiracy with Shaulov and no evidence that Gupta's alleged "agreement with [Rajaratnam] encompassed a broader scope than the two of them." *McDermott*, 245 F.3d at 138 (tipper-tippee conspiracy does not encompass tippee (like Rajaratnam) sharing information with remote tippee (like Shaulov)). On these facts, it is "unacceptable" to admit the statements under the coconspirator exception because "the speaker and the defendant were not jointly engaged in the criminal venture that was being advanced by the speaker." *U.S. v. Russo*, 302 F.3d 37, 44 (2d Cir. 2002).

The prosecution has theorized that Rajaratnam's statements were aimed at influencing Horowitz in some way with regard to the alleged Rajaratnam/Gupta conspiracy, rather than enlisting him to help pacify Shaulov. But that explanation is untenable because the purpose of the call is manifest. The call followed shortly after Galleon trader Gary Rosenbach's email to Rajaratnam about his own efforts to calm Shaulov following Shaulov's angry email. A1261, A1264. Rajaratnam stated clearly on the call his motivating concern that "Leon was very upset" (A1149); Horowitz confirmed that Rajaratnam's explanation of when he learned the information left Shaulov nothing to be upset about ("upset about what? You got … this at 3:58"); Rajaratnam provided no trading instructions to Horowitz on the call; and the only thing Horowitz promised to do on the call was to let

Rajaratnam know if Shaulov expressed any further concerns ("He's not in, so I'm, he hasn't said anything.  Listen, if something comes in, I'll let you know").

Nor has the prosecution identified any plausible way in which the information Rajaratnam shared would have helped Horowitz to further the alleged Rajaratnam/Gupta conspiracy.  Buffett's investment in Goldman was already public knowledge by the evening of September 23.  A340-A341, A1225.  There was no evidence that the information Rajaratnam shared in the call—how far in advance of that announcement Rajaratnam had heard that "something good" might happen—could somehow induce Horowitz to act differently when performing his own narrow function, which was simply to carry out specific trading directions from Rajaratnam (*e.g.*, "sell 100 GS" (A1265)).

Because the content of the September 24 call itself shows that Rajaratnam was acting to further his separate conspiracy with Shaulov, rather than the charged conspiracy with Gupta, the prosecution failed to meet its burden of proving that the statement was intended to further a conspiracy with the defendant.

### B.    Rajaratnam's Statements In The October And September Wiretaps Would Not Be Admissible As Statements Against Interest

The prosecution argued below that the September and October wiretapped conversations were also admissible as statements against Rajaratnam's interest. The court declined to rule on the prosecution's alternative theory but noted that it

was "dubious" about the prosecution's arguments.  A192.  The court's skepticism was warranted:  The prosecution failed to make the requisite showing that a reasonable person in Rajaratnam's position would have made the statements "*only if the person believed [them] to be true.*"  Fed. R. Evid. 804(b)(3)(A) (emphasis added).

Courts admit hearsay statements made against the declarant's penal interest based on the "assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true."  Fed. R. Evid. 804(b)(3) Advisory Committee Notes.  But that assumption falters "when the declarant has ulterior motives for admitting conduct."  *Gill v. Arab Bank, PLC*, __ F. Supp. 2d __, 2012 WL 5395746, at *23 (E.D.N.Y. Nov. 6, 2012) (excluding statement claiming credit for a terrorist attack because among terrorists it would be construed as "a benefit, not a detriment"); *see Dutton v. Evans*, 400 U.S. 74, 89 (1970) (declarations against penal interest reliable where declarant "had no apparent reason to lie").

Rajaratnam's statement to Lau on October 24 that he supposedly received an inside tip from someone "on the Board of Goldman Sachs" (A1153) is just such inadmissible braggadocio.  Other evidence at trial showed that Rajaratnam was

prone to false and exaggerated claims about his status and connections. *See* A529.[6] Moreover, Rajaratnam had significant "reason to lie" about his sources—in particular, his desire to enhance his perceived importance among his colleagues— and his statement to Lau was therefore inadmissible under the penal-interest exception. *U.S. v. Salvador*, 820 F.2d 558, 562 (2d Cir. 1987).

Rajaratnam's statements to Horowitz are similarly inadmissible under this exception. *First*, Rajaratnam had reason to lie about precisely when he heard that "something good might happen to Goldman": It gave him an excuse for failing timely to inform Shaulov of the news. *See supra* pp. 36-37. *Second*, the rule "does not provide that any statement which 'possibly could' or 'maybe might' lead to criminal liability is admissible." *U.S. v. Butler*, 71 F.3d 243, 252-253 (7th Cir. 1995). Rajaratnam's statements are not sufficiently definite to be against his penal interest. In both of the September 24 calls, Rajaratnam never claimed to have received information from an inside source, nor did he claim that he received confidential or material information. His statements were limited to saying that he heard "something good might happen to Goldman" and "something good's gonna happen." A1143, A1148. Rajaratnam's general musing about whether he could

---

[6] The government has itself challenged Rajaratnam's credibility. *See* Opp. to Gov't Mot. in Limine, Dkt. 65, at 28-29.

- 41 -

have shared this information with a colleague does not qualify as a statement

against his interest.

### C.    Title III And The Fourth Amendment Mandate Suppression Of The Wiretaps

Title III and the Fourth Amendment mandate suppression of the wiretap

recordings admitted into evidence at Gupta's trial.[7]  This issue has been fully

briefed and argued to this Court in *U.S. v. Rajaratnam*, No. 11-4416, and Gupta's

appeal raises identical challenges to a subset of the wiretaps introduced at

Rajaratnam's trial.[8]

Reviewing the government's wiretap application following an evidentiary

hearing on Rajaratnam's suppression motion, Judge Holwell found that the

government recklessly disregarded the truth of its allegations of necessity and

---

[7]    As to the Title III and Fourth Amendment issues, this Court reviews questions of law *de novo*.  *Fiero v. FINRA, Inc.*, 660 F.3d 569, 573 (2d Cir. 2011); *U.S. v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).  Gupta has standing to assert Title III and Fourth Amendment violations with respect to the July 29, 2008 wiretap because it captured his conversation with Rajaratnam.  The government has waived any argument that Gupta lacks standing under Title III or the Fourth Amendment to challenge the September and October wiretaps because it failed to raise any standing issue in the district court.  *See U.S. v. Garcia*, 882 F.2d 699, 701-702 (2d Cir. 1989); *see also U.S. v. Ewing*, 638 F.3d 1226, 1230 (9th Cir. 2011) ("Since *Rakas* [*v. Illinois*, 439 U.S. 128, 139 (1978)], we repeatedly have held that Fourth Amendment standing is not a jurisdictional issue and therefore can be waived."); *U.S. v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (Title III standing challenge can be waived when not raised by government).

[8]    Gupta adopts Rajaratnam's arguments relating to suppression of the wiretaps as set forth in Rajaratnam's opening brief at pages 20-56, and in his reply brief at 4-35.

probable cause, *U.S. v. Rajaratnam*, No. 09 Cr. 1184, 2010 WL 4867402, at \*10-11 (S.D.N.Y. Nov. 24, 2010), included misleading statements throughout its affidavit, *id.* at \*10, \*17, and violated its duty of candor to the court, *id.* at \*10 n.15. The court was

> at a loss to understand how the government could have ever believed that Judge Lynch [the authorizing judge] could determine whether a wiretap was necessary to this investigation without knowing about the most important part of that investigation—the millions of documents, witness interviews, and the actual deposition of Rajaratnam himself, … all of which was being acquired through the use of conventional investigative techniques.

*Id.* at \*15. Despite finding that the government's misleading and incomplete affidavit made it "impossible" (*id.* at \*18) for Judge Lynch to evaluate reliably the necessity of a wiretap, the court denied suppression and allowed the government to salvage its application with entirely new factual allegations introduced for the first time at a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), held two-and-a-half years after the wiretaps were obtained. This was error.

The government's violation of the statutory requirements of "full and complete statement[s]" of necessity and probable cause (18 U.S.C. § 2518(1)(b)) mandate suppression. *See U.S. v. Giordano*, 416 U.S. 505, 527 (1974) ("Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional

intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.").

The Fourth Amendment also requires suppression of the wiretaps because the government's application was submitted "with reckless disregard for the truth," and once the "affidavit's false material [is] set to one side, the affidavit's remaining content is insufficient" to sustain the wiretap. *Franks*, 438 U.S. at 156. The court's determination that suppression was not required based on the new facts submitted at the *Franks* hearing violates two foundational principles of Fourth Amendment jurisprudence: (1) the constitutional requirement of *prior* judicial review, *Katz v. U.S.*, 389 U.S. 347, 359 (1967); and (2) the constitutional requirement that when affidavits are proven false, the search can only be sustained if the "remaining content" of the original affidavit is sufficient to support the wiretap, *Franks*, 438 U.S. at 156.

### D.    Exclusion Of Any Wiretap Requires A New Trial

There is no serious argument that the admission of any of the three wiretaps was harmless error—the jury only convicted on those counts supported by wiretaps, and acquitted on those that were not.

The prosecution conceded that the September and October wiretaps were "essential evidence of the insider trading charges against Gupta" (A47), whose "importance … cannot be overstated" (A48).  The October 24 call was the only

evidence identifying Rajaratnam's supposed source as a member of the Goldman board, and that statement undoubtedly colored the jury's perception of the rest of the circumstantial evidence—the prosecution itself referred to this call as "devastating" and told the jury there was "no better evidence" against Gupta. A1044.  "[W]here the prosecution has emphasized the wrongly admitted evidence"—as it did here, including by referring to and playing the September and October wiretaps during summation (A1006, A1008-A1009, A1012-A1013, A1043-A1045)—"it may well have been important in the minds of the jurors." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000).  The prosecution similarly conceded the importance of the July 29, 2008 wiretap.  *See* A1015-A1017, A1042.

Where "the government's proof relies primarily on circumstantial evidence, trial errors tend to acquire greater significance.  It takes less to tip the scales." *Detrich*, 865 F.2d at 22.  Given the fundamental importance of all three wiretap conversations to the prosecution's case, the erroneous admission of any one of them requires a reversal on all counts.

## II.    THE COURT ERRED BY EXCLUDING CRITICAL DEFENSE EVIDENCE

### A.    The Court Erred By Excluding Evidence Of Gupta's State Of Mind

One of the puzzles raised by the prosecution's case is *why* Gupta would have acted so uncharacteristically to tip Rajaratanam—especially since there was no evidence that Gupta benefitted financially from the tips.  The prosecution argued

that Gupta and Rajaratnam had a longstanding personal and professional relationship and were planning future business ventures together.  In response, Gupta had powerful evidence that he had no motive to tip Rajaratnam.  At the time in question, Gupta had learned that Rajaratnam had swindled him out of millions of dollars by covertly redeeming his own investment in the Voyager fund. Moreover, Gupta had already decided to donate the vast majority of his wealth to charitable causes.  The court improperly excluded Gupta's key evidence on both points.  Those rulings denied Gupta his opportunity to present his case and deprived him of a fair trial.

> ### 1.    The court erred by excluding testimony from Geetanjali Gupta concerning her father's state of mind shortly before the alleged tips

The linchpin of Gupta's defense was that on September 20, 2008—just three days before he supposedly tipped Rajaratnam with information about Goldman— Gupta was furious with Rajaratnam for having covertly made unilateral redemptions from the Voyager fund in which both had invested.  The fact that Rajaratnam had effectively stolen $25 million from Voyager by the end of 2007 was undisputed—indeed, the prosecution introduced evidence proving as much during its own case.  A676, A1441.  The only disputed fact was when Gupta *learned* that Rajaratnam had stolen from him—as opposed to thinking, for

example, that Rajaratnam had lost his money because of mistakes or adverse market conditions.

The prosecution sought to prove that Gupta had no suspicion of Rajaratnam's deception until, at the earliest, February 2009, *after* all of the tips with which Gupta was charged.  A676; *see also* A1085-A1087.  Gupta attempted to rebut that evidence with testimony from his daughter, who would have explained to the jury that Gupta was angry about Rajaratnam's redemptions on September 20, 2008, *before* the tips on which he was convicted.  Specifically, Geetanjali would have testified:

> He told me that he was upset about Voyager.  He told me that he was worried about the performance of the fund and that *he was frustrated that he couldn't get information from Raj about it.*
>
> He also told me *he was angry that Raj had taken money out of the fund without telling him* and that he thought that that—he didn't understand why he had taken the money out of the fund, and why if he had taken money out of the fund, he had not gotten any of it.

A983 (emphases added).  This testimony also provided the innocent explanation for Gupta's calls to Rajaratnam—he was trying, without success, to get information from Rajaratnam about the state of his investment in Voyager.[9]

---

[9]     The evidence showed that Gupta was making every effort to obtain information about his Voyager investment from Rajaratnam, repeatedly trying to reach Rajaratnam on September 22 and 23.  *See* A1141, A1527, A1528, A1529, A1531.

- 47 -

The court excluded that evidence, crippling Gupta's ability to respond to the prosecution's theory that his relationship with Rajaratnam did not deteriorate until 2009. The court reasoned that the jury would "inevitably think that if they accept this testimony at all that he is telling the truth to his own daughter, and they will be taking it for its truth, and I don't see how under [Fed. R. Evid.] 403 that gross violation of the hearsay rule can be avoided." A955-A956; *see also* A984-A985. Neither rationale is justified.

Gupta did not seek to introduce Geetanjali's testimony to prove that Rajaratnam had in fact stolen from him (a point that was undisputed anyway); rather, he wanted to show that he *believed* Rajaratnam had stolen from him at a particular point in time. Rule 803(3) provides an exception to the rule against hearsay for statements "of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." This Court has held that statements expressing concern, anger, and fear are admissible under Rule 803(3). *See U.S. v. Quinones*, 511 F.3d 289, 311-312 (2d Cir. 2007); *U.S. v. Ostrander*, 999 F.2d 27, 32 (2d Cir. 1993); *U.S. v. Lawal*, 736 F.2d 5, 9 (2d Cir. 1984). Geetanjali's testimony—that on September 20, Gupta told her "he was angry that Raj had taken money out of the fund without telling him" (A983)—was classically

admissible evidence establishing Gupta's state of mind, and directly relevant to his motive for calling Rajaratnam.

Rule 803(3) creates an exception to the hearsay rule for state-of-mind statements but excludes from admissibility "a statement of memory or belief *to prove* the fact remembered or believed." Fed. R. Evid. 803(3) (emphasis added). That exclusion is not implicated here. While Gupta's statement to Geetanjali "that Raj had taken money out of the fund" (A983) would have been inadmissible to prove that Rajaratnam had *in fact* stolen from him, that was not the purpose for which it was offered (and that fact had already been proven by the prosecution). A676, A1441. Rather, Gupta sought to establish that he *believed at the time* that Rajaratnam was defrauding him, and his statement was admissible as evidence of that belief. *See Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005); *Detrich*, 865 F.2d at 21.

The excluded testimony was critical to Gupta's defense because it showed his belief *before* the alleged September and October 2008 tips that Rajaratnam was cheating him and his anger about that belief, which would have raised a reasonable doubt in jurors' minds as to Gupta's willingness to provide inside information to Rajaratnam. The testimony also would have rebutted evidence the prosecution introduced through Kumar, suggesting that Gupta did not become aware of

- 49 -

Rajaratnam's Voyager redemptions until 2009.  *See supra* p. 18.[10]  The exclusion of this core defense evidence was not rendered harmless by the admission of evidence that Gupta thought Rajaratnam had mismanaged the fund or that Gupta found out about Rajaratnam's deception after the tips on which the jury convicted. To the contrary, as the jury surely would have recognized, Gupta's state of mind towards Rajaratnam would have been much different if he thought Rajaratnam had been *stealing* from him, rather than if he thought Rajaratnam had lost his money through mismanagement or a market downturn.  Geetanjali's excluded testimony would have raised a reasonable doubt, because it provided the evidentiary support for counsel to argue, and the jury to conclude, that Gupta believed as early as September 2008 that Rajaratnam had swindled him.

> **2.  The court erred by excluding the portion of Heather Webster's notes that concerned Gupta's intent to donate his wealth to charity**

The court further hobbled Gupta's attempt to disprove the prosecution's theory by excluding part of the notes taken by Gupta's private banker Heather Webster during an April 2008 meeting with him.  The excluded portion of the notes recorded Gupta's intent to donate most of his wealth to charity.  That portion of the notes was not hearsay, as it went to Gupta's state of mind; and regardless, it

---

[10]    Indeed, the prosecution attempted to push back the date Gupta discovered Rajaratnam's redemptions from Voyager even further, to December 2009, during its cross-examination of Ajit Jain.  *See* A1085-A1087.

should have been admitted to ensure a fair and impartial understanding of the admitted portion.

The court allowed the prosecution to introduce (as a recollection recorded (A631, A634)) a portion of Webster's handwritten notes to attempt to prove that Gupta held a financial stake in Galleon International (*see* A1470). Under the rule of completeness, the court allowed the defense to introduce the portion of the notes concerning Gupta's other sources of wealth, which the court deemed relevant "to why he would be doing insider trading because he doesn't need the money." A626; *see also* A631. But it erroneously excluded the portion of the notes addressed to Gupta's charitable plans (A1473), ruling that the statements were hearsay and not encompassed by the rule of completeness. A631. The notes comprised one document, memorializing one conversation.[11]

The court's hearsay ruling was in error. Gupta's statements to Webster concerning his charitable intentions were admissible under Rule 803(3) as "a statement of the declarant's then existing state of mind" because they reflected Gupta's then-present intent to dispose of his wealth through charitable giving, which the defense should have been free to argue was inconsistent with the

---

[11]    The first page of the notes is a typed agenda for the meeting, with Webster's handwritten notes interlineated. A1469. Webster then wrote on the back of her agenda; when she ran out of space, she switched to a notebook. The full set of notes was originally marked by the government as a single exhibit. *See* A625.

prosecution's theory that Gupta tipped Rajaratnam for personal financial gain.  The court clearly disbelieved that argument, perceiving no conflict between generosity and cupidity (A626), but that was not a proper basis for denying Gupta the opportunity to put the evidence before the jury; that goes to weight, not admissibility.  *See Lawal*, 736 F.2d at 8; *U.S. v. Cardascia*, 951 F.2d 474, 487-488 (2d Cir. 1991).

The court suggested that Gupta's statement to Webster "really goes to motive … not state of mind."  A626.  But in this case evidence of Gupta's state of mind was directly relevant to the central issue of motive, so the court's distinction makes no sense.  Indeed, Rule 803(3) expressly identifies "motive" as a species of "state of mind."  And this Court has recently defined "motive" to mean "an emotion or *state of mind* that prompts a person to act in a particular way," and further recognized that, "[a]lthough it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted." *U.S. v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012) (emphasis added; quotation marks and citations omitted).  Thus, the fact that this evidence of Gupta's state of mind was in turn relevant to motive was an affirmative reason to *admit*, not to exclude, the evidence.

Even if Gupta's statements were hearsay, they should have been admitted under the rule of completeness.  Fed. R. Evid. 106.  The prosecution sought to

- 52 -

admit Webster's notes because they allegedly reflected Gupta's financial stake in

Galleon International, and thus supported the prosecution's theory that Gupta

tipped Rajaratnam for financial gain.  A624.  The excluded portion of Webster's

notes would have cast doubt on that theory.  The source of Gupta's income and his

intended disposition of it were two sides of the same coin, as both concerned

Gupta's motive.  The excluded notes should have been admitted "to ensure fair and

impartial understanding of the admitted portion," *U.S. v. Johnson*, 507 F.3d 793,

796 (2d Cir. 2007) (internal quotation marks omitted).  With only the portion of the

notes that supported the prosecution's theory, the jury received an unfair and

partial view of Gupta's alleged financial interest in tipping Rajaratnam.

### B.   The Court Erred By Excluding Evidence Of An Alternative Goldman Sachs Tipper

Gupta's second defense suggested an alternative source of the alleged

September and October tips of confidential Goldman Sachs information.  Gupta

sought to introduce evidence that David Loeb, a Goldman vice president and the

relationship manager for Galleon, had repeatedly tipped Rajaratnam with

confidential information from publicly traded companies—a contention the

prosecution did not dispute.  *See* A343, A962.  Loeb's position at Goldman, his

relationship with Galleon, and his frequent calls to Galleon—including on the very

days of the tips for which the jury convicted Gupta—were already in evidence; the

additional evidence proffered by the defense of Loeb's history of providing

Rajaratnam with inside information was sufficient to place an alternative-
perpetrator theory before the jury.  The prosecution was permitted to prove its
entirely circumstantial case through evidence that Gupta had a close relationship
with Rajaratnam, a history of providing allegedly confidential information, a
motive for tipping, and communications with Rajaratnam during the relevant time
period; Gupta sought only to introduce comparable information about a plausible
alternative perpetrator.

As the Supreme Court has made clear, "the accused may introduce any legal
evidence tending to prove that another person may have committed the crime with
which the defendant is charged," because "the Constitution guarantees criminal
defendants a meaningful opportunity to present a complete defense."  *Holmes v.
South Carolina*, 547 U.S. 319, 324, 327 (2006) (quotation marks omitted).  The
trial court may "exclud[e] evidence that has only a very weak logical connection to
the central issues" in a case, *id.* at 330, but where the defendant disputes the
contention that he was the perpetrator of a crime, "[i]t is entirely proper for [the
defendant] to disprove the government's contention by proving that the
[perpetrator] was someone else," *U.S. v. Robinson*, 544 F.2d 110, 112-113 (2d Cir.
1976).  Evidence tending to show that another person may have committed the
charged offense is "crucial to the defense," because absent such evidence, there is
little to "rebut[] the inference that [the defendant] must have committed the [crime]

because no one else was in a position to do so." *U.S. v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996).

Defense counsel made an itemized proffer of alternative-perpetrator evidence that included, among other things, two wiretapped conversations in which Loeb relayed confidential Apple and Intel data and Rajaratnam reacted with palpable excitement. Without attending to the specific arguments that Gupta advanced with respect to the wiretap records, the court categorically excluded the entirety of Gupta's proffer on the ground that the evidence was "blatant hearsay," which no "jury could remotely understand" in the absence of witness testimony. A962-A963; *see also* A979.

Exclusion of the wiretap evidence as hearsay was error. Gupta sought to introduce undisputed evidence that Loeb had provided Rajaratnam with confidential information relating to public companies. As the government itself has argued, such out-of-court statements by tippers are not hearsay because they are not "offered for the truth of any matter asserted … but rather for the fact that such information was communicated." U.S. Opp. 4, Dkt. 150, *U.S. v. Newman*, No. 12-cr-121 (S.D.N.Y. Oct. 12, 2012); *see also* U.S. Opp. 3-4, Dkt. 213, *U.S. v. Rajaratnam*, No. 09-cr-1184 (S.D.N.Y. Feb. 14, 2011) (similar). Thus, as even the prosecution appears to acknowledge, the court's hearsay ruling is unfounded.

Nor was the court's jury-confusion rationale well founded. The court appeared to believe that introduction of an alternative-perpetrator theory is inherently confusing, but the Supreme Court has rejected the contention that evidence of an alternative perpetrator is necessarily an independent issue that would confuse the jury. *Holmes*, 547 U.S. at 327-329. Such speculative concerns (which could be mitigated with proper instructions) must yield to the defendant's compelling right to "'put before a jury evidence that might influence the determination of guilt.'" *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). And the court's specific ground for excluding the evidence—that a witness was required to explain this evidence to the jury—is demonstrably unsustainable in this case. The prosecution's entire case depends on the September 24 tape recordings it played to the jury without a witness even on the stand (A369), and the October 24 recording it played during the testimony of a custodial witness (A384). It never offered testimony from anyone in a position to explain what any of the recordings meant.

Moreover, the prosecution admitted, in a pretrial *Brady* disclosure, that Loeb had done precisely what the defense claimed the tapes showed:  tipped Rajaratnam with confidential information. *See* A962; *see also* A343. And the prosecution acknowledges there was admitted evidence that would have provided the requisite

context for the Loeb wiretaps.[12]  Taken alongside the evidence that had been
introduced into evidence, the wiretaps were sufficient to place a straightforward
alternative-Goldman-perpetrator theory before the jury.

### C.    The Court Improperly Curtailed Gupta's Character Defense

The prosecution charged Gupta with acting in a way that suggested a marked
departure from the way he had lived his entire life and the attributes for which he
was widely known:  treating sensitive information with discretion, and exercising
good judgment.  To highlight this incongruity, Gupta sought to have witnesses
testify to his integrity and honesty and to explain how they knew that Gupta
possessed those attributes.  Gupta also asked the court to instruct the jury that such
character evidence is appropriately considered when deciding whether a defendant
has committed a crime.  The court, however, curtailed Gupta's ability to use such
evidence and thus denied him the opportunity to shed light on his character.

The court was dismissive of Gupta's character evidence throughout the
proceedings (A900), which culminated in the impermissible exclusion of any
evidence of Gupta's character for integrity.  *See, e.g.*, A794-A795.  The court
prohibited Gupta's witnesses from testifying about Gupta's character for integrity
on the ground that "some aspects" of integrity—in particular "moral uprightness,"

---

[12]    U.S. Br. in Opp. to Mot. for Stay of Surrender 17, *U.S. v. Gupta*, No. 12-4448-cr (2d Cir. Nov. 26, 2012).

or, as the prosecution described it, law-abidingness—were not pertinent.  A794.
This was error.

It is settled that "character is relevant in resolving probabilities of guilt."
*Michelson v. U.S.*, 335 U.S. 469, 476 (1948); *see also Edgington v. U.S.*, 164 U.S.
361, 366 (1896).  A defendant may introduce evidence of a "pertinent trait" of
character, Fed. R. Evid. 404(a)(2)(A), and "the general character trait of law-
abidingness is pertinent to almost all criminal offenses," *In re Sealed Cases*, 352
F.3d 409, 412 (D.C. Cir. 2003); *U.S. v. Yarbrough*, 527 F.3d 1092, 1100-1101,
1103 (10th Cir. 2008) (finding reversible error where evidence of "integrity and
status as a law-abiding, trusted police officer" was excluded).

Integrity was directly at issue in this case:  The fundamental question for the
jury was whether Gupta, a business leader to whom countless clients and
colleagues had over decades entrusted sensitive information, would have acted out
of character and misused confidential information for his benefit.  Gupta's integrity
speaks directly to whether he would violate federal securities laws.  Particularly in
these circumstances, where the prosecution's case was entirely circumstantial,
evidence of Gupta's integrity may have been "of sufficient weight, by itself, to
generate a reasonable doubt."  *U.S. v. Pujana-Mena*, 949 F.2d 24, 30 (2d Cir.
1991).

The court permitted evidence about Gupta's *honesty* (A794; *see also* A796, A892, A907, A953, A989), but that trait was much less relevant to the crimes with which he was charged. Gupta was not charged with making a false statement to anyone; the prosecution did not allege that he lied or dissimulated in any way.[13] The charge was that he provided information to Rajaratnam when the law and his obligations to Goldman required that he keep what he knew secret. The character testimony the court grudgingly allowed may have painted Gupta in a favorable light, but it did not respond to that core allegation in the way that evidence of integrity would have.

Moreover, what character evidence the court did allow was drastically curtailed. The court refused to allow the witnesses to give more than a few sentences of background about how they knew Gupta, followed by a short response on whether they had an opinion about Gupta's honesty. *See, e.g.*, A907, A908-A909. Thus, the jury was given little more than a bare assertion that the witnesses believed in Gupta's honesty without understanding how or why they did so, rendering that evidence of little use.

---

[13]    Integrity means "incorruptibility." *Merriam-Webster's Collegiate Dictionary* 608 (10th ed. 1993); *see also Webster's New College Dictionary* 742 (2007) ("the quality or state of being of sound moral principle; uprightness, honesty, and sincerity"). Honesty, by contrast, refers to truth telling or "sincerity." *Webster's Ninth New Collegiate Dictionary* 579 (1988) (defining honesty as "a : fairness and straightforwardness of conduct b : adherence to the facts").

Finally, the court refused to instruct the jury that character evidence "may be sufficient in itself to establish reasonable doubt," instead diminishing the importance of character evidence.  A1002; *see also* A972, SPA19-SPA20.  But as the Supreme Court has recognized, "[t]he circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although, without it, the other evidence would be convincing." *Edgington*, 164 U.S. at 366.  In such cases, where character evidence "alone … may be enough to raise a reasonable doubt of guilt," the jury "*should be so instructed*." *Michelson*, 335 U.S. at 476 (emphasis added).[14]

Under this Circuit's precedent, the district court was not required to give a "standing alone" character-evidence instruction.  *Pujana-Mena*, 949 F.2d at 27-28; *see also id.* at 28 n.2 (describing circuit split).  Its refusal to do so, however, combined with the instruction it did provide, which minimized the importance of character evidence, was prejudicial because it likely left the jury confused as to whether or why it should consider character evidence, even though this is the kind of case in which that evidence is most relevant—where the charged conduct is demonstrably *out of character*.  Gupta therefore respectfully requests that this Court reconsider its holding in *Pujana-Mena*, which is contrary to the Supreme

---

[14]    This Court "review[s] the propriety of jury instructions de novo." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 146 (2d Cir. 2010) (quotation marks and citations omitted).

Court's decisions in *Edgington* and *Michelson*, and in conflict with the law of the D.C. Circuit.  *U.S. v. Lewis*, 482 F.2d 632, 637 (D.C. Cir. 1973).

**D.    None Of These Errors Was Harmless**

Gupta was denied the opportunity to present the best evidence of his innocence.  The court crippled each of Gupta's three defenses—his state of mind *before* the tips on which the jury convicted, the existence of a plausible alternative tipper, and his character for integrity—through erroneous decisions to exclude admissible evidence.  None of these errors is harmless.  *See U.S. v. White*, 692 F.3d 235, 251-252 (2d Cir. 2012).  And even were any of these errors, standing alone, insufficient to warrant reversal, "in the aggregate, the district court's errors deprived [Gupta] of a fair trial."  *U.S. v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008).

**CONCLUSION**

The Court should reverse Gupta's conviction on all counts.

Dated: January 18, 2013       Respectfully submitted,

/s/  Seth P. Waxman
_____

GARY P. NAFTALIS             SETH P. WAXMAN
DAVID S. FRANKEL             PAUL R.Q. WOLFSON
ALAN R. FRIEDMAN            MEGAN BARBERO
ROBIN M. WILCOX             DANIEL AGUILAR
KRAMER LEVIN NAFTALIS     WILMER CUTLER PICKERING
  & FRANKEL LLP             HALE AND DORR LLP
1177 Avenue of the Americas    1875 Pennsylvania Avenue, NW
New York, NY  10036          Washington, DC  20006
(212) 715-9100               (202) 663-6000

PETER G. NEIMAN
ALAN E. SCHOENFELD
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32, the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,815 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/  Seth P. Waxman
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2013, I caused a copy of the foregoing document to be served on all parties by this Court's electronic filing system.

/s/  Seth P. Waxman
SETH P. WAXMAN