# 12-4448

*To Be Argued By*:
RICHARD C. TARLOWE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 12-4448

————◆————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

RAJAT K. GUPTA,

*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

RICHARD C. TARLOWE,
DAMIAN WILLIAMS,
EDWARD B. DISKANT,
JUSTIN S. WEDDLE,
   *Assistant United States Attorneys,
      Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    A.   The Government's Case . . . . . . . . . . . . . . .   3

        1.   Gupta's Relationship with Rajaratnam
            and Galleon . . . . . . . . . . . . . . . . . . . . . . .   3

        2.   Gupta's Inside Tips to Rajaratnam . . .   7

            a.   The September 23, 2008 Trades
                (Counts Three and Four) . . . . . . . .   8

            b.   The October 24, 2008 Trades (Count
                Five) . . . . . . . . . . . . . . . . . . . . . . . .   12

            c.   Gupta's Other Goldman and P&G
                Tips. . . . . . . . . . . . . . . . . . . . . . . . .   14

                i.   Gupta's March 2007 Goldman
                     Tip (Count Two) . . . . . . . . . . .   14

                ii.   Gupta's September 2007
                     Goldman Tip . . . . . . . . . . . . . .   15

                iii.   Gupta's June 2008 P&G Tip .   15

                iv.   Gupta's June 2008
                     Goldman Tip . . . . . . . . . . . . . .   17

                v.   Gupta's December 2008
                     P&G Tip . . . . . . . . . . . . . . . .   17

ii

PAGE

vi.  Gupta's January 2009 P&G Tip
(Count Six) . . . . . . . . . . . . . . .  18

B.  The Defense Case . . . . . . . . . . . . . . . . . . . . .  18

C.  Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

POINT I—The District Court Properly Admitted the
September 24 and October 24, 2008 Wiretapped
Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  21

1.  Standard of Review . . . . . . . . . . . . . . .  21

2.  Rule 801(d)(2)(E): Co-Conspirator
Statements in Furtherance of the
Conspiracy . . . . . . . . . . . . . . . . . . . . . .  23

3.  Rule 804(b)(3): Statements Against Penal
Interest . . . . . . . . . . . . . . . . . . . . . . . . . .  25

B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  26

1.  Rajaratnam's Statements to Horowitz
Were in Furtherance of the Conspiracy 27

2.  Rajaratnam's Statements to Horowitz
Were Independently Admissible as
Statements Against Interest . . . . . . . .  36

3.  Rajaratnam's Statements to Lau Were in
Furtherance of the Conspiracy . . . . . .  38

iii

PAGE

    4.   Rajaratnam's Statements to Lau Were
          Independently Admissible as Statements
          Against Interest . . . . . . . . . . . . . . . . . .   41

POINT II—No Basis Exists for Suppression of the
    Wiretaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

POINT III—The District Court Did Not Abuse its
    Discretion in Excluding a Portion of the
    Testimony of Gupta's Daughter . . . . . . . . . . .   46

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   46

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .   51

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   53

POINT IV—The District Court Properly Excluded a
    Portion of Handwritten Notes Concerning the
    Gupta Family's Estate Planning . . . . . . . . . . .   56

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   56

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .   58

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   60

POINT V—The District Court Did Not Abuse its
    Discretion in Excluding Emails and Recordings
    Offered by Gupta in Support of His Alternative
    Tipper Theory . . . . . . . . . . . . . . . . . . . . . . . . . .   63

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   64

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .   67

iv

PAGE

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  68

POINT VI—The District Court Permissibly Limited
the Testimony of Gupta's Six Character
Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  72

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  74

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  75

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

v

## TABLE OF AUTHORITIES

*Cases*:

*Constantino* v. *Herzog,*
    203 F.3d 164 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 51

*Nash* v. *United States,*
    54 F.2d 1006 (2d Cir. 1932) . . . . . . . . . . . . . . . . . 77

*Rakas* v. *Illinois,*
    439 U.S. 128 (1978). . . . . . . . . . . . . . . . . . . . . . . . 46

*Steagald* v. *United States,*
    451 U.S. 204 (1981). . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Cardascia,*
    951 F.2d 474 (2d Cir. 1991) . . . . . . . . . . . . . . 52, 54

*United States* v. *Carpenter,*
    791 F.2d 1024 (2d Cir. 1986) . . . . . . . . . . . . . . . . 31

*United States* v. *Castro,*
    813 F.2d 571 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 59

*United States* v. *Contorinis,*
    692 F.3d 136 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 51

*United States* v. *Coplan,*
    703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . 22

*United States* v. *Coppola,*
    671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . 22-23

*United States* v. *Damblu,*
    134 F.3d 490 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 74

vi

PAGE

*United States* v. *Desena,*
260 F.3d 150 (2d Cir. 2001) . . . . . . . . 24, 27-28, 34

*United States* v. *Dhinsa,*
243 F.3d 635 (2d Cir. 2001) . . . . . . . . . . . . . . . . 22

*United States* v. *Diaz,*
176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . 24, 27, 29

*United States* v. *Farhane,*
634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . 29

*United States* v. *Ferguson,*
676 F.3d 260 (2d Cir. 2011) . . . . . . . . . . . . . . . . 22

*United States* v. *Gallo,*
863 F.2d 185 (2d Cir. 1988) . . . . . . . . . . . . . 45-46

*United States* v. *Garcia,*
882 F.2d 699 (2d Cir. 1989) . . . . . . . . . . . . . . . . 45

*United States* v. *Geibel,*
369 F.3d 682 (2d Cir. 2004) . . . . . . . . . . . . . . . . 31

*United States* v. *Glover,*
101 F.3d 1183 (7th Cir. 1996) . . . . . . . . . . . . . . 59

*United States* v. *Johnson,*
507 F.3d 793 (2d Cir. 2007) . . . . . . . . . . . . . 59, 63

*United States* v. *Jordan,*
485 F.3d 1214 (10th Cir. 2007) . . . . . . . . . . . . . 70

*United States* v. *Katsougrakis,*
715 F.2d 769 (2d Cir. 1983) . . . . . . . . . . . . . . . . 26

*United States* v. *Kopp,*
562 F.3d 141 (2d Cir. 2009) . . . . . . . . . . . . . . . . 59

vii

PAGE

*United States* v. *Lang,*
    589 F.2d 92 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . 23

*United States* v. *Lieberman,*
    637 F.2d 95 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . 27

*United States* v. *Maldonado-Rivera,*
    922 F.2d 934 (2d Cir. 1990) . . . . . . . . . . . . . 24, 28

*United States* v. *Mangan,*
    575 F.2d 32 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . 23

*United States* v. *Marin,*
    669 F.2d 73 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . 58

*United States* v. *McDermott,*
    245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 31

*United States* v. *Mercado,*
    573 F.3d 138 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 51

*United States* v. *Morgan,*
    554 F.2d 31 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . 74

*United States* v. *Mulder,*
    273 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . 24

*United States* v. *O'Connor,*
    650 F.3d 839 (2d Cir. 2011) . . . . . . . . . . . . . 52-54

*United States* v. *Paguio,*
    114 F.3d 928 (9th Cir. 1997) . . . . . . . . . . . . . . . . 43

*United States* v. *Persico,*
    645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . 21, 23

*United States* v. *Pujana-Mena,*
    949 F.2d 24 (2d Cir. 1991) . . . . . . . . . . . . 74-75, 77

viii

PAGE

*United States* v. *Rastelli*,
    870 F.2d 822 (2d Cir. 1989) . . . . . . . . . . 24-25, 27

*United States* v. *Rivera*,
    22 F.3d 430 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 33

*United States* v. *Ruggiero*,
    928 F.2d 1289 (2d Cir. 1991) . . . . . . . . . 46, 48-49

*United States* v. *Saget*,
    377 F.3d 223 (2d Cir. 2004) . . . . . . . . . . . . . . . . 26

*United States* v. *Scheffer*,
    523 U.S. 303 (1998). . . . . . . . . . . . . . . . . . . . . . . 67

*United States* v. *Simmons*,
    923 F.2d 934 (2d Cir. 1991) . . . . . . . . . . . . . . . . 24

*United States* v. *SKW Metals & Alloys, Inc.*,
    195 F.3d 83 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 24

*United States* v. *Stewart*,
    433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . 67

*United States* v. *Szur*,
    289 F.3d 200 (2d Cir. 2002) . . . . . . . . . . . . . . . . 67

*United States* v. *Terrorist Bombings of U.S.*
    *Embassies in East Africa*,
    552 F.3d 93 (2d Cir. 2008) . . . . . . . . . . . . . . 22, 33

*United States* v. *Thai*,
    29 F.3d 785 (2d Cir. 1994) . . . . . . . . . . . 22, 24, 27

*United States* v. *Wexler*,
    522 F.3d 194 (2d Cir. 2008) . . . . . . . . . . . . . . . . 26

ix

PAGE

*United States* v. *Williams,*
   506 F.3d 151 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 26

*United States* v. *Yousef,*
   327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 58

*Williamson* v. *United States,*
   512 U.S. 594 (1994) . . . . . . . . . . . . . . . . . . . . . . . 25

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 2510(11) . . . . . . . . . . . . . . . . . . . . . . . . . 44

18 U.S.C. § 2518(10) . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Evid. 106 . . . . . . . . . . . . . . . . . . . . . . . 57, 59

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . 51, 67

Fed. R. Evid. 801(d)(2)(A) . . . . . . . . . . . . . . . . . . . 58

Fed. R. Evid. 801(d)(2)(E) . . . . . . . . . . . . . . . . . . . 23

Fed. R. Evid. 803(3) . . . . . . . . . . . . . . . . . . . . . 52, 60

Fed. R. Evid. 803(5) . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Evid. 804 . . . . . . . . . . . . . . . . . . . . . . . . . 68

Fed. R. Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . 25, 36

Fed. R. Evid. 804(b)(3)(B) . . . . . . . . . . . . . . . . . . . 37

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 12-4448

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

RAJAT K. GUPTA,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Rajat K. Gupta appeals from a judgment of conviction entered on November 9, 2012, in the United States District Court for the Southern District of New York, following a four-week trial before the Honorable Jed S. Rakoff, United States District Judge, and a jury.

Superseding Indictment S1 11 Cr. 907 (JSR) (the "Indictment") was filed on January 31, 2012, in six counts. Count One charged Gupta with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Counts Two through Six charged Gupta with substantive securities fraud, in violation of 15 U.S.C.

2

§§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.

Trial against Gupta commenced on May 21, 2012, and ended on June 15, 2012, when the jury returned verdicts of guilty on Counts One, Three, Four, and Five of the Indictment, and not guilty on Counts Two and Six. On October 26, 2012, Judge Rakoff sentenced Gupta principally to concurrent terms of 24 months' imprisonment and a $5 million fine. The defendant remains on bail pending the resolution of this appeal.

## Statement of Facts

The Government's evidence at trial demonstrated that Gupta—a member of the boards of directors of Goldman Sachs ("Goldman") and Procter & Gamble ("P&G")—repeatedly and illegally disclosed material nonpublic information about those companies to Raj Rajaratnam—the head of a multi-billion-dollar hedge fund called the Galleon Group ("Galleon"). Over and over, as the evidence showed, Gupta received inside information during confidential board meetings of the two companies and promptly disclosed that information to Rajaratnam, either by phone or in person. Upon receiving these illegal tips from Gupta, Rajaratnam and other co-conspirators at Galleon traded on the information, reaping millions of dollars in profits and avoiding millions of dollars in losses.

3

## A. The Government's Case

### 1. Gupta's Relationship with Rajaratnam and Galleon

Gupta and Rajaratnam had a close personal relationship. Gupta described Rajaratnam as "a very close friend" and "one of the most outstanding hedge fund managers." (A.1391, 1394).[1] Rajaratnam, in turn, listed Gupta as a "good friend" in his address book. (GX 1965-R). Gupta called Rajaratnam frequently (Tr. 228, 2362-63), and was one of only five "important people" on a list that Rajaratnam's secretary created in 2008 for purposes of screening Rajaratnam's calls. (A.1458; Tr. 209-14). Gupta visited Galleon's office frequently, at times entering the secure office space using a Galleon keycard Rajaratnam had given him. (Tr. 340; A.1398; GX 1977-C).

Gupta's business relationship with Rajaratnam was similarly close. For example, Gupta had a variety of interests in Galleon. Gupta was a personal investor in Galleon, having put money into offshore Galleon funds. (Tr. 2110-16). Gupta also participated in several actual and contemplated Galleon ventures. In one such venture, Gupta, Rajaratnam, and Anil Kumar (a mutual friend and partner of Gupta's at the consulting firm, McKinsey & Co.) explored jointly

---

[1]  "Br." refers to Gupta's brief on appeal; "A." refers to the joint appendix filed with that brief; "Tr." refers to the trial transcript, which appears at pages 212 to 1064 of the joint appendix; and "GX" refers to a Government exhibit admitted at trial.

4

launching an entity called Galleon Global. (Tr. 1820-28). Later, in early 2008, Rajaratnam made Gupta the Chairman of Galleon International—a Singapore-based fund that managed more than $1 billion in assets. (Tr. 1476-79, 1696; A.1334). Gupta also received a 15% ownership stake in Galleon International and the right to participate in its performance fees. (Tr. 1696; A.1470). Also in 2008, Gupta executed an agreement that gave him an ownership stake in an entity called Galleon Special Opportunities. (A.1399-1414; Tr. 2208-11).

Gupta also acted as a Galleon emissary, traveling to the Middle East to pitch Galleon to prospective investors, and meeting with potential investors in New York, including at Galleon's office. (Tr. 1473-87, 1494-95, 1501-25, 1556). Gupta spoke knowledgably to investors about Galleon, including the size and performance of Galleon's funds. (Tr. 1479).

Beyond Galleon, Gupta and Rajaratnam were also business partners in several other ventures. One such venture was a leveraged investment fund called Voyager Capital Partners ("Voyager") that Gupta and Rajaratnam formed in 2005. (Tr. 2117-22). By 2007, Gupta had invested $10 million in Voyager and held a 20% equity interest in the fund. (Tr. 2124-26). Rajaratnam had an 80% stake and made the investment decisions for Voyager, which included investing Voyager assets in Galleon funds. (Tr. 2122-24).

In another non-Galleon venture, Gupta and Rajaratnam formed a private equity fund called New Silk Route ("NSR"). (Tr. 1796-99). Rajaratnam committed $50 million to NSR and served as a member of NSR's

5

investment committee. (Tr. 1811-17, 1852-53). Gupta
served as the fund's Chairman (Tr. 1796), in which
capacity he sent numerous letters to potential inves-
tors, including his fellow Goldman and P&G board
members, touting Rajaratnam's involvement. (*E.g.,*
A.1447-56).

A July 29, 2008 wiretapped call between Gupta
and Rajaratnam—in which the two men discussed a
wide variety of personal and professional topics—
provided a window on the breadth and closeness of
their relationship. The recorded conversation also
demonstrated Gupta's willingness to place that rela-
tionship above his corporate duties of confidentiality.[2]
(A.1115-40).

During the call, Rajaratnam referred to a "rumor"
he had heard that Goldman was looking to buy a
commercial bank. (A.1116). Rajaratnam asked Gupta
whether he had "heard anything along that line."
(A.1116). Gupta had, in fact, heard about just such a
potential investment during a confidential strategy
meeting of the Goldman board that had taken place
the prior month in Russia. (Tr. 807-19, 2045-49).
Notwithstanding the duty of confidentiality that he
owed to Goldman, Gupta responded to Rajaratnam's

—————————

    [2]   Although toll records showed over 150 calls be-
tween Gupta and Rajaratnam during an eight-month
period in 2008 (Tr. 2363), only one conversation be-
tween them was recorded as part of the FBI's wiretap
on Rajaratnam's cellular phone during that same pe-
riod.

6

inquiry by informing Rajaratnam that the bank investment had been "a big discussion at the board meeting." (A.1116). Gupta then disclosed more non-public details of the board's deliberations, including that it was a "divided discussion" and that the insurance company AIG was "definitely" in the "mix." (A.1117).

Gupta's disclosures to Rajaratnam violated policies that he, himself, had voted to adopt as a board member. (A.1184-1200; GX 251). Those policies prohibited non-employee directors like Gupta from speaking to outside constituencies on behalf of Goldman and dictated that the proceedings and deliberations of the board were confidential. (A.1199-1200; *see* Tr. 795-99, 858-61, 1978-80, 2048-49, 2668). Even the fact that something was discussed at a board meeting was itself confidential. (Tr. 2048-49, 797-799).

Gupta and Rajaratnam turned from this confidential Goldman information to discussing the value of Gupta's stake in Voyager. Rajaratnam had previously agreed to increase the value of Gupta's stake by nearly $4 million. (Tr. 2135-41). On the recorded July 29 call, Rajaratnam promised Gupta that Galleon's CFO would send Gupta a letter memorializing the upward adjustment—a promise that was fulfilled several days later. (A.1119, 1443-44).

Another topic of the recorded July 29 conversation was Anil Kumar, a mutual friend of Gupta and Rajaratnam and a senior partner at McKinsey. As Kumar would later describe in his guilty plea and during his testimony at Gupta's trial, he had been secretly providing Rajaratnam with inside information ob-

7

tained from his McKinsey clients, including AMD.
(Tr. 1767, 1775-78). In the wiretapped call, Raja-
ratnam and Gupta discussed Rajaratnam's payments
to Kumar, which Gupta knowingly described as "very
generous." (A.1120-21). Rajaratnam later added that
the "million bucks a year" he had been giving Kumar
for the last "four or five years" were "[a]fter taxes, off
shore, cash." (A.1123). Rajaratnam complained to
Gupta that Kumar never even said "thank you for
giving me 5 million dollars after taxes." (A.1123).

On the subject of Galleon, Gupta told Rajaratnam
during the recorded July 29 conversation that he
wanted to explore how he could "be helpful" not only
to Galleon International, where he formally held a
"position," but also to the rest of Galleon. (A.1127).
Gupta encouraged Rajaratnam and his Galleon em-
ployees to "pull me in wherever they think I can add
value." (A.1128).

Finally, during the same call, Gupta sought Raja-
ratnam's advice concerning an employment oppor-
tunity at the private equity firm KKR. (A.1133-40).
Gupta specifically focused on how financially lucra-
tive the position would be, telling Rajaratnam that he
would make a minimum of $5 million per year, and
potentially $15 to $20 million, if not more. (A.1138-
39).

### 2.  Gupta's Inside Tips to Rajaratnam

Gupta's and Rajaratnam's close personal and pro-
fessional relationship—showcased during the record-
ed July 29 call—also encompassed an illegal conspir-
acy to engage in securities fraud. Specifically, in

8

2007, 2008, and 2009, Gupta repeatedly tipped Raja-
ratnam with material inside information so that Ra-
jaratnam could use the information to make securi-
ties trades. Five of those trades became the basis of
the five substantive securities fraud counts charged
in the Indictment. The jury found Gupta guilty on
three of those counts—relating to two trades in
Goldman stock on September 23, 2008 and another
trade in Goldman stock on October 24, 2008—as well
as on the Indictment's conspiracy count. Overall, as
Judge Rakoff subsequently remarked, the Govern-
ment's proof established Gupta's guilt not only be-
yond a reasonable doubt, but to a "virtual certainty."
(A.1635).

### a. The September 23, 2008 Trades (Counts Three and Four)

On September 23, 2008, in the midst of the finan-
cial crisis, Goldman arranged for a $5 billion invest-
ment by Warren Buffett. A substantial investment
from someone of Buffett's stature and reputation was
expected to provide a huge boost for the company's
stock. (Tr. 496, 1590, 1610). The deal was negotiated
over that one day and was known only to a small
group of the most senior executives at Goldman.
(Tr. 499-511, 2055-57).

A special telephonic meeting of Goldman's board
was convened in the afternoon to consider the trans-
action. (Tr. 511-13, 2056-58). Gupta participated in
the call from approximately 3:13 p.m. to 3:53 p.m.
(A.1157, 1221, 1462). During the call, the board ap-
proved the confidential transaction, which would not

9

be announced to the public until that evening. (A.1221; Tr. 517-18).

Immediately after the call ended, Gupta illegally tipped Rajaratnam about the Buffett transaction. At 3:54 p.m.—just minutes before the stock market's 4:00 p.m. close—Gupta called Rajaratnam's Galleon office. (A.1157, 1159; GX 628-A; Tr. 180, 251-53, 664-65, 683). Phone records showed that this call from Gupta (which ended just shy of 3:56 p.m.) was the only call to Rajaratnam's direct line in the entire hour before the market closed. (A.1159; GX 628-A). Rajaratnam's secretary, Caryn Eisenberg, testified that the caller said it was urgent that he speak to Rajaratnam and that she put him through because he was on a short list of "important people" whose calls Rajaratnam would take during the last 30 minutes of the trading day. (Tr. 209-14, 238-39). Eisenberg told the jury that she saw Rajaratnam speak briefly with this urgent caller (Tr. 253-54), following which she saw Rajaratnam talk to Galleon co-founder Gary Rosenbach, and then, immediately after that, overheard Rosenbach on the phone ordering Goldman stock. (Tr. 254-55).

Galleon trader Ananth Muniyappa, a witness at trial, shed more light on what happened in the minutes between Gupta's call and the end of the trading day. Muniyappa testified that either while Rajaratnam was still on the phone or just after he had finished the call in question, Rajaratnam urgently instructed Muniyappa to purchase 100,000 shares of Goldman stock. (Tr. 378-80). Muniyappa immediately contacted a broker to execute the trade. (Tr. 380-81).

10

Trading records showed that Muniyappa's order was placed just 63 seconds after Rajaratnam's call with Gupta ended. (GX 53).

Muniyappa testified that the broker initially could fill only 40,000 shares of the order. (Tr. 381). When Muniyappa quickly reported this back to Rajaratnam, Rajaratnam turned to Rosenbach and directed him to purchase more Goldman stock for him. (Tr. 381, 388-93). Just 68 seconds after Muniyappa's order, Rosenbach ordered 250,000 more shares of Goldman stock. (GX 53). Rosenbach was able to secure only 200,000 shares—150,000 for Rajaratnam's portfolio and 50,000 for Rosenbach's portfolio (Tr. 388-93, 402)—but also purchased for Rajaratnam and himself 1.5 million shares of a financial sector index fund that included Goldman stock among its holdings. (Tr. 403-05, 2889-90).

In total, with less than five minutes remaining between the conversation with Gupta and the close of the market, Rajaratnam ordered approximately $43 million of Goldman stock. (GX 53). Eisenberg testified that after the close of the market, Rosenbach returned to Rajaratnam's office and Rajaratnam was smiling. (Tr. 254-59).

At 6:09 p.m., Gupta received an email from Goldman attaching the press release that announced to the public the Buffett transaction. (A.1226-27). Minutes later, using the blackberry on which he received the email (Tr. 639; GX 650-B), Gupta made three quick attempts to reach Rajaratnam, calling his direct line, his cell phone, and his secretary's phone. (Tr. 2299-2300; GX 601; A.1157-58).

11

When the market opened for trading the next morning, Goldman's stock price surged and Rajaratnam sold for a profit all of the Goldman shares that he had purchased the previous afternoon. (Tr. 2359; GX 55). The last-minute purchases of Goldman stock on September 23 resulted in an overnight profit of more than $1 million. (Tr. 2304).

On this same morning in which he was raking in his illegal profits, Rajaratnam discussed his crime in two recorded calls with Ian Horowitz—Rajaratnam's principal trader and the head trader at Galleon (Tr. 205, 361-62)—corroborating in his own words the testimony of Muniyappa and Eisenberg and the other evidence showing what had transpired the prior afternoon. (A.1142-50). During the first of the two calls with Horowitz—who had not been present for the previous day's events (Tr. 379)—Rajaratnam referenced the "big drama" of the prior afternoon, and told Horowitz that he had received a call "at 3:58" "saying something good might happen to Goldman." (A.1142-43). Rajaratnam continued: "I told Ananth [Muniyappa] to buy some, he was f—ing around, he can't, you know. So I went to Gary [Rosenbach] and say just buy me, right? Because you were not there." (A.1143). Similarly, during the second call, Rajaratnam told Horowitz that he "got a call, right, saying something good's gonna happen" (A.1148), and that because Horowitz had not been there to place any trades, Rajaratnam had "asked Ananth to buy some" and then "went to Gary." (A.1149).

Rajaratnam also talked to Horowitz about the reaction of another Galleon portfolio manager—Leon

12

Shaulov—to these events. (A.1149). Rajaratnam told Horowitz that Shaulov should not be upset that he did not receive this tip because there had been no time to share it, and because Rajaratnam always shared inside information with Shaulov, including inside information about AMD. (A.1149). Rajaratnam explained that "at 3:58, I can't, I can't yell out in the f—ing halls." (A.1149). During the call, Horowitz repeatedly urged Rajaratnam to stop having the conversation over the phone and to wait until Rajaratnam got to the office so they could talk in person instead. (A.1149).

The jury convicted Gupta of the two substantive securities fraud counts that related to the September 23, 2008 Goldman trades—one count relating to the trades by Muniyappa and one count relating to the trades by Rosenbach.

### b. The October 24, 2008 Trades (Count Five)

On October 23, 2008, approximately eight weeks into the company's fourth quarter, Goldman's CEO convened a call to alert the board that Goldman was losing money for the quarter; something it had never before done in its entire history as a public company. (Tr. 2060-62). The significance of this bad news was magnified because while Goldman was losing nearly $2 per share for the quarter, the consensus estimate among Wall Street analysts was that Goldman would earn a quarterly *profit* of almost $2.50 per share. (Tr. 2060-62; A.1182). The board call took place shortly after the close of the market on October 23 and

13

lasted about 30 minutes (Tr. 692; A.1235), during which the board was given the bad news and a "rough estimate" of the loss. (Tr. 927-30, 2061).

Immediately after the call ended, Gupta illegally tipped Rajaratnam about Goldman's undisclosed losses. Just 23 seconds after disconnecting from the board call, Gupta called Rajaratnam, and the two men spoke for approximately 12 minutes. (Tr. 2351, 692-93; A.1160). The next morning, just one minute after the market opened for trading, Rajaratnam began dumping all of his Goldman stock, thereby avoiding losses of approximately $3.8 million. (Tr. 2353-54; GX 59, 60).

That afternoon, in a wiretapped call, Rajaratnam spoke with David Lau, a portfolio manager based in Singapore for Galleon International—the Galleon entity of which Gupta was chairman and in which he held an ownership interest. During the call, Rajaratnam provided his views on the market, gave Lau specific trading recommendations, and then told Lau: "I heard yesterday from somebody who's on the board of Goldman Sachs, that they are gonna lose $2 per share. The Street has them making $2.50." (A.1152-53). Continuing to discuss Goldman's non-public earnings information, Rajaratnam added: "So what he was telling me was that, uh, Goldman, the quarter's pretty bad. They have zero revenues because their trading revenues are offset by asset losses, and to date they have lost $2 per share." (A.1153). Rajaratnam told Lau that he did not think this information was "built into Goldman Sachs' stock price" and that he planned to "whack," or short, the stock if

14

the price reached $105. (A.1153). Finally, Rajaratnam
advised Lau, "I don't think it makes sense to take
longer term views right now." (A.1153).

The jury convicted Gupta of one substantive secu-
rities fraud count relating to this October 23, 2008 tip
by Gupta to Rajaratnam.

### c.    Gupta's Other Goldman and P&G Tips

Gupta's tips on September 23 and October 23,
2008 shared a pattern with his tips throughout the
period of the conspiracy. Specifically, all of Gupta's
tips to Rajaratnam related to material inside infor-
mation that Gupta learned while serving on the
boards of either Goldman (which he joined in late
2006) or P&G (which he joined in June 2007). Evi-
dence of these other tips was offered as proof of the
overall conspiracy, and—with respect to two of the
tips—as proof of two substantive securities fraud
counts on which the jury acquitted Gupta.

### i.    Gupta's March 2007 Goldman Tip (Count Two)

On March 12, 2007, Gupta participated in a tele-
phonic meeting of the Goldman audit committee dur-
ing which the committee reviewed an announcement
planned for the following day revealing record earn-
ings that far exceeded Wall Street's expectations.
(A.1164, 1213, 1236). Gupta participated in the call
from Galleon's office, just prior to a scheduled meet-
ing with Rajaratnam. (GX 3509-R; A.1161, 1397).
Gupta immediately tipped Rajaratnam. Less than

15

half an hour after Gupta disconnected from the call, Rajaratnam directed Horowitz to purchase 200,000 shares of Goldman stock (A.1259), and, over the course of that afternoon, accumulated what was, at the time, his largest ever position in Goldman. (A.1162-63, 1174-75; GX 100). The jury acquitted Gupta of the substantive count relating to this trade.

### ii.    Gupta's September 2007 Goldman Tip

On September 17 and 18, Gupta participated in Goldman board meetings that included a review of the upcoming announcement, scheduled for September 20, 2007, that Goldman's third-quarter earnings had beaten consensus estimates by more than 40%. (GX 70, 223, 224). In the late afternoon of September 18, after the market had closed for the day, Gupta spoke to Rajaratnam and tipped him about the still confidential news. (GX 66). When the market opened for trading the following morning, Rajaratnam began buying what would, over the course of the day's trading, total approximately $164 million worth of Goldman stock—his largest position ever in Goldman stock. (Tr. 2370-72; GX 67, 100; A.1165).

### iii.    Gupta's June 2008 P&G Tip

On June 2, 2008, Gupta participated by telephone in a special meeting of the P&G board to approve the sale of P&G's Folgers coffee business to Smucker's. (GX 1256). Approximately 45 minutes after the call ended, Gupta called Rajaratnam and tipped him

16

about the transaction.[3] (A.1168). Just eight minutes later, Rajaratnam's brother—Galleon portfolio manager RK Rajaratnam—began purchasing Smucker's stock. (Tr. 1200-01; GX 77). RK Rajaratnam's purchases that day accounted for 25% of all trading volume in Smucker's stock and represented RK Rajaratnam's largest position in Smucker's stock up to that point. (Tr. 1204-05).

Early the next morning, RK Rajaratnam sent an instant message to his trader, Michael Cardillo, directing him to purchase additional Smucker's stock and to "stop by for [the] story." (GX 1704; Tr. 1207). RK Rajaratnam told Cardillo that P&G was selling Folgers to Smucker's and that the information had come from "Raj's guy at P&G." (Tr. 1192).

_____

   [3]  Although the call was from an unassigned phone number at McKinsey's Stamford, Connecticut office, the circumstantial evidence demonstrated that Gupta (who worked in that office) made the call. The unassigned number had been used, for example, to call Gupta's home, as well as Rajaratnam's office (Tr. 2393-94), and a memo pad kept by Rajaratnam's secretary noted a call from Gupta around the same time as an incoming call from that unassigned number. (*Compare* GX 2505-R *with* GX 629; *see* Tr. 2396). Although Gupta argued below that Kumar could have made the calls to Galleon, it is clear that he did not—on the day of the tip in June 2008, Kumar was in California. (Tr. 1791-92).

17

On the basis of that inside information, Cardillo
made his first ever purchase of Smucker's stock for
the Galleon portfolio he managed. (Tr. 1191-93). P&G
publicly announced the sale of Folgers to Smucker's
the following day. (Tr. 751-52).

### iv.    Gupta's June 2008 Goldman Tip

On June 10, 2008, Gupta learned from Goldman's
CEO that Goldman's quarterly earnings, which would
be announced about a week later, exceeded Wall
Street's expectations. (A.1166-67; GX 278; Tr. 2038-
44, 2472-79). Later that night, Gupta called Raja-
ratnam and provided this tip. (A.1166). The next day,
Rajaratnam purchased Goldman call options, and in
the days leading up to Goldman's positive earnings
announcement on June 17, he purchased additional
shares of Goldman stock. (GX 74, 75).

### v.    Gupta's December 2008 P&G Tip

On December 9, 2008, Gupta was informed at a
P&G board meeting in Cincinnati, Ohio, that P&G
planned to disclose later in the week that it would
miss its sales growth target for the first time in six
years. (Tr. 1115-20). The next day, Gupta met Raja-
ratnam for lunch at Galleon's office and tipped him
on this news. (GX 3607-R; A.1398). Shortly after that
lunch ended, Rajaratnam began shorting P&G stock
—a stock Rajaratnam only rarely traded. (A.1171;
GX 101). P&G made its public announcement a day
later. (Tr. 1120-22).

18

### vi.   Gupta's January 2009 P&G Tip (Count Six)

On January 29, 2009, while in Davos, Switzerland, Gupta participated in a telephonic meeting of the P&G audit committee. (A.1172, 1258). The committee discussed the company's plans to announce its earnings the following day, including the news that the company expected its organic sales to be below previous guidance. (Tr. 1129-31). Later that same day, Gupta called Rajaratnam from Davos and tipped him on the news. (A.1172). Thereafter, RK Rajaratnam and Cardillo began shorting P&G stock. (A.1173). RK Rajaratnam told Cardillo that the company's organic sales would be lower than expected and that the information "was coming from Raj's guy on the P&G board." (Tr. 1046). The jury acquitted on the substantive count relating to this insider trade.

## B.   The Defense Case

Gupta called six character witnesses familiar with him from various philanthropic endeavors who testified, among other things, that he was an honest, truthful, and honorable man. Gupta also called his daughter, Geetanjali Gupta, to testify about statements that Gupta had made to her, including that Gupta was upset with Rajaratnam over the way Rajaratnam had treated the Voyager investment. Gupta's friend, Ajit Jain, testified that Gupta told him in January 2009 that Rajaratnam had "swindled" him and that Gupta had lost his entire investment in Voyager. Finally, Gupta called Richard Schutte, a former chief operating officer of Galleon's domestic

19

business, to testify about Galleon's relationship with
Goldman and the role of analysts at Galleon.

## C. Sentencing

On October 26, 2012, the District Court sentenced
Gupta principally to 24 months' imprisonment. The
Court found that the Government had proven Gupta's
guilt to a "virtual certainty" and characterized Gup-
ta's conduct as "brazen" and the "functional equiva-
lent of stabbing Goldman in the back." (A.1635). On
the question of why Gupta had done so, the Court ob-
served:

> Rajaratnam, a clever cultivator of per-
> sons with information, repeatedly held
> out prospects of exciting new interna-
> tional business opportunities that Raja-
> ratnam would help fund but that Gupta
> would lead. There is also in some of the
> information presented to the Court un-
> der seal an implicit suggestion that, af-
> ter so many years of assuming the role
> of father to all, Gupta may have longed
> to escape the straightjacket of over-
> whelming responsibility, and had begun
> to loosen his self-restraint in ways that
> clouded his judgment. But whatever was
> operating in the recesses of his brain,
> there is no doubt that Gupta, though not
> immediately profiting from tipping Ra-
> jaratnam, viewed it as an avenue to fu-
> ture benefits, opportunities, and even
> excitement.

20

(A.1636).

## **A R G U M E N T**

Rajat Gupta was convicted after a fair trial conducted by a thoughtful and experienced district judge. During that lengthy trial, he was the beneficiary of numerous contested evidentiary decisions.[4] On appeal, however, he identifies a handful of carefully considered evidentiary decisions that the trial judge decided in the Government's favor, and strings them together in an effort to assert, in effect, that the trial was rigged against him.

The picture Gupta tries to paint is an illusion. The District Court properly and fairly exercised its discretion throughout the trial, including in each of the instances Gupta chooses to call to this Court's attention. In trying to undo the jury's verdict based on his challenges to these context-specific evidentiary rulings—decisions firmly committed to the discretion of the District Court—Gupta assumes a burden that, for good reason, is quite high. He does not carry it.

_____

[4] The District Court excluded significant evidence the Government sought to introduce (*e.g.,* Tr. 852-53, 1248-49, 1721-30, 1851, 2081-88), and admitted significant evidence at Gupta's request over the Government's objection (*e.g.,* Tr. 3065-71).

21

**POINT I**

### The District Court Properly Admitted the September 24 and October 24, 2008 Wiretapped Calls

The District Court admitted two wiretapped calls between Rajaratnam and his main trader, Ian Horowitz, on September 24, 2008, and one wiretapped call between Rajaratnam and Galleon International portfolio manager David Lau on October 24, 2008. In the September 24 calls, Rajaratnam updated Horowitz on the events of the prior afternoon, explaining that his large purchases of Goldman stock had been prompted by a call in the last few minutes of the trading day alerting him to positive news. In the October 24 call, Rajaratnam relayed to Lau that "somebody who's on the board of Goldman Sachs" had supplied him the prior day with inside information about Goldman's surprisingly negative earnings.

Judge Rakoff's findings that these conversations contained statements in furtherance of the conspiracy were correct and certainly not clearly erroneous. In any event, the statements were also admissible as statements against interest.

### A.  Applicable Law

#### 1.  Standard of Review

The trial court's evidentiary rulings are reviewed for abuse of discretion. *United States* v. *Persico*, 645 F.3d 85, 99 (2d Cir. 2011). This Court will not deem the trial judge to have abused his discretion in mak-

ing an evidentiary ruling absent the conviction that the district judge acted "in an arbitrary and irrational fashion." *United States* v. *Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001) (internal quotations omitted). Moreover, whether a statement qualifies as a co-conspirator's statement in furtherance of a conspiracy admissible under Rule 801(d)(2)(E) is a preliminary question of fact to be resolved by the district court by a preponderance of the evidence, and that determination is reviewed only for clear error. *United States* v. *Coppola*, 671 F.3d 220, 246 (2d Cir. 2012); *United States* v. *Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 137 (2d Cir. 2008). Where there are two permissible views of the evidence, the trial judge's choice between them cannot be deemed clearly erroneous. *United States* v. *Thai,* 29 F.3d 785, 814 (2d Cir. 1994).[5]

---

[5]   Although Gupta cites *United States* v. *Ferguson*, 676 F.3d 260 (2d Cir. 2011), for the proposition that "the Court reviews *de novo* the legal question '[w]hether a statement is hearsay,'" (Br. 30 (quoting *Ferguson*)), because the hearsay issues here are not pure legal questions, the standards of review applicable are clear error and abuse of discretion. Gupta and *Ferguson* both agree that a finding that a statement is "in furtherance" is subject only to review for clear error. (Br. 30-31; *United States* v. *Ferguson*, 676 F.3d at 285 n.27). And, a decision regarding whether a statement is offered for its truth or is admissible pursuant to the state of mind exception are subject to review for abuse of discretion. *See United States* v.

23

## 2. Rule 801(d)(2)(E): Co-Conspirator Statements in Furtherance of the Conspiracy

Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement under Rule 801(d)(2)(E), the district court must find only by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States* v. *Coppola*, 671 F.3d at 246 (internal quotation marks omitted).[6]

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing

————————

*Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (offered for truth); *United States* v. *Persico*, 645 F.3d at 102 (state of mind).

[6] Gupta seems to suggest that there is a special standard for construing the Rule on statements "in furtherance," based on *United States* v. *Lang*, 589 F.2d 92 (2d Cir. 1978). (Br. 31). But *Lang* only quoted certain generalities from *Weinstein's Evidence*, and as another case from the same year pointed out, *Weinstein's Evidence* itself "recognized the limited usefulness of such generalities." *United States* v. *Mangan*, 575 F.2d 32, 43 (2d Cir. 1978).

24

conspiracy. Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *United States* v. *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989).

Accordingly, a narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States* v. *Thai*, 29 F.3d at 813; *see also United States* v. *Mulder*, 273 F.3d 91, 103 (2d Cir. 2001) (narrative of past events furthered conspiracy by updating co-conspirator); *Desena*, 260 F.3d at 158 (statements to club members ridiculing defendant about his inexpert attempt to commit arson admissible because they "could be understood as informing other coconspirators about the status of the conflict between the two gangs, and perhaps as an exhortation to avoid ridicule by doing things right"); *United States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88-89 (2d Cir. 1999) (written notes about past events intended "to act as a record and as a guide to future conduct"); *United States* v. *Sim-*

25

*mons*, 923 F.2d 934, 945 (2d Cir. 1991) (narrative of past events may have encouraged cohesiveness and induced assistance); *United States* v. *Rastelli*, 870 F.2d at 837 (statements about what happened to money furthered current purposes of the conspiracy).

### 3.  Rule 804(b)(3): Statements Against Penal Interest

If a declarant is "unavailable," Rule 804(b)(3) provides an exception to the hearsay rule for statements "against interest." The rule defines a statement against interest as one that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson* v. *United States*, 512 U.S. 594, 599 (1994).

26

To satisfy Rule 804(b)(3), the proponent of the statement must show by only a preponderance of the evidence: "'(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement.'" *United States* v. *Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (quoting *United States* v. *Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983)) (alteration in original). In general, a statement is against penal interest if "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States* v. *Saget,* 377 F.3d 223, 231 (2d Cir. 2004). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context." *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007).

## B.  Discussion

Gupta does not and cannot dispute the District Court's findings that (1) there was a conspiracy and (2) its members included the declarant (Rajaratnam) and the party against whom the statements were offered (Gupta). Gupta disputes only the District Court's finding that the admitted statements were "in furtherance" of the conspiracy. That finding—which need only be made by a preponderance of the evidence and is only reviewed for clear error—was correct, and certainly not clearly erroneous. In any

27

event, Rajaratnam's statements were also admissible as statements against penal interest.[7]

### 1. Rajaratnam's Statements to Horowitz Were in Furtherance of the Conspiracy

As Judge Rakoff found, Rajaratnam's statements to one of his top lieutenants at Galleon about the "big drama" in the last few minutes of the trading day on September 23, 2008 were in furtherance of the conspiracy. Although Rajaratnam's statements described events that had taken place the prior afternoon, they plainly served a "current purpose" in the ongoing conspiracy. *Thai*, 29 F.3d at 813.

First, Rajaratnam's statements informed and updated Horowitz about the progress of the conspiracy. *See Desena*, 260 F.3d at 158; *United States* v. *Diaz*, 176 F.3d at 87; *Rastelli*, 870 F.2d at 837. The evidence showed, at least by a preponderance, that since early 2007, Gupta had been tipping Rajaratnam, and that Rajaratnam, in turn, had been enlisting the help of Horowitz to execute profitable trades in Goldman stock on the basis of Gupta's illegal tips. Rajaratnam

---

[7]    Although the District Court did not reach the question of whether the calls contained statements against interest admissible under Rule 804(b)(3) because it found that the statements were in furtherance of the conspiracy, this Court will "uphold the admission [of a statement] on any theory which finds support in the record, regardless of the ground relied on by the trial court." *United States* v. *Lieberman*, 637 F.2d 95, 103 n.11 (2d Cir. 1980).

28

made clear that he would have turned to Horowitz once again on September 23, 2008, if Horowitz had not been out of the office at the time. (A.1143, 1149).

Second, Rajaratnam's statements served to reassure Horowitz of his role in the conspiracy. *See Desena*, 260 F.3d at 158. Rajaratnam had turned to others at Galleon to make significant Goldman trades ahead of the Buffett announcement. Rajaratnam reassured Horowitz in both calls that he had not been cut out of the loop; rather, the particular circumstances of the tip had compelled Rajaratnam to rely on people other than Horowitz. (A.1143 ("Because you were not there."); A.1149 ("you were not there.")).

Third, Rajaratnam sought to induce Horowitz's assistance for further trading in connection with Gupta's inside information, *see Maldonado-Rivera*, 922 F.2d at 958, and to that end armed Horowitz with information relevant to Horowitz's subsequent sale of the Goldman stock purchased the day before. Gupta dismisses this argument, contending that Horowitz could not make use of the information since the Buffett announcement was already public. But Rajaratnam had not yet sold the stock he purchased before the Buffett announcement, and Rajaratnam's reasons for having bought the stock were relevant to Horowitz's decisions about how to sell the stock later that morning.

Gupta's assertion that Horowitz, the firm's head trader, had a "narrow function" and thus had no use for information about why trades were made is contradicted by the record. Rajaratnam in fact shared with Horowitz the details of the illegal tips that

29

prompted Horowitz's trading activity (*See* A.73-75), and the trial evidence showed that Cardillo likewise was told of RK Rajaratnam's reasons for placing trades. (Tr. 1046, 1192). Galleon's traders had to make decisions about how to execute an order, such as the pricing, timing and type of order, and were able to execute trades with varying degrees of success. (*See* Tr. 2441-44, 369-372, 381, 393). Thus, by providing this information to Horowitz on September 24, Rajaratnam equipped Horowitz to make informed decisions about selling the stock to maximize the conspiracy's profits and minimize the chances of it being detected.

Fourth, Rajaratnam's statements served to foster trust and cohesiveness among Horowitz and other Galleon co-conspirators, *see United States* v. *Farhane*, 634 F.3d 127, 162 (2d Cir. 2011), and to protect the conspiratorial activities, *see Diaz*, 176 F.3d at 88, by allaying discontent over Rajaratnam's failure to share Gupta's tip with others at Galleon in time for them to trade on it. At the time of the Buffett announcement, Leon Shaulov held a short position in financial stocks (meaning his portfolio at Galleon would profit from a *decline* in prices of financial stocks like Goldman). (Tr. 441-43). After the announcement was made, Shaulov sent an email to Rosenbach expressing his anger and frustration over Rajaratnam and Rosenbach not sharing the Goldman tip with him: "Thx for the heads up btw [by the way]. . . . Not one word from anyone. . . . Thnku [sic] very much. . . . What I give vs what I get back is disgusting. . . . Fucking bull shit." (A.1261; Tr. 438-43). Early the next morning, Rosenbach told Rajaratnam,

30

"I spoke to Leon [Shaulov] and believe I d[e]fused him." (A.1264).

During the second call with Horowitz, Rajaratnam explained that although Shaulov had been "upset," he should not be; Rajaratnam had not been able to share the tip because he received it with only a few minutes left in the trading day and, given its obvious illegality, Rajaratnam could not just "yell out" that information. (A.1149). Rajaratnam reminded Horowitz that he always shared inside information with Shaulov, including inside information about AMD.[8] (A.1149). Thus, allaying Shaulov's displeasure fostered trust and cohesiveness and served a current purpose in the ongoing Gupta conspiracy.

In light of these facts, Gupta does not come close to establishing clear error in the District Court's finding that the statements were in furtherance of the conspiracy. As an initial matter, Gupta's argument proceeds from a faulty premise—that the conspiracy alleged and proven here was a two-person conspiracy. It was not. As the indictment alleged and the evidence proved, Gupta's conspiracy reached to others at Galleon beyond Rajaratnam. The trades following Gupta's tips were not executed by Rajaratnam alone. They were also executed—with criminal intent—by Horowitz, Rosenbach, and other traders, and the in-

---

[8]    Rajaratnam received inside information about AMD from Kumar (Tr. 1777-78) and shared it with Shaulov who, in turn, traded on that information. (GX 187; Tr. 3186-88).

31

formation Gupta gave to Rajaratnam was passed on to other portfolio managers at Galleon, including Rosenbach, RK Rajaratnam and Cardillo, so that they too could illegally trade on the information for the benefit of Galleon. As alleged and proven, those traders and portfolio managers were an integral (and foreseeable to Gupta) part of the conspiracy.[9]

For this reason, Gupta's reliance on *United States* v. *McDermott*, 245 F.3d 133, 138 (2d Cir. 2001) (Br. 32, 38) is misplaced. In *McDermott*, the defendant was an investment banker who provided inside tips to his mistress, an adult film star. *Id.* at 135-36. Unbeknownst to McDermott, she was passing those tips to her other lover, a man named Pomponio. *Id.* at 136. McDermott had no reason to know of, or even to suspect, Pomponio's existence, and thus McDermott could not have been said to be in a conspiracy with Pomponio. *Id.* at 138. The Court pointed out, however, that the situation might have been different "had the trades been 'part of the ramifications of the plan which could . . . be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" *Id.* at 138 (quoting *United States* v. *Carpenter*, 791 F.2d 1024 (2d Cir. 1986)); *United States* v. *Geibel*, 369 F.3d 682, 690 (2d Cir. 2004) (remote tippee's membership in the conspiracy may be established in three

_____

[9] In admitting statements by RK Rajaratnam and Shaulov as co-conspirator statements under Rule 801(d)(2)(E), Judge Rakoff implicitly found that they were both members of the same conspiracy as Gupta (Tr. 430-40, 1069-88).

32

ways: "(1) if the scope of the trading agreement were broader 'to include trading by or for persons other than the small group of conspirators; (2) if the conspirators reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees; and (3) actual awareness of the remote tippees." (internal quotations omitted)).

In stark contrast to the mistress-tippee in *McDermott,* Rajaratnam—as Gupta well knew—ran a global hedge fund with more than $7 billion in assets under management and over one hundred employees, including more than a dozen portfolio managers responsible for managing different pools of money within Galleon, and more than a dozen traders like Horowitz whose function was to execute trades on behalf of Rajaratnam and other portfolio managers. (A.1323-29; Tr. 357-59, 1012-13; GX 2294). Whereas the tipper in *McDermott* had no basis even to *suspect* the existence of any remote tippee, Gupta was familiar with the structure and operations of Galleon—he was an investor in Galleon funds, he knowledgably made sales pitches on behalf of Galleon, and he frequently visited Rajaratnam's office, which had clear glass windows opening onto the trading desk where Horowitz and other traders sat, just feet away. (A.1459, 1390; Tr. 197-204, 178, 364-67). Thus, the other Galleon participants were not "remote" in any sense; Gupta expressly stated his desire to help Galleon, and in providing inside tips to Rajaratnam, he clearly knew (or it was reasonably foreseeable to him) that others at Galleon would execute on those tips.

33

In any event, although the evidence showed, at least by a preponderance, that Horowitz was a member of the same conspiracy as Gupta, even if he were not, Rajaratnam's statements to Horowitz still would be in furtherance of Gupta's conspiracy with Rajaratnam. As Rajaratnam's top lieutenant, Horowitz was someone to whom Rajaratnam consistently turned for assistance executing trades on the basis of illegal tips from Gupta and other inside sources. (*See* A.73-75, 1143, 1149). Execution of the trades—both before and after the inside information became public —was an essential part of the Rajaratnam-Gupta agreement, and thus there is no clear error in Judge Rakoff's finding that statements to Horowitz—which served to update him, ensure his cooperation, and provide him information useful to maximizing profits on the tips—were in furtherance of the conspiracy. *United States* v. *Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) ("communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators achieve the conspiracy's goals" satisfies the "in furtherance" requirement); *see also United States* v. *Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 139.

Gupta also claims that Rajaratnam's statements to Horowitz were not in furtherance of the conspiracy because the calls were designed to placate Leon Shaulov, not to further the conspiracy.[10] That claim is unavailing for a host of reasons.

––––––––––

[10]  Although Gupta now claims on appeal that it is "manifest" that the solitary purpose of Rajaratnam's

34

First, Shaulov is not even mentioned in the first call, so Gupta's arguments about Shaulov say nothing to undermine the admissibility of that call. Second, Judge Rakoff implicitly found that Shaulov was a participant in the conspiracy (in the context of admitting other statements by Shaulov). (Tr. 430-40). Because he was a co-conspirator—a finding that has neither been challenged on appeal nor is clearly erroneous—even if statements Rajaratnam made were solely for the purpose of placating Shaulov, they were properly admitted as furthering the conspiracy. *See Desena*, 260 F.3d at 158. Third, even if Shaulov had not been a member of the conspiracy, a statement made by Rajaratnam for the sole purpose of pacifying Shaulov on September 24, 2008 would still have been in furtherance of the conspiracy. Shaulov was aware that Galleon had traded on inside information the previous day, and was apparently angry with Rajaratnam about it. It plainly served an important current purpose of the conspiracy for Rajaratnam to make efforts to calm Shaulov and reduce the possibil-

—————————

calls to Horowitz was to placate Shaulov (Br. 38), Gupta did not identify that as even *part* of the purpose of the calls in lengthy pretrial briefing on the admissibility of these very statements, or in his argument to the jury. Nowhere in Gupta's 34-page brief on these statements did he mention Leon Shaulov. *See* Opp. to Gov't Mot. in Limine, Dkt. 65. Instead, Gupta argued that the calls did not have to do with the Buffett deal or any insider trading. *See id.* at 5, 7, 11-13.

35

ity that Shaulov would spitefully expose the crime or take other vindictive action that might injure the conspiracy. Finally, even if one purpose of the call was to pacify Shaulov, and even if that purpose did not serve a current purpose in furtherance of the Gupta conspiracy, there still is no clear error in Judge Rakoff's finding because the call also updated and informed Horowitz of the status and progress of the conspiracy.

Gupta also contends that Rajaratnam's statements to Horowitz were inadmissible because Rajaratnam's apparent desire to placate Shaulov created a motive for Rajaratnam to lie about *when* he received the Goldman tip. Thus, Gupta contends that Rajaratnam might have actually received the tip at some earlier point and merely *pretended* that he received it in the last few minutes of the trading day to excuse his failure to share the tip with Shaulov. That argument, however, defies logic and is conclusively undermined by the evidence. Even independent of the wiretaps, the evidence made clear that Rajaratnam ordered Muniyappa, and then Rosenbach, to purchase Goldman stock just minutes before the market closed, immediately after receiving the call from Gupta—and not at some earlier time. Even if Rajaratnam had some conceivable motive to mislead Shaulov about the timing of the tip, he had no motive to wait until 3:56 p.m. and 3:57 p.m. to make the trades had he actually received the tip earlier. In fact, because he placed the trades so late in the day, the brokers could not even fill the orders. Gupta also offers no plausible reason for Rajaratnam to lie to *Horowitz*—a trusted

Case: 12-4448    Document: 117    Page: 46    03/22/2013    886063    89

36

confidant with whom Rajaratnam shared inside in-
formation—in order to placate *Shaulov*.

But, in any event, a conceivable motive for Raja-
ratnam to mislead Shaulov would go to the weight
and not admissibility of the statements. Gupta was
free to argue to the jury what he now presses on ap-
peal—*i.e.*, that Rajaratnam's statements to Horowitz
should not be credited because of his purported mo-
tive to mislead Shaulov about when he received the
tip. Tellingly, Gupta elected not to do so.

## 2. Rajaratnam's Statements to Horowitz Were Independently Admissible as Statements Against Interest

Rajaratnam's statements to Horowitz were also
independently admissible as statements against pe-
nal interest, pursuant to Rule 804(b)(3).

First, Rajaratnam's statements were self-
inculpatory. A "reasonable person in [Rajaratnam's]
position," Fed. R. Evid. 804(b)(3), would have under-
stood that his statements to Horowitz on the two calls
were an obvious admission that he had committed a
serious crime. Rajaratnam well knew that his narra-
tive to Horowitz of the previous day's events—that he
had purchased shares of Goldman stock in the last
few minutes of the trading day after receiving a call
alerting him to impending positive news about Gold-
man that was then, in fact, publicly announced hours
later—was effectively a confession that he had en-
gaged in insider trading. That is particularly so given
that Rajaratnam's relationship with a Goldman board
member (Gupta) was no secret and Rajaratnam had

37

in fact spoken to Gupta the prior afternoon. In addition, a reasonable person would have recognized that his statement to Horowitz that he could not "yell out" the information he had been provided about Goldman in the "halls" of Galleon—notwithstanding that he ran the firm and Galleon was a noisy place where people frequently shouted (Tr. 200-01, 1831)—further confirms that Rajaratnam knew he was telling Horowitz about a crime he had committed. Moreover, Rajaratnam's admission to having committed insider trading the previous day was all the more obvious in the context of his simultaneous statements to Horowitz about his relationship with Shaulov—specifically, that he had kept his "mouth shut" concerning information he received from Shaulov, and had shared "everything" with Shaulov—thinly veiled references to having engaged in prior acts of insider trading. Not surprisingly, with Rajaratnam freely admitting criminal activity, Horowitz tried repeatedly to stop Rajaratnam from talking over the phone and urged Rajaratnam at least three separate times to wait and talk about it in person instead. (A.1149)[11]

As to the reliability of Rajaratnam's statements against penal interest, *see* Fed. R. Evid. 804(b)(3)(B), those statements were extensively corroborated. The

_____

[11] That Rajaratnam described his criminal conduct shamelessly does not suggest that he—or a reasonable declarant in his position—did not understand what he was admitting. Rather, it confirms that Horowitz was a co-conspirator with whom Rajaratnam felt free to discuss the conspiracy.

38

testimony of Eisenberg and Muniyappa (both of which Gupta fails even to acknowledge in his brief), as well as the phone and trading records, demonstrated—wholly independent of the wiretaps—that the events of September 23, 2008 unfolded precisely as Rajaratnam described them in the recorded calls with Horowitz. Rajaratnam did in fact receive a call (from Gupta) with minutes left in the trading day, immediately directed Muniyappa to purchase Goldman stock, and moments later, when Muniyappa informed Rajaratnam that he could not complete the order, Rajaratnam directed Rosenbach to purchase more Goldman stock for him. The statements are further corroborated by the fact that Gupta had placed that call to Rajaratnam upon concluding the board call in which the Buffett deal—"something good" that was known only to a small number of people—had been approved.

### 3. Rajaratnam's Statements to Lau Were in Furtherance of the Conspiracy

There was no clear error in Judge Rakoff's finding that Rajaratnam's statements to Galleon International portfolio manager David Lau on October 24, 2008 detailing material, nonpublic information about Goldman's surprisingly negative earnings were in furtherance of the conspiracy.

At the time of the call, Wall Street analysts expected Goldman to report a profit of almost $2.50 per share. (A.1182). Rajaratnam had learned from Gupta, however, that the company was actually *losing* nearly $2 per share. Rajaratnam shared that confidential

39

information with Lau, one of Galleon's other portfolio managers, to assist Lau in making trading decisions for Galleon International—a company that was 15% owned by Gupta.

Indeed, the context of the call belies any claim that the statements were mere "idle chatter." Lau expressly told Rajaratnam that the purpose of his call (at the height of the financial crisis) was so that Rajaratnam could help Lau "find the pulse because we are quite shocked overseas" (A.1152)—*i.e.*, to assist Lau in better understanding market conditions that would shape Lau's investment decisions for Galleon International. In response, Rajaratnam provided his views on the market and specifically recommended at least two different trades to Lau: "I think one trade in equities would be, you know, buy the Spiders and short the EEMs or something." (A.1153). Rajaratnam then shared his views on particular stock sectors ("the semi[conductor] equipment companies and the home builders are the ones that are leading the way out") (A.1153), before, in the same vein, detailing the information he had learned about Goldman's unexpectedly negative results and his plans to short Goldman stock if it reached $105.[12]

------

[12] Gupta contends that because neither Lau nor Rajaratnam shorted Goldman stock after the call, "neither viewed their conversation as a conspiratorial instruction to trade on inside information." (Br. 35). But the only exhibit Gupta cites gives no intraday pricing information and, thus, does not show whether Goldman's share price reached the $105 trigger at

40

Gupta argues that Lau could not make use of this information because Galleon International primarily invested in Asian securities. But there was no evidence that Lau could not trade Goldman stock (or other U.S. securities), as Galleon International had done on several prior occasions (each time based on a Gupta tip). (A.1178). Even within the October 24 call itself, Rajaratnam specifically suggested that Lau trade other U.S.-based securities (*e.g.*, "Spiders") and provided commentary on U.S. stocks (*e.g.*, stocks in the "home builders" sector). (A.1153).

In any event, in the midst of the financial crisis, the fact that a major global financial institution was losing money for the first time—while experts believed it would report a profit—was significant and helped to supply Lau with the "pulse" of the markets that he was seeking. In fact, after disclosing the information about Goldman to Lau, Rajaratnam expressly told Lau the overall conclusion that he drew from the Goldman news: "I don't think it makes sense to take longer term views right now." (A.1153). Although Gupta argues that there was no logical reason for Rajaratnam to share the information with Lau, there is no mystery to why Rajaratnam would want a portfolio manager within the Galleon family to derive

_____

any point *after* the mid-day call with Lau, as Gupta baldly asserts. (Br. 35; A.801, 1480). In fact, Goldman's stock did *not* reach $105 after the call with Lau—a point the Government easily would have established had Gupta pressed this factually inaccurate claim below.

41

a trading advantage from this illegally obtained
knowledge—and no mystery to why Gupta would
want the same in light of his 15% interest in the enti-
ty for which Lau traded. In fact, Rajaratnam had on
several prior occasions steered Gupta's Goldman tips
to Galleon International so that it could reap some of
the profits from the inside trades. (A.1178).

## 4. Rajaratnam's Statements to Lau Were Independently Admissible as Statements Against Interest

Rajaratnam's statements to Lau in the October
24, 2008 call were also admissible as statements
against interest under Rule 804(b)(3).

First, Rajaratnam's statements were clearly self-
inculpatory. Even standing alone, Rajaratnam's
statements established nearly every element of the
crime of insider trading. Rajaratnam acknowledged
that: (1) he learned that Goldman was "gonna lose $2
per share" from an insider ("somebody who's on the
board of Goldman Sachs"); (2) the information was
nonpublic ("the Street has them making $2.50"); (3)
the information was material ("I don't think that's
built into Goldman Sachs' stock price"); and (4) Raja-
ratnam planned to trade on that information by
"whack[ing]" (shorting) Goldman stock if the stock
price got "to $105."

Second, Rajaratnam's statements during his con-
versation with Lau are supported by corroborating
circumstances that clearly indicate their trustworthi-
ness. Rajaratnam's reports of Goldman's perfor-
mance, Wall Street's expectations, and the reasons

42

for that performance were all accurate. (Tr. 2504-10, 2678-79; A.1182, 1228-33). On top of that, phone records established that on the preceding day, just 23 seconds after Gupta finished the Goldman board call in which he was informed that Goldman was losing approximately $2 per share, Gupta called Rajaratnam and the two men spoke for approximately 12 minutes.

Gupta argues that the statements are unreliable because, according to Gupta, Rajaratnam had some theoretical motive to lie to Lau about the source of this inside information. Gupta's argument, however, is not supported by logic or the evidence.

Gupta makes the nonsensical claim that Rajaratnam—the founder and head of Galleon—was motivated to lie about the source of the inside information in order to impress his subordinate Lau. Gupta does not explain why, if Rajaratnam had received such closely-guarded inside information from some other source (no doubt equally highly-placed), he would need to falsely attribute it to an unnamed board member to impress Lau. Nor is there a plausible reason why Rajaratnam would have to lie about the *timing* of having received that information. Rajaratnam told Lau he had learned the information "yesterday"—the day when, unbeknownst to Lau, Rajaratnam had spoken to Gupta.

Gupta asserts that "Rajaratnam was prone to false and exaggerated claims about his status and connections," and characterizes Rajaratnam as a "known fabulist" with a "known history of exaggeration." (Br. 3, 28, 41). But remarkably, the defendant

43

cites only trial testimony in which cooperating witness Michael Cardillo, a Galleon trader and portfolio manager, actually testified on cross-examination that it was "rare" for people at Galleon to lie about having sources. (A.529). And significantly, neither Cardillo nor anyone else testified that Rajaratnam falsely attributed his inside information to someone other than the true source, much less that he was "prone" to doing so. Among the hundreds of conversations captured during the eight months of wiretaps on Rajaratnam's phone, Gupta never identified any showing that Rajaratnam was anything but truthful when discussing inside information with Galleon colleagues, including specifically with David Lau. (*See, e.g.,* A.84-85 & n.14, 73-75; Tr. 1372-73).

In any event, because the statements were plainly against Rajaratnam's interest and were certainly sufficiently corroborated to satisfy Rule 804(b)(3), Gupta's argument about Rajaratnam's supposed motive to impress Lau is one properly addressed to the jury. *See United States* v. *Paguio*, 114 F.3d 928, 933 (9th Cir. 1997) ("[I]t was up to the jury to decide whether the [defendant's] father's statement against penal interest was motivated by truthfulness or a noble motive to lie [in order to exonerate his son]."). The jury simply rejected that argument.

## POINT II

## No Basis Exists for Suppression of the Wiretaps

Adopting the arguments advanced by Raj Rajaratnam in the appeal of his criminal conviction currently pending before a different panel of this Court,

44

*see United States* v. *Rajaratnam*, No. 11-4416, Gupta argues that Title III and the Fourth Amendment require suppression of the wiretaps on Rajaratnam's cellular phone. Gupta's argument lacks merit.

The Government adopts, in full, the arguments set forth in its brief in the *Rajaratnam* appeal,[13] which demonstrate that, consistent with the findings below of both the Honorable Richard J. Holwell, United States District Judge (in the *Rajaratnam* case), and Judge Rakoff (in this case), any omissions from the original wiretap application do not warrant suppression.

Additionally, even if a panel of this Court were to reject those arguments in the context of the *Rajaratnam* appeal, this Court should nonetheless reject Gupta's claims with respect to the September 24 and October 24 calls. By statute, only an "aggrieved person" may challenge the sufficiency of a Title III application. 18 U.S.C. § 2518(10). An "aggrieved person" is any "person who was a party to any intercepted wire . . . or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Where the defendant was neither the target of the wire, nor a participant in the recorded conversation, the defendant is not an "aggrieved person" and cannot challenge the wire because the statute "is . . . construed in accordance with standing requirements usually applied to suppression

---

[13] The relevant arguments appear on pages 12-67 of that brief.

45

claims under the fourth amendment." *United States* v. *Gallo*, 863 F.2d 185, 192 (2d Cir. 1988).

Here, there is no dispute that Gupta lacks standing to challenge the admission of the wiretapped calls in which he did not participate. (*E.g.*, Br. 42 n.7). Instead, Gupta relies on this Court's opinion in *United States* v. *Garcia*, 882 F.2d 699, 701-02 (2d Cir. 1989), for the proposition that the Government waived any challenge to standing by not pressing the issue below. The argument—based on a misreading of *Garcia*—is incorrect.

In *Garcia*, the suppression issue on appeal turned principally on a *factual* issue, namely whether the defendant had sufficient connections to an apartment to have a reasonable expectation of privacy as to it. Noting that the Government had failed to request a factual hearing on that issue or develop a factual record below, the Court declined to engage in that exercise for the first time on appeal. *United States* v. *Garcia*, 882 F.2d at 701-02; *see also id.* (citing *Steagald* v. *United States*, 451 U.S. 204, 209 (1981) for proposition that "*factual question* of whether defendant had reasonable expectation of privacy in the searched dwelling [was] waived by government because it 'failed to raise such questions in a timely fashion during the litigation'" (emphasis added)).

Here there is no need for factual development of the record relating to Gupta's standing to challenge wiretapped calls on which he was not captured, and thus *Garcia* does not apply. Rather, the question here "focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on

46

any theoretically separate, but invariably intertwined concept of standing," *Rakas* v. *Illinois*, 439 U.S. 128, 139 (1978). Since it is indisputable that Gupta was not a participant in the September 24 and October 24 calls, it is also clear that he had no Fourth Amendment or Title III rights that could be vindicated through suppression. *See, e.g.*, *United States* v. *Gallo*, 863 F.2d at 192; *United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991).

## POINT III

### The District Court Did Not Abuse its Discretion in Excluding a Portion of the Testimony of Gupta's Daughter

The few limits placed on Gupta's daughter's testimony were modest and well within the District Court's discretion. Accordingly, Gupta's argument to the contrary should be rejected.

### A.   Relevant Facts

Gupta's joint investment with Rajaratnam in Voyager initially performed exceedingly well (A.1438), but the value of the fund plummeted during the financial crisis in the fall of 2008. (Tr. 2134-35, 1858-61). Gupta was unhappy about the performance of Voyager and the potential loss of his entire $10 million investment. (Tr. 1858-63). Anil Kumar testified that Gupta told him in mid-to-late October 2008 that Rajaratnam had mismanaged the Voyager fund and that Rajaratnam had "a moral and ethical responsibility to make [him] whole." (Tr. 1860). The Government argued that part of the reason Gupta

47

tipped Rajaratnam on September 23 and October 23, 2008 was to incentivize Rajaratnam to make Gupta whole on his Voyager losses. (Tr. 3342).

In addition, and initially unbeknownst to Gupta, before Voyager's decline in value, Rajaratnam had unilaterally redeemed approximately $25 million of equity from Voyager. (Tr. 1862-63, 2140). Rajaratnam had done so in order to effectuate a change in his and Gupta's respective ownership stakes after Gupta exercised an option to purchase an additional 10% interest in the Voyager fund. (A.1441). Judge Rakoff permitted the defense (over the Government's objection) to introduce an October 2, 2008 wiretapped conversation between Rajaratnam and a Galleon colleague in which Rajaratnam stated, in apparent reference to Gupta and Voyager, "I didn't tell him that I took that equity out." (A.1603; Tr. 3065-69). Judge Rakoff also permitted Gupta to elicit testimony from a friend that Gupta told him in January 2009 that Rajaratnam had "swindled" him and that Gupta had lost his entire investment in Voyager. (A.1071).

Gupta also sought to show that by September 23, 2008 (the date of the Buffett tip), he had received notice that Rajaratnam had taken equity out of Voyager. (Tr. 2971-72). Gupta had repeatedly asserted—until the final day of evidence—that he would call Gregory Orman, his friend and financial advisor, to testify. (Tr. 1499, 2822, 2976, 3072). Orman claimed that he communicated to Gupta around the summer of 2008 that Rajaratnam had taken money out of Voyager. (Tr. 3072-73). Other evidence flatly contradicted this account, and demonstrated that Gupta

48

first learned of the redemptions much later than Orman claimed. (Gov't Ltr. Br. in Opp., Dkt. 139, at 2-3; Tr. 1842-43). Nevertheless, Orman's testimony would have been non-hearsay evidence about Gupta's receiving notice of the withdrawals.

Despite Orman's availability as a witness, Gupta sought to establish his timeline of events by calling his daughter, Geetanjali Gupta ("Geetanjali"), and seeking to elicit from her Gupta's own statements in order to establish the timing of the disputed notice. (Tr. 3077-83). Among other things, Gupta sought to elicit from Geetanjali that"[Gupta] told her that he lost his money with Rajaratnam and that Rajaratnam had taken money out of the fund." (Tr. 2972). Unlike Orman, Geetanjali had no first-hand knowledge of the Voyager fund or when and how Gupta learned of Rajaratnam's alleged redemption. (Tr. 2077-83). Instead, her proffered testimony was based entirely on hearsay statements by her father. (*Id.*)

After receiving briefing from the parties, the District Court stated that it was inclined to preclude Geetanjali's testimony because it would be cumulative of other testimony and would be "extremely difficult for the jury not to treat it as truthful, the underlying statements of Mr. Gupta despite the hearsay problem and not to give it any weight that would be prejudicial given that she has virtually no knowledge of any of the underlying circumstances or relevance of it." (Tr. 3072). The District Court then questioned Geetanjali outside the jury's presence about the four conversations she had with her father about Voyager.

49

Geetanjali testified that in the first conversation, Gupta relayed that he was "upset about Voyager" and "worried about the performance of the fund and that he was frustrated that he couldn't get information from Raj about it." (Tr. 3079). She also testified that Gupta told her that he was "angry that Raj had taken money out of the fund without telling him and that he thought that—he didn't understand why he had taken the money out of the fund, and why if he had taken money out of the fund, he had not gotten any of it." (*Id.*). Geetanjali then recounted an October 10, 2008 conversation she had with Gupta in which Gupta told her that he was "still having difficulty getting information." (Tr. 3081). She also testified about a Thanksgiving conversation in which Gupta "was very upset about [Voyager]" and discussed suing Rajaratnam. (Tr. 3081).

Based on this testimony, the District Court again expressed concern that the content of the conversation would be taken for its truth. (Tr. 3084). As a result, Judge Rakoff explained, Geetanjali's testimony "carries a danger here that no other witness carries for the reasons . . . already elaborated on the record." (Tr. 3086). The District Court also recognized that "what is going on as a tactical matter here" is "troubling" because the "person with knowledge [Orman] . . . is not taking the stand even though he was available." (Tr. 3089). Nevertheless, the District Court permitted Geetanjali to testify before the jury as follows:

- On September 20, 2008, the following occurred: (a) Gupta expressed "signifi-

50

cant concern" about his investment in
Voyager; (b) Gupta "was upset. He was
stressed. . . . He was quite upset. He's
normally a very calm and collected per-
son."; and (c) Gupta was upset "more be-
cause of how Mr. Rajaratnam was treat-
ing the investment" than because of how
the investment was performing.
(Tr. 3094).

- On October 10, 2008, Gupta told Geetan-
  jali that "he was still having difficulty
  getting information from Mr. Raja-
  ratnam. He was very frustrated about it.
  And he was still very upset about the
  money." (Tr. 3095).

- On October 29, 2008, Geetanjali emailed
  Gupta a question about the problems he
  was having with the Voyager fund, ask-
  ing Gupta "[h]ow bad are things with
  the Raj fund?" (Tr. 3098).

- In November 2008, "there was quite a
  bit of conversation over Thanksgiving
  about Voyager. My father was quite dif-
  ferent from his normal self. He was
  quite depressed and withdrawn about it.
  He was upset about the Voyager invest-
  ment. At that point the family knew that
  he had lost all of his money." (Tr. 3100).

In the end, the District Court imposed only one
limit on Geetanjali's testimony—she was not permit-
ted to testify that Gupta told her that Rajaratnam

51

had taken money out of Voyager without telling him. Nonetheless, in his summation, Gupta cited Geetanjali's testimony as evidence that it made no sense for him to tip Rajaratnam in September and October 2008 because he was angry with Rajaratnam about Rajaratnam's treatment of Voyager, which Gupta argued related to Rajaratnam secretly removing $25 million from the fund. (Tr. 3271-74; 3259-60).

## B.   Applicable Law

Rule 403 of the Federal Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. This Court grants great deference to the District Court's balancing under Rule 403, *United States* v. *Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012), and it will only overturn that balancing if it determines that the judge acted arbitrarily or irrationally, *United States* v. *Mercado*, 573 F.3d 138, 141 (2d Cir. 2009). This considerable deference reflects the recognition that, in the context of Rule 403 determinations, trial courts are in the best position to evaluate the impact of disputed evidence upon the jurors. *See Constantino* v. *Herzog*, 203 F.3d 164, 173 (2d Cir. 2000) ("Because the trial judge is in the best position to evaluate the evidence and its effect on the jury, his Rule 403 rulings are entitled to considerable deference and will not be overturned absent a clear abuse of discretion.").

52

Rule 803(3) of the Federal Rules of Evidence recognizes a hearsay exception in limited circumstances for

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3).

As this Court has recognized, there are limits to state-of-mind testimony offered by criminal defendants. For instance, in *United States* v. *Cardascia*, 951 F.2d 474 (2d Cir. 1991), this Court considered a defendant's request to admit his resignation letter to the bank in a prosecution for bank fraud. *Id.* at 486. The defense argued that the letter was a statement evidencing the defendant's then-existing state of mind. The Court disagreed and noted that admitting the resignation letter would effectively allow "one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." *Id.* at 487.

*United States* v. *O'Connor*, 650 F.3d 839 (2d Cir. 2011), clearly illustrates the point. There, this Court held that a portion of a note written by a sexual abuse victim was admissible under Rule 803(3), while

53

another portion was not (although it was admitted as a prior consistent statement of the declarant, who testified). The note read: "I hate my mother. She used me." *Id.* at 862. The Court explained that the statement "I hate my mother" was classic state-of-mind evidence contemplated by the rule. However, the victim's elaboration of why she hated her mother—because "[s]he used me"—was not. *Id.* Accordingly, this Court has distinguished core (and permissible) state-of-mind evidence from statements about an event that gave rise to the state of mind.

## C. Discussion

There was nothing arbitrary or irrational in the District Court's rulings regarding the 403 limits to Geetanjali's testimony. Indeed, despite the "troubling" tactics at work in the defense's attempt to elicit evidence from Geetanjali rather than Orman, and unfair prejudice that resulted from those tactics, Judge Rakoff largely permitted Geetanjali to testify about Gupta's out-of-court statements about Voyager, with the result that Gupta relied heavily on Geetanjali's testimony in his summation to make the argument he now claims was thwarted.

Gupta's argument effectively centers on the hair's breadth of difference between the statement that the District Court properly precluded Geetanjali from putting before the jury—that Gupta was "angry that Raj had taken money out of the fund without telling him" (Tr. 3079)—and the one that she was able to offer anyway—that Gupta was "upset" "because of how Mr. Rajaratnam was treating the investment"

54

(Tr. 3094).[14] As noted, the key issue in dispute was *when* Gupta was notified about Rajaratnam's withdrawals from Voyager. Rather than calling Orman (who purportedly communicated information to Gupta about the withdrawals) or testifying himself, Gupta attempted to elicit this statement from his daughter in order to "provide an inference of the happening of an event"—the notice to Gupta—"that produced the state of mind." *United States* v. *Cardascia*, 951 F.2d at 487. Thus, just as in *O'Connor*, the statement "[H]e was angry" is core state-of-mind testimony (and a fact to which Geetanjali was permitted to, and effectively did, testify) while the remainder of the sentence—"that Raj had taken money out of the fund without telling him"—is not (even though Geetanjali ultimately did offer something remarkably similar). *See United States* v. *O'Connor*, 650 F.3d at 862.

In any event, even if it could be said to be an abuse of discretion to exclude this statement pursuant to Rule 403, any error would be harmless. In summation, the defense quoted Geetanjali's statement that Gupta was more upset about how Rajaratnam was treating the investment than about the loss of money, and used that testimony, in combination with the October 2, 2008 recording in which Ra-

───────────

[14] It is worth noting that Geetanjali's testimony at trial that Gupta was "upset" differed from her testimony to Judge Rakoff that Gupta was "angry" only because that is how she elected to answer the question in front of the jury. Nothing prevented her from telling the jury that Gupta was "angry."

jaratnam said he did not tell Gupta about removing the equity, to argue that Gupta was referring to Rajaratnam's removal of the $25 million and that, under those circumstances, Gupta would not have favored Rajaratnam with insider tips. (Tr. 3271-74, 3259-60). In other words, it is clear that Gupta's defense was not "crippled" as he now claims (Br. 48), but rather he obtained enough from Geetanjali to make his argument, and chose as a tactical matter not to present through Orman or his own testimony non-hearsay evidence that would seek to prove the same point.[15] Under these circumstances, and in light of the overwhelming evidence that (regardless of his feelings about Rajaratnam and Voyager) Gupta illegally tipped Rajaratnam in September 2008 and again in October 2008, any error was harmless.

———————

[15] Of course, Gupta's own actions belied his claim that his relationship with Rajaratnam had so deteriorated by September 2008 that he would not have been motivated to help him. In October 2008, Gupta left Rajaratnam a friendly voice mail saying "I know it must be an awful and busy week. I hope you are holding up well. Uh, and I'll, uh, try to give you a call over the weekend to just catch up. Uh, all the best to you, talk to you soon." (A.1151). In January 2009, Gupta sent Rajaratnam an email wishing him a "Happy New Year," forwarding information about someone Gupta thought could benefit Galleon International, and concluding, "Let's catch up soon." (A.1445).

56

## POINT IV

### The District Court Properly Excluded a Portion of Handwritten Notes Concerning the Gupta Family's Estate Planning

The District Court acted well within its discretion in excluding as hearsay, and pursuant to Rules 403 and 106, a cryptic set of handwritten notes relating to the Gupta family's evolving and on-going estate planning.

### A.   Relevant Facts

In April 2008, Heather Webster, Gupta's longtime banker from JPMorgan, held a multi-hour, wide-ranging meeting with Gupta, his wife, and his daughters to discuss the state of the family's financial affairs according to an agenda broken into four topics. (Tr. 1665-75; A.1469). Notes Webster took at the meeting recorded Gupta's statement, in the context of a discussion of Gupta's positions and income streams, that he was the chairman of Galleon International, a company he described as having $1.3 billion in capital, and that he held a 15 percent ownership stake and was entitled to performance fees. (A.1470; Tr. 1696). At trial, Webster had little independent recollection of the meeting, and thus this portion of the notes was admitted as a recorded recollection of the defendant's admission. *See* Fed. R. Evid. 803(5), 801(d)(2)(A).

Prior to Webster's testimony, the District Court considered and rejected the defense claim that other portions of Webster's notes should also be admitted

57

pursuant to the "rule of completeness," Fed. R. Evid.
106. The defense sought to present the portion of the
following cryptic notes that appear on a page headed
"Estate Planning Discussion" and that are italicized
below:

> want to give to charity while alive
> wants her family to get all household
> possessions
> if all her kids gone too.
> *?80% to charity & 20% to extended fami-*
> *ly? perhaps.*

(A.1471). Before ruling on the defense request, the
District Court examined the handwritten notes and
ruled that the estate planning discussion "is entirely
separable" from the "discussion about [Gupta's] as-
sets." (Tr. 1659). Judge Rakoff then commented that
the portion of Webster's notes dealing with the poten-
tial disposition of Gupta's wealth "has two big ques-
tion marks on either side of it. So it's very hard to tell
what that all means." (Tr. 1659). Finally, in response
to Gupta's argument that Gupta's desire to donate to
charity was inconsistent with a motive to engage in
insider trading, the District Court noted that there
was no such inconsistency—because white collar
criminals often give to charity to enhance their stat-
ure—and in any event, the notes suffer from "a great
403 problem." (Tr. 1661-62). The District Court also
noted that unless these portions of the notes were
admissible pursuant to the rule of completeness, not
only was their relevance questionable, but they also
were hearsay when offered by the defense. (Tr. 1663).

58

The defense stated, "I do think 803(3) would apply." (Tr. 1663).

Judge Rakoff then questioned Webster outside the jury's presence. Webster testified that the April 2008 meeting lasted "[s]everal hours" and that the charitable giving discussion was a "separate topic" from the group's discussion of the Gupta family's investments. (Tr. 1672-72). She noted that, based on her notes, she recalled that the estate planning discussion involved both Gupta and his wife discussing their wishes regarding how to dispose of their wealth should they *and their children* pass away. (Tr. 1673-74). When asked about the two question marks that bracket the statement in her notes about donating to charity, Webster explained that the Gupta family's estate planning discussions were ongoing and that concrete plans "hadn't been drawn up as of yet." (Tr. 1674).

After hearing from Webster, the District Court permitted Gupta to elicit from Webster his own statements about his net worth and his various sources of income, but excluded the portion of Webster's notes dealing with estate planning. (Tr. 1682).

## B. Applicable Law

Under Rule 801(d)(2)(A), a defendant's out-of-court statement is not hearsay when offered by the Government. Fed. R. Evid. 801(d)(2)(A) . By contrast, "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *see also United States* v. *Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (not-

59

ing that defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted").

Nonetheless, pursuant to the rule of completeness, a defendant may sometimes require the introduction of additional portions of his own out-of-court statement when the Government offers excerpts of it. *See* Fed. R. Evid. 106. "Under this principle, even though a statement may be hearsay, an 'omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" *United States* v. *Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (quoting *United States* v. *Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)). The rule of completeness "does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States* v. *Kopp*, 562 F.3d 141, 144 (2d Cir. 2009). It is incumbent on the defendant to demonstrate that the portion of the statement he seeks to offer is necessary to clarify or explain the portions the Government intends to offer. *See United States* v. *Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996).

A "trial court's application of the rule of completeness is reviewed for abuse of discretion" *United States* v. *Johnson*, 507 F.3d at 796, as are Rule 403 balancing and other evidentiary rulings. And, as always, even if the trial court has abused its discretion in admitting or excluding evidence, there is no remedy

60

for an error that is harmless. *See* Fed. R. Crim. P. 52(a).

## C.    Discussion

On appeal, Gupta argues that the District Court abused its discretion by excluding the portion of Heather Webster's handwritten notes that memorialize his family's estate planning discussion. Gupta's primary contention is that the notes reflected his then-existing intention to donate his wealth to charity. *See* Fed. R. Evid. 803(3). He then posits that, even if the notes are not admissible under Rule 803(3), the District Court should have admitted Webster's notes pursuant to the rule of completeness. Neither argument has merit.

First, the District Court properly excluded Webster's estate planning notes pursuant to Rule 403. The notes—which reflect a fluid and ongoing conversation about the disposition of the family's wealth in the event of the death of Gupta, his wife, *and their children*—lacked probative value, while carrying the substantial risk of unfairly impressing the jury with Gupta's charitable nature.

As to the notes' minimal probative value, there is nothing inherently contradictory about a person wanting to make money and also wanting to donate money to charity. Indeed, Judge Rakoff aptly remarked that there were many similarly situated defendants "who wanted to make themselves respected, powerful citizens by making big contributions to charity." (Tr. 1661-62). Gupta himself demonstrated this point during his wiretapped conversation with Raja-

61

ratnam on July 29, 2008, when he focused on the financial compensation he might receive if he decided, as he later did, to take a position with the private equity firm KKR, at a time, he claims, when he had already decided to give away his assets. (A.1138-39).

The probative value of the notes is further reduced by their facial ambiguity. The statement about donating 80 percent to charity and 20 percent to extended family is flanked by two question marks and the ultimate caveat—"perhaps." This note also follows two lines that seem to reflect Gupta's wife's statements (A.1473 ("wants *her* family . . ."; "if all *her* kids gone too" (emphasis added)). The District Court remarked that the notes are hard to decipher, and based on Webster's limited recollection of the events—including which member of the Gupta family was speaking about their charitable plans—the notes standing alone shed only the dimmest light on Gupta's intentions.

As to the substantial danger of unfair prejudice, the notes posed the risk that the jury would disregard the evidence of Gupta's guilt and would instead pass judgment based on its favorable view of Gupta's good works. Thus, the risk of unfair prejudice substantially outweighed any minimal probative value of the ambiguous notes. Accordingly, the District Court did not abuse its discretion in excluding this portion pursuant to Rule 403.

Second, and in any event, even if the notes could clear the Rule 403 hurdle, they still were inadmissible hearsay. Gupta's argument below, in sum total, was: "I do think 803(3) would apply." (Tr. 1633). Gup-

62

ta did not identify a theory of how the notes fell within the hearsay exception. Judge Rakoff expressed skepticism about Rule 803(3)'s applicability and told the defense that he would consider it further, after questioning Webster outside the jury's presence. Gupta did not mention Rule 803(3) again.

The defense likely abandoned the Rule 803(3) argument because the notes were so cryptic and tentative that they could not even be attributed to Gupta, let alone be demonstrated to reflect any definite state of mind. Based on Webster's testimony outside the jury's presence, the most that could have been said about the disputed portion of the notes was that they reflected the Gupta family's collective consideration of the possibility of donating 80 percent of their wealth to charity if the entire immediate family passed away. (Tr. 1673-74). That heavily conditioned, highly improbable plan is a far cry from evidencing Gupta's "then-present intent to dispose of his wealth through charitable giving" (Br. 51), and it was properly excluded.

Finally, the District Court did not abuse its discretion in rejecting the defendant's rule of completeness argument. Judge Rakoff *permitted* the defense to elicit, under the rule of completeness, Gupta's statements to Webster about his net worth and other sources of income. But as the notes suggest and Webster explained, the estate planning discussion was separate from the earlier discussion of Gupta's affiliation with Galleon International, and was simply not necessary to "explain the admitted portion, to place the admitted portion in context, to avoid misleading

63

the jury, or to ensure fair and impartial understanding of the admitted portion." *Johnson*, 507 F.3d at 796.

Even if the District Court erred by not admitting Webster's estate planning notes, any error was plainly harmless. While Gupta argues that the trial court's ruling "hobbled" his ability to rebut the Government's motive theory (Br. 50), the record tells a different story. In his closing argument, Gupta relied heavily on Webster's notes to argue that he had no motive to engage in insider trading. Defense counsel declared: "He didn't need the money. You heard the testimony of Heather Webster; that he was, you know, through the dint of his own hard work, he accumulated a substantial amount of money for himself and his family. There is no issue that he was in need of any money." (Tr. 3279). Far from being hobbled, Gupta forcefully argued that he had no motive to violate the law. The jury was simply unconvinced.

## POINT V

## The District Court Did Not Abuse its Discretion in Excluding Emails and Recordings Offered by Gupta in Support of His Alternative Tipper Theory

The District Court did not, as Gupta suggests, preclude his so-called alternative-tipper defense. As far-fetched as the theory was, the District Court permitted the defense to pursue it through the introduction of *competent* evidence. What Judge Rakoff did *not* permit was the wholesale introduction of recordings and documents without the defense calling a

64

single witness, when that evidence contained multiple levels of hearsay, ambiguous and confusing language that required interpretation, and foundational problems. (*See* Tr. 2982-3000). Judge Rakoff's evidentiary ruling was sound and well-reasoned and was not an abuse of his discretion.

## A.  Relevant Facts

In advance of trial, the Government disclosed to Gupta information about Goldman employee David Loeb, including that he had provided confidential information to Rajaratnam about certain technology companies, including Apple and Intel. Loeb was an institutional salesperson who communicated research ideas and analysis about primarily Asian public companies from Goldman's research department to institutional clients like Galleon. (Tr. 2873-76). As the Government repeatedly emphasized, there was "no evidence, zero, none from the [G]overnment . . . and none that we have seen from the defense in any way, shape or form—that Mr. Loeb had access to material non-public information about *Goldman*" including information about "Goldman's earnings or . . . the possibility that he could have ever heard about the Buffett deal before the announcement." (Tr. 533) (emphasis added).

The defense expressed its intent to argue its alternative-tipper theory even before trial. Yet, not until the eve of the close of evidence did the defense move, for the first time, to admit in wholesale fashion and without a single witness, dozens of emails and at least two recordings relating to Loeb. (A.1591-1600).

65

The defense sought to admit those calls and documents in that fashion and then simply argue without basis that Loeb had passed material, nonpublic information regarding Goldman to Rajaratnam.

The proffered probative value of the emails and calls—that they included instances of Loeb (whose legitimate job was to pass information) passing *material, nonpublic* information to Galleon about other companies (*i.e.* not Goldman)—was not remotely evident from the content of the emails and calls themselves. Yet the defense sought to introduce the emails and calls to establish this point without calling a single witness to explain the emails and calls, or to provide any context for the particular information Loeb had provided therein. And, the defense never proffered any evidence that would have suggested that Loeb had access to *any* confidential information about Goldman, much less the specific information that Gupta was convicted of providing.[16]

_____

[16] On that point, Gupta asserts that Loeb was somehow "highly-placed," and points to the testimony of a Goldman executive identifying six "employees" at Goldman who knew of the Buffett deal before it was announced. (Br. 11, 20). Those six people were: the chairman and CEO; one of the co-presidents; the CFO; one co-general counsel; the chief of staff to the chairman; and, at some point that day, the other co-president and chief operating officer. (Tr. 500-507). Loeb was a public-facing vice president (far from a senior executive), and was specifically "walled off" from the non-public side of Goldman. (Tr. 1588-89,

66

The District Court, after hearing argument over the course of two days, receiving briefing from the defendant, and individually reviewing each proffered exhibit (Tr. 2986-3000, 3065), denied the defense request on two grounds. First, the District Court found that the calls and related documents were "replete with inadmissible hearsay" and that Gupta had failed to identify a permissible basis for offering them. (Tr. 3065). Second, the District Court concluded that admitting the evidence without any context or any witness to explain the calls or documents "would create endless confusion on the part of the jury." (Tr. 3065).

Gupta was not without potential witnesses to clear these basic evidentiary hurdles. There is nothing in the record to suggest that, if subpoenaed, Loeb would have invoked his Fifth Amendment right not to testify.[17] Likewise, Adam Smith, who as Gupta notes on appeal, had numerous calls with Loeb and appears

————

2874). Gupta's own Galleon witness testified that Loeb had never provided information to him about Goldman. (Tr. 2875-6). And if called as a witness, Adam Smith, who was one of Loeb's Galleon contacts and who pled guilty to insider trading, would have testified that he never received information about Goldman from Loeb.

[17] Indeed, upon Gupta's demand, Loeb was present at the Courthouse during the defense case and was prepared to testify—a fact the defense did not bring to the attention of the District Court.

67

on a number of the emails and calls at issue, was a
Government cooperator (who had already testified at
the Rajaratnam trial) and who thus also was available
to testify. And Gupta easily could have called witnesses
from Intel or Apple to provide sufficient background
and context to enable the jury to understand
the information being discussed in the calls and
emails. Gupta availed himself of none of these opportunities
to lay an appropriate foundation for the evidence
he sought to admit.

## B.  Applicable Law

"A defendant's right to present relevant evidence
is not unlimited, but rather is subject to reasonable
restrictions." *United States* v. *Scheffer*, 523 U.S. 303,
308 (1998); *see United States* v. *Szur*, 289 F.3d 200,
217 (2d Cir. 2002). A defendant "[c]learly" does not
"have an unfettered right to offer testimony that is
incompetent, privileged, or otherwise inadmissible
under standard rules of evidence." *United States* v.
*Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) (internal
quotation marks omitted). "Thus, even where the exclusion
of evidence affects the defense case, [the Second
Circuit] afford[s] judges broad latitude in excluding
evidence that poses an undue risk of harassment,
prejudice [or] confusion of the issues, and review[s]
their evidentiary determinations for abuse of discretion."
*United States* v. *Szur*, 289 F.3d at 217 (internal
quotation marks and citations omitted); *see generally*
Fed. R. Evid. 403.

68

## C.   Discussion

Judge Rakoff acted well within his discretion in concluding that Gupta's proposed last-minute document dump was replete with inadmissible hearsay and was too confusing and prejudicial.

First, the documents themselves belie Gupta's claim that they were not offered for their truth. Many of the statements were relevant to the defense's theory only if they were being offered for their truth. By way of example, Gupta sought to establish the confidentiality of the information communicated by Loeb simply by pointing to hearsay statements that Loeb or others made about the information as it was being passed. (*See*, *e.g.*, A.1536 ("this is foxconn internal file"), 1597 ("it's directly from Apple")). And many of Loeb's emails to Rajaratnam were filled with hearsay statements that, whatever they may have meant, were not relevant unless offered for the truth of the matters asserted. (*See*, *e.g.*, A.1568 ("[H]ave some good tiddies. May I call?"), 1567 ("just got updated dose-o INNIE"), 1565 ("have some fresh tiddies"), 1563 ("have some IMPORTANT tiddies re HAPPIE")).[18]

In addition to the hearsay problem, the proffered evidence was full of ambiguous and confusing language, thus requiring counsel, as the District Court

––––––––––

[18] These statements were not admissible as statements against penal interest because, among other problems, the declarant (Loeb) was not "unavailable." Fed. R. Evid. 804.

69

found, "to subtly and not so subtly make implicit or explicit representations to the jury of what is not in evidence." (Tr. 3000). For example, in the first call, Loeb provided Rajaratnam with what appear to be Intel "chipset" numbers—the purported "tip"—but Gupta offered no evidence to explain what chipsets were, much less whether that information was confidential, material, or nonpublic.[19] Gupta's counsel tried to fill in this gap by doing precisely what the District Court feared—*i.e.* simply making representations of what was not in evidence. (Tr. 2990-92). In the second call, Loeb said, "[T]his is a, a series of checks that, uh, Henry does equity effectively. . . . [T]his is production data, but it's directly from Apple and it's been pretty good on the production side." (A.1597). The proffered emails are similarly obscure. Without explanation, foundation, and context, these materials had little or no probative value.

The emails were also replete with information about other companies that was virtually impossible to decipher without testimony and, as Gupta appeared to concede, was not even confidential or otherwise improper. (*See*, e.*g.,* A.1550-51, 1557-78, 1577-82, 1588-90). The evidence thus presented a high likelihood of misleading or confusing the jury because no basis existed for the jury to distinguish between that information and the allegedly confidential information. Finally, several of the emails were sent by

——————

[19] While certain Loeb information was confidential, the Government did not concede that it was either material or nonpublic.

70

Loeb to himself and were connected to Rajaratnam only through the ambiguous subject line "RAJ call." (*See*, *e.g.,* A.1580).

On appeal, Gupta has abandoned his arguments regarding the emails, and argues only that the two Loeb-Rajaratnam wiretapped calls were incorrectly excluded. (Br. 55-57). The calls were properly excluded because they lacked foundation, consisted of hearsay, and presented serious potential to confuse the jury. First, even according to the defense argument, the calls were only relevant if they constituted improper tips by Loeb to Rajaratnam, but no foundational witness was proffered (although several were available) who could establish that any of the statements by Loeb constituted the transmission of confidential—much less material and nonpublic—information. As Judge Rakoff correctly found, "the jury cannot remotely understand what these exhibits are all about without substantial either representations from counsel which would be improper, or other argument that would be speculative in nature." (Tr. 3065). Second, absent a witness to explain the context, the calls presented a serious risk of confusing and misleading the jury, since nothing about Loeb's tips about Apple or Intel had any relation to Loeb's ability to learn of or tip Rajaratnam about confidential Goldman information. Since Loeb had no conceivable nexus to the non-public Goldman information at issue, he was not in any non-speculative way an alternative-perpetrator. *See United States* v. *Jordan*, 485 F.3d 1214, 1219 (10th Cir. 2007) ("courts may properly deny admission of alternative perpetrator evidence that fails to establish . . . a non-

71

speculative 'nexus' between the crime charged and the alleged perpetrator.").

In other words, Judge Rakoff's ruling did not at all prevent the defendant from "complet[ing] the picture" of the Loeb-Galleon relationship (Br. 24); Gupta could easily have done that by calling Loeb, Smith, or other competent witnesses. The problem was that, had he done so, it would have been clear to the jury that, unlike Gupta, Loeb simply had no access to the confidential Goldman information at issue in the case, and that Loeb therefore was not a plausible alternative tipper. Thus, Gupta's failure to use competent witnesses available to him to "complete the picture" was a strategic choice, not an abuse of discretion by the Judge.[20]

## POINT VI

### The District Court Permissibly Limited the Testimony of Gupta's Six Character Witnesses

The District Court's modest limitation on Gupta's six character witnesses—precluding them from offering their opinions on Gupta's "integrity," given that

---

[20] Gupta is not correct in claiming that what he sought to do was equivalent to what the Government did in presenting its evidence. (Br. 56). As Judge Rakoff found, the Government had offered the testimony of numerous witnesses before playing each call, such that the "jury already ha[d] a very rich background as to their significance . . . . This is totally different." (Tr. 2996).

72

word's ambiguous meaning—was not an abuse of discretion, and controlling authority of this Circuit confirms the propriety of the District Court's decision declining to give a special "standing alone" instruction about character evidence.

## A.  Relevant Facts

At the start of the defense case, Gupta informed the District Court and the Government that his character witnesses would offer their opinion about his honesty and integrity. (Tr. 2331). The District Court correctly noted that the meaning of "integrity"— despite its common usage—was ambiguous. (Tr. 2331-33). The District Court then consulted a dictionary and, finding that some of the meanings of "integrity" beyond "honesty" were themselves ambiguous and not pertinent, concluded that the witnesses' testimony should be limited to their opinion of Gupta's honesty. (Tr. 2332-33).

Gupta did not respond by arguing, as he now does (Br. 58), that the meaning of integrity that he sought, and the one not captured by "honesty," was his character for discretion—for keeping secrets—and his character for "law-abidingness." Rather, when the District Court specifically asked what the jury could be expected to "understand by the word 'integrity' that is relevant to any issue in this case that was not conveyed by the word honesty," the defense responded, "I think Definition 3 that you read, moral soundness, honesty, uprightness?" (Tr. 2333). Judge Rakoff then limited the opinion to honesty, given that "moral

73

uprightness" was ambiguous and carried some non-pertinent meanings. (Tr. 2333).

The defendant's six character witnesses then testified about the circumstances through which they came to know Gupta (generally through his philanthropic work) and their opinions not only of his honesty, but, in certain instances, of other traits as well. (*See*, *e.g.*, Tr. 2961-62 (offering opinion that Gupta is "one of the most honest, forthright, genuine and giving people that I know"), 3106 (offering opinion that Gupta is "an honest and honorable man")). In summation, Gupta argued that the character witnesses' testimony about his "extensive philanthropic work" and his expenditure of "a good portion of [his] time on good works" amounted to a "badge of innocence" and a "fatal flaw" in the Government's case. (Tr. 3279).

Finally, during the charge conference, Gupta requested that the District Court give the jury a "standing alone" charge on character evidence. The charge would have instructed that character witness testimony, standing alone, is "in and of itself sufficient to raise a reasonable doubt." (Tr. 3039). Judge Rakoff declined to do so, reasoning that "it artificially singles out one aspect of the proof and gives it sort of prominence above all others by implication, which seems . . . inappropriate." (Tr. 3039). Judge Rakoff ultimately gave an instruction that informed the jury that it could consider "character evidence together with all the other facts and all the other evidence in the case and give it such weight as you deem appropriate." (Tr. 3155).

74

### B.  Applicable Law

It is well-established in this Circuit that a trial judge retains broad discretion in admitting character evidence. *See United States* v. *Damblu*, 134 F.3d 490, 494 (2d Cir. 1998). This Court will only reverse the exercise of that discretion upon a clear showing of prejudicial abuse. *Id.*; *see also United States* v. *Morgan*, 554 F.2d 31, 33-34 (2d Cir. 1977) (affording district court broad discretion in ruling on admissibility of character evidence, which "will be reversed only upon a clear showing of prejudicial abuse").

Similarly, this Court has long recognized "the broad discretion accorded district judges in framing a jury charge." *United States* v. *Pujana-Mena*, 949 F.2d 24, 31 (2d Cir. 1991). With regard to a "standing alone" jury instruction on character evidence, this Court held in *Pujana-Mena* that such a charge is not required. *Id.* A "standing alone" instruction, the Court explained:

> threatens to interfere with one of the quintessential functions of the jury—to determine the relative weight, if any, to be given to particular evidence. While a jury may find character evidence to be of sufficient weight, by itself, to generate a reasonable doubt, instructing them to focus on such evidence in isolation or suggesting that they give it determinative weight usurps this fundamental jury responsibility.

75

*Id.* at 30. Instead, "[i]t is sufficient for the trial judge to instruct the jury to consider character evidence along with all the other evidence in determining whether the prosecution has proven guilt beyond a reasonable doubt." *Id.*

## C.  Discussion

Judge Rakoff did not abuse his considerable discretion by ruling that Gupta's six character witnesses could not offer their opinion of Gupta's "integrity." As an initial matter, the trial judge was correct that "integrity" is an ambiguous term—and one that could encompass traits that were not relevant to the charges at trial. The dictionary used by Judge Rakoff defined it as: "1. State or quality of being complete, undivided or unbroken; 2. Unimpaired state, soundness, purity; 3. Moral soundness, honesty, uprightness." (Tr. 2332). While Gupta argues on appeal that "integrity" conveys "discretion," "law-abidingness," or "incorruptibility" and "honesty" means "sincerity" (Br. 58-59 & n.13), he did not highlight those meanings below, and in any event, the terms cannot be so neatly defined. Indeed, one definition of "honesty" quoted by Gupta on appeal—"fairness and straightforwardness of conduct" (Br. 59 & n.13)—is quite similar to "uprightness"—the character trait Gupta argued to the District Court was missing from "honesty" but captured by "integrity." Faced with an inherently ambiguous term, and a limited argument by the defense about what was missing from "honesty," Judge Rakoff's decision to preclude the six character witnesses from offering opinions as to "integrity" was not an abuse of discretion.

76

In any event, any error was harmless. Despite the District Court's ruling, Gupta's character witnesses offered testimony that went well beyond a bare recitation of an opinion for "honesty." From one witness, the jury learned that through Gupta's work establishing India's first School of Public Health, the witness "found [the defendant] to be absolutely straightforward and honest even when being critical of things we did." (Tr. 2340). From another, the jury learned that through Gupta's anti-malaria work, the witness "found Rajat Gupta to be a man of exceptional honesty and truthfulness." (Tr. 2720). From another, the jury learned that Gupta sought to end malaria worldwide, and that, through that work, the witness regarded Gupta as "one of the most honest, forthright, genuine and giving people" that he knew. (Tr. 2961-62). And from still another, the jury learned that through Gupta's work with the Global Fund to Fight AIDS, Tuberculosis, and Malaria, the witness came to view Gupta as "an honest and honorable man." (Tr. 3106).[21] In his summation, Gupta's counsel used the character testimony to argue that Gupta's good deeds and "extensive philanthropic work" amounted to a "badge of innocence." (Tr. 3279).

---

[21] According to Merriam-Webster, "honorable" means "characterized by *integrity*." *Merriam-Webster's Collegiate Dictionary* 557 (10th ed. 1998) (emphasis added).

77

Accordingly, Gupta's argument on appeal that Judge Rakoff "drastically curtailed" his character evidence (Br. 59) is not consistent with the record, and any error was harmless, particularly in light of the overwhelming evidence of Gupta's guilt.

Finally, Gupta's argument that Judge Rakoff erred by instructing the jury that it could give the character evidence "such weight as [it] deem[ed] appropriate" (Tr. 3155) is squarely foreclosed by this Court's decision in *Pujana-Mena*. *See Pujana-Mena*, 949 F.2d at 31. Gupta's primary complaint on appeal is that Judge Rakoff's instruction likely confused the jury about "whether or why it should consider character evidence." (Br. 60). But, as this Court explained in *Pujana-Mena*, when it comes to instructing a jury about character evidence, less is more: "We are mindful of Judge Learned Hand's observation, made nearly sixty years ago, that 'evidence of good character is to be used like any other, once it gets before the jury, and the less they are told about . . . what they shall do with it, the more likely they are to use it sensibly.'" *Pujana-Mena*, 949 F.2d at 30 (quoting *Nash* v. *United States*, 54 F.2d 1006, 1007 (2d Cir. 1932)).

As Gupta appears to concede (Br. 60), Judge Rakoff followed this Court's clear precedent. Thus, there was no error in his instruction to the jury.

78

**CONCLUSION**

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
           March 22, 2013

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                            *of America.*

RICHARD C. TARLOWE,
DAMIAN WILLIAMS,
EDWARD B. DISKANT,
JUSTIN S. WEDDLE,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief does not comply with the type-volume limitation of Rule 32(a)(7)(B), but complies with this Court's order permitting the Government to file an oversize brief of no more than 18,000 words. As measured by the word processing system used to prepare this brief, there are 17,973 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: RICHARD C. TARLOWE,
*Assistant United States Attorney*